UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| EDISON MISSION ENERGY, et al.,[1] | ) Case No. 12-49219 (JPC) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) Ref. Doc. Nos. 31, 404 |
| | ) |

## FINAL ORDER AUTHORIZING COMPENSATION OF INSIDER SENIOR EXECUTIVES UNDER EMPLOYEE INCENTIVE PROGRAMS

Upon the motion (the "Motion") of the above-captioned debtors and debtors in

possession (collectively, the "Debtors") for entry of an order (this "Order") authorizing the

Debtors to make payments to certain Senior Executives under the Incentive Plans, as more fully

set forth in the Motion; and upon the First Day Declaration; and the Court having found that the

Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court

having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court

having found that venue of this proceeding and the Motion in this district is proper pursuant to

28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion,

as limited by the relief granted in this Order, is in the best interests of the Debtors' estates, their

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Edison Mission Energy (1807); Camino Energy Company (2601); Chestnut Ridge Energy Company (6590); Edison Mission Energy Fuel Services, LLC (4630); Edison Mission Fuel Resources, Inc. (3014); Edison Mission Fuel Transportation, Inc. (3012); Edison Mission Holdings Co. (6940); Edison Mission Midwest Holdings Co. (6553); Midwest Finance Corp. (9350); Midwest Generation EME, LLC (1760); Midwest Generation, LLC (8558); Midwest Generation Procurement Services, LLC (2634); Midwest Peaker Holdings, Inc. (5282); Mission Energy Westside, Inc. (0657); San Joaquin Energy Company (1346); Southern Sierra Energy Company (6754); and Western Sierra Energy Company (1447). The location of parent Debtor Edison Mission Energy's corporate headquarters and the Debtors' service address is: 3 MacArthur Place, Suite 100, Santa Ana, California 92707.

creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed: (a) the Motion; (b) the *Declaration of Todd McGovern in Support of Debtors' Insider and Non-Insider Incentive Plan Motions* [Docket No. 216] (the "McGovern Declaration"); (c) the *Declaration of Pedro J. Pizarro in Support of Debtors' Insider and Non-Insider Incentive Plan Motions* [Docket No. 218] (the "Pizarro Declaration"); (d) the *Debtors' Supplement to Non-Insider and Insider Incentive Plan Motions* [Docket No. 588] (the "Supplement"); and (e) the revised EME 2013-2014 Long Term Incentive Plan, filed on March 19, 2013 [Docket No. 610],and attached hereto as **Exhibit 1** (the "LTIP"); and having heard the statements in support of the relief requested therein at a hearings before the Court held on January 16, 2013, February 5, 2013, and March 20, 2013 (collectively, the "Hearings"); and the Court having determined that the legal and factual bases set forth in the Motion, the McGovern Declaration, the Pizarro Declaration, the Supplement, and at the Hearings establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and the Court having previously entered the *[Interim] Order Authorizing Compensation of Insider Senior Executives Under Employee Incentive Programs* [Docket No. 404]; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.     The Motion is granted solely to the extent set forth herein.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2.     The Debtors are authorized but not directed to take all actions necessary to compensate the Senior Executives under the STIP on the terms and conditions set forth in the Motion, including, without limitation, making any payments to the Senior Executives under the STIP; provided, however, that the "stretch" levels of performance with regard to 2013 adjusted

EBITDAR under the STIP shall be (a) $33.8 million for the first six-month performance period

and (b) $223.2 million for the second six-month performance period, subject in all respects to the

terms and conditions set forth in the STIP (a copy of which was annexed as Exhibit A to the

McGovern Declaration.

3.      Subject to Paragraph 4 of this Order, the Compensation Committee is hereby

authorized, in its sole discretion, to administer the STIP, approve or deny participation in the

STIP, approve or deny upward or downward adjustments to threshold, target, or stretch

performance goals as justified by unanticipated and/or atypical circumstances, and make any and

all other bonus determinations under the STIP.

4.      To the extent the Debtors make any material modifications to the STIP, the

Debtors shall notify each of the counsel to the official committee of unsecured creditors, the ad

hoc committee of certain noteholders of EME, and the Office of the U.S. Trustee for the

Northern District of Illinois (collectively, the "Notice Parties") of any material modifications to

be made to the STIP (each notice, a "Modification Notice").  Upon receipt of a Modification

Notice, the Notice Parties shall have ten (10) calendar days to notify the Debtors of any objection

to the proposed material modifications to the STIP (such 10 calendar day period, the "Informal

Objection Notification Period").  If the Notice Parties inform the Debtors that they have no

objection or if the Notice Parties fail to notify the Debtors of any objection within the Informal

Objection Notification Period, the Debtors may make the proposed material modifications to the

STIP.  If any of the Notice Parties notify the Debtors of any objection during the Informal

Objection Notification Period, the Debtors and the Notice Parties shall work in good faith to

resolve the dispute.  If the dispute remains unresolved, the Notice Parties may file an objection

with the Court within seven (7) calendar days from the end of the Informal Objection

Notification Period (such seven (7) calendar day period, the "Formal Objection Period"), and the dispute shall be resolved at a hearing to be set at a mutually agreeable time. For the avoidance of doubt, no material modifications may be made to the STIP unless (a) the Informal Objection Notification Period terminates without any of the Notice Parties notifying the Debtors of any objection, (b) the Formal Objection Period terminates without the filing of any formal objection by any of the Notice Parties, or (c) the Court rules on any formal objection by any of the Notice Parties.

5.     Subject to the terms and conditions of the LTIP, the Debtors are authorized but not directed to take all actions necessary to compensate the Senior Executives thereunder. Notwithstanding anything to the contrary, any material modifications to the LTIP shall be subject to the terms and conditions of Section 4.5 of the LTIP.

6.     All postpetition payments from a Debtor to another Debtor are hereby accorded superpriority administrative expense status and shall have priority over any administrative claims that arise under section 503(b) of the Bankruptcy Code in accordance with the Court's order approving continued use of the Debtors' cash management system.

7.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules of the United States Bankruptcy Court for the Northern District of Illinois are satisfied by such notice.

8.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

9.     In accordance with Section 5.3 of the LTIP, (a) each LTIP participant shall receive an administrative expense priority claim under section 503 of the Bankruptcy Code

against the estate of MWG on account of all amounts due under the Enterprise Value Goal (as defined in the LTIP) related to MWG Adjusted Enterprise Value (as defined in the LTIP), and (b) EME shall receive a superpriority administrative expense claim under section 364(c)(1) of the Bankruptcy Code against the estate of MWG to the extent EME satisfies any of MWG's obligations pursuant Section 5.3 of the LTIP, including the guarantee described therein.

10.     Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed:  (a) an admission or finding as to the validity of any claim against a Debtor entity; (b) a waiver of the right of the Debtors, the Committee or the Noteholder Group to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver of the rights of the Debtors, the Committee or the Noteholder Group under the Bankruptcy Code or any other applicable law.

11.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

12.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: __March 20__, 2013
Chicago, Illinois

_____
Jacqueline P. Cox
United States Bankruptcy Judge

## Exhibit 1

**Long-Term Incentive Plan**

# EME 2013–2014 Long Term Incentive Plan

## ARTICLE I

### *PURPOSE OF THE PLAN*

The Edison Mission Energy 2013–2014 Long Term Incentive Plan (the "Plan") is hereby established by the Committee (as defined below) of Edison Mission Energy, a Delaware corporation ("EME"), effective on January 1, 2013, subject to approval from the U.S. Bankruptcy Court for the Northern District of Illinois. The Plan is designed to align the interests of the recipients of awards under the Plan with the interests of the key economic stakeholders of the Company (as defined below) by providing incentive compensation to recipients based on the Company's achievement of its 2013–2014 financial and operating performance and enterprise value goals. The Plan shall not create any contractual right of any individual to any amount prior to the payment of such amount.

## ARTICLE II

### *DEFINITIONS*

For purposes of this Plan, the following terms, when capitalized, shall have the meanings set forth below:

**Section 2.1.** "Ad Hoc Noteholder Group" means the ad hoc committee of unsecured noteholders of EME.

**Section 2.2.** "Award Statement" means a letter or other writing (including in electronic format) provided by the Company to a Participant that sets forth, among other things, the LTIP Award that the Participant is eligible to earn in accordance with the Plan, based upon the Bonus Pool, the size of which varies based upon the level at which the LTIP Goals are satisfied.

**Section 2.3.** "Bankruptcy Proceedings" shall mean the bankruptcy proceedings in the United States Bankruptcy Court for the Northern District of Illinois (the "Court") under the caption *In re Edison Mission Energy, et al.*, Case No. 12-49219.

**Section 2.4.** "Board" means the Board of Directors of the Company.

**Section 2.5.** "Bonus Pool" means the total pool of bonus amount that can be paid to all Participants collectively, based upon the level at which the LTIP Goals are satisfied. Each Participant's share of the Bonus Pool shall be set forth in an Award Statement; provided, that in no event shall the shares of all Participants exceed 100% in the aggregate.

**Section 2.6.** "Cause" shall mean: (a) the refusal or continued failure by the Participant to perform substantially his or her duties with the Company or any of its subsidiaries (other than any failure resulting from incapacity due to physical or mental illness) after the Company or such subsidiary provides the Participant with a demand for substantial performance identifying in reasonable detail the manner in which the Participant has not substantially performed his or her duties; (b) a plea of guilty or nolo contendere by the Participant to, or conviction of the Participant of, a felony or other crime of moral turpitude; or (c) the determination by the

1

Committee in its sole discretion that the Participant has engaged in: (1) illegal conduct, gross negligence or willful misconduct in connection with the Participant's job duties or the business of the Company or its subsidiaries; (2) a material breach of any written policy of the Company or its subsidiaries; (3) fraud or material dishonesty in connection with the business of the Company or its subsidiaries; or (4) any violation of a statutory or common law duty of loyalty to the Company or its subsidiaries.

**Section 2.7.** "Code" means the Internal Revenue Code.

**Section 2.8.** "Committee" means the Compensation Committee of the Board of Directors of the Company, or any successor thereto or delegate thereof with the authority to act on behalf of the Committee with respect to this Plan.

**Section 2.9.** "Company" means Edison Mission Energy and includes any successor thereto, including pursuant to a plan of reorganization under title 11 of chapter 11 of the United States Code (the "Bankruptcy Code").

**Section 2.10.** "Creditors' Committee" means the official committee of unsecured creditors appointed in the Bankruptcy Proceedings.

**Section 2.11.** "Disability" means an individual's long-term disability as defined under the long-term disability plan of the Company that covers that individual; or if the individual is not covered by such a long-term disability plan, an individual's disability as defined for purposes of eligibility for a disability award under the Social Security Act.

**Section 2.12.** "Effective Date" shall mean January 1, 2013, subject to approval from the Court.

**Section 2.13.** "Emergence Date" means the later of (x) the date on which all transactions required for the Company's plan of reorganization to become effective are consummated, and (y) to the extent Midwest Generation, LLC ("MWG") seeks to confirm a chapter 11 plan independent of the Company's plan of reorganization, the date on which all transactions required for such MWG chapter 11 plan to become effective are consummated.

**Section 2.14.** "LTIP Award" means the incentive bonus awarded to a Participant under the Plan and pursuant to an Award Statement, which bonus represents a portion of the total Bonus Pool, the amount of which is dependent upon the specific level of the Company's achievement of each of the LTIP Goals. The level at which each of the LTIP Goals is satisfied will be determined by the Committee, in consultation with the Creditors' Committee and the Ad Hoc Noteholder Group, in accordance with **Exhibit A**, **Exhibit B**, and **Exhibit C**.

**Section 2.15.** "LTIP Goals" mean the Enterprise Value Goal, the Reliability Performance Goal, and the EME G&A and MWG Controllable O&M Goal, as defined below. A Participant's LTIP Award is based upon a Bonus Pool, the total amount of which is based upon the level at which these three LTIP Goals are satisfied. Section 4.2, Section 4.3 and Section 4.4 of the Plan set forth more information on how each of these LTIP Goals will be determined, and further details on the LTIP Goals and the corresponding amount of the Bonus Pool are attached hereto as **Exhibit A**, **Exhibit B**, and **Exhibit C**.

a) "**Enterprise Value Goal**" reflects the (a) aggregate adjusted enterprise value of EME (the "EME Adjusted Enterprise Value"), and (b) aggregate adjusted enterprise value of MWG (the "MWG Adjusted Enterprise Value"), in each case, as determined by the Court in connection with a confirmed plan of reorganization for each of EME and MWG, with certain adjustments for changes in EME Adjusted Enterprise Value following the Emergence Date as provided in **Exhibit A**. A portion of the total Bonus Pool is determined based upon the level at which the Enterprise Value Goal is satisfied, as provided in **Exhibit A**.

b) "**Reliability Performance Goal**" means overall reliability targets for the Company's coal, gas, and wind energy projects, as established by the Committee over the Measurement Period, as described in **Exhibit B**. A portion of the total Bonus Pool is determined based upon the level at which the Reliability Performance Goals are satisfied, as provided in **Exhibit B**.

c) "**EME G&A and MWG Controllable O&M Goal**" is established by the Committee and reflects levels of certain expenses over the Measurement Period:

1) EME General and Administrative ("EME G&A") expenses directly incurred by the Company and its subsidiaries, including but not limited to, labor, employee expenses, and consultants for the Executive, Finance, Legal, Public Affairs, Human Resources, Compliance, Coal Generation, Tech Services, Development and Marketing & Trading cost centers and other general and administrative costs incurred, with expenses to include direct billed costs and common benefits from Edison International ("EIX") and Southern California Edison ("SCE") and their affiliates. Specifically excluded from the calculation will be restructuring costs, severance costs, and indirect or allocated costs from EIX or SCE that will be discontinued and otherwise not replaced during finalization of the Shared Services Agreement as well as any costs associated with the restructuring activities. The budget will reasonably identify in good faith total Company costs that will be subsequently allocated to other Edison Mission Group ("EMG") subsidiaries under an inter-company services agreement and both the budget and actuals will exclude such reasonable costs and the corresponding reductions to EME G&A costs achieved through billings to other EMG subsidiaries for services provided.

2) MWG Controllable Operations and Maintenance ("MWG Controllable O&M") expenses will reflect MWG expenses. These expenses are defined as the cost elements in the following list and, for the avoidance of doubt, will exclude any costs already reflected in EME G&A and severance costs.

- Payroll & Overhead
- Materials
- Contractors/Services
- Rental/Other
- Building/Facility Operations Cost
- Miscellaneous Costs (to be defined by general ledger code)
- Administrative Expense
- Maintenance – Routine
- Maintenance – POH
- Maintenance - Forced
- Maintenance – Projects
- Maintenance – Unsettled Orders

3

A portion of the total Bonus Pool is determined based upon the level at which the EME G&A and MWG Controllable O&M Goals are satisfied, as provided in **Exhibit C**.

**Section 2.16.** "Measurement Period" means the period beginning on the Effective Date of this Plan and concluding on the earlier of (x) December 31, 2014 and (y) the Emergence Date; provided, however, that for purposes of the Enterprise Value Goal, the Measurement Period shall conclude on the Emergence Date.

**Section 2.17.** "Participant" means an employee of the Company or any of its subsidiaries who satisfies the requirements of Section 3.1 for eligibility to participate in the Plan and receives an Award Statement hereunder. The Participants as of the Effective Date shall be set forth on **Exhibit E.**

**Section 2.18.** "Payment Date" means the date on which all or a portion of the LTIP Award is paid to a Participant. For the portion of the Bonus Pool attributable to the Reliability Performance Goal and the EME G&A and MWG Controllable O&M Goal, the Payment Date, in all circumstances, shall be within the sixty (60) day period following the end of the Measurement Period. For the portion of the Bonus Pool attributable to the EME Adjusted Enterprise Value component of the Enterprise Value Goal, the Payment Date shall be the date that is 95 days following the Emergence Date. For the portion of the Bonus Pool attributable to the MWG Adjusted Enterprise Value component of the Enterprise Value Goal, the Payment Date shall be the date that is 60 days following the Emergence Date, as applicable. Notwithstanding the foregoing, in the event that any Interim Contributions to the Bonus Pool are made pursuant to Section 4.8, including to the extent MWG confirms a chapter 11 plan independent of the Company's chapter 11 plan, such amounts shall be paid within sixty (60) days of the closing of the transaction giving rise to the Interim Contribution.

**Section 2.19.** "Plan" means this Edison Mission Energy 2013–2014 Long-Term Incentive Plan, as amended from time to time.

## ARTICLE III

### *ELIGIBILITY*
**Section 3.1.**   Eligibility Requirements.

a) Subject to Section 3.2, an individual shall be entitled to be a Participant in the Plan only if he or she:

(1) Was employed on or before January 1, 2013, or such later date as determined by the Committee on a case by case basis;

(2) Is designated by the Committee as an eligible Participant via an Award Statement; and

(3) Remains continuously employed with the Company or one of its subsidiaries or affiliates through the Payment Date, in each case as determined by the Committee.

b) In the event a Participant transfers into or otherwise assumes another position that participates in the Plan (or does not participate in the Plan, as the case may be), the Committee,

4

subject to the terms of the Plan, retains the sole discretion to determine what adjustments, if any, will be made to the Participant's Award Statement.

**Section 3.2.**   Effect of Termination of Employment.

(a) Notwithstanding anything herein to the contrary, a Participant shall not be entitled to receive any portion of such Participant's LTIP Award if, prior to the Payment Date, he or she resigns from his or her employment or is terminated by the Company or any of its subsidiaries for Cause, in each case as determined by the Committee.   Any portion of the Bonus Pool that is forfeited pursuant to this Section 3.2 shall be reallocated to other Participants at the discretion of the Committee.

(b) If a Participant's employment is terminated (i) by the Company or any of its subsidiaries without Cause or (ii) due to the Participant's death or Disability, in each case on or after January 1, 2013, such Participant shall continue to be entitled to earn an LTIP Award, determined in accordance with the level at which the LTIP Goals are satisfied following the end of the Measurement Period, and otherwise in accordance with the Plan; provided, however, that within sixty (60) days of such termination (other than due to death) (such 60-day period, the "Release Period") such Participant delivers to the Company and does not revoke a general release of claims in favor of the Company and its subsidiaries in a form reasonably satisfactory to the Committee; which release shall exclude any claims relating to this Plan or to any directors' and officers' liability insurance coverage or any right of indemnification under the Company's or any of its subsidiaries' organizational documents or otherwise.   To the extent required with respect to any payment pursuant to an LTIP Award under Code Section 409A, if the Release Period begins in one taxable year and ends in a second taxable year, the payment shall be made on the last day of the Release Period that occurs in the second taxable year. Payment of any subsequently earned portion of the LTIP Award shall be made at the same time that such payments are made to Participants generally pursuant to the terms of the Plan.

## ARTICLE IV

### *CALCULATION OF AWARD*
**Section 4.1.**   Plan Components.   The total value of the Bonus Pool will be based upon three components—the Enterprise Value Goal component, the Reliability Performance Goal component, and the EME G&A and MWG Controllable O&M Goal component.   The total amount included in the total Bonus Pool will depend upon the level at which each of these goals is satisfied, as provided in **Exhibit A**, **Exhibit B**, and **Exhibit C**.   The portion of the total Bonus Pool that will be paid to a Participant will be set forth in a Participant's Award Statement.   A sample calculation is provided in **Exhibit D**.

**Section 4.2.**   Enterprise Value Goal component.   **Exhibit A** sets forth the method to determine the amount of a portion of the total Bonus Pool that will be paid to all Participants following the Emergence Date, which depends upon EME Adjusted Enterprise Value and MWG Adjusted Enterprise Value, in each case as determined by the Court in connection with a confirmed plan of reorganization, with certain adjustments to EME Adjusted Enterprise Value for changes in value following the Emergence Date.   Below an EME Adjusted Enterprise Value of $1.6 billion, no amounts will be added to the Bonus Pool for the EME Adjusted Enterprise Value component of the Enterprise Value Goal.   Below a MWG Adjusted Enterprise Value of $100 million, no amounts will be added to the Bonus Pool for the MWG Adjusted Enterprise Value component of

5

the Enterprise Value Goal. For EME and MWG Adjusted Enterprise Values in excess of these figures, respectively, amounts will be added to the Bonus Pool as a percentage of excess EME and MWG Enterprise Value as set forth for each component of the Enterprise Value Goal as set forth in **Exhibit A**.

**Section 4.3.** Reliability Performance Goal component. **Exhibit B** sets forth the method to determine the amount of a portion of the total Bonus Pool that will be paid to all Participants following the end of the Measurement Period, based upon the level of satisfaction of monthly reliability levels. The Committee shall reasonably determine in good faith the level at which the Reliability Performance Goal for calendar years 2013 and 2014 is satisfied, and this actual performance shall be measured against a scale that includes a threshold level of performance (below which no payment shall be made with respect to the Reliability Performance Goal portion of the Bonus Pool), a target level of performance at which specified percentages of the Reliability Performance Goal portion of the Bonus Pool shall be paid, and a maximum level of performance above which no additional Reliability Performance Goal portion of the Bonus Pool shall be paid, as provided in **Exhibit B**. In the event that actual performance falls between the threshold, target, and stretch levels of performance, the actual amount of the Bonus Pool attributable to the Reliability Performance Goal will be determined through linear interpolation.

**Section 4.4.** EME G&A and MWG Controllable O&M Goal component. **Exhibit C** sets forth the method to determine the amount of a portion of the total Bonus Pool that will be paid to all Participants following the end of the Measurement Period, based upon the level of satisfaction of monthly EME G&A and MWG Controllable O&M levels. The Committee shall reasonably determine in good faith the level at which the EME G&A and MWG Controllable O&M Goal for calendar years 2013 and 2014 is satisfied and this actual performance shall be measured against a scale that includes a threshold level of performance (below which no payment shall be made with respect to the EME G&A and MWG Controllable O&M Goal portion of the Bonus Pool), a target level of performance at which specified percentages of the EME G&A and MWG Controllable O&M Goal portion of the Bonus Pool shall be paid, and a maximum level of performance above which no additional EME G&A and MWG Controllable O&M Goal portion of the Bonus Pool shall be paid, as provided in **Exhibit C**. In the event that actual performance falls between the threshold, target, and stretch levels of performance, the actual amount of the Bonus Pool attributable to the EME G&A and MWG Controllable O&M Goal will be determined through linear interpolation.

**Section 4.5.** Material Modifications. The Enterprise Value Goal, Reliability Performance Goal, and/or EME G&A and MWG Controllable O&M Goal may be changed by the Committee in the event of unanticipated and/or atypical circumstances, as reasonably determined by the Committee in its good faith discretion; provided, however, that to the extent the Committee makes or wishes to make any material modifications to the Plan, including, without limitation, authorizing an Interim Contribution (as defined herein) pursuant to Section 4.8 hereof (each, a "Proposed Modification"), the Company shall notify counsel to the Creditors' Committee, the Ad Hoc Noteholder Group, and the office of the U.S. Trustee for the Northern District of Illinois (collectively, the "Notice Parties") of any such Proposed Modifications (each notice, a "Modification Notice"). Upon receipt of a Modification Notice, the Notice Parties shall have ten (10) calendar days to notify the Company of any objection to the Proposed Modifications to the Plan (such ten (10) day calendar period, the "Informal Objection Notification Period"). If the Notice Parties inform the Company that they have no objection or if the Notice Parties fail to notify the Company of any objection within the Informal Objection Notification Period, the

6

Committee may make the Proposed Modifications to the Plan.  If any of the Notice Parties notify the Company of any objection during the Informal Objection Notification Period, the Company and the Notice Parties shall work in good faith to resolve the dispute.  If the dispute remains unresolved, the Company may seek Court approval of the Proposed Modifications, and the dispute shall be resolved at a hearing to be set at a mutually agreeable time.  For the avoidance of doubt, no Proposed Modifications may be made to the Plan unless (a) the Informal Objection Notification Period terminates without any of the Notice Parties notifying the Company of any objection; (b) the Company and the applicable Notice Parties consensually resolve all objections of which the Notice Parties notified the Company during the Informal Objection Notification Period; or (c) to the extent the Company and the Notice Parties cannot resolve all objections during the Informal Objection Notification Period, the Court rules on any motion filed by the Company seeking approval of such Proposed Modifications.

**Section 4.6.**  **Award Statements.**  The Company shall provide an Award Statement to each Participant.  Each Award Statement shall be subject to the terms of the Plan and shall specify the total portion of the Bonus Pool to which such Participant is entitled, as determined by the Committee in accordance with **Exhibit A**, **Exhibit B**, **Exhibit C**, and the Company's plan of reorganization confirmed by the Court or the Court's confirmation order with respect thereto (the "Confirmation Order").

**Section 4.7.**  **Emergence from Bankruptcy.**  In the event of the Emergence Date occurs prior to December 31, 2014, the Measurement Period will end with respect to the Reliability Performance Goal and the EME G&A and MWG Controllable O&M Goal, and each Participant that has satisfied all conditions to payment shall be paid their applicable portion of the Bonus Pool, based on the Company's actual achievement of each of the LTIP Goals (without any proration of the Bonus Pool) determined in accordance with this Section 4.7 and the applicable Exhibit.  As described above, there will be monthly targets developed over the Measurement Period for each of these two goals, so that the Committee may determine the level at which the applicable LTIP Goals are satisfied, in the event that the Measurement Period ends prior to December 31, 2014 due to the prior occurrence of the Emergence Date.  Should the Emergence Date occur in the middle of a month, the end of the immediately prior month will serve as the end of the Measurement Period for purposes of calculating LTIP Awards.  The portion of the Bonus Pool attributable to the Reliability Performance Goal and EME G&A and MWG Controllable O&M Goal component will not, however, be subject to proration if the Emergence Date occurs prior to December 31, 2014.  For the avoidance of doubt, the Measurement Period for the Enterprise Value Goal shall not end until the Emergence Date.

**Section 4.8.**  **Pre-Emergence Asset Sales.** In the event that the Company (together with its subsidiaries) sells material assets (the "Divested Assets") before the Emergence Date (a "Pre-Emergence Asset Sale"), the Committee shall:

a) determine in good faith the extent to which the Company has achieved (i) the Reliability Performance Goal and (ii) the EME G&A and MWG Controllable O&M Goal (collectively, the "Operational Goals") using the monthly schedules set forth in **Exhibit B** and **Exhibit C**, respectively (the "Interim Measurement Period") with respect to the Divested Assets;

b) authorize in good faith a contribution to the Bonus Pool (an "Interim Contribution") in an amount corresponding to the achievement of the Operational Goals with respect to

7

the Divested Assets during the Interim Measurement Period (without any proration of the Bonus Pool attributable to the Divested Assets);

c) reduce in good faith the aggregate amount of the Bonus Pool that remains outstanding and unearned to take into account the Interim Contribution;

d) adjust, in good faith, the Operational Goals as appropriate to account for the sale of the Divested Assets.

Furthermore, the Committee shall authorize in good faith an Interim Contribution in an amount corresponding to the MWG Adjusted Enterprise Value as determined in accordance with **Exhibit A** in the event that: (a) a Pre-Emergence Asset Sale constitutes a sale of all or substantially all of the MWG business after which the Committee, in its reasonable discretion, determines in good faith the MWG Adjusted Enterprise Value (as defined in **Exhibit A**) implied by the consideration received in connection with such a sale; or (b) MWG confirms a chapter 11 plan, independent of the Company's chapter 11 plan, before the Emergence Date.

For the avoidance of doubt any adjustments by the Committee pursuant to subsections (c) and (d) of this Section 4.8 following a Pre-Emergence Asset Sale will be made in accordance with the Material Modification provisions set forth in Section 4.5. In addition, the authorization of any Interim Contributions to the Bonus Pool shall be considered a Proposed Modification and subject to the procedures set forth in Section 4.5 hereof.

## ARTICLE V

### *PAYMENT OF AWARDS*
**Section 5.1.**   Time of Payment.  Payment of the LTIP Award shall be made on the Payment Date, provided that the Participant has remained continuously employed with the Company or any of its subsidiaries through such time, except as specifically provided in Section 3.2.

**Section 5.2.**   Form of Payment.  All portions of the LTIP Award shall be paid in the form of a lump sum cash payment, reduced by any applicable withholding taxes, as determined by the Committee; provided, however, that all or any part of the portion of a Participant's Award attributable to the EME Adjusted Enterprise Value portion of the Enterprise Value Goal may be paid, at the election of the Participant (which election must be provided no more than ninety (90) days following the Emergence Date) in the form of publicly traded equity securities of EME (if any) following the Emergence Date, with the number of such securities determined by dividing the cash amount of such payment by the volume-weighted average trading price of such security over the first ninety (90) days following the Emergence Date, subject to applicable withholding taxes; which withholding taxes may, at the Participant's discretion, be satisfied by withholding the number of such securities having a fair market value equal to the applicable withholding tax (but not in excess of the minimum withholding required by law).

**Section 5.3.**   Obligations for Awards. EME will be the primary source of funds for all payouts made under the (a) Enterprise Value Goal related to EME Adjusted Enterprise Value, (b) Reliability Performance Goal, and (c) EME G&A and MWG Controllable O&M Goal. MWG will be the primary source of funds for payouts under the Enterprise Value Goal related to MWG Adjusted Enterprise Value; provided, however, that (x) for the avoidance of doubt, all payouts made under the Enterprise Value Goal related to MWG Adjusted Enterprise Value shall be paid

8

in cash in accordance with Section 5.2 hereof, (y) each Participant shall receive an administrative expense priority claim under section 503 of the Bankruptcy Code against MWG's estate on account of all amounts due under the Enterprise Value Goal related to MWG Adjusted Enterprise Value, and (z) MWG's obligations under this Section 5.3 shall be guaranteed by EME, and EME shall receive a superpriority administrative expense claim under section 364(c)(1) of the Bankruptcy Code against MWG's estate to the extent EME to satisfies any of MWG's obligations pursuant this Section 5.3.

## ARTICLE VI

### *ADMINISTRATION*
**Section 6.1.**   The Committee shall, in its sole discretion, administer the Plan reasonably and in good faith.  The Committee shall have the sole authority to interpret, construe, and administer the Plan and any other document relating to the Plan in accordance with the provisions set forth herein, including without limitation the authority to:  (i) select the Participants who are eligible to participate in the Plan; (ii) determine, consistent with the terms of the Plan and the Exhibits hereto:  (A) the terms and conditions of each Award Statement; (B) the portion of the Bonus Pool that each Participant is eligible to receive; (C) the level at which the LTIP Goals are attained; and (D) the impact of the attainment of various levels of the LTIP Goals on the Bonus Pool; (iii) approve or deny upward or downward adjustments to threshold, target, or stretch performance goals as justified by unanticipated and/or atypical circumstances, and make any and all other bonus determinations under the Plan (which for the avoidance of doubt, shall be a modification subject to Section 4.5); and (iv) make any other determination and take any other action that the Committee reasonably deems necessary or desirable for administration of the Plan; provided, however, that the Company will comply with Section 4.5 hereto the extent it makes any changes to the Plan covered thereby.  All actions taken and all interpretations and determinations made by the Committee in respect of the Plan shall be conclusive and binding on all persons, except as otherwise contemplated by the terms of the Plan, including, without limitation, Section 4.5 hereof.  The Committee may also delegate any and all responsibilities described hereunder to any other independent sub-committee of the Board.

**Section 6.2.**   A majority of the members of the Committee may determine its actions.

**Section 6.3.**   No officer or employee of the Company shall be liable to any person for any action taken or omitted in connection with the interpretation and administration of the Plan unless attributable to his or her own willful misconduct, gross negligence or lack of good faith.

**Section 6.4.**   The reasonable expenses of administering the Plan shall be paid by the Company and shall not be charged against the Plan.

## ARTICLE VII

### *MISCELLANEOUS*
**Section 7.1.**   Successors.  All obligations of the Company and MWG under the Plan will be binding on any successor to the Company or MWG, as the case may be, whether the existence of the successor results from a change in control or otherwise.

**Section 7.2.**   Non-transferability.  No LTIP Award or any rights thereto shall be transferable other than by will or the laws of descent and distribution or pursuant to any beneficiary

9

designation procedures as may be approved by the Committee for such purpose. Except to the extent permitted by the foregoing sentence, no LTIP Award payable hereunder may be assigned, alienated, sold, transferred, anticipated, pledged, encumbered, or subjected to any charge or legal process, and if any such attempt is made, or a person eligible for any LTIP Award hereunder becomes bankrupt, the amount under the Plan which would otherwise be payable with respect to such person may be eliminated by the Committee which, in its sole discretion, may cause the same to be held or applied for the benefit of one or more of the dependents of such person or make any other disposition of such amount that it deems appropriate.

**Section 7.3.**   Beneficiary Designation.   Each Participant may, from time to time, name any beneficiary or beneficiaries (who may be named contingently or successively) to whom any amount payable under the Plan is to be paid in case the Participant should die before receiving such amount.   Each beneficiary designation will revoke all prior designations by the same Participant with respect to this Plan, must be in a form prescribed by the Committee, and must be made during the Participant's lifetime.   If the Participant's designated beneficiary predeceases the Participant or no beneficiary has been designated, any amount remaining unpaid at the Participant's death shall be paid to the Participant's estate or legal representative as determined under applicable law.

**Section 7.4.**   Claim to LTIP Award and Employment Rights.   Nothing in this Plan shall require the Company to segregate or set aside any funds or other property for purposes of paying all or any portion of a LTIP Award hereunder, and no trust principles shall apply to the Plan.   Neither the adoption of the Plan nor the continued operation thereof shall confer upon any Participant any right to continue in the employ of the Company or shall in any way affect the right and power of the Company to dismiss or otherwise terminate the employment of any Participant at any time for any or no reason, with or without Cause.

**Section 7.5.**   Income Tax Withholding/Rights of Offset.   The Company shall have the right to deduct and withhold from any amounts paid pursuant to the Plan, or to require the Participant to pay to the Company, all federal, state, local, and other withholding taxes as may be required by law. In addition to the foregoing, the Company shall have the right to set off against any amount which would otherwise be payable hereunder, the amount of any debt, judgment, claim, expense, or other obligation owed at such time by the Participant to the Company, to the extent permitted by law.

**Section 7.6.**   Rights as a Creditor.   No Participant shall have any interest in any particular assets of the Company or MWG by reason of the right to receive a benefit under the Plan and any such Participant shall have only the rights of a general unsecured creditor of the Company and MWG, as the case may be, with respect to any rights under the Plan

**Section 7.7.**   If any provision of the Plan is held illegal or invalid for any reason, the illegality or invalidity will not affect the remaining parts of the Plan, and the Plan will be construed and enforced as if the illegal or invalid provision had not been included.

**Section 7.8.**   Governing Law; JURY TRIAL WAIVER.   All questions pertaining to the construction, validity and effect of the Plan, and all questions pertaining to any amount payable hereunder, shall be determined in accordance with the laws of the State of Delaware.   The Company and, as a condition to participation, all Participants SHALL IRREVOCABLY WAIVE

10

ALL RIGHTS TO A JURY TRIAL IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THE PLAN.

**Section 7.9.**   Code Section 409A and 4999.  Although the Company, its subsidiaries, affiliates, successors and assigns make no guarantee with respect to the tax treatment of payments hereunder and shall not be responsible in any event with regard to non-compliance with Code Section 409A, the Plan is intended to either comply with, or be exempt from, the requirements of Code Section 409A.  To the extent that the Plan is not exempt from the requirements of Code Section 409A, the Plan is intended to comply with the requirements of Code Section 409A and shall be limited, construed and interpreted in accordance with such intent.  Accordingly, the Company reserves the right to amend the provisions of the Plan at any time and in any manner without the consent of Participants solely to comply with the requirements of Code Section 409A and to avoid the imposition of the additional tax, interest or income inclusion under Code Section 409A on any payment to be made hereunder.  Notwithstanding the foregoing, in no event whatsoever shall the Company, its subsidiaries, affiliates, successors or assigns be liable for any additional tax, interest, income inclusion or other penalty that may be imposed on a Participant by Code Section 409A or Code Section 4999 or for damages for failing to comply with Code Section 409A.

Notwithstanding anything to the contrary contained herein, if at the time of a Participant's termination of employment the Participant is a "specified employee," as defined below, any and all amounts payable under Section 3.2 on account of such separation from service that constitute deferred compensation and would (but for this provision) be payable within six (6) months following the date of termination, shall instead be paid on the next business day following the expiration of such six (6) month period or, if earlier, upon the Participant's death; except (A) to the extent of amounts that do not constitute a deferral of compensation within the meaning of Treasury regulation Section 1.409A-1(b) (including without limitation by reason of the safe harbor set forth in Section 1.409A-1(b)(9)(iii), as determined by the Company in its reasonable good faith discretion); (B) benefits that qualify as excepted welfare benefits pursuant to Treasury regulation Section 1.409A-1(a)(5); or (C) other amounts or benefits that are not subject to the requirements of Section 409A.

For purposes of this Plan, all references to "termination of employment" and correlative phrases shall be construed to require a "separation from service" (as defined in Section 1.409A-1(h) of the Treasury regulations after giving effect to the presumptions contained therein), and the term "specified employee" means an individual determined by the Company to be a specified employee under Treasury regulation Section 1.409A-1(i).

For purposes of Code Section 409A, a Participant's right to receive any payments pursuant to the Plan shall be treated as a right to receive a series of separate and distinct payments. Whenever a payment under the Plan specifies a payment period with reference to a number of days, the actual date of payment within the specified period shall be within the sole discretion of the Committee. Notwithstanding any other provision of this Plan to the contrary, in no event shall any payment under this Plan that constitutes "nonqualified deferred compensation" for purposes of Code Section 409A be subject to offset by any other amount unless otherwise permitted by Code Section 409A.

**Section 7.10.**  Amendment.  The Company reserves the right to change, amend, or terminate the Plan at any time; provided, however, that the Company shall obtain approval from the Court

11

to the extent any such changes or amendments require Court approval to comply with applicable provisions the Bankruptcy Code or any order of the Court; and provided, further, that no such changes, amendments or termination shall occur without the agreement of the parties provided for in Section 4.5 hereof to the extent applicable.

**Section 7.11.** The Plan is not intended, and shall not be construed, to provide retirement benefits for any purpose and shall constitute a "bonus program" for purposes of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). The section headings herein are for convenience of reference only, and they form no part of the Program and shall not affect its interpretation.

**Section 7.12.** Amounts payable hereunder shall not constitute compensation for purposes of any other plan, program, arrangement or agreement of the Company or its subsidiaries, or any successor thereto, except to the extent required by applicable law and pursuant to the terms of any qualified plan.

**Section 7.13.** Information Sharing.  On or before the date that is thirty (30) calendar days after each of (a) the completion of any Measurement Period (including, for the avoidance of doubt, any Interim Measurement Period) or (b) an order is entered confirming a chapter 11 plan of reorganization for EME and/or MWG (as applicable) and, in all circumstances, at least thirty (30) calendar days prior to any Payment Date, the Company shall share its calculation of any contribution to the Bonus Pool and the data and other information used in making all determinations regarding the achievement of any of the LTIP Goals (collectively, the "Initial Reporting") with the Creditors Committee and Ad Hoc Noteholder Group.  Upon receiving the Initial Reporting, the Creditors' Committee and/or the Ad Hoc Noteholder Group shall be entitled to request reasonable additional information, and the Company shall promptly share such information with the Creditors' Committee and the Ad Hoc Noteholder Group.

## EXHIBIT A

## ENTERPRISE VALUE GOAL BONUS POOL DETERMINATION

### Enterprise Value Goal Bonus Pool Determination

- The Enterprise Value Goal has two components: (a) EME Adjusted Enterprise Value and (b) MWG Adjusted Enterprise Value.

a.    **EME Adjusted Enterprise Value**

- EME Adjusted Enterprise Value is the value attributed to EME in any confirmed plan of reorganization filed in these chapter 11 cases ("EME Plan Value") plus cash, excluding the value of MWG.

- To the extent that EME's equity securities are publicly traded following the Emergence Date and the volume-weighted average trading price of equity securities distributed to creditors as non-cash consideration for the first 90 days following the Emergence Date implies that the EME Adjusted Enterprise Value is greater than 15 percent higher or lower than the EME Plan Value plus cash, then the EME Adjusted Enterprise Value shall be adjusted to reflect the EME Adjusted Enterprise Value implied by the volume-weighted average trading price for the first 90 days following the Emergence Date and the portion of the Bonus Pool attributable to EME Plan Value shall be determined based upon such modified EME Adjusted Enterprise Value. If this difference is within +/-15 percent, there will be no adjustment.

| EME Adjusted Enterprise Value | | |
|---|---|---|
| EME Adjusted Enterprise Value ($ in millions) | % Payout of Incremental Excess | Incremental Contribution to Bonus Pool up to:[1] |
| Below $1,600 | 0.000% | $0 |
| $1,600 to $1,750 | 1.125% | $1.688 million |
| Above $1,750 to $2,000 | 1.750% | $4.375 million |
| Above $2,000 to $2,250 | 2.250% | $5.625 million |
| Above $2,250 to $2,500 | 2.500% | $6.250 million |
| Above $2,500 to $2,900 | 3.000% | $12.000 million |
| Over $2,900 | 0.01% | |

---

[1]    The incremental contribution to the Bonus Pool depicted in the chart assumes the highest EME Adjusted Enterprise Value in the given category is achieved. For the avoidance of doubt, any such incremental contribution will be added to the MWG Adjusted Enterprise Value to determine the Enterprise Value Goal Bonus Pool. The Enterprise Value Bonus Pool will then be added to the Reliability Performance Goal and EME G&A and Controllable O&M Goal Bonus Pools to establish the overall Bonus Pool for the Plan.

14

b.   MWG Adjusted Enterprise Value

- MWG Adjusted Enterprise Value is the value attributed to MWG in any confirmed plan of reorganization filed in these chapter 11 cases ("MWG Plan Value") plus cash, excluding the value of intercompany notes and all claims including, without limitation, the EME guaranty claim.

| MWG Adjusted Enterprise Value | | |
|---|---|---|
| MWG Adjusted Enterprise Value ($ in millions) | % Payout of Incremental Excess | Incremental Contribution to Bonus Pool up to:[2] |
| Below $100 | 0% | $0 |
| $100 to $300 | 1.25% | $2.500 million |
| Above $300 to $500 | 2.25% | $4.500 million |
| Above $500 to $750 | 2.75% | $6.875 million |
| Over $750 | 0.01% | |

- If MWG Adjusted Enterprise Value exceeds the aggregate amount of MWG claims, then, to the extent that such MWG Adjusted Enterprise Value would otherwise result in a contribution to the Bonus Pool in accordance with the chart above, the incremental excess value shall result in an additional contribution to the Bonus Pool in an amount equal to 2.75% of such incremental excess.  For example, if MWG Adjusted Enterprise Value is $500 million, and MWG claims were $400 million, then the amount contributed to the Bonus Pool would be the sum of (i) the amount determined in accordance with the chart above at a MWG Adjusted Enterprise Value of $400 million and (ii) 2.75% of $100 million.

---

[2]   The incremental contribution to the Bonus Pool depicted in the chart assumes the highest MWG Adjusted Enterprise Value in the given category is achieved.  For the avoidance of doubt, any such incremental contribution will be added to the EME Adjusted Enterprise Value to determine the Enterprise Value Goal Bonus Pool.  The Enterprise Value Bonus Pool will then be added to the Reliability Performance Goal and EME G&A and Controllable O&M Goal Bonus Pools to establish the overall Bonus Pool for the Plan.

# EXHIBIT B

# RELIABILITY PERFORMANCE GOAL BONUS POOL DETERMINATION

### Reliability Performance Goal Bonus Pool Determination

- Reliability metrics consist of: (i) equivalent unplanned outage rate for the Company's and its debtor and non-debtor subsidiaries' coal-fired power plants ("Coal EUOR"); (ii) equivalent unplanned outage rate for the Company's and its debtor and non-debtor subsidiaries' gas projects ("Gas EUOR"); and (iii) equivalent availability factor ("Wind EAF") for the Company's and its debtor and non-debtor subsidiaries' wind projects. For the avoidance of doubt, the plants and projects of the Company and its debtor and non-debtor subsidiaries described in this bullet shall be those referenced in the Declaration of Maria Rigatti, Senior Vice President and Chief Financial Officer of Edison Mission Energy, in support of Chapter 11 Petitions and First Day Motions filed with the Bankruptcy Court on or about December 17, 2012 [Docket No. 6].

- Each of Coal EUOR, Gas EUOR, and Wind EAF will be weighted at 33.3 percent of the total contribution to Bonus Pool for Reliability Performance Goal.

| Reliability Performance Goal | | | |
|---|---|---|---|
| Performance Measure | Threshold | Target | Stretch |
| Coal EUOR | 11.37% | 9.72% | 7.27% |
| Gas EUOR | 2.33% | 2.12% | 1.79% |
| Wind EAF | 95.09% | 95.67% | 96.05% |
| Total Contribution to Bonus Pool for Reliability Performance Goal | $3 million | $6 million | $11 million |

- Monthly schedules of the Reliability Performance Goal follow.

| Coal EUOR Goal | | | |
|---|---|---|---|
| Date | Threshold | Target | Stretch |
| Jan-13 | 11.06% | 9.47% | 7.27% |
| Feb-13 | 11.06% | 9.47% | 7.27% |
| Mar-13 | 11.06% | 9.47% | 7.27% |
| Apr-13 | 11.06% | 9.47% | 7.27% |
| May-13 | 11.06% | 9.47% | 7.27% |
| Jun-13 | 11.06% | 9.47% | 7.27% |
| Jul-13 | 11.06% | 9.47% | 7.27% |
| Aug-13 | 11.06% | 9.47% | 7.27% |
| Sep-13 | 11.06% | 9.47% | 7.27% |
| Oct-13 | 11.06% | 9.47% | 7.27% |
| Nov-13 | 11.06% | 9.47% | 7.27% |
| Dec-13 | 11.06% | 9.47% | 7.27% |
| Jan-14 | 11.67% | 9.97% | 7.27% |
| Feb-14 | 11.67% | 9.97% | 7.27% |
| Mar-14 | 11.67% | 9.97% | 7.27% |
| Apr-14 | 11.67% | 9.97% | 7.27% |
| May-14 | 11.67% | 9.97% | 7.27% |
| Jun-14 | 11.67% | 9.97% | 7.27% |
| Jul-14 | 11.67% | 9.97% | 7.27% |
| Aug-14 | 11.67% | 9.97% | 7.27% |
| Sep-14 | 11.67% | 9.97% | 7.27% |
| Oct-14 | 11.67% | 9.97% | 7.27% |
| Nov-14 | 11.67% | 9.97% | 7.27% |
| Dec-14 | 11.67% | 9.97% | 7.27% |
|  |  |  |  |
| Total 2013 | 11.06% | 9.47% | 7.27% |
| Total 2014 | 11.67% | 9.97% | 7.27% |
| Total 2013 -2014 | 11.37% | 9.72% | 7.27% |

18

| Gas EUOR Goal | | | |
|---|---|---|---|
| Date | Threshold | Target | Stretch |
| Jan-13 | 7.62% | 7.40% | 7.00% |
| Feb-13 | 7.62% | 7.40% | 7.00% |
| Mar-13 | 1.75% | 1.52% | 1.11% |
| Apr-13 | 1.75% | 1.52% | 1.11% |
| May-13 | 1.75% | 1.52% | 1.11% |
| Jun-13 | 1.75% | 1.52% | 1.11% |
| Jul-13 | 1.75% | 1.52% | 1.11% |
| Aug-13 | 1.75% | 1.52% | 1.11% |
| Sep-13 | 1.75% | 1.52% | 1.11% |
| Oct-13 | 1.75% | 1.52% | 1.11% |
| Nov-13 | 1.75% | 1.52% | 1.11% |
| Dec-13 | 1.75% | 1.52% | 1.11% |
| Jan-14 | 1.94% | 1.74% | 1.49% |
| Feb-14 | 1.94% | 1.74% | 1.49% |
| Mar-14 | 1.94% | 1.74% | 1.49% |
| Apr-14 | 1.94% | 1.74% | 1.49% |
| May-14 | 1.94% | 1.74% | 1.49% |
| Jun-14 | 1.94% | 1.74% | 1.49% |
| Jul-14 | 1.94% | 1.74% | 1.49% |
| Aug-14 | 1.94% | 1.74% | 1.49% |
| Sep-14 | 1.94% | 1.74% | 1.49% |
| Oct-14 | 1.94% | 1.74% | 1.49% |
| Nov-14 | 1.94% | 1.74% | 1.49% |
| Dec-14 | 1.94% | 1.74% | 1.49% |
|  |  |  |  |
| Total 2013 | 2.73% | 2.50% | 2.09% |
| Total 2014 | 1.94% | 1.74% | 1.49% |
| Total 2013 -2014 | 2.33% | 2.12% | 1.79% |

| Wind EAF Goal | | | |
|---|---|---|---|
| Date | Threshold | Target | Stretch |
| Jan-13 | 95.09% | 95.67% | 96.05% |
| Feb-13 | 95.09% | 95.67% | 96.05% |
| Mar-13 | 95.09% | 95.67% | 96.05% |
| Apr-13 | 95.09% | 95.67% | 96.05% |
| May-13 | 95.09% | 95.67% | 96.05% |
| Jun-13 | 95.09% | 95.67% | 96.05% |
| Jul-13 | 95.09% | 95.67% | 96.05% |
| Aug-13 | 95.09% | 95.67% | 96.05% |
| Sep-13 | 95.09% | 95.67% | 96.05% |
| Oct-13 | 95.09% | 95.67% | 96.05% |
| Nov-13 | 95.09% | 95.67% | 96.05% |
| Dec-13 | 95.09% | 95.67% | 96.05% |
| Jan-14 | 95.09% | 95.67% | 96.05% |
| Feb-14 | 95.09% | 95.67% | 96.05% |
| Mar-14 | 95.09% | 95.67% | 96.05% |
| Apr-14 | 95.09% | 95.67% | 96.05% |
| May-14 | 95.09% | 95.67% | 96.05% |
| Jun-14 | 95.09% | 95.67% | 96.05% |
| Jul-14 | 95.09% | 95.67% | 96.05% |
| Aug-14 | 95.09% | 95.67% | 96.05% |
| Sep-14 | 95.09% | 95.67% | 96.05% |
| Oct-14 | 95.09% | 95.67% | 96.05% |
| Nov-14 | 95.09% | 95.67% | 96.05% |
| Dec-14 | 95.09% | 95.67% | 96.05% |
|  |  |  |  |
| Total 2013 | 95.09% | 95.67% | 96.05% |
| Total 2014 | 95.09% | 95.67% | 96.05% |
| Total 2013 -2014 | 95.09% | 95.67% | 96.05% |

## EXHIBIT C

## EME G&A AND MWG CONTROLLABLE O&M GOAL BONUS POOL DETERMINATION

**EME G&A and MWG Controllable O&M Goal Bonus Pool Determination**

- The EME G&A and MWG Controllable O&M Goal includes two cost reduction performance metrics, which are measured on a combined basis for purposes of determining the Bonus Pool related to the EME G&A and MWG Controllable O&M Goal:   (i) EME G&A and (ii) MWG Controllable O&M.

| EME G&A and MWG Controllable O&M Goal | | | |
|---|---|---|---|
| Performance Measure | Threshold | Target | Stretch |
| EME G&A Expenses | $299 million | $289.9 million | $275.6 million |
| MWG Controllable O&M Expenses | $613 million | $576.3 million | $488.1 million |
| Aggregate EME G&A and MWG Controllable O&M Goal | $912 million | $866.2 million | $763.7 million |
| Total Contribution to Bonus Pool for EME G&A and MWG Controllable O&M Goal | $3 million | $6 million | $11 million |

- Monthly schedules of the EME G&A and MWG Controllable O&M Goal follow.

| EME G&A and MWG Controllable O&M Goal ($ in millions) | | | | | | | | |
| Date | Threshold | | | Target | | | Stretch | | |
| | MWG Controllable O&M | EME G&A | Aggregate EME G&A and MWG Controllable O&M | MWG Controllable O&M | EME G&A | Aggregate EME G&A and MWG Controllable O&M | MWG Controllable O&M | EME G&A | Aggregate EME G&A and MWG Controllable O&M |
|---|---|---|---|---|---|---|---|---|---|
| Jan-13 | $17.4 | $12.6 | $30.0 | $17.4 | $12.6 | $30.0 | $17.2 | $12.6 | $29.8 |
| Feb-13 | 21.2 | 12.2 | 33.5 | 20.3 | 12.2 | 32.5 | 18.0 | 12.2 | 30.2 |
| Mar-13 | 48.3 | 12.2 | 60.6 | 44.0 | 12.2 | 56.2 | 33.6 | 12.2 | 45.9 |
| Apr-13 | 37.3 | 12.4 | 49.7 | 35.0 | 12.4 | 47.4 | 29.6 | 12.4 | 42.0 |
| May-13 | 30.3 | 12.3 | 42.6 | 28.4 | 12.3 | 40.6 | 23.7 | 12.3 | 35.9 |
| Jun-13 | 18.2 | 12.4 | 30.6 | 17.8 | 11.9 | 29.8 | 17.0 | 11.2 | 28.2 |
| Jul-13 | 16.9 | 12.3 | 29.2 | 16.5 | 11.9 | 28.3 | 15.4 | 11.2 | 26.6 |
| Aug-13 | 17.4 | 12.2 | 29.6 | 16.8 | 11.7 | 28.6 | 15.5 | 11.0 | 26.5 |
| Sep-13 | 18.4 | 12.3 | 30.7 | 17.7 | 11.9 | 29.5 | 15.9 | 11.2 | 27.1 |
| Oct-13 | 17.4 | 12.4 | 29.8 | 16.9 | 11.9 | 28.8 | 15.5 | 11.2 | 26.7 |
| Nov-13 | 16.0 | 12.3 | 28.3 | 15.8 | 11.9 | 27.6 | 15.3 | 11.2 | 26.4 |
| Dec-13 | 17.6 | 12.4 | 30.0 | 17.1 | 12.0 | 29.1 | 16.0 | 11.3 | 27.3 |
| Jan-14 | 17.4 | 12.8 | 30.2 | 16.9 | 12.3 | 29.2 | 15.6 | 11.6 | 27.2 |
| Feb-14 | 18.0 | 12.5 | 30.5 | 17.6 | 12.0 | 29.6 | 16.7 | 11.2 | 27.9 |
| Mar-14 | 36.9 | 12.5 | 49.4 | 32.7 | 12.0 | 44.7 | 22.8 | 11.2 | 33.9 |
| Apr-14 | 31.4 | 12.7 | 44.1 | 30.2 | 12.2 | 42.4 | 27.4 | 11.4 | 38.8 |
| May-14 | 28.5 | 12.5 | 41.0 | 28.9 | 12.0 | 40.9 | 29.7 | 11.2 | 40.9 |
| Jun-14 | 18.5 | 12.6 | 31.1 | 18.0 | 12.1 | 30.1 | 16.7 | 11.3 | 28.1 |
| Jul-14 | 17.0 | 12.6 | 29.6 | 16.6 | 12.1 | 28.6 | 15.6 | 11.3 | 26.8 |
| Aug-14 | 17.5 | 12.4 | 29.9 | 17.3 | 12.1 | 29.2 | 16.8 | 11.2 | 28.0 |
| Sep-14 | 34.5 | 12.6 | 47.0 | 31.1 | 12.1 | 43.1 | 22.9 | 11.3 | 34.2 |
| Oct-14 | 46.8 | 12.6 | 59.3 | 40.2 | 12.1 | 52.3 | 24.6 | 11.3 | 35.9 |
| Nov-14 | 39.6 | 12.6 | 52.2 | 34.9 | 12.1 | 46.9 | 23.4 | 11.3 | 34.7 |
| Dec-14 | 30.6 | 12.7 | 43.2 | 28.4 | 12.2 | 40.6 | 23.3 | 11.4 | 34.6 |
| | | | | | | | | | |
| Total 2013 | $276.4 | $148.1 | $424.5 | $263.5 | $144.9 | $408.5 | $232.7 | $140.0 | $372.7 |
| Total 2014 | 336.6 | 150.9 | 487.5 | 312.7 | 145.0 | 457.7 | 255.4 | 135.6 | 391.0 |
| Total 2013 - 2014 | $613.0 | $299.0 | $912.0 | $576.3 | $289.9 | $866.2 | $488.1 | $275.6 | $763.7 |

# EXHIBIT D

## SAMPLE PLAN CALCULATION

## Sample Plan Calculation

- The following sets forth a sample calculation of a Participant's hypothetical LTIP Award under the Plan. The following sample calculation is for illustrative purposes only and shall not be final or binding on any party, the Committee, or the Company. Note that each Participant's share of the total Bonus Pool will be determined by the Committee in its discretion consistent with the Plan and set forth in each Participant's Award Statement.

- Assume that a Participant's Award Statement provides for an LTIP Award equal to 5% of the Bonus Pool, the Company achieves the target level of performance under the (a) Reliability Performance Goal and (b) EME G&A and Controllable O&M Goal, that (x) EME Adjusted Enterprise Value is $1.75 billion and (y) MWG Adjusted Enterprise Value is $200 million.

- At target level of performance, the Reliability Performance Goal Bonus Pool would be $6 million and the EME G&A and MWG Controllable O&M Goal Bonus Pool would be $6 million. Of this $12 million Bonus Pool, the Participant would receive 5%, or $600,000, to be paid in sixty days of the end of the Measurement Period.

- If EME Adjusted Enterprise Value is $1.75 billion, the Bonus Pool would be increased by 1.125% of $150 million (the difference between $1.75 billion and the $1.6 billion threshold set forth in **Exhibit A**), or $1.6875 million. If MWG Adjusted Enterprise Value is $200 million, the Bonus Pool would be further increased by 1.25% of $100 million (the difference between $200 million and the $100 million threshold set forth in **Exhibit A**), or $1.25 million.

  - Of this $2.9375 million Bonus Pool, the Participant would receive 5%, or $146,875 (subject to withholding).

    - The EME Adjusted Enterprise Value payout, 5% of $1.6875 million, or $84,375, would be payable on the 95th day following the Emergence Date.

    - The MWG Adjusted Enterprise Value payout, 5% of $1.25 million, or $62,500, would be payable within sixty days of the end of the Measurement Period.

  - Any EME Enterprise Value Goal payout will be paid at the Participant's election in either cash or any non-cash consideration distributed to creditors.

  - Any EME Adjusted Enterprise Value payout is subject to adjustment for non-cash consideration received by creditors as set forth in **Exhibit A**.

- Thus, under this sample calculation, the total Incentive Pool would be $14.9375 million. The Participant would receive 5% of this total Incentive Pool, or approximately $746,875.