## UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Edison Mission Energy, et al.[1] | ) | Case No. 12-49219 |
| | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | Hon. Jacqueline P. Cox |
| | ) | |

**Memorandum Opinion on Debtors' Motion to Assume Partnership Agreements
(dkt. no. 1017)**

This matter is before the Court on the Motion of Western Sierra Energy Company ("Western Sierra) and Southern Sierra Energy Company ("Southern Sierra" and together with Western Sierra the "Gas Partnership Debtors") to assume the Sycamore Cogeneration Company General Partnership Agreement (the "Sycamore Partnership Agreement") and the Kern River Cogeneration Company General Partnership Agreement (the "Kern River Partnership Agreement" and together with the Sycamore Partnership Agreement, the "Gas Partnership Agreements"). For the reasons that follow, the Motion is Granted.

## I.    Jurisdiction and Venue

This Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. §§ 157 and 1334. Motions concerning the assumption or rejection of executory contracts are core matters pursuant to 28 U.S.C. § 157(b)(2)(O), as it is a proceeding affecting the adjustment of a debtor-creditor relationship.

Under 28 U.S.C. § 1334(a), the federal district courts have original and exclusive jurisdiction of all cases under the Bankruptcy Code. 28 U.S.C § 157(a) allows the district courts

---

[1] The debtors in these chapter 11 cases include: Edison Mission Energy; Camino Energy Company; Chestnut Ridge Energy Company; Edison Mission Energy Fuel Services, LLC; Edison Mission Finance Co.; Edison Mission Fuel Resources, Inc.; Edison Mission Fuel Transportation, Inc.; Edison Mission Holdings Co.; Edison Mission Midwest Holdings Co.; EME Homer City Generation L.P.; Homer City Property Holdings, Inc.;  Midwest Finance Corp.; Midwest Generation EME, LLC; Midwest Generation, LLC; Midwest Generation Procurement Services, LLC; Midwest Peaker Holdings, Inc.; Mission Energy Westside, Inc.; San Joaquin Energy Company; Southern Sierra Energy Company; and Western Sierra Energy Company (the "Debtors").

to refer these cases to the bankruptcy judges for their districts. The District Court for the
Northern District of Illinois has promulgated Internal Operating Procedure 15(a), which refers its
bankruptcy cases to this Court.

Under 28 U.S.C. § 157(b)(1), a bankruptcy judge to whom a case has been referred may
enter final judgment on core proceedings arising under the Bankruptcy Code. The question to be
determined herein - whether debtors may assume certain partnership agreements - affects the
adjustment of a debtor-creditor relationship and concerns the administration of the bankruptcy
estate. *In re UAL Corp.*, 293 B.R. 183, 184 (Bankr. N.D. Ill. 2003); *See also Moody v. Amoco Oil
Co.*, 734 F.2d 1200, 1208 (7th Cir. 1984). For those reason, it is a core proceeding under 28
U.S.C. § 157(b)(2)(O) and § 157(b)(2)(A).

Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.    Facts and Background

Edison Mission Energy ("EME"), together with its Debtor and non-Debtor affiliates, is a
leading independent power producing enterprise specializing in developing, operating, and
selling energy and capacity from approximately 40 generating facilities in 12 states and the
Republic of Turkey. The Debtors have approximately 925 employees and maintain headquarters
in Chicago, Illinois and Santa Ana, California. (*See* Motion for Joint Administration of Lead
Case, dkt. no. 717, p. 4.)

The Debtors are indirect subsidiaries and affiliates of non-Debtor Edison International
Inc. ("EIX"). (*See* Declaration of Maria Rigatti, Senior Vice President and Chief Financial
Officer of Edison Mission Energy ("Rigatti Declaration"). (dkt. no. 6, p. 2, ¶ 6.) EME and its
subsidiaries own and operate certain unregulated coal, wind, and gas power generating assets.
(*Id.* at ¶ 6.) EME's coal plants are its most significant assets and historically have driven its
domestic profits and losses for over ten years. (*Id.* )

-2-

**Debtors' Capital Structures**

The significant indebtedness of Debtors EME, Midwest Generation and Midwest Generation EME, LLC includes: $3.7 billion of senior unsecured notes; approximately $345 million in certificate obligations related to Powerton-Joliet leveraged lease transactions; $1.367 billion of intercompany notes issued by EME to Midwest Generation; and letter-of-credit facilities for EME and Midwest Generation EME, LLC. (*See* Rigatti Declaration, dkt. no. 6, ¶ 110.)

**Gas Portfolio - Gas Partnership Debtors**

Four of the Debtors are joint venture partners in the Kern River, Midwest-Sunset, Sycamore, and Watson natural gas power projects located in California (the "Big Four"). The Big Four operate cogeneration facilities that generate electricity and capture by-product heat and steam to use for other purposes or processes. By-product heat from the plants is used at nearby oil refinery facilities which are operated by non-Debtor joint venture counterparties. (Rigatti Declaration, dkt. no. 6, ¶ 101.)

Debtor Southern Sierra Energy Company and its nondebtor partner Chevron Kern River Co. share a 50/50 partnership interest in the Kern River Project, located in Bakersfield, California. Debtor Western Sierra Energy Company and its nondebtor partner Chevron Sycamore Cogeneration Co. share a 50/50 partnership interest in the Sycamore Project, also located in Bakersfield, California. (*Id.* ¶ 101.) (*See* Chart, attached as an appendix to this Court's opinion). The Debtors who hold interests in these projects are holding companies with no operations or funded debt obligations. (*Id.* ¶ 101-102.)

The Kern River Cogeneration Co. and Sycamore Cogeneration Co. partnerships (the "Cogeneration Partnerships") began nearly 30 years ago and are two of six steam/electricity cogeneration ventures that debtor and nondebtor affiliates of EME have with affiliates of Chevron Global Power Company, a division of Chevron U.S.A. (*See* Chevron's Objection, dkt. no. 1081, p. 1, ¶ 1.) The Cogeneration Partnerships are profitable and have returned over $1

-3-

billion to the partners over the last 25 years. (*See* Motion, dkt. no. 1017, p. 4, ¶ 9.) The
relationship between the Gas Partnership Debtors and their nondebtor partners is governed by
certain Gas Partnership Agreements entered into on July 25, 1983 (Kern River Partnership
Agreement) and August 28, 1985. (Sycamore Partnership Agreement). (*See* dkt. no. 1017,
Exhibits B and C, Gas Partnership Agreements, p. 1.)

On December 17, 2012, the Debtors filed voluntary petitions for relief under chapter 11
of the Bankruptcy Code[2].  On December 18, 2012, the Court entered an order approving the
procedural consolidation and joint administration of these cases, pursuant to Federal Rule of
Bankruptcy Procedure 1015(b).  (dkt. no. 115.)  The Debtors continue to operate their businesses
as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code[3].

On December 26, 2012, Chevron Kern River Company and Chevron Sycamore
Cogeneration Company ("Chevron") initiated an adversary proceeding against the Gas
Partnership Debtors (the "Complaint") (*See* Adv. Pro. No. 12-01954), seeking a declaration of
their rights and remedies under applicable California partnership law and the Gas Partnership
Agreements.  They contemporaneously filed a motion in the adversary proceeding (*See* Adv. Pro.
No. 12-01954, dkt. no. 6) for relief from the automatic stay ("Lift Stay Motion") and for a
preliminary injunction.  The crux of Chevron's pleadings was that EME's bankruptcy filing
placed the Gas Partnership Debtors in default of the Gas Partnership Agreements.  Accordingly,
Chevron sought a declaration that the automatic stay should be lifted so that it could send a

---

[2]On May 2, 2013, Debtors EME Homer City Generation L.P, Edison Mission Finance
Company and Homer City Property Holdings, Inc. filed voluntary petitions for relief under
Chapter 11 of the Bankruptcy Code. (*See* Bankruptcy Case Nos. 13-18703; 13-18704; and 13-
18705.) On May 15, 2013, the Court entered an order authorizing their joint administration
under lead Case No. 12-49219. (dkt. no. 771.)

[3]Section 1107 of the Bankruptcy Code vests in debtor in possession the duties and powers
of a trustee, with certain limitations not relevant here. 11 U.S.C. § 1107(a).  Section 1108 of the
Bankruptcy Code authorizes a debtor in possession to operate the debtor's business. 11 U.S.C. §
1108.

default notice to the Gas Partnership Debtors, expel them from the Cogeneration Partnerships, and purchase their interests. On January 18, 2013, the Court denied the Lift Stay Motion, finding that Chevron had failed to sustain its burden to establish the elements of a preliminary injunction and to establish "cause" sufficient to lift the stay under section 362 of the Bankruptcy Code. An appeal of this Court's Order is currently pending in the District Court for the Northern District of Illinois. (*See* Adv. No. 12-01954, dkt. no. 40.)

### Jurisdiction of the Bankruptcy Court to hear this Motion

In *In re Teknek, LLC*, 563 F.3d 639 (7th Cir. 2009), the Seventh Circuit held that the bankruptcy court lacked jurisdiction to compromise the chapter 7 trustee's alter ego claims during the pendency of the trustee's related appeal from an order vacating a preliminary injunction. In so ruling, the court noted that "while the trustee's settlement does not directly and specifically address the issues immediately before us, it purports to deal with matters that are integral to this appeal." *Teknek*, 563 F.3d at 650.

In denying Chevron's Motion to Lift Stay and for preliminary injunction in this matter, the Court found that based on the record at that time:

(1) The Plaintiffs were not likely to succeed on the merits of their declaratory judgment and the Court was not convinced that the hypothetical test was valid; (*See* Adversary No. 12-01954, Hearing Transcript, January 16, 2013, dkt. no. 77, p. 191.)

(2) The Plaintiffs would not suffer irreparable harm if the injunction was not granted because the Court found that there had been no change and that Chevron was not being forced to accept new partners as the Debtors did not anticipate assigning the Gas Partnership Agreements; (*Id.* at 192.)

(3) That granting the requested injunction would not serve the public interest because the public has an interest in seeing businesses reorganize successfully; (*Id.* at 192.)

(4) The Court was not convinced that there is no adequate remedy at law: Chevron has the right to seek a declaratory judgment which they are pursuing in the adversary proceeding, not specifically in the motion; (*Id.* at 192.)

(5) The Plaintiffs do not have the right to adequate protection as there is no allegation that

the Debtors are using, leasing or selling property that Chevron has an interest in. (*Id.* at 192-193.)

The adversary proceeding Plaintiffs request a declaratory judgment in their Complaint. The Lift Stay Motion (Adv. No. 12-01954, dkt. no. 6) the Court denied on January 18, 2013 requested modification of the automatic stay and injunctive relief permitting the plaintiffs to exercise their rights under the partnership agreements. (Adv. Pro. 12-01954, dkt. no. 6, ¶ 6.)

A full trial on the adversary proceeding is necessary to resolve whether California partnership law controls section 365 of the Bankruptcy Code.

The requirements for injunctive and declaratory relief that were before the Court at the January 16, 2013 hearing are not at issue in the Motion herein and can be distinguished. Here, the Court is merely determining whether the Gas Partnership Debtors may assume certain Gas Partnership Agreements pursuant to section 365, which is a core proceeding, squarely within the Court's jurisdiction. *See* 28 U.S.C. § 157(b)(2)(O). The District Court's jurisdiction over the appeal is not being usurped, as the record before the Court indicates that the granting of the Motion to Assume in no way "alter[s] the status quo or results in any legal prejudice" to Chevron's claims in Adversary No. 12-01954. *See Teknek*, at 651. The Gas Partnership Agreements are not being assigned herein.

Further, the Gas Partnership Debtors' assumption of the Gas Partnership Agreements is not prejudicial to Chevron as the parties will continue to operate as before upon the entry of this Court's order. Should the District Court rule in favor of Chevron on the pending appeal and hold that the hypothetical test is appropriate or that the bankruptcy filing of EME constitutes a default under the Gas Partnership Agreements it would be binding on this Court in this case, as the law of the case. Therefore, this Court does not feel the disposition of the Motion to Assume deals with matters that are integral to the pending appeal.

If the District Court rules against Chevron, it would likely be on the separate, discreet issue of whether this bankruptcy case can be stopped and essentially dismissed within one month

-6-

of its filing.

**Motion to Assume**

On July 17, 2013, the Gas Partnership Debtors filed the instant Motion to Assume Partnership Agreements related to the Gas Cogeneration Facilities (the "Motion). (Bankruptcy Case No. 12-49219 dkt. no. 1017.) On August 14, 2013, Chevron, the nondebtor parties to the Cogeneration Partnerships, filed an objection to the Motion, arguing that: (1) Section 365(c)(1) of the Bankruptcy Code precludes assumption because the Gas Partnership Debtors intend a "de facto" assignment of the Gas Partnership Agreements; and (2) that Section 365(b) of the Bankruptcy Code prohibits assumption because the bankruptcy filings of the Gas Partnership Debtors and EME are defaults under the Gas Partnership Agreements. (Objection, dkt. no. 1081).

**III.    Discussion**

The Court begins its discussion with 11 U.S.C. § 365(a), the provision governing executory contracts and unexpired leases.  Section 365(a) provides that subject to court approval, a trustee may "assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C.§ 365(a).  This provision "[a]llows a trustee or debtor in possession to accept the benefits of an advantageous contract by assuming it or to be relieved of the obligations of a burdensome contract by rejecting it." *In re Fitch*, 174 B.R. 96, 100 (Bankr. S.D. Ill. 1994). *See also In The Matter of Midway Airlines*, 6 F.3d 492, 494 (7th Cir. 1993) ("Section 365 thus advances one of the Code's central purposes, the maximization of the bankruptcy estate for the benefit of creditors.").

To assume an executory contract under section 365(a), the Bankruptcy Code requires that (1) the contract be executory; (2) all non-*ipso facto*[4] defaults are cured; and (3) the assumption is not prohibited by section 365(c).  11 U.S.C. § 365(a) - (c).

---

[4]An "*ipso facto* clause" is one that permits a contracting party to terminate or even modify an executory contract in the event of a bankruptcy filing by the other party. *See Lyons Sav. & Loan Ass'n v. Westside Bancorporation, Inc.*, 828 F.2d 387, 393 n.6 (7th Cir. 1987).

### A.    The Gas Partnership Agreements are Executory Contracts

Although not defined in the Bankruptcy Code, the Seventh Circuit has held that an executory contract is one under which "significant unperformed obligations remain on both sides." *In re Streets & Beard Farm P'ship*, 882 F.2d 233, 235 (7th Cir. 1989). Here, the parties do not dispute that the Gas Partnership Agreements, which contain unperformed and continuing obligations for both parties, constitute executory contracts. *(See* Objection, dkt. no. 1081, p. 3, n. 4.) ("The Debtors also argue that the Partnership Agreements are executory contracts . . . which Chevron does not dispute.") For purposes of this Motion, the Court finds that the Gas Partnership Agreements are executory agreements within the meaning of section 365(a)(1).

A debtor's decision to assume or reject an executory contract is governed by the business judgment rule. *Johnson v. Fairco Corp.*, 61 B.R. 317, 320 (N.D. Ill. 1986). The business judgment rule is "premised upon the debtor's business judgment that assumption would be beneficial to its estate." *In re Footstar, Inc.*, 323 B.R. 566, 568-69 (Bankr. S.D. N.Y. 2005). *See also In re Abbot Labs. Derivative S'holders Litig.*, 325 F.3d 795, 807 (7th Cir. 2003) (internal citation omitted) ("The business judgment rule is a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." )

The evidence of record herein establishes that the agreements are valuable and would bring millions of dollars to the Gas Partnership Debtors' estates. (*See* Hearing Tr., August 21, 2013 ("Tr.") 99-100; 103-107.) Both Chevron and the Gas Partnership Debtors agree that the Gas Partnership Agreements are valuable assets. Indeed, the most recent net income current outlook, or "NICO" statement, for the Cogeneration Partnerships reveals that the combined partners' equity for Kern River Cogeneration Company and Sycamore Cogeneration Company is nearly $158 million dollars. (*See* Debtors Exhibit G, Sycamore Cogeneration Company & Kern River Cogeneration, July 2013 NICO Statement; Tr. 106-107.) The evidence also reveals that

the Cogeneration Partnerships continue to produce steam and electricity at a profit and that the Cogeneration Partnerships recently executed long term power purchase agreements through the year 2020 which are capable of producing substantial revenues. (Tr. 99-100.) Accordingly, the Court finds that the assumption of the Gas Partnership Agreements is a reasonable business decision.

Now the Court will address the remaining issues of whether the Gas Partnership Debtors have cured all non-*ipso facto* defaults and whether assumption of the Gas Partnership Agreements is prohibited by section 365(c) of the Bankruptcy Code.

### B.   There are No Non-*Ipso Facto* Defaults

As a condition to assuming an executory contract, the Bankruptcy Code also requires the debtor to cure any default or provide adequate assurance that the debtor will promptly cure any default under the contract. 11 U.S.C. § 365(b)(1)(A). Pursuant to the section 365(b)(2) *ipso facto* provision, however, the debtor is excused from the cure requirement where the default is based on the insolvency or financial condition of the debtor or the commencement of a bankruptcy proceeding. 11 U.S.C. §365(b)(2).

The Gas Partnership Debtors contend that because there are no non-*ipso facto* defaults under the Gas Partnership Agreements, they are not required to cure any defaults. Chevron argues, however, that the Chapter 11 Bankruptcy filing by EME constitutes a default under the Gas Partnership Agreements. In support, Chevron cites to Article VIII, Section 8.1 of the Gas Partnership Agreements, which governs defaults and remedies.

The Chevron parties rely on California partnership law in arguing that the bankruptcy filing is an act of default, allowing them to declare the Gas Partnership Debtors to be in default, allowing the Chevron parties to pursue remedies including the right to purchase the Gas Partnership Debtors' partnership interests. Chevron's position in this regard suggests that state law can vitiate the Bankruptcy Code. No authority has been cited that supports this position.

Section 8.1 of the Kern River Partnership Agreement provides:

**8.1 Default of a Partner.  If any of the following events occur:**

(2) the institution by a Partner or its Parent of proceedings to be adjudicated as bankrupt or insolvent, or the consent by it to the institution of bankruptcy or insolvency proceedings against it, or the filing of a petition or answer or consent seeking reorganization or relief under the Federal Bankruptcy Act or any other applicable Federal or State law . . . .

Section 8.1 of the Sycamore Partnership Agreement provides:

(2) the institution by a Partner or its Parent of proceedings to be adjudicated as bankruptcy or insolvent, or the consent by it to the institution of bankruptcy or insolvency proceedings against it, or the filing of a petition or answer or consent seeking reorganization or relief under bankruptcy, insolvency, or other similar law, or state or Federal . . . .

*See* Kern River and Sycamore Gas Partnership Agreements, Article VIII, dkt. no. 1017, Exhibits B and C.


In its objection, Chevron urges that the Court recognize EME as the "Parent" for purposes of determining whether EME's bankruptcy filing put the Gas Partnership Debtors in default under the Gas Partnership Agreements.  The Gas Partnership Debtors contend that because "EME" is not the "Parent" as the term is defined in the Partnership Agreements, its bankruptcy filing did not trigger a default.  The Court agrees.

The first paragraph of the Kern River Partnership Agreement provides as follows:

This Agreement is made and entered into as of the 25th day of July, 1983, by and between Getty Energy Company, a California corporation ("GEC"), a wholly owned subsidiary of Getty Oil Company, a Delaware Corporation ("Getty"),and Southern Sierra Energy Company, a California corporation ("SSEC"), a wholly owned subsidiary of Southern California Edison Company, a California Corporation ("Edison"). GEC and SSEC are each hereinafter sometimes refereed to individually as a "Partner" and collectively as "Partners." Getty and Edison are each hereinafter sometimes referred to individually as a "Parent."

*See* dkt. no. 1017, Exhibit C.

The first paragraph of the Sycamore Partnership Agreement provides as follows:

> This Agreement is made and entered into as of the 28th day of August, 1985, by and
> between Texaco Cogeneration Company, a Delaware corporation ("TCC"), a wholly
> owned subsidiary of Texaco Producing Inc., a Delaware corporation ("Texaco"), and
> Western Sierra Energy Company, a California corporation ("WSEC") a wholly owned
> subsidiary of Southern California Edison Company, a California corporation ("Edison").
> TCC and WSEC are each hereinafter sometimes referred to individually as a "Partner"
> and collectively as "Partners." Texico and Edison are each hereinafter sometimes referred
> to individually as a "Parent."

*See* dkt. no. 1017, Exhibit B.

Each Gas Partnership Agreement expressly defines Southern California Edison Company
as a "Parent". Despite this unequivocal language, Chevron complains that because the Gas
Partnership Agreements have not been updated in more than 25 years (Objection, dkt. no. 1081,
p. 23, ¶ 49), the Court should disregard the express terms of the agreements and instead
recognize the "relational significance" and ordinary usage of the word parent and find that
Edison Mission Energy is a parent under the provision that says a "Parent's" bankruptcy filing is
an act of default. (*See* Objection, p. 24, ¶ 50.) In support, Chevron cites to *Crawford v. Weather
Shield Mfg., Inc.*, 187 P.3d 424, 430 (Cal. 2008). However, *Crawford's* discussion of contract
interpretation is more helpful to the Gas Partnership Debtors' argument than to Chevron. In
*Crawford*, the court observed:

> In general, such an agreement is construed under the same rules as govern the
> interpretation of other contracts. Effect is to be given to the parties' mutual intent (§
> 1636), as ascertained from the contract's language if it is clear and explicit (§ 1638).
> *Unless the parties have indicated a special meaning*, the contract's words are to be
> understood in their ordinary and popular sense.

*Crawford*, 187 P.3d at 430. (Emphasis added).

Here, each Gas Partnership Agreement clearly indicates a specific meaning by defining
"Parent" as Southern California Edison Company. In the absence of any ambiguity, the Court
declines to rewrite or read into the Gas Partnership Agreements a term which was not expressly
contracted to by the parties. *See Founding Members of the Newport Beach Country Club v.*

-11-

*Newport Beach Country Club, Inc.,* 109 Cal. App. 4th 944, 956 (2003) ("California recognizes
the objective theory of contracts . . . under which '[i]t is the objective intent, as evidenced by the
words of the contract, rather than the subjective intent of one of the parties, that controls
interpretation.'")  The Court recognizes that the governing documents have not been updated in
nearly 25 years.  However, the agreement was drafted by two sophisticated parties presumably
represented by counsel, who are capable of modifying an agreement to reflect subsequent
changes to the parties' corporate structure.  It is irrelevant for the purposes of this analysis that
the document is "out of date."  The Gas Partnership Agreements govern the parties' contractual
relationships.  Chevron does not dispute this.

Chevron's argument that the parties' "course of conduct over . . . time" should govern
the identity of the "Parent" is unconvincing as any post-contract changes to the Gas Partnership
Agreement requires mutual assent by Chevron and the Gas Partnership Debtors.  *See, e.g., AMC
Tech., LLC v. Cisco Sys., Inc.* No. 11 cv 3403, 2013 WL 3559807, at * 8 (N.D. Cal. July 11,
2013) ("As with any contract, a modification requires mutual assent between the parties. . . .").
In addition, the Gas Partnership Agreements' integration clauses expressly provide that "No
alteration, modification, or interpretation hereof shall be binding unless in writing and signed by
the Partners." (*See* dkt. no. 1017, Debtors Exhibit C, Section 12.1, p. 31.)  Several amendments
have been made to the Kern River Partnership Agreement since it was initially executed
indicating that the parties know how to modify the Gas Partnership Agreements when they deem
it necessary. (*See* dkt. no. 1017, Debtors Exhibit C, Kern River Partnership Agreement, pp. 35-
46, Amendments of General Partnership Agreement, January 16, 1984; Second Amendment of
General Partnership Agreement, June 7, 1984; Third Amendment of General Partnership
Agreement, February 20, 1986.)  Chevron has not produced any writing signed by Chevron and
the Gas Partnership Debtors reflecting a change in the definition of "Parent" under the Gas
Partnership Agreements.  Accordingly, the Court declines to accept the different meaning of
"Parent" advanced by Chevron.

It is worth noting, however, that even if the Court were to look beyond the express terms

of the Gas Partnership Agreements to determine the meaning of "Parent" as Chevron urges, a study of the corporate structure of the Gas Partnership Debtors reveals that the immediate parent of Debtor Southern Sierra Energy Company is Mission Kern River Holdings, Inc. ("Mission Kern") and that the immediate parent of Debtor Western Sierra Energy Company is Mission Sycamore Holdings, Inc. ("Mission Sycamore"). Neither Mission Kern nor Mission Sycamore have filed for Chapter 11 protection in connection with the Debtors' pending bankruptcy proceedings, therefore, the Mission Kern and Mission Sycamore entities are not in default of § 8.1(2) of the Gas Partnership Agreements, which provides that the bankruptcy filing by a Parent constitutes a default. (*See* Stipulation, dkt. no. 1106-2, ¶ 4.)

As to Chevron's suggestion that the formation of these entities was improper or done in violation of the Gas Partnership Agreements, the Court again looks to the express terms of the parties' governing documents. Article VII of each Gas Partnership Agreement expressly permits such corporate reorganizations. The Kern River Partnership Agreement provides, in relevant part: "[T]he forgoing shall not preclude assignment of income to be received from the Partnership or a transfer of Ownership Interest in the Partnership by a Partner to such Partner's Parent or to an entity 100% of whose equity is owned either directly or indirectly by that Partner's Parent (an "Affiliate") . . . .[5]" (*See* dkt. no. 1017, Debtors Exhibit C, Kern River Partnership Agreement, Article VII, p. 17.)

Accordingly, because the Chapter 11 bankruptcy filing of EME does not constitute a default by a Parent under the Gas Partnership Agreements, the Court finds that there are no defaults as to the Parents that prohibit assumption under Section 365(b)[6]. The Gas Partnership

---

[5]Article VII of the Sycamore Partnership Agreement similarly provides that "[T]he foregoing shall not preclude assignment of income to be received from the Partnership or a transfer of Ownership Interest in the Partnership by a Partner to a direct or indirect parent corporation of such Partner or to an entity 100% of whose equity is owned either directly or indirectly by such a parent corporation (an "Affiliate") . . . ." *See* Debtors Exhibit 10, Article VII, p. 17.

[6]Although this Court finds that the bankruptcy filing of EME does not constitute a default under the governing Gas Partnership Agreements, one bankruptcy court decision suggests that the *ipso facto* protection applies not only to the party to the agreement but, also to related debtor entities. *See Lehman Bros. Holdings Inc. v. BNY*

Debtors' bankruptcy filings are not defaults as bankruptcy law does not recognize defaults based on filings for protection under the Bankruptcy Code.

### C.    Application of Section 365(c)(1) of the Bankruptcy Code.

Finally, the Court must determine whether assumption of the Gas Partnership Agreements is barred by the requirements of Section 365(c)(1).

Section 365(c)(1) of the Bankruptcy Code circumscribes a debtor's authority to assign an executory contract when "(1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and (B) such party does not consent to such assumption or assignment." The purpose of this exception is "[t]o prevent a trustee from forcing a party to accept performance from, or provide performance to, someone other than the party with whom it contracted in those situations where the identity of the party is central to the obligation itself." *In re Matter of Midway Airlines, Inc.* 6 F.3d 492, 495 (7th Cir. 1993). 11 U.S.C. § 365(c)(1).

There is no consensus among the courts regarding the correct interpretation of section 365(c)(1). The split in authority is due in part to conflicting language in sections 365(c) and 365(f). The ambiguity was succinctly noted by the Seventh Circuit in *Midway Airlines* where the court opined:" [t]he reference to "applicable law" in both subsections (c) and (f) is confusing. Subsection (f) seems to invalidate all laws that limit the free assignability of contracts while subsection (c) allows a non-party debtor to invoke certain of these laws in order to prevent a proposed assignment." 6 F.3d at 496 n.6. The majority of circuits that have decided this issue adopted the "hypothetical test," which looks to whether under applicable law, there is any entity

---

*Corp. Trustee Serv. Ltd.* (*In re Lehman Bros. Holdings, Inc.*), 422 B.R 407 (Bankr. S.D.N.Y. 2010). The court declined, however, to make any "broad pronouncements" and was clear to limit its holding to the unique circumstances of the Lehman Brothers bankruptcy case, which in the court's words involved the "perhaps the most complex and multi-faceted business ventures ever to seek the protection of chapter 11." *Lehman*, at 419-420.

other than the debtor in possession from whom the non-moving party could reject performance. If there is such a hypothetical entity, then assumption of the agreement is prohibited, notwithstanding a debtor's actual intention not to make an assignment. *See, e.g., Resort Computer Corp. v. Sunterra Corp (In re Sunterra Corp.)*, 361 F.3d 257 (4th Cir. 2004); *Perlman v. Catapult Entm't, Inc. (In re Catapult Entm't, Inc.)*, 165 F.3d 747 (9th Cir. 1999); *City of Jamestown, Tenn. v. James Cable Partners, L.P. (In re James Cable Partners, L.P.)*, 27 F.3d 534 (11th Cir. 1994). This approach prohibits assumption even where the debtor does not intend to assign the contract.

The second test is the so-called "actual approach," or "actual test," whereby the court must determine on a case by case basis, whether the nondebtor party's contract "will actually be assigned or that the nondebtor party will in fact by asked to accept performance from or render performance to a party–including the trustee–other than the party with whom it originally contracted." *Bonneville Power Admin. v. Mirant Corp. (In re Mirant Corp.)*, 440 F.3d 238, 248 (5th Cir. 2006); *Summit Inv. & Dev. Corp. v. Leroux*, 69 F.3d 608 (1st Cir. 1995). Under the actual test, assumption is prohibited only where the debtor expresses an actual intent to assign the contract to a party to whom the nondebtor could refuse performance.

In their Motion, the Gas Partnership Debtors maintain that they want to assume the Gas Partnership Agreements but that they have no intention of assigning their valuable interests in the Cogeneration Partnerships to anyone else. They urge the Court to adopt the actual test which they posit is consistent with both the text of the statute and the policies of the Bankruptcy Code. Chevron advances the hypothetical test and contends that the assumption of the Gas Partnership Agreements is prohibited by Section 365(c)(1) of the Code because under applicable non-bankruptcy law, California law to be more specific, Chevron would be excused from performing or accepting performance from any party other than the Gas Partnership Debtors. (dkt. no. 1081; Objection, pp. 13-14, ¶ 28.)

After a review of the relevant authority noted above, the Court is persuaded that the "actual test" or "actual approach" is most consistent with the intended purpose of the non

-15-

assumption rule and general bankruptcy principles, as well as the Bankruptcy Code.

In support, the Court finds the First Circuit's discussion of the legislative history of section 365(c)(1) in *Summit Inv. & Dev. Corp. v. Leroux* instructive. In *Summit*, the First Circuit rejected the hypothetical test approach in favor of the actual test, finding that section 365(c)(1) requires "an actual showing–prior to any termination of the debtor's postpetition contract rights–that the nondebtor party (Summit) would not be forced to accept performance under its executory contract from someone other than the debtor party with whom it originally contract." *Summit*, 69 F.3d at 612. In acknowledging legislative concern over contractual rights of the nondebtor party, the court explained that "[i]n replacing the highlighted language in section 365(c) with the phrase 'to an entity other than the debtor or the debtor in possession,' Congress intended to make clear that the prohibition against the trustee's power to assume an executory contract does not apply where it is the debtor that is in possession and the performance to be given or received under a personal service contract will be the same as if no petition had been filed because of the personal nature of the contract." *Summit*, 69 F. 3d at 613 (citing H.R.Rep. No. 1195, 96th Cong., 2d Sess. §27(b) (1980))[7]. Here, there is little risk that Chevron will not receive the "full benefit of its bargain" as it is the Gas Partnership Debtors, the original parties to the Gas Partnership Agreements, that seek to assume, rather than a third party trustee.

The Court also finds that the actual test is more congruous with fundamental bankruptcy policy: the maximization of the value of the debtor's estate. *See Bank of America, Illinois v. 203 North LaSalle Street P'ship*, 195 B.R. 692, 708 (N.D. Ill. 1996), *rev'd on other grounds*, 526 U.S.434 (noting that among the purposes of chapter 11 bankruptcy are the successful reorganization of the debtor and maximization of the value of the estate). As noted above in the Court's opinion, section 365(a) of the Code furthers that purpose by allowing a trustee or debtor

---

[7]*See also* 3 COLLIER ON BANKRUPTCY ¶ 365.07[1][d][ii] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). "The 1984 amendment [to section 365(c)(1)], which refers to an entity other than the debtor in possession, seems to envision that the debtor in possession could stand in the shoes of the debtor and render or receive performance, but that any other entity, including a bankruptcy trustee, could not do so . . . there seems to be little reason for the amendment unless there was an intention to permit a debtor in possession to assume otherwise nonassignable contracts."

in possession to accept the benefits of an advantageous contract. In this Court's view, analysis of section 365(c)(1) under the actual approach or actual test allows a debtor in possession to hold on to a valuable estate asset in situations, where as here, the debtor has expressed an intent not to assign the contract. By considering specific factual circumstances to determine whether the debtor intends to assign the executory contract, the actual approach or actual test properly balances both the rehabilitative goals of the debtor and the nondebtor party's rights under the executory contract. The hypothetical test, by contrast, would preclude the assumption of an advantageous contract to the detriment of the entire creditor body and the debtor's reorganizing efforts. This is so even when the debtor has no plans to assign the contract. Thus, this Court rejects the hypothetical test approach and will apply the actual test herein.

### Analysis of Section 365(c)(1) under the Actual Test

As discussed above, under the actual test, assumption is permitted only if the Court determines that, under the actual circumstances, Chevron would not be forced to accept performance under the Gas Partnership Agreements from a party other than the Gas Partnership Debtors. The Gas Partnership Debtors have maintained throughout these proceedings that they seek to assume but do not intend to assign the Gas Partnership Agreements, therefore obviating any risk that Chevron would have to deal with a substitute partner. (*See* Motion, dkt. no. 1017, p. 14 ¶ 33; Debtors' Reply, dkt. no. 1117, p. 27, ¶ 50.) Chevron posits that even under the actual test, assumption is prohibited by section 365(c)(1) because the Gas Partnership Debtors intend a "*de facto*" assignment through the sale of their direct or indirect interests in the Gas Partnership Agreements. (Objection, dkt. no. 1081, p.14, ¶ 30.)

The Gas Partnership Debtors acknowledge that in addition to developing a stand alone plan of reorganization, EME has retained financial experts to evaluate whether to sell assets which may include the Mission Kern and Mission Sycamore entities. (*See* Stipulation, dkt. no. 1106-2, ¶ 10; dkt. no. 1021, Order Granting Application to Employ J.P. Morgan Securities ("J.P. Morgan"), LLC; Tr. 69.) In particular, J.P. Morgan was engaged by EME to provide such services as

-17-

"becoming familiar with the financial condition and business of the [Debtors'] Assets and, to the extent necessary, any prospective Purchaser, and of advising and assisting the Debtors in *considering the desirability* of effecting a Transaction [which includes a plan of reorganization, in connection with a sale under section 363, or an acquisition of a material portion of the capital stock of the Debtors' Assets.]" (*See* Debtors' Application to Employ, dkt. no. 936, p. 8, ¶ 18(a); pp. 8-9, n.4). (Emphasis added.)  Chevron contends that a sale by EME of its interest in the Mission Kern and Mission Sycamore entities would amount to a *de facto* assignment of the Gas Partnership Agreements.  However, as noted by the Gas Partnership Debtors in their response, the fact that EME has considered the sale of certain of its assets along with the possibility of a stand alone plan does not translate to an intent to sell the Gas Partnership Debtors' interest in the Gas Partnership Agreements. This point is articulated in *Charal Inv. Co., Inc v. Rockefeller,* 131 F.Supp. 2d 593, 605 (D. Del. 2001) in the context of alleged securities fraud.  In *Charal*, a plaintiff brought claims against the defendants based on an alleged failure to disclose the investor groups' sale intentions.  In rejecting the plaintiff's claim, the court noted that defendant's statements suggesting that they considered a sale alternative did not establish that they formed an intent to sell. *Charal*, 131 F. Supp. 2d at 605.  Similarly here, the Court finds that EME's consideration of a sale of certain of its assets in connection with their restructuring efforts does not mean they intend to sell the Gas Partnership Debtors' interests in the CoGen Partnerships.

Chevron next asserts that a sale by EME of the Gas Partnership Debtors is a ploy designed to circumvent the language of § 7.1 of the Gas Partnership Agreements, which prohibits transfers of the ownership interest in the Partnership to third parties. (*See* Partnership Agreement, Exhibits 9-10, § 7.1.)  In support, Chevron cites to *Oregon v. Castle Rock Cellular of Oregon Ltd. P'ship.,* 840 F.Supp. 770 (D. Or. 1993).  In *Castle Rock*, the court held that the sale of a limited partner was intended to thwart the plaintiff's contractual expectation, and thus violated the covenant of good faith and fair dealing.  However, the *Castle Rock* decision was premised on Oregon law, which analysis Chevron does not contend is analogous to California law which governs the parties' contracts.  Further, the facts presented in *Castle Rock* are distinguishable from the case at bar:  no sale process by EME has occurred, nor has it been shown that one will occur or that EME

-18-

intends to sell the Gas Partnership Debtors.  In any event, in a Ninth Circuit Court of Appeals

opinion issued after the *Castle Rock* decision, the court recognized that "California courts have

already held that the transfer of stock is not the same thing as a transfer of assets of that

corporation." *U.S. Cellular Inv. Co. of L.A. Inc. v. GTE Mobilnet, Inc.*, 281 F.3d 929, 935 (9th

Cir. 2002).

This Court is sensitive to the Chevron parties' concern that they would be forced to accept

new partners,  however, the Court has seen no evidence suggesting the Gas Partnership Debtors'

interests are among the assets contemplated by any potential sale by EME, nor any evidence that

the assumption of the Gas Partnership Agreements would deprive the Chevron parties of their

bargained-for benefits under the contracts or disrupt the services performed under the Gas

Partnerships. (Tr. 107-111.)  *See Summit*, 69 F.3d 608, 613.  To the contrary, the evidence of

record shows that the same management personnel, Edison Mission Operation and Maintenance

Inc. ("EMOMI"), a nondebtor subsidiary of EME, will continue to handle the day-to-day physical

operations of the Gas Partnerships pursuant to operation agreements entered into between

EMOMI and the Cogeneration Partnerships. (*See* Kostrzewa Declaration, dkt. no. 1017, Exhibit F,

¶¶ 16-18; Tr. 109-111.)

Further, the *de facto* assignment theory advanced by Chevron has been rejected by at least

one bankruptcy court, in *In re Ohio Skill Games, Inc.*, No. 08-60560, 2010 WL 2710522, at * 7

(Bankr. N.D. Ohio July 8, 2010), although in the context of determining an alleged breach of non

assignment clause in the parties' business contract.  In *Ohio Skill*, the nondebtor partner objected

to debtor's assumption of a manufacturing agreement, arguing that the transfer of debtor's

ownership to her husband was a *de facto* attempt to assign her rights under the agreement, in

default of the parties' agreement.  Making a distinction between a change of ownership and an

assignment, the court overruled the objection, noting that "[t]he change of ownership of [d]ebtor

did not alter the partnership [a]greement, nor the identity of the parties to the Agreement" and thus

did not violate the anti assignment clause of the contract.  *Id.* at * 8.  Herein, the Court declines to

equate EME's exploration of sale options to an intent to sell its interest in the Gas Partnership

Debtors. Those efforts do not show that the Gas Partnership Debtors intend, at this time, to assign their Gas Partnership Agreements or interests in the Cogeneration Partnerships. Under these facts, the Court finds that Chevron is not at risk at this time of having to deal with a substitute partner by virtue of the Gas Partnership Debtors' assumption of the Gas Partnership Agreements.

The Court therefore concludes that the assumption of the Gas Partnership Agreements is not barred by section 365(c)(1).

## IV.    Conclusion

For the reasons noted herein, the Court finds that there are no non-*ipso facto* defaults and the assumption of the Gas Partnership Agreements are not barred by 11 U.S.C. § 365(c)(1). Accordingly, the Motion to Assume is Granted.

This constitutes the Court's findings of fact and conclusions of law. The Court will issue a separate order consistent with this opinion.

Dated: September 16, 2013                    ENTER:    *Jacqueline P. Cox*

                                             _____
                                             Jacqueline P. Cox
                                             U.S. Bankruptcy Judge

