**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EDISON MISSION ENERGY, et al.,[1] | ) | Case No. 12-49219 (JPC) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' REPLY TO THE LIMITED OBJECTION OF THE UNITED
STATES TRUSTEE TO DEBTORS' MOTION TO APPROVE (I) ENTRY INTO PLAN
SPONSOR AGREEMENT, (II) SPONSOR PROTECTIONS, AND (III) RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby submit this reply in support of the *Debtors' Motion to Approve (I) Entry into Plan Sponsor Agreement, (II) Sponsor Protections, and (III) Related Relief* [Docket No. 1375] (the "Motion")[2] and in response to the limited objection [Docket No. 1397] (the "Limited Objection") filed by the United States Trustee for the Northern District of Illinois (the "U.S. Trustee"), and respectfully state as follows:[3]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Edison Mission Energy (1807); Camino Energy Company (2601); Chestnut Ridge Energy Company (6590); Edison Mission Energy Fuel Services, LLC (4630); Edison Mission Finance Co. (9202); Edison Mission Fuel Resources, Inc. (3014); Edison Mission Fuel Transportation, Inc. (3012); Edison Mission Holdings Co. (6940); Edison Mission Midwest Holdings Co. (6553); EME Homer City Generation L.P. (6938); Homer City Property Holdings, Inc. (1685); Midwest Finance Corp. (9350); Midwest Generation EME, LLC (1760); Midwest Generation, LLC (8558); Midwest Generation Procurement Services, LLC (2634); Midwest Peaker Holdings, Inc. (5282); Mission Energy Westside, Inc. (0657); San Joaquin Energy Company (1346); Southern Sierra Energy Company (6754); and Western Sierra Energy Company (1447). The location of parent Debtor Edison Mission Energy's corporate headquarters and the Debtors' service address is: 3 MacArthur Place, Suite 100, Santa Ana, California 92707.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

[3] In further support of the Motion and this reply, the Debtors intend to submit the declarations of Frederic "Jake" Brace (the "Brace Declaration"), an independent director on the board of Edison Mission Energy ("EME") and a member of EME's compensation committee (the "Compensation Committee"), and Todd McGovern (the "McGovern Declaration" and, together with the Brace Declaration, the "Declarations"), EME's compensation consultant from Hewitt Associates LLC (d/b/a Aon Hewitt) ("Aon Hewitt").

K&E 28272494

**Introduction**

1.  Each of the Debtors' major economic stakeholders, including the Committee, the Supporting Noteholders, and the PoJo Parties (which include multiple owner lessors, a significant group of certificateholders, and various trustees), have entered into the Plan Sponsor Agreement pledging their support for a transaction with NRG that will bring a swift and successful conclusion to these chapter 11 cases. It is no surprise that the transaction with NRG has already locked in key stakeholder support: the transaction is value-maximizing and involves a process designed to ensure that the best recovery for stakeholders is achieved through these chapter 11 cases.

2.  The sole opposition to the relief sought in the Motion is the U.S. Trustee's Limited Objection. The U.S. Trustee raises two concerns: (1) the lack of a mechanism to object to the reasonableness of any claimed amounts asserted as part of the proposed Expense Reimbursement; and (2) approval of the Exit Plan, which the U.S. Trustee characterizes as a retention/severance plan designed to "end run" section 503(c) of the Bankruptcy Code. As demonstrated herein, the Debtors believe that the Expense Reimbursement objection should be resolved with changes to the proposed order approving the Plan Sponsor Agreement and that the Exit-Plan-related objection should be denied.

3.  In response to the U.S. Trustee's objection with respect to the Expense Reimbursement,[4] The Debtors and NRG have proposed that NRG will provide copies of all

---

[4] The $2.635 billion commitment from NRG, which is not subject to due diligence and will result in the satisfaction of substantial claims in these chapter 11 cases, is subject to superior alternatives. Indeed, EME has begun and will continue its ongoing sale process to determine if any superior alternatives are available. Because of these circumstances, and as explained in detail in the Motion, it is not surprising or unreasonable for NRG to demand certain protections, including the $65 million Break-Up Fee and the Expense Reimbursement.

2

written fee and expense statements delivered for reimbursement to each of the Debtors, the Committee, the Supporting Noteholders, and the U.S. Trustee, and will afford those parties five business days to review and lodge any objections.  Moreover, the Debtors and NRG have agreed to a proposed process to resolve any such objections that has been incorporated in a revised form of order approving the Motion (attached hereto as **Exhibit A**).  Although the U.S. Trustee has not yet responded to these proposed modifications, the Debtors respectfully submit that the changes appropriately address the U.S. Trustee's concern that there be a "mechanism to object to the reasonableness of any claimed amounts" for the Expense Reimbursement.

4. As it relates to the Exit Plan, while the U.S. Trustee is correct that the Purchase Agreement (and all related transactions) will only be approved in connection with submission and consideration of a chapter 11 plan of reorganization, which plan the Debtors intend to file on or before November 15, 2013, it is not correct to view each term of the integrated pieces of the overall series of transactions under the Plan Sponsor Agreement and Purchase Agreement in isolation.  On the contrary, from the Debtors' perspective, the various provisions in each of the agreements—including the Exit Plan—are inextricably intertwined and necessary to the entirety of the transaction.  Just as NRG insisted on certain deal protections (including the Break-Up Fee and Expense Reimbursement) in the face of the Debtors' ongoing marketing efforts, it was similarly important to the Debtors to immediately implement appropriate incentive plans to ensure that plan participants are properly motivated to deliver on a value-maximizing transaction that has the support of all major stakeholders.  Importantly, under the Plan Sponsor Agreement, each of the Debtors' major stakeholders has expressly agreed to the Exit Plan.  Indeed, the parties' agreement provides that an order approving the Exit Plan must be entered before

3

November 8th—a date consistent with the outside date for approval of the Motion.  See Plan Term Sheet at 14; Purchase Agreement § 7.1(b)(ii).

5. As was indicated in the Motion, the Exit Plan is "designed to comply with all applicable bankruptcy and non-bankruptcy laws, *including section 503(c) of the Bankruptcy Code*."  See Motion at 12, n.6 (emphasis added).  As evidenced by the underlying Exit Plan documentation (attached hereto as **Exhibit B**), as well as the Brace and McGovern Declarations, the Exit Plan undoubtedly is consistent with section 503(c) of the Bankruptcy Code and otherwise compliant with applicable laws.  It is simply not the case, as the Limited Objection suggests, that approval of the Exit Plan is "an attempt to end run the Section 503(c) Code protections against improper retention/severance payments." (Limited Obj. ¶ 5.)  Accordingly, the Debtors respectfully submit that the Limited Objection should be overruled.

## The Exit Plan

6. The Debtors have filed the Exit Plan as an exhibit to this reply to demonstrate, consistent with the Debtors' description in the Motion, that the Exit Plan complies with all applicable laws, including section 503(c) of the Bankruptcy Code.  In short, the Exit Plan provides incentives for two distinct groups of participants—(a) directors, officers, and other executive-level employees, including certain insiders (collectively, the "Pool A Participants") and (b) non-executive, non-insider employees (collectively, the "Pool B Participants")—to maximize value and consummate the transactions contemplated in the Plan Sponsor Agreement, the Purchase Agreement, and Plan Term Sheet.  The Exit Plan provides distinct metrics for each participant group, as set forth below.

7. *First*, for the Pool A Participants, the key terms of the Exit Plan provide the following:[5]

| | **Pool A Participants** |
|---|---|
| Participants | Limited to select directors, officers, or executive-level employees who, in the Compensation Committee's discretionary judgment, are integral to the consummation of the transactions contemplated by the NRG transaction (the "NRG Transaction"). |
| Maximum Cost | Not to exceed $6.4 million in the aggregate. |
| Performance Criteria | The Committee shall consider the following non-exhaustive list of goals (the "Bonus Pool A Goals") in its determination of awards for Pool A Participants:<br><br>a. Complete any and all actions necessary, proper and advisable to effectuate and consummate the Transaction on a timely basis.<br><br>b. Minimize transaction costs and professional fees through, among other things, timely resolution of issues.<br><br>c. Enhance employee engagement through balance of chapter 11 process.<br><br>d. Analyze, develop a strategy for, market and negotiate with potential purchasers during the "go shop" period in an effort to maximize estate value.<br><br>e. Respond to information requests from potential purchasers during the go shop period.<br><br>f. Collect and disseminate requested information to potential purchasers during the go shop period.<br><br>g. Timely conclude the go shop process leading to (i) a higher value offer or (ii) independent verification that the Transaction with NRG represents the highest value alternative.<br><br>h. Minimize liabilities associated with Excluded Liabilities and maximize value associated with the Excluded Assets to enhance the overall value of the Transaction for stakeholders, including, but not limited to, management of (i) claims, including claims for rejected executory contracts, (ii) issues related to the Company's subsidiaries, including Homer City Debtors, (iii) Tax Sharing Agreements, and (iv) Shared Services arrangements.<br><br>i. Analyze, develop a strategy for, market and negotiate the sale of the Non-Core Assets, any Excluded Assets and other Permitted Asset Disposals.<br><br>j. Effectively manage NRG access and transition planning balancing regulatory requirements and schedule and manage communications with, respond to requests from, and provide information to, the Purchaser Parties for purposes of transition planning<br><br>k. Evaluate and potentially implement opportunities to maximize the benefit of Company tax attributes.<br><br>l. Ensure the Company and its subsidiaries' comply with pre-closing period negative covenants |

---

[5] The following summaries are provided for illustrative purposes only and are qualified in its entirety by reference to the Exit Plan. In the event of any inconsistency between these summaries and the Exit Plan, the Exit Plan shall control. Capitalized terms used but not defined in these summaries shall have the meanings ascribed to them in the Exit Plan.

5

|   |   |
|---|---|
|   | to avoid value erosion, including, but not limited to, refraining from (i) changing the accounting, billing, cash management, and inventory practices used by the Company, (ii) increasing VaR limits, notional limits or other risks and (iii) waiving, releasing, assigning, settling or compromising any material claims of the Company or any of the Acquired Companies |
|   | m. Identify, analyze and effectuate the contribution and transfer of certain Excluded Assets from the various EME Subsidiaries to the Company. |
|   | n. Collect and deliver certificated Purchased Interests. |
|   | o. Analyze the necessity of and prepare drafts of appropriate conveyance documents including, but not limited to, bills of sale, certificates of title, and assignment and assumption agreements. |
|   | p. Collect, organize, analyze and prepare information for various governmental filings including, but not limited to HSR, FERC, Texas PUC, California PUC, and possible filings in foreign jurisdictions, including the Republic of Turkey. |
|   | q. Ensure that neither the Company nor any of its subsidiaries take or omit from taking any actions with respect to any Events of Loss or Takings during the executory period (if any). |
|   | r. Ensure that neither the Company nor any of its subsidiaries take or omit from taking any actions to cause a Leverage Event during the relevant period. |
|   | s. Identify, assemble and deliver to the purchasers a comprehensive list of all executory contracts, collective bargaining agreements, unexpired leases of real and personal property and other assumable and assignable contracts. |
|   | t. Analyze potential retained causes of action and interact with parties to analyze same. |
|   | u. Manage the Company's available Cash and provide Purchaser Parties with updates regarding the same. |
|   | v. Coordinate with the purchaser regarding seeking and obtaining third party consents. |
|   | w. Respond to questions and requests for information from various third parties in order to obtain third party consents. |
|   | x. Implement and coordinate with advisors regarding new Employee Benefit Plans to be effective as of January 1, 2014. |
|   | y. Identify and address satisfactory treatment of all Support Obligations. |
|   | z. Identify possible insurance claims of the Company and its subsidiaries and submit such claims, along with appropriate supporting materials, to insurers. |
|   | Depending on the Compensation Committee's assessment, there is no guarantee any particular Pool A Participants will receive an awarded under the Exit Plan. |
| Award Limits | Based on Compensation Committee's assessment of the degree of the each Pool A Participant's responsibility over the performance criteria, as well as how well the Pool A Participant executed against each measure. |
| Payment Timing | Upon consummation of the effective date (the "<u>Effective Date</u>") of the plan of reorganization contemplated in the Plan Term Sheet. |
| Payment Requirements | The Compensation Committee has discretion whether to provide payment, regardless of a Pool A Participant's employment status. |

6

K&E 28272494

8. *Second*, for the Pool B Participants, the key terms of the Exit Plan provide the following:

| | **Pool B Participants** |
|---|---|
| Participants | Limited to up to 20 non-executive, non-insider employees identified by the Compensation Committee. |
| Maximum Cost | Not to exceed $1.1 million in the aggregate. |
| Eligibility | Employees whose skills are critical to maintaining the value of business operations to be transferred to NRG and are in high demand from other employers, and whose loss has a high risk of serious impact on the Company's ability to timely consummate the NRG Transaction in a way that maximizes value and minimizes losses to the estate.  For the avoidance of doubt, no Pool B Participant shall be:  (a) an "insider," as such term is defined in section 101(31) of the Bankruptcy Code; (b) compensated in an executive payband (paybands E, F, G); (c) a member of the board of directors of EME; (d) employed in a position that is provided for, or created by, the governing corporate documents of the Company; (e) a member of any subsidiary board of directors of any of the debtor entities in the Bankruptcy Proceedings; or (f) employed in a position that holds the title of officer with respect to any of the debtor entities in the Bankruptcy Proceedings.  Also, importantly, none of these employees are participants in the Debtors' long-term incentive plan or the executive severance plan. |
| Award Limits | Based on degree of criticality and denominated as a percent of annual salary. |
| Payment Timing | Upon the Effective Date. |
| Payment Requirements | Payment is forfeited if Pool B Participant voluntarily terminates employment prior to the Effective Date. |

## Argument

**I.   The Exit Plan Is a Necessary and Appropriate Component of the Plan Sponsor Agreement, Satisfies All Applicable Requirements of the Bankruptcy Code, and Should Be Approved.**

9. The Exit Plan provided for in the Plan Term Sheet and agreed to under the Plan Sponsor Agreement has one overriding purpose:  to incentive participants toward emergence from chapter 11 as expeditiously as possible and thereby maximize value and minimize costs for all stakeholders through consummation of the transactions contemplated by the NRG Transaction (or a higher and better alternative that materializes).  It is therefore no surprise that each of the Debtors' creditor constituencies supports the Exit Plan.  Given that support, the

7

purpose of the Bankruptcy Code's restrictions on this issue cannot be overlooked. "[Section] 503(c) has two overriding policy objectives: (i) to preserve the value of the estate for the benefit of its creditors and (ii) to prevent the unjust enrichment of the estate at the expense of its creditors." In re Journal Register, 407 B.R. 520, 535 (Bankr. S.D. Ohio 2009). Here, in light of the reality that EME's unsecured creditors will not be paid in full, any payments the Debtors' estates make under the Exit Plan represent funds that will be unavailable for distributions to constituencies represented by the Committee and the Supporting Noteholders. The approval of those supporting creditors—the very beneficiaries of the protections of section 503(c) of the Bankruptcy Code—belies the notion that the Exit Plan violates the Bankruptcy Code's prohibitions on improper compensation.

10.     Quite plainly, the Exit Plan is neither an improper retention plan nor a severance plan prohibited by section 503(c) of the Bankruptcy Code. To the contrary, and as evidenced through the Declarations and the underlying Exit Plan itself, the Exit Plan has been designed as a necessary and appropriate compensation plan, satisfies all provisions of the Bankruptcy Code, and is a material aspect of the Debtors' overall agreement with their major stakeholders—just like the protections that were negotiated with NRG. Failure to immediately secure approval of the Exit Plan could result in operational risk surrounding execution and implementation of the NRG Transaction. And no stakeholder in this case should be willing to take that risk. As described below, the Limited Objection's invocation of section 503(c) of the Bankruptcy Code is without merit. The Exit Plan satisfies the requirements of the Bankruptcy Code for precisely the same reasons that the Debtors' stakeholders support it, i.e., the Exit Plan is a permissible plan that gives each group of eligible participants appropriate, meaningful compensation awards to maximize the value of the Debtors' estates through the conclusion of these chapter 11 cases.

**II. The Exit Plan's Incentive-Based Payments Satisfy the Business Judgment Rule and the Requirements of Section 503(c)(3) of the Bankruptcy Code.**

11. All awards under the Exit Plan comport with the business judgment rule and are authorized under section 503(c)(3) of the Bankruptcy Code. See 11 U.S.C. § 503(c)(3). Section 503(c)(3) of the Bankruptcy Code prohibits certain transfers made to officers, managers, consultants, and others that are both outside the ordinary course of business and not justified by the facts and circumstances of the case. See id. In applying section 503(c)(3) of the Bankruptcy Code, the court in In re Dana Corp. noted that the "test in section 503(c)(3) appears to be no more stringent than one courts must apply in approving any administrative expense under section 503(b)(1)(A) . . . [an] expense must be an actual, necessary cost, or expense of preserving the estate." 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006).

12. Further, courts that have analyzed the section's prohibition on "other transfers" have applied a standard based upon the standard applied under section 363(b)—specifically, transfers are approved if made as a sound exercise of a debtor's business judgment and warranted by the facts and circumstances of the case. See In re Velo Holdings Inc., 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) ("Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)."); Dana Corp., 358 B.R. at 576 (considering whether the structure of a compensation proposal and the process for developing the proposal meet the "sound business judgment" test); In re Global Home Prods., 369 B.R. 778, 783 (Bankr. D. Del. 2007) ("If [the proposed plans are] intended to incentivize management, the analysis utilizes the more liberal business judgment review under § 363.").

9

13. As described in the McGovern Declaration, the factors set forth in Dana Corp. support approval of the awards under the Exit Plan pursuant to section 503(c)(3) of the Bankruptcy Code.[6]

- ***The Exit Plan is Calculated to Achieve Desired Performance.*** The Exit Plan is calculated to achieve desired performance, specifically, contributions to the successful and expeditious implementation of the proposed NRG Transaction and its consummation through a plan of reorganization. Absent realization of the Debtors' restructuring goals and approval in the sole discretion of the Compensation Committee, participants will not be entitled to receive any awards under the Exit Plan. Moreover, as described in the McGovern Declaration, it is typical for companies to offer incentives to successfully and efficiently complete a transaction because such programs incentivize the participants with the most control over consummation of the transaction to appropriately and efficiently conduct and finalize the requirements to close the transaction.

- ***The Cost of the Exit Plan Is Reasonable and Market-Based.*** As described in the McGovern Declaration, the cost of the Exit Plan is reasonable, market-based, and, in the context of the consideration proposed under the NRG Transaction, essentially *de minimis*. Indeed, the maximum amount of the payouts under the Exit Plan for which Pool A and Pool B Participants are eligible—$7.5 million—is a small amount in comparison to the obligations to be restructured as part of these chapter 11 cases. Moreover, the amount of the Exit Plan available for Pool A Participants and Pool B Participants is well below the market for similar transactions. Typically, the cost of these programs commonly range from 1–3 percent of the transaction value, in the aggregate. In comparison, at the absolute maximum value of the Exit Plan would be approximately 0.2 percent of the NRG Transaction value.[7]

- ***The Scope of the Exit Plan Is Fair and Reasonable.*** The Exit Plan's treatment of participants is fair and reasonable and includes only those participants whose work is

---

[6] While the court in Dana applied a "sound" business judgment standard under section 503(c)(3), it looked to several factors to determine whether an employee bonus plan could be approved, including: (1) whether the plan is calculated to achieve the desired performance; (2) whether the plan is reasonable in relation to the debtor's assets, liabilities, and potential earnings; (3) whether the plan is fair and reasonable or discriminates in favor of certain employees; (4) whether the plan is consistent with industry standards; (5) whether the debtor undertook any diligence in determining that employees needed to be incentivized; and (6) whether the debtor received independent counsel in performing due diligence and crafting the compensation plan. Dana Corp., 358 B.R. at 576–77.

[7] For purposes of the analysis in this paragraph, the NRG Transaction value is based upon a purchase price of over $2.63 billion, adjusted for cash on hand and debt assumption. This excludes the value of assumption of certain intercompany guarantees, NRG's commitment to fund environmental retrofits, and various purchase price adjustments.

10

Case 12-49219    Doc 1403    Filed 10/24/13    Entered 10/24/13 00:14:29    Desc Main
Document      Page 11 of 17

integral to the consummation of the NRG Transaction in addition to their day-to-day responsibilities. Furthermore, the Exit Plan does not discriminate unfairly among participants.

14. Based on the foregoing, the Debtors submit that the Exit Plan's proposed treatment of participants is a proper exercise of the Debtors' business judgment and use of the Debtors' resources, is justified by the facts and circumstances of these chapter 11 cases and, therefore, satisfies the requirements of section 503(c)(3) of the Bankruptcy Code. The Debtors submit that the Exit Plan will motivate eligible participants to the ultimate benefit of all parties in interest in these chapter 11 cases and should be approved. Importantly, the approval of the Exit Plan, if it is to achieve its intended result, is necessary *now* to ensure that eligible participants are in fact working *now* to implement the NRG Transaction that all of the Debtors' stakeholders have bound themselves to support.

15. Courts in this jurisdiction and others have recognized that programs such as the Exit Plan can be an efficient means of maximizing value for a debtor's estate and, accordingly, have approved similar incentive programs that provide for awards for achieving chapter 11 milestones like those set forth in the Exit Plan. See, e.g., In re Kimball Hill, Inc., No. 08-10095 (SPS) (Bankr. N.D. Ill. Dec. 17, 2008) (approving incentive plans in connection with the sale or wind-down on a sliding scale depending upon the level of completion of the sale or wind-down targets achieved by specified milestone dates); In re Velo Holdings Inc., 472 B.R. 201, 213 (Bankr. S.D.N.Y. 2012) (approving key employee incentive plan for both insiders and non-insiders with incentive targets tied to sales of the debtors' business units and financial performance); In re Borders Grp., Inc., 453 B.R. 459, 473 (MG) (Bankr. S.D.N.Y. Apr. 27, 2011) (approving an incentive plan for senior management participants, including insiders, based on the dual achievement of: (1) the confirmation of a chapter 11 reorganization plan or a section 363 sale of the business as a going concern and by specified milestone dates and (2) meeting

11
K&E 28272494

specific financial benchmarks related to costs reduction); In re Lear Corp., No. 09-14326 (ALG) (Bankr. S.D.N.Y. Aug. 28, 2009) (approving insider incentive plan primarily based on achievement of restructuring milestones, confirmation and consummation of a plan of reorganization by certain deadlines); In re Midway Games Inc., No. 09-10465 (KG) (Bankr. D. Del. Apr. 22, 2009) (approving an incentive plan for insiders based on dual milestones related to court approval of a plan and the closing of a sale of the debtors' assets after marketing and sale process); In re Nortel Networks, Inc., No. 09-10138 (KG) (Bankr. D. Del. Mar. 5 and 20, 2009) (approving incentive plan based on the achievement of separate milestones, including a cost reduction plan, "certain financial parameters . . . that will result in a leaner and more focused organization" and plan confirmation); In re WCI Comtys., Inc., No. 08-11643 (KJC) (Bankr. D. Del. Feb. 4, 2009) (approving incentive plan based in part on timing of the effective date of a confirmed chapter 11 plan or consummation of a sale of substantially all of the debtors' assets); In re PlusFunds Grp., Inc., No. 06- 10402 (JMP) (Bankr. S.D.N.Y. Apr. 19, 2006) (approving incentive plan payable upon the successful going concern sale of substantially all of the debtors' assets with bonus pool adjustments related to purchase price adjustments); In re Musicland Holding Corp., No. 06-10064 (SMB) (Bankr. S.D.N.Y. Feb. 1, 2006) (approving "success payments" for five senior management participants to be paid on the earlier of sale of substantially all assets or consummation of a chapter 11 plan of reorganization). Here, likewise, the Exit Plan satisfies the requirements of the Bankruptcy Code and should be approved.

### III. Pool A of the Exit Plan Is Not an Insider Retention or Severance Plan Governed by Section 503(c)(1) or Section 503(c)(2).

16.    Section 503(c)(1) of the Bankruptcy Code places certain restrictions on retention plans for insiders. See 11 U.S.C. § 503(c)(1). Section 503(c)(2) places restrictions on severance

payments to insiders.  <u>See</u> 11 U.S.C. § 503(c)(2).  Neither provision applies to performance-based incentive (i.e., "success") plans like the Exit Plan here.[8]

17.     Specifically, section 503(c)(1) applies only to true, "pay-to-stay" retention plans for insiders, and not to awards—like those proposed for Pool A Participants in the Exit Plan—that provide incentive compensation to participants for contributions to maximizing the value of a debtor's business.  <u>See</u> <u>In re Global Homes Prods., LLC</u>, 369 B.R. 778, 787 (Bankr. D. Del. 2007) (holding that section 503(c) "was not intended to foreclose a chapter 11 debtor from reasonably compensating employees, including 'insiders,' for their contribution to the debtor's reorganization," and that plans that have an ancillary retentive effect are not retention plans subject to section 503(c)(1));  In re Nellson Nutraceutical, Inc., 369 B.R. 787, 802 (Bankr. D. Del. 2007) (finding that section 503(c)(1) applies only to retention programs with "the *primary* purpose of inducing [an employee] to remain with the debtor's business") (emphasis in original).

18.     The Debtors recognize that merely styling a bonus program as an "incentive" plan does not automatically exempt an insider compensation plan from the requirements of section 503(c)(1).  <u>See, e.g.</u>, <u>In re Residential Capital, LLC</u>, 478 B.R. 154, 170 (Bankr. S.D.N.Y. 2012) ("The Debtors must show that the [key employee incentive plan] is a 'pay for value' plan that offers incentives based on performance rather than a 'pay to stay' plan."); <u>In re Hawker Beechcraft, Inc.</u>, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012) ("The Court must examine a

---

[8] See, e.g., <u>Velo Holdings Inc.</u>, 472 B.R. at 210 (finding that an incentive-based plan alleviated the need for a section 503(c)(1) analysis); <u>Borders Grp.</u>, 453 B.R. at 471 (finding that "the Debtors [had] met their burden of establishing that the KEIP [was] incentivizing, thereby alleviating the need for a section 503(c)(1) analysis"); <u>Dana Corp.</u>, 358 B.R. at 584 (concluding that sections 503(c)(1) and 503(c)(2) did not apply to incentive plans); Transcript of Hearing at 84–85, <u>In re Calpine Corp.</u>, No. 05-60200 (BRL) (Bankr. S.D.N.Y. Apr. 26, 2006) (stating that sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code do not apply to incentive programs); <u>In re Musicland Holding Corp.</u>, No. 06-10064 (SMB) (Bankr. S.D.N.Y. Feb. 1, 2006) (finding that debtor continuing to provide incentive bonuses under management incentive plan did not violate section 503(c)); Tr. of Hr'g at 67, <u>In re Nobex Corp.</u>, No. 05-20050 (CSS) (Bankr. D. Del. Jan. 12, 2006) (explaining that section 503(c)(1) does not apply to incentive programs).

13

proposed [key employee incentive plan] . . . [to] determine whether the proposed targets are designed to motivate insiders to rise to a challenge or merely report to work."). Likewise, the Debtors understand that the milestones and targets triggering the incentives must force the participants to stretch and cannot be compared to "lay-ups" or "free throws" for the ease by which the participants could achieve the targets. See Dana Corp., 358 B.R. at 583; Hawker Beechcraft, 479 B.R. at 313 n.7.

19. Here, for the Pool A Participants, the primary effect of the Exit Plan is to incentivize them in a manner that will benefit the Debtors' business as a whole and, as a result, all stakeholders. Importantly, Pool A does not contain any retention or severance awards. (Only non-insiders are eligible for any retention-based awards to Pool B Participants.) The Pool A Participants will not receive any payments for merely remaining employed and continuing status quo operations or for merely maintaining their employment for a certain time period. Instead, Pool A Participants' awards will be paid only for meaningful contributions to the Debtors' progress toward successful and timely consummation of the NRG Transaction and are limited to payments authorized at the discretion of the Compensation Committee. See Exit Plan, Art. IV ("Bonus Pool A Goals"). Thus, there is no concern about "lay-ups" or easy targets: the Compensation Committee has full discretion and authority to award some or all of the available pool based upon achievement of the Bonus Pool A Goals. And given the discretionary nature of the plan, there is no guarantee that the Debtors will make any payments to Pool A Participants under the Exit Plan.

20. Section 503(c)(2), on the other hand, applies to (and restricts) severance payments to insiders, and not to incentive plans like the Exit Plan. See 11 U.S.C. § 503(c)(2); Dana Corp., 358 B.R. at 584. Severance payments are those due to an employee as a result of the termination

14

of employment or some other significant adjustment to or change in the employment circumstances. See 5 *Collier on Bankruptcy* ¶ 507.06[5][b] (16th ed. 2013). Here, Pool A of the Exit Plan provides no such severance payments to any of the eligible participants. As described above and in the Exit Plan itself, all awards relate to contributions to the achievement of goals that further the Debtors' restructuring process and the consummation of the NRG Transaction (in the case of the Pool A Participants). There are simply no Pool A awards triggered by a Pool A Participant's employment status. Accordingly, Pool A does not implicate section 503(c)(2) of the Bankruptcy Code.

21.     Therefore, the Debtors respectfully submit that the Exit Plan's treatment of insiders constitutes a permissible performance-based incentive plan and that sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code do not apply to the Exit Plan.

### IV.    Any Retention-Based Payments Under Pool B of the Exit Plan Are for Non-Insiders Only, Are Supported by the Debtors' Business Judgment, and Should Be Approved.

22.     The Exit Plan's treatment of non-insiders, i.e., the Pool B Participants, reflects a sound exercise of the Debtors' business judgment and therefore should be approved under sections 363(b) and 503(c)(3) of the Bankruptcy Code. As noted above, only ***non-insider*** participants are eligible for retention-based payments under the Exit Plan. Indeed, the Compensation Committee is responsible for identifying eligible Pool B Participants from employees in the salary bands well below the executive payroll. Insiders are ***not*** eligible for retention-based awards under the Exit Plan. Accordingly, the limitations of section 503(c)(1) of the Bankruptcy Code do not apply to the Exit Plan. Instead, section 503(c)(3) of the Bankruptcy Code provides that any transfer to or obligations incurred on behalf of participants (including insiders) of a debtor outside the ordinary course of business must be justified by the facts and circumstances of the case. 11 U.S.C. § 503(c)(3).

23. Here, the Exit Plan's retention awards accomplish the interrelated goals of incentivizing, retaining, and appropriately compensating the Debtors' non-insider employees. In light of the timing demands NRG has made in exchange for the valuable consideration being offered, it is critical that the Debtors' employees are incentivized to continue their employment with the Debtors and drive the various transactions (and workstreams supporting those transactions) forward. In addition to providing the appropriate incentives, the Exit Plan also compensates non-insider employees for the extra time and attention needed to complete the sale process and pursue the NRG Transaction. Importantly, the Exit Plan provides that a Pool B Participant who voluntarily terminates his or her employment prior to the Effective Date is not eligible for an award.

## Conclusion

24. For the reasons stated herein the Court should overrule the Limited Objection and grant the Motion approving the Plan Sponsor Agreement.

*[Remainder of page intentionally left blank.]*

Dated: October 23, 2013

/s/ David R. Seligman, P.C.
James H.M. Sprayregen, P.C.
David R. Seligman, P.C.
Sarah Hiltz Seewer
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

- and -

Joshua A. Sussberg
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Counsel to the Debtors and Debtors in Possession other than Camino Energy Company*

- and -

David A. Agay
Joshua Gadharf
**MCDONALD HOPKINS LLC**
300 North LaSalle
Suite 2100
Chicago, Illinois 60654
Telephone: (312) 280-0111
Facsimile: (312) 280-8232

*Counsel to Debtor Camino Energy Company and Conflicts Counsel to the other Debtors and Debtors in Possession*

K&E 28272494