**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| EDISON MISSION ENERGY, et al.,[1] | ) | Case No. 12-49219 (JPC) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF FILING OF DISCLOSURE STATEMENT FOR THE**
**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

 **PLEASE TAKE NOTICE** that on November 15, 2013, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Disclosure Statement for the Debtors' Joint Chapter 11 Plan of Reorganization* (the "Disclosure Statement") with the United States Bankruptcy Court for the Northern District of Illinois (the "Court"). A copy of the Disclosure Statement is attached hereto as **Exhibit 1**.[2]

 **PLEASE TAKE FURTHER NOTICE** that on November 15, 2013, the Debtors filed the *Debtors' Motion for Entry of an Order Approving (A) the Adequacy of the Disclosure Statement, (B) Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Joint Chapter 11 Plan of Reorganization, (C) the Form of Ballots and Notices in Connection Therewith, and (D) the Scheduling of Certain Dates with Respect Thereto*.

 **PLEASE TAKE FURTHER NOTICE** that additional copies of the Disclosure Statement or other any other document filed in these chapter 11 cases are available for free by (a) accessing GCG, Inc.'s website at www.edisonmissionrestructuring.com (the "Notice, Claims, and Solicitation Agent"); (b) writing to the Notice, Claims, and Solicitation Agent, by first-class mail, Edison Mission Energy, et al., c/o GCG, P.O. Box 9942, Dublin, OH 43017-5942, or by

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Edison Mission Energy (1807); Camino Energy Company (2601); Chestnut Ridge Energy Company (6590); Edison Mission Energy Fuel Services, LLC (4630); Edison Mission Finance Co. (9202); Edison Mission Fuel Resources, Inc. (3014); Edison Mission Fuel Transportation, Inc. (3012); Edison Mission Holdings Co. (6940); Edison Mission Midwest Holdings Co. (6553); EME Homer City Generation L.P. (6938); Homer City Property Holdings, Inc. (1685); Midwest Finance Corp. (9350); Midwest Generation EME, LLC (1760); Midwest Generation, LLC (8558); Midwest Generation Procurement Services, LLC (2634); Midwest Peaker Holdings, Inc. (5282); Mission Energy Westside, Inc. (0657); San Joaquin Energy Company (1346); Southern Sierra Energy Company (6754); and Western Sierra Energy Company (1447). The location of parent Debtor Edison Mission Energy's corporate headquarters and the Debtors' service address is: 3 MacArthur Place, Suite 100, Santa Ana, California 92707.

[2]   The Disclosure Statement remains subject to amendment, supplement, or modification, subject to the reasonable consent of the Purchaser Parties, the Committee, the Supporting Noteholders, and (solely with respect to any terms thereof that affect the rights of the PoJo Parties) the PoJo Parties (each as defined in the *Debtors' Joint Chapter 11 Plan of Reorganization*, filed contemporaneously herewith).

writing, by hand delivery or overnight mail, Edison Mission Energy, et al., c/o GCG, 5151 Blazer Parkway, Suite A, Dublin, OH 43017; or (c) calling the Notice, Claims, and Solicitation Agent at (866) 241-6491.  You may also obtain copies of any pleadings by visiting the Court's website at www.ilnb.uscourts.gov in accordance with the procedures and fees set forth therein. Please be advised that the Notice, Claims, and Solicitation Agent is not permitted to provide legal advice.

**PLEASE TAKE FURTHER NOTICE** that a hearing to consider the adequacy of the Disclosure Statement and approve procedures for soliciting votes on the *Debtors' Joint Chapter 11 Plan of Reorganization* is scheduled for **10:30 a.m. Central Time on December 18, 2013**, before the Honorable Jacqueline P. Cox, Everett McKinley Dirksen United States Courthouse, 219 South Dearborn Street, Courtroom 680, Chicago, Illinois 60604.  This hearing may be continued by the Court or the Debtors without further notice other than by announcement of same in open court and/or by filing and service, as applicable, of a notice of adjournment.

*[Remainder of page intentionally left blank.]*

KE 28507211

Dated: November 15, 2013

/s/ David R. Seligman, P.C.

James H.M. Sprayregen, P.C.
David R. Seligman, P.C.
Sarah Hiltz Seewer
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

- and -

Joshua A. Sussberg
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Counsel to the Debtors and Debtors in Possession
other than Camino Energy Company*

- and -

David A. Agay
Joshua Gadharf
**MCDONALD HOPKINS LLC**
300 North LaSalle
Suite 2100
Chicago, Illinois 60654
Telephone:    (312) 280-0111
Facsimile:    (312) 280-8232

*Counsel to Debtor Camino Energy Company
and Conflicts Counsel to the other Debtors
and Debtors in Possession*

KE 28507211

## <u>Exhibit 1</u>

**Disclosure Statement for the Debtors' Joint Chapter 11 Plan of Reorganization**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| EDISON MISSION ENERGY, et al.,[1] | ) | Case No. 11-49219 (JPC) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

**DISCLOSURE STATEMENT FOR THE**
**DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

James H.M. Sprayregen, P.C.
David R. Seligman, P.C.
Sarah H. Seewer
Brad Weiland
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
- and -
Joshua A. Sussberg (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

*Counsel to the Debtors and Debtors in Possession*
*other than Camino Energy Company*

David A. Agay
Joshua Gadharf
**McDONALD HOPKINS LLC**
300 North LaSalle
Suite 2100
Chicago, Illinois 60654
Telephone:      (312) 280-0111
Facsimile:      (312) 280-8232

*Counsel to Debtor Camino Energy Company*
*and Conflicts Counsel to the other Debtors*
*And Debtors in Possession*

Dated: November 15, 2013

THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Edison Mission Energy (1807); Camino Energy Company (2601); Chestnut Ridge Energy Company (6590); Edison Mission Finance Co. (9202); Edison Mission Energy Fuel Services, LLC (4630); Edison Mission Fuel Resources, Inc. (3014); Edison Mission Fuel Transportation, Inc. (3012); Edison Mission Holdings Co. (6940); Edison Mission Midwest Holdings Co. (6553); EME Homer City Generation L.P. (6938); Homer City Property Holdings, Inc. (1685); Midwest Finance Corp. (9350); Midwest Generation EME, LLC (1760); Midwest Generation, LLC (8558); Midwest Generation Procurement Services, LLC (2634); Midwest Peaker Holdings, Inc. (5282); Mission Energy Westside, Inc. (0657); San Joaquin Energy Company (1346); Southern Sierra Energy Company (6754); and Western Sierra Energy Company (1447).  The location of parent Debtor Edison Mission Energy's corporate headquarters and the Debtors' service address is:  3 MacArthur Place, Suite 100, Santa Ana, California 92707.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, A GROUP OF EME UNSECURED NOTEHOLDERS HOLDING MORE THAN 74 PERCENT OF THE APPROXIMATELY $3.7 BILLION IN UNSECURED NOTES, THE POJO PARTIES, AND NRG, AND ALL SUCH PARTIES URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.  IN CONNECTION WITH THE NRG TRANSACTION CONTEMPLATED UNDER THE PLAN, THE DEBTORS HAVE FILED APPLICATIONS WITH THE DEPARTMENT OF JUSTICE, PURSUANT TO THE HART-SCOTT-RODINO ACT, AND THE FEDERAL ENERGY REGULATORY COMMISSION SEEKING APPROVAL OF THE TRANSACTION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES.  WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE

BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION..................................................................................................................1

II.     OVERVIEW OF THE PLAN.................................................................................................1

III.    IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT ..................2
        A.     Key Terms Used in this Disclosure Statement........................................................2
        B.     Additional Important Information.............................................................................3

IV.     QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
        THE PLAN .............................................................................................................................3
        A.     What is chapter 11?..................................................................................................3
        B.     Why are the Debtors sending me this Disclosure Statement?..................................3
        C.     Am I entitled to vote on the Plan?............................................................................4
        D.     What will I receive from the Debtors if the Plan is consummated? .........................5
        E.     What will I receive from the Debtors if I hold an Allowed Administrative Claim or a
               Priority Tax Claim?..................................................................................................6
        F.     If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
               Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
               "Consummation?"......................................................................................................7
        G.     What are the sources of cash and other consideration required to fund the Plan? ...........7
        H.     Who is the Purchaser?..............................................................................................7
        I.     Will the final amount of Allowed General Unsecured Claims affect my recovery under
               the Plan?...................................................................................................................7
        J.     Will there be releases and exculpation granted to parties in interest as part of the Plan? .................7
        K.     What is the deadline to vote on the Plan? ................................................................7
        L.     How do I vote for or against the Plan?.....................................................................7
        M.     Why is the Bankruptcy Court holding a Confirmation Hearing and when is the
               Confirmation Hearing set to occur? ........................................................................8
        N.     What is the purpose of the Confirmation Hearing?..................................................8
        O.     What is the effect of the Plan on the Debtors' ongoing business? ...........................8
        P.     Who do I contact if I have additional questions with respect to this Disclosure Statement
               or the Plan?...............................................................................................................8
        Q.     Do the Debtors recommend voting in favor of the Plan?.........................................9
        R.     Who Supports the Plan?............................................................................................9

V.      BACKGROUND TO THESE CHAPTER 11 CASES ..........................................................9
        A.     The Debtors' Business and Industry ........................................................................9
        B.     Regulatory Matters.................................................................................................15
        C.     Environmental Matters and Regulations.................................................................16
        D.     The Debtors' Capital Structure and Prepetition Indebtedness ...............................22
        E.     Tax Sharing Agreements ........................................................................................25

VI.     EVENTS LEADING TO THE CHAPTER 11 FILINGS .....................................................26
        A.     Macroeconomic Pressures Coincide with Debt Obligations ..................................26
        B.     Prepetition Reorganization Efforts.........................................................................26

VII.    ADMINISTRATION OF THE CHAPTER 11 CASES .......................................................27
        A.     First Day Motions and Certain Related Relief........................................................27

i

B.      Employee Incentive/Retention Plans ...................................................................31

VIII.   SIGNIFICANT EVENTS OF THE CHAPTER 11 CASES ......................................................33

A.      EIX Investigation .................................................................................................33
B.      Discussions Regarding Powerton and Joliet Stations..........................................35
C.      Chevron Dispute .................................................................................................37
D.      Homer City ..........................................................................................................37
E.      Exclusivity ..........................................................................................................39
F.      Sale Process and Stand Alone Plan .....................................................................39
G.      NRG Transaction and Plan Sponsor Agreement .................................................39
H.      Continuation of Intercompany Arrangements and Shared Services......................41

IX.    RISK FACTORS ...................................................................................................................41

A.      Certain Bankruptcy Law Considerations .............................................................41
B.      Risk Factors that May Affect the Value of Securities to be Issued Under the Plan .....................43
C.      Disclosure Statement Disclaimer ........................................................................44
D.      Liquidation Under Chapter 7 ..............................................................................46

X.     SOLICITATION AND VOTING PROCEDURES ........................................................46

A.      Holders of Claims Entitled to Vote on the Plan ..................................................46
B.      Voting Record Date .............................................................................................47
C.      Voting on the Plan...............................................................................................47
D.      Ballots Not Counted............................................................................................47

XI.    CONFIRMATION OF THE PLAN...........................................................................................48

A.      Requirements for Confirmation of the Plan .........................................................48
B.      Best Interests of Creditors/Liquidation Analysis ................................................48
C.      Feasibility............................................................................................................48
D.      Acceptance by Impaired Classes.........................................................................48
E.      Confirmation without Acceptance by All Impaired Classes ................................49

XII.   CERTAIN SECURITIES LAW MATTERS ................................................................50

A.      New Equity ..........................................................................................................50
B.      Issuance of New Interests Under the Plan; Resale of New Interests....................50

XIII.  CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN..................................................................................................................................51

A.      Certain United States Income Tax Consequences to the Debtors ........................52
B.      Certain United States Federal Income Tax Consequences to Holders of Claims...........58

**EXHIBITS**

EXHIBIT A        Joint Plan of Reorganization

EXHIBIT B        Executed Purchase Agreement

EXHIBIT C        Signed Disclosure Statement Order

EXHIBIT D        Consolidated Financial Statements

EXHIBIT E        Liquidation Analysis

EXHIBIT F        Creditors' Committee Letter of Support

## I.    INTRODUCTION

Edison Mission Energy ("<u>EME</u>") and its debtor affiliates, as debtors and debtors in possession (each, a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>"), submit this disclosure statement (the "<u>Disclosure Statement</u>") pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances with respect to the *Debtors' Joint Chapter 11 Plan of Reorganization* (the "<u>Plan</u>"), dated November 15, 2013.[1]    A copy of the Plan is attached hereto as **<u>Exhibit A</u>** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS BELIEVE THAT THE COMPROMISE CONTEMPLATED UNDER THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDES THE BEST RECOVERY TO CLAIM HOLDERS.  AT THIS TIME, THE DEBTORS AND THE CONSENTING PARTIES BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THESE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    OVERVIEW OF THE PLAN

The Plan provides for a sale (as defined in the Plan, the "<u>NRG Transaction</u>") of substantially all of EME's assets, including its direct and indirect equity interests in the Debtor Subsidiaries and the Non-Debtor Subsidiaries (other than any Homer City Debtor and any subsidiary of any Homer City Debtor), to NRG Energy Holdings Inc. ("<u>Purchaser</u>" or "<u>NRG</u>"), a subsidiary of NRG Energy, Inc. ("<u>Parent,</u>" together with Purchaser, the "<u>Purchaser Parties</u>"), a Fortune 500 company and the largest competitive power generation company in the U.S., with approximately 47,000 MW of fossil, nuclear, solar, and wind generation capacity.  In exchange for this transfer, Purchaser will provide EME's estate with the Sale Proceeds of $2,635 million (comprised of $2,285 million payable in cash and $350 million payable in Parent Common Stock) to be distributed by the Debtors in accordance with the Plan and assume certain liabilities of the Debtors, including the leveraged leases for Debtor Midwest Generation, LLC's Powerton and Joliet facilities.    The Debtors, the Purchaser Parties, the Committee, the Supporting Noteholders, and the PoJo Parties entered into the Plan Sponsor Agreement, which was approved by the Bankruptcy Court on October 24, 2013, to implement the NRG Transaction pursuant to the Plan.

More specifically, the Plan, which will effectuate the NRG Transaction, contemplates the following distributions to Holders of Claims and Interests, among other recoveries:

- Holders of Allowed Other Priority Claims against EME and Allowed Other Priority Claims against Debtor Subsidiaries shall receive payment in full, in Cash;

- Holders of Allowed Secured Claims against EME, Allowed Secured Claims against Debtor Subsidiaries, and Allowed Secured Claims against Homer City Debtors shall receive (a) payment in full, in Cash, or (b) such other treatment such that the Holder shall be rendered Unimpaired;

- Holders of Allowed General Unsecured Claims against Debtor Subsidiaries shall receive payment of principal in full in Cash;

- Holders of Allowed General Unsecured Claims against EME (Assumed Liabilities), Allowed General Unsecured Claims against EME (Not Assumed Liabilities), and Allowed Joint-Liability General Unsecured Claims shall receive (a) a Pro Rata distribution of the Net Sale Proceeds, and (b) a Pro Rata distribution of the New Interests; and

---

[1]    Capitalized terms used but not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

- Holders of Allowed Claims against the Homer City Debtors shall be paid in absolute priority from the Homer City Wind Down Proceeds for the applicable Homer City Debtor.

The Plan contemplates that, as a general matter, Holders of Intercompany Claims against EME, Intercompany Claims against Subsidiary Debtors, Subordinated Claims against EME, Subordinated Claims against Subsidiary Debtors, and Subordinated Claims against Homer City Debtors shall receive no distribution on account of their Claims. The Plan also contemplates that, as a general matter, Intercompany Interests in Subsidiary Debtors will be reinstated on the Effective Date, and EME Interests and Interests in Homer City Debtors will be cancelled on the Effective Date, subject to certain exceptions contained in the Plan. However, EME Interests may remain outstanding following the Effective Date, as Reorganized EME reasonably determines, in consultation with the Committee and the Supporting Noteholders, in order to preserve EME's tax attributes and maximize the value of the Estates.

## III.   IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

### A.   Key Terms Used in this Disclosure Statement

The following are some of the defined terms used in this Disclosure Statement. This is not an exhaustive list of defined terms in the Plan or this Disclosure Statement, but is provided for ease of reference only. Please refer to the Plan for additional defined terms.

References to the "Bankruptcy Court" are to the United States Bankruptcy Court for the Northern District of Illinois Eastern Division having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 157, the United States District Court for the Northern District of Illinois Eastern Division.

References to the "Bankruptcy Rules" mean the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

References to the "Chapter 11 Cases" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for all of the Debtors in the Bankruptcy Court under case number 12-49219 (JPC).

References to a "Claim" are to any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

References to the "Confirmation Hearing" are to the hearing held by the Bankruptcy Court on confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

References to the "Confirmation Date" are to the date upon which the Bankruptcy Court enters the Confirmation Order on the Docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

References to "Interests" means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors together with any warrants, options, or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto.

References to "Person" means to a person, as the term is defined in section 101(41) of the Bankruptcy Code.

References to the "Plan" are to the *Debtors' Joint Chapter 11 Plan of Reorganization* dated November 15, 2013, a copy of which is attached as **Exhibit A** hereto and incorporated herein by reference.

References to the "Plan Supplement" are to the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed 10 days prior to the Voting Deadline, as amended, supplemented, or

modified from time to time in accordance with the terms of the Plan, the Purchase Agreement, the Plan Sponsor Agreement, the Bankruptcy Code, and the Bankruptcy Rules.  Except as specifically provided otherwise in the Plan, each document, schedule, and exhibit included in the Plan Supplement shall be reasonably acceptable to the Purchaser Parties, the Committee, the Supporting Noteholders, and (solely with respect to any document, schedule, or exhibit that affects the rights of the PoJo Parties) the PoJo Parties.

**B.      Additional Important Information**

The confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to go effective will be satisfied (or waived).

You are encouraged to read this Disclosure Statement in its entirety, the Plan and the section entitled "Risk Factors" before submitting your ballot to vote on the Plan.

**The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.**

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan.  The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entirety by reference to those documents.  The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date.  Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose.  In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provisions of the Plan will govern.

**IV.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN**

**A.      What is chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.   The Plan contemplates a sale of EME's assets to the

Purchaser, and this Disclosure Statement is being submitted to provide information about this transaction and related information concerning the Debtors, all in accordance with the requirements of the Bankruptcy Code.

**C.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold (if any).  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below.

### 1.      Summary of Classification for EME

The classification of Claims against and Interests in EME pursuant to the Plan is set forth below.  The classification of Claims and Interests set forth herein shall apply **only** to Claims against and Interests in EME.

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| A1 | Other Priority Claims against EME | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| A2 | Secured Claims against EME | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| A3 | General Unsecured Claims against EME (Assumed Liabilities) | Impaired | Entitled to Vote |
| A4 | General Unsecured Claims against EME (Not Assumed Liabilities) | Impaired | Entitled to Vote |
| A5 | Joint-Liability General Unsecured Claims against EME | Impaired | Entitled to Vote |
| A6 | Intercompany Claims against EME | Impaired | Not Entitled to Vote (Deemed to Reject) |
| A7 | Subordinated Claims against EME | Impaired | Not Entitled to Vote (Deemed to Reject) |
| A8 | EME Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

### 2.      Summary of Classification for Debtor Subsidiaries

The classification of Claims against and Interests in the Debtor Subsidiaries pursuant to the Plan is set forth below.  The classification of Claims and Interests set forth herein shall apply **only** to Claims against and Interests in the Debtor Subsidiaries.

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| B1 | Other Priority Claims against Debtor Subsidiaries | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| B2 | Secured Claims against Debtor Subsidiaries | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| B3 | General Unsecured Claims against Debtor Subsidiaries | Impaired | Entitled to Vote |
| B4 | Intercompany Claims against Debtor Subsidiaries | Impaired | Not Entitled to Vote (Deemed to Reject) |
| B5 | Subordinated Claims against Debtor Subsidiaries | Impaired | Not Entitled to Vote (Deemed to Reject) |
| B6 | Intercompany Interests in Debtor Subsidiaries | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

### *3.*   *Summary of Classification for Homer City Debtors*

The classification of Claims against and Interests in the Homer City Debtors pursuant to the Plan is set forth below.  The classification of Claims and Interests set forth herein shall apply **only** to Claims against and Interests in the Homer City Debtors.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| C1 | Other Priority Claims against Homer City Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| C2 | Secured Claims against Homer City Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| C3 | General Unsecured Claims against Homer City Debtors | Impaired | Entitled to Vote |
| C4 | Intercompany Claims against Homer City Debtors | Impaired | Entitled to Vote |
| C5 | Subordinated Claims against Homer City Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |
| C6 | Intercompany Interests in Homer City Debtors | Impaired | Entitled to Vote |

### D.   What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Allowed Claims and Interests under the Plan.  Any estimates of Claims in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

| Class | Claim/Interest | Estimated Amount of Allowed Claims | Anticipated Recovery for Holders of Allowed Claims |
|-------|----------------|-----------------------------------|---------------------------------------------------|
| A1 | Other Priority Claims against EME | **[to come]** | **[100 %]** |
| A2 | Secured Claims against EME | **[to come]** | **[100 %]** |

5

| Class | Claim/Interest | Estimated Amount of Allowed Claims | Anticipated Recovery for Holders of Allowed Claims |
|---|---|---|---|
| A3 | General Unsecured Claims against EME (Assumed Liabilities) | **[to come]** | **[Pro Rata]** |
| A4 | General Unsecured Claims against EME (Not Assumed Liabilities) | **[to come]** | **[Pro Rata]** |
| A5 | Joint-Liability General Unsecured Claims against EME | **[to come]** | **[Pro Rata]** |
| A6 | Intercompany Claims against EME | **[to come]** | **[0 %]** |
| A7 | Subordinated Claims against EME | **[to come]** | **[0 %]** |
| A8 | EME Interests | **n/a** | **[0 %]** |
| B1 | Other Priority Claims against Debtor Subsidiaries | **[to come]** | **[100 %]** |
| B2 | Secured Claims against Debtor Subsidiaries | **[to come]** | **[100 %]** |
| B3 | General Unsecured Claims against Debtor Subsidiaries | **[to come]** | **[100 %]** |
| B4 | Intercompany Claims against Debtor Subsidiaries | **[to come]** | **[0 %]** |
| B5 | Subordinated Claims against Debtor Subsidiaries | **[to come]** | **[0%]** |
| B6 | Intercompany Interests in Debtor Subsidiaries | **n/a** | **[100 %]** |
| C1 | Other Priority Claims against Homer City Debtors | **[to come]** | **[100 %]** |
| C2 | Secured Claims against Homer City Debtors | **[to come]** | **[100 %]** |
| C3 | General Unsecured Claims against Homer City Debtors | **[to come]** | **[Pro Rata]** |
| C4 | Intercompany Claims against Homer City Debtors | **[to come]** | **[0 %]** |
| C5 | Subordinated Claims against Homer City Debtors | **[to come]** | **[0 %]** |
| C6 | Intercompany Interests in Homer City Debtors | **n/a** | **[0 %]** |

**E.** **What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article II of the Plan. Administrative Claims will be satisfied as set forth in Article II of the Plan, and Priority Tax Claims will be satisfied as set forth in Article II of the Plan.

**F.**     **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan. See "Confirmation of the Plan," which begins on page 48, for a discussion of the conditions to Consummation of the Plan.

**G.**     **What are the sources of cash and other consideration required to fund the Plan?**

The Plan will be funded by the following sources of cash and consideration: (1) payment of the Sale Proceeds by the Purchaser; (2) issuance and distribution of New Interests of EME; (3) payments by the Purchaser made on account of Assumed Liabilities of the Purchaser; and (4) payment by the Purchaser of the Proposed Cure Payments. In addition, General Unsecured Claims against Subsidiary Debtors that are Assumed Liabilities under the Purchase Agreement will be paid directly by the Purchaser.

**H.**     **Who is the Purchaser?**

The Purchaser under the Plan is NRG Energy Holdings Inc. NRG Energy Holdings Inc. is a subsidiary of NRG Energy, Inc., a Fortune 500 company and the largest competitive power generation company in the U.S. with approximately 47,000 MW of fossil, nuclear, solar, and wind generation capacity.

**I.**     **Will the final amount of Allowed General Unsecured Claims affect my recovery under the Plan?**

Allowed Claims in Class A3 (General Unsecured Claims against EME (Assumed Liabilities), Class A4 (General Unsecured Claims against EME (Not Assumed Liabilities), Class A5 Joint-Liability General Unsecured Claims against EME, Class C3 (General Unsecured Claims against Homer City Debtors), and Class C4 Intercompany Claims against Homer City Debtors will be paid on a Pro Rata basis out of the Net Sale Proceeds and New Interests (in the case of Class A3, A4, and A5) or out of the Homer City Wind Down Proceeds (in the case of Class C3 and C4). As such, an increase in the amount of Allowed Claims for each of these Classes will result in a decrease in individual distributions on account of Claims in these Classes.

**J.**     **Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan provides for releases and exculpation of the Debtors, the Purchaser Parties, and other parties in interest as set forth in Article VIII of the Plan.

**K.**     **What is the deadline to vote on the Plan?**

The Voting Deadline is February 7, 2014, at 5:00 p.m. (prevailing Central Time).

**L.**     **How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be completed and signed so that it is ***actually received*** by February 7, 2014, at 5:00 p.m. (prevailing Central Time) at the following address: Edison Mission Energy Claims Processing, c/o GCG, Inc., 5151 Blazer Parkway, Suite A, Dublin, Ohio 43017. See Article X of this Disclosure Statement, which begins on page 46.

**M.**     **Why is the Bankruptcy Court holding a Confirmation Hearing and when is the Confirmation Hearing set to occur?**

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for February 26, 2014, at [_____] a.m. (prevailing Central Time).  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than February 7, 2014, at 5:00 p.m. (prevailing Central Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **Exhibit C** and incorporated herein by reference.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the national edition of *The New York Times* to provide notification to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

**N.**     **What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under the plan of reorganization, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of the plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**O.**     **What is the effect of the Plan on the Debtors' ongoing business?**

Upon consummation of the Plan, substantially all of the assets of EME, including EME's ownership interests in the Debtor Subsidiaries and Non-Debtor Subsidiaries, will be transferred to the Purchaser as going concerns.  The Plan does not provide for a shut down or decommissioning of any of the Debtors' facilities.

**P.**     **Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' notice, claims and solicitation agent, Garden City Group, Inc.:

*By regular Mail at:*
Edison Mission Energy, et al.
c/o GCG
PO Box 9942
Dublin, OH 43017-5942

*By hand delivery or overnight mail at:*
Edison Mission Energy, et al.
c/o GCG
5151 Blazer Parkway, Suite A
Dublin, Ohio 43017

*By electronic-mail at:*
edisonmissioninfo@gcginc.com

*By telephone at:*
(866) 241-6491 (U.S. and Canada)
(202) 470-4956 (International)

*By facsimile at:*
(866) 697-5553

Copies of the Plan, this Disclosure Statement and any other publicly filed documents in these Chapter 11 Cases are available upon written request to the Debtors' counsel at the address above or by downloading the exhibits and documents from the website of the Debtors' notice, claims and solicitation agent at www.edisonmissionrestructuring.com (free of charge) or the Bankruptcy Court's website at www.ilnb.uscourts.gov (for a fee).

**Q.    Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe the Plan, which contemplates a sale of the Debtors' operating businesses to the Purchaser Parties, is in the best interest of all Holders of Claims, and that other alternatives fail to realize or recognize the value inherent under the Plan.

**R.    Who Supports the Plan?**

The Plan is supported by the Debtors, the Committee, the Supporting Noteholders, and the PoJo Parties, all as set forth in the Plan Sponsor Agreement.

## V.    BACKGROUND TO THESE CHAPTER 11 CASES

Below is a summary of the Debtors' businesses and operations.  For additional details concerning the Debtors and the background to these Chapter 11 Cases, readers are referred to the *Declaration of Maria Rigatti, Senior Vice President and Chief Financial Officer of Edison Mission Energy, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 6].

### A.    The Debtors' Business and Industry

#### 1.    The Company

The Debtors are indirect subsidiaries and affiliates of non-Debtor Edison International ("EIX"), a holding company of businesses comprised of two principal divisions of subsidiaries—one composed of regulated businesses and the other composed of unregulated businesses.  EIX subsidiary Southern California Edison ("SCE") and its subsidiaries own and operate regulated utility assets.  EME and its subsidiaries own and operate certain unregulated coal, wind, and gas power generating assets.

The Debtors and their Non-Debtor Subsidiaries and affiliates are engaged in the business of developing, acquiring, owning or leasing, operating and selling energy and capacity from independent power production facilities.  Additionally, the Debtors and their Non-Debtor Subsidiaries and affiliates (a) sell energy and capacity under contracts to specific purchasers, or on a merchant basis in the marketplace and into wholesale markets, and (b) through their Non-Debtor Subsidiary, Edison Mission Marketing & Trading, Inc. ("EMMT"), engage in hedging and energy trading activities in power markets, and provide scheduling and other services.

EME's subsidiaries or affiliates typically have been formed to own full or partial interests in one or more power generation facilities and ancillary facilities, with each plant or group of related plants being individually referred to by EME as a "project."  EME's operating projects primarily consist of coal- and gas-fired generating facilities and wind energy facilities.  EME's subsidiaries and affiliates own or lease interests in 42 operating projects with an aggregate net physical capacity of 9,358 megawatts ("MW") of which EME's pro rata share was 7,935 MW.

Debtor Midwest Generation, LLC ("MWG"), an indirect wholly owned subsidiary of EME, was formed in 1999 for the purpose of owning or leasing, making improvements to, and operating and selling the capacity and

9

energy of, the power generation assets purchased from Commonwealth Edison Company ("Commonwealth Edison"). EME's coal-fired facilities are primarily owned or leased and operated by MWG. As of December 31, 2012, MWG operated power plants capable of producing 4,619 MW in Illinois (the "MWG plants"):

- the Powerton, Joliet, Will County and Waukegan coal-fired generating plants consisting of 4,314 MW; and

- the Fisk and Waukegan on-site, oil-fired generating peaker plants consisting of 305 MW.

MWG leases the Powerton Station and Units 7 and 8 of the Joliet Station from third-party lessors pursuant to a sale-leaseback transaction completed in August 2000 (the "Powerton and Joliet Sale Leaseback"). MWG's obligations under these leases are guaranteed by EME. In connection with the Powerton and Joliet Sale Leaseback, MWG facilitated the issuance of lessor debt of $1.147 billion in the form of pass-through certificates. MWG is a party to a contract with EMMT under which EMMT, as an agent for MWG, sells energy and capacity from the MWG plants into the wholesale market, engages in hedging activities, and provides scheduling and other services. EMMT has the ability to enter into fuel hedging arrangements on MWG's behalf.

### 2.    Electric Power Industry

EME's and MWG's businesses are both impacted by changes in the United States electric power industry. The electric power industry, including companies engaged in providing generation, transmission, distribution and retail sales and service of electric power, has undergone significant deregulation over the last three decades, which has led to increased competition, especially in the generation sector.

In areas where independent system operators ("ISOs") and regional transmission organizations ("RTOs") have been formed, market participants have open access to transmission service typically at a system-wide rate. ISOs and RTOs may also operate real-time and day-ahead energy and ancillary service markets, which are governed by Federal Energy Regulatory Commission ("FERC") approved tariffs and market rules. The development of such organized markets into which independent power producers are able to sell has reduced these producers' dependence on bilateral contracts with electric utilities. In addition, capacity markets in various regional wholesale power markets compensate supply resources for the capability to supply electricity when needed and demand resources for the electricity they avoid using.

### a.    Seasonality

Due to fluctuations in electric demand resulting from warm weather during the summer and cold weather during the winter, electric revenues from MWG's coal-fired plants normally vary substantially on a seasonal basis. In addition, maintenance outages generally are scheduled during periods of lower projected electric demand in the spring and fall, further reducing generation and increasing major maintenance costs, which are recorded as expenses when incurred. Accordingly, MWG's income is seasonal and has significant quarterly variability. Seasonal fluctuations may also be affected by changes in market prices.

EME's third quarter equity in income from its unconsolidated energy projects is normally higher than equity in income related to other quarters of the year due to seasonal fluctuations and higher energy contract prices during the summer months.

### b.    Competition

Recent developments in drilling for natural gas in shale formations have dramatically reduced natural gas prices, which in turn have created downward pressure on power prices. As a result, the MWG plants are now facing increased competition from natural gas-fueled power generation facilities.

State and local environmental regulations, particularly those that impose stringent state-specific emission limits, could put the MWG plants at a disadvantage compared with competing power plants operating in nearby states which are subject to less stringent state emission limits or to federal emission limits alone. The Combined Pollutant Standard ("CPS") puts the MWG plants at a disadvantage compared with competing plants not subject to similar regulations, and federal air quality regulations, such as the Mercury and Air Toxics Standards ("MATS")

rule, put the MWG plants at a disadvantage compared to plants utilizing other fuels. Potential future climate change regulations could also put the MWG plants at a disadvantage compared to power plants utilizing other fuels as well as utilities that may be able to recover climate change compliance costs through rate-based mechanisms. The ability of the MWG plants to compete could also be affected by future environmental regulations and by governmental and regulatory activities designed to support the construction and operation of power generation facilities fueled by renewable energy sources.

EME's and MWG's businesses are subject to competition from energy marketers, public utilities, government-owned power agencies, industrial companies, financial institutions, and other independent power producers. These companies may have competitive advantages as a result of scale, the location of their generation facilities or other factors. Some of EME's and MWG's competitors have a lower cost of capital and, in the case of utilities, may be able to recover fixed costs through rate-based mechanisms, allowing them to build, buy, and upgrade generation facilities without relying exclusively on market clearing prices to recover their investments.

### 3.    Products

EME operates in one line of business, independent power production, with all its continuing operations located in the United States, except Doga Enerji, which is located in the Republic of Turkey. Operating revenues are primarily derived from the generation and sale of energy and capacity from coal-fired, natural gas-fired, and wind power plants and energy trading. MWG also generates operating revenue from oil-fired generating peakers.

### 4.    Merchant Power Plants

A description of EME's larger power plants and major investments in energy projects is set forth below. In addition to the facilities and power plants that EME owns, EME uses the term "its" in regard to facilities and power plants that EME or an EME subsidiary operates under sale leaseback arrangements.

### a.    MWG Plants

MWG and Commonwealth Edison have various reciprocal permanent and temporary easements over MWG's parcels for the location, use, maintenance, and repair of those facilities and equipment that are used in connection with the operations of MWG and Commonwealth Edison.

### i.    The Powerton and Joliet Stations

The Powerton Station is a 1,538 MW coal-fired station located in Pekin, Tazewell County, Illinois on a site that is approximately 568 acres in size. The site also includes an approximately 1,440–acre lake. The operating units comprising the Powerton Station are referred to as Units 5 and 6 and began operations in 1972 and 1975, respectively. The Joliet Station is located in Joliet, Will County, Illinois, approximately 40 miles southwest of Chicago on a site that is approximately 467 acres in size. The operating units comprising the Joliet Station are referred to as Units 6, 7, and 8. The operation of Units 6, 7, and 8 began in 1959, 1965, and 1966, respectively. Joliet Unit 6 is a 290 MW coal-fired unit located adjacent to, but across the Des Plaines River from, Joliet Units 7 and 8. Joliet Units 7 and 8 are coal-fired and have a combined capacity of 1,036 MW.

In conjunction with the Powerton and Joliet Sale Leaseback, MWG leased substantially all the property on which the generating units are located to the owner trusts under site leases, and the owner trusts in turn subleased their undivided ground interest in the property back to MWG under site subleases.

### ii.    The Waukegan Station

The Waukegan Station is a 689 MW coal-fired power plant located in Waukegan, Lake County, Illinois, on Lake Michigan. The Waukegan Station occupies approximately 194 acres, inclusive of the switchyard. The operating units comprising the Waukegan Station are referred to as Units 7 and 8 and began operations in 1958 and 1962, respectively.

### iii.      The Will County Station

The Will County Station is a 761 MW coal-fired power plant located in Romeoville, Will County, Illinois. The Will County Station is located on approximately 215 acres, inclusive of the switchyard. The operating units comprising the Will County Station are referred to as Units 3 and 4 and began operations between 1955 and 1963.

### iv.      The Former Fisk and Crawford Stations

The Fisk Generating Station ("Fisk") and the Crawford Generating Station ("Crawford"), located in Chicago, Cook County, Illinois, began operations in 1903 and 1927, respectively.  In September 2012, facing increased expenses from complying with environmental regulations, macroeconomic pressures, and certain opposition to the continued operation of the facilities, MWG permanently shut down the Fisk and Crawford facilities.  The facilities are no longer operational.  The Debtors may pursue a sale of the Fisk property (a 43-acre site), the Crawford property (a 72-acre site), and/or Sampson's Canal (a canal near Fisk located at 2251 and 2401 South Loomis Street, Chicago, Illinois) outside of the Plan, as permitted by the Purchase Agreement.  To the extent those properties are not divested, they will remain in MWG's ownership after the Effective Date.

### v.      On-Site Peaking Facilities

The on-site peaking units consist of 305 MW at Fisk and Waukegan, which were commissioned in 1968. The Fisk and Waukegan peaking units burn fuel oil.  Natural gas is used by the Fisk peaking unit for ignition.  The on-site peaking units at Fisk would not be subject to the proposed Crawford and Fisk sale mentioned above.

### vi.      Fuel Supply

MWG purchases coal primarily from the Southern Powder River Basin of Wyoming.  The total volume of coal consumed annually is largely dependent on the amount of generation.  Excluding consumption from retired units, historical consumption has ranged between 14.5 million to 16.5 million tons.  Coal consumption in the current low natural gas price environment may be lower than the historical range.  Coal is transported under transportation agreements with Union Pacific Railroad and various short-haul carriers.  In late 2011, MWG signed agreements, effective January 1, 2012, to provide such fuel transportation on a long-term basis.  As of December 31, 2012, MWG leased approximately 3,200 railcars to transport the coal from the mines to the generating stations under leases with remaining terms that range from one year to seven years. Pursuant to an order entered in the Chapter 11 Cases, MWG rejected a lease related to 1,275 of these railcars.

### vii.      Emission Allowances for the Coal Plants

Federal regulations require electric generating stations to hold sulfur dioxide ("SO$_2$") allowances sufficient to cover their annual emissions.  Pursuant to Illinois' implementation of the Clean Air Interstate Rule ("CAIR"), the MWG plants are required to hold seasonal and annual nitrogen oxide ("NO$_X$") allowances.  The CAIR remains in effect until a replacement regulation becomes effective.

Cross-State Air Pollution Rule ("CSAPR"), which was invalidated by the District of Columbia Circuit Court of Appeals, like CAIR, is an allowance-based regulation that provides for emissions trading.  If CSAPR were to become effective, the amount of actual SO$_2$ or NO$_X$ emissions from plant operations would need to be matched by a sufficient amount of SO$_2$ or NO$_X$ allowances that were either allocated or purchased in the open market.  SO$_2$ allowances under the federal Acid Rain Program could not be used to satisfy the requirements under CSAPR. MWG believes its current environmental remediation plan, developed to comply with the CPS, along with the allowances allocated to it under the CAIR, will be sufficient to comply with the requirements of either the CAIR or CSAPR, as applicable.

### b.      Natural Gas

### i.      Sunrise Project

EME owns a 50 percent interest in Sunrise Power Company, LLC, which owns a 586 MW natural gas-fired combined cycle facility in Kern County, California ("Sunrise").  The power purchase agreement at Sunrise expired

on June 30, 2012, and the project operates on a merchant basis selling into the California ISO market until a new power purchase agreement is executed. Dispatch will depend on market conditions, and Sunrise may run less than it has in the past. Historically, Sunrise has operated more during the summer due to higher demand driven by warmer weather, and during summer 2013, Sunrise had resource adequacy contracts for capacity with PG&E and SDG&E. The profitability of Sunrise as a merchant generator depends on market prices for power and natural gas and future results may differ from historical earnings.

### ii.    Big Four Projects

EME owns partnership investments in Kern River Cogeneration Company ("Kern River"), Midway-Sunset Cogeneration Company ("Midway-Sunset"), Sycamore Cogeneration Company ("Sycamore") and Watson Cogeneration Company ("Watson" and, together with Kern River, Midway-Sunset and Sycamore, the "Big 4 Projects").

### a.    Kern River

Kern River sells electricity to SCE under a transition power purchase agreement and has entered into a long-term power purchase agreement with PG&E. Kern River sells steam to Chevron North America Exploration and Production Company, a division of Chevron U.S.A., Inc. ("Chevron"), pursuant to a cogeneration partnership agreement (the "Kern River Agreement"). Chevron has objected to the Debtors' motion to assume the Kern River Agreement and has filed a complaint against the Debtors seeking to lift the automatic stay and terminate the Kern River Agreement. This litigation, as described in more detail in Article VIII.C below, remains pending.

### b.    Midway-Sunset

Midway-Sunset sells electricity to PG&E under a power purchase agreement that expires in 2016. Midway-Sunset also sells electricity and steam to Aera Energy LLC under agreements that expire concurrently with the PG&E power purchase agreement.

### c.    Sycamore

Sycamore sells electricity to SCE under a transition power purchase agreement and has entered into a long-term power purchase agreement with SCE. Sycamore sells steam to Chevron North America Exploration and Production Company, a division of Chevron U.S.A., Inc., under an agreement that expires in 2020 (the "Sycamore Agreement"). Chevron has objected to the Debtors' motion to assume the Sycamore Agreement and has filed a complaint against the Debtors seeking to lift the automatic stay and terminate the Sycamore Agreement. This litigation, as described in more detail in Article VIII.C below, remains pending.

### d.    Watson

Watson sells electricity to SCE under a transition power purchase agreement. Watson currently sells power and steam to BP West Coast Products LLC under agreements that expire in 2014.

### iii.    Westside Projects

EME owns 50 percent partnership interests in each of Coalinga Cogeneration Company, Mid-Set Cogeneration Company, Salinas River Cogeneration Company, and Sargent Canyon Cogeneration Company, each of which owns a 38 MW natural gas-fired cogeneration facility located in California (collectively, the "Westside Projects"). These projects sell electricity to PG&E under power purchase agreements that expire in 2016. The power purchase agreements became effective in December 2011.

### iv.    Walnut Creek Project

Walnut Creek is a 479 MW natural gas-fired peaker plant in southern California. It achieved commercial operation during the second quarter of 2013 and started earning revenues under its 10-year power sales agreement with SCE in June 2013.

### c.        Coal

EME owns a 50 percent interest in American Bituminous Power Partners, L.P., which owns an 80 MW waste coal facility located in Grant Town, West Virginia ("Ambit"). Ambit sells electricity to Monongahela Power Company under a power purchase agreement that expires in 2036. On October, 1, 2013, Ambit made the required annual principal payments to certain bondholders by drawing on its line of credit and was unable to fully reimburse the drawdown, which is a potential event of default. However, Ambit and various counterparties, including the line of credit issuer, executed an amendment, effective October 1, 2013, to waive any event of default.

### 5.        Doga (International)

EME indirectly owns an 80 percent interest in Doga Enerji, which owns a 180 MW natural gas-fired cogeneration plant near Istanbul in the Republic of Turkey ("Doga"). Doga sells electricity to the Turkish Electricity Distribution Company under a power purchase agreement that expires in 2019, after which date the facility is to be conveyed to the Turkish Ministry of Energy and Natural Resources.

### 6.        Renewable Energy

### a.        Wind

EME, through certain other non-Debtor affiliates, also owns or operates 29 wind facilities throughout the United States—in Illinois, Iowa, Minnesota, Nebraska, New Mexico, Oklahoma, Pennsylvania, Texas, Utah, West Virginia, and Wyoming. Those wind facilities accounted for 22 percent of EME's total power generating capacity on the Petition Date. Generation from 428 MW of wind capacity is sold on a merchant basis, while the balance is sold pursuant to privately negotiated long-term power purchase agreements.

### b.        Biomass

Until January 2013, EME indirectly owned a 38 percent limited partnership interest in Covanta Huntington LP, which owns a 25 MW waste-to-energy facility located near the Town of Huntington, New York. In October 2012, a Non-Debtor Subsidiary of EME exercised an option to sell all of its interest in the project. In January 2013, EME received $7.5 million in exchange for its indirect interest in the project.

### 7.        Asset Management and Trading Activities

EME's power marketing and trading subsidiary, EMMT, manages the energy and capacity of EME's merchant generating plants and, in addition, trades electric power, natural gas, oil and related commodity, and financial products, including forwards, futures, options, and swaps. EMMT segregates its activities into two categories:

- *Asset Management.* EMMT engages in the sale of energy and capacity and the purchase and sale of fuels, including natural gas and fuel oil, through intercompany contracts with EME's subsidiaries that own or lease EME's facilities. EME uses derivative instruments to reduce its exposure to market risks that arise from price fluctuations of electricity, capacity, fuel, emission allowances, and transmission rights. The objective of these activities is to sell the output of the facilities on a forward basis or to hedge the risk of future changes in prices or price differences between different locations. Hedging activities typically include on-peak and off-peak periods and may include load service requirements contracts with local utilities. Transactions related to hedging activities are designated separately from EMMT's trading activities. Not all contracts entered into by EMMT for hedging purposes qualify as hedges for accounting purposes. MWG is a party to a contract with EMMT under which EMMT, as an agent for MWG, sells energy and capacity from the MWG plants into the wholesale market, engages in hedging activities, and provides scheduling and other services. EMMT has the ability to enter into fuel hedging arrangements on MWG's behalf.

14

- *Trading.* EMMT seeks to generate trading profits from volatility in the price of electricity, capacity, fuels, and transmission congestion by buying and selling contracts in wholesale markets under guidelines approved by EME's risk management committee.

### 8.   Employees

As of September 30, 2013, EME's businesses employed 1,063 people, including employees of MWG.  At that date, MWG employed 661 people (or 588 without including MWG EME employees), approximately 436 of whom were covered by a collective bargaining agreement governing wages, certain benefits, and working conditions. On November 6, 2013, the Bankruptcy Court approved the Debtors' extension of this collective bargaining agreement and the agreement is now set to expire on December 31, 2014.  MWG also has a separate collective bargaining agreement governing retirement, health care, disability, and insurance benefits that expires on March 31, 2015.

### B.   Regulatory Matters

EME's and MWG's businesses are subject to extensive regulation.  EME's operating projects, including the MWG plants, are subject to energy, environmental, and other governmental laws and regulations at the federal, state, and local levels in connection with project development, ownership, and operation, and the use of electric energy, capacity and related products, including ancillary services, from the projects. In addition, EME's and MWG's businesses are subject to the market rules, procedures, and protocols of the markets in which they participate.

### 1.   Federal Power Act

The FERC has exclusive jurisdiction over the rates, terms and conditions of wholesale sales of electricity and transmission services in interstate commerce, including on-going, as well as initial, rate jurisdiction, but does not exercise jurisdiction over transmission that is "bundled" with retail sales. The FERC also has jurisdiction over the direct and indirect sale or transfer of, and the transfer of control over, specified assets, including wholesale power sales contracts and generation facilities and, in some cases, jurisdiction over the issuance of securities or the assumption of specified liabilities and some interlocking directorates. Dispositions of EME's and MWG's jurisdictional assets and certain types of financing arrangements may require FERC approval.

Each of EME's domestic generating facilities is either a qualifying facility, as determined by the FERC, or the subsidiary owning the facility is an exempt wholesale generator (an "EWG").  Most qualifying facilities are exempt from the ratemaking and several other provisions of the Federal Power Act (the "FPA").  MWG's and EME's other EWGs, except the Goat Wind and Cedro Hill wind projects located in Texas, are subject to the FERC's ratemaking jurisdiction under the FPA, but have been authorized to sell power at market-based rates to purchasers that are not affiliated electric utility companies as long as they continue to lack market power.  In addition, EME's power marketing subsidiaries, including EMMT, have been authorized by the FERC to make wholesale market sales of power at market-based rates and are subject to the FERC ratemaking regulation under the FPA.

If a qualifying facility in which EME has an interest were to lose its qualifying facility status, the project would no longer be entitled to the related exemptions from regulation and could become subject to rate regulation by the FERC and state authorities.  If an EWG or qualifying facility in which EME has an interest were to lose such status, the EWG or qualifying facility, any intermediate holding company, and EME could become subject to FERC regulation under PUHCA 2005.  Loss of qualifying facility or EWG status could also trigger defaults under covenants contained in the project's power sales agreements and financing agreements.

### 2.   The Dodd-Frank Act

The Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") provides the Commodity Futures Trading Commission and the Securities and Exchange Commission with jurisdiction to regulate financial derivative products, including swaps, options, and other derivative products, collectively referred to herein as "swaps."

The Dodd-Frank Act subjects swaps to new mandatory clearing and trading requirements, if no exemption applies.  It may also impose capital requirements on non-exempt market participants.  The clearing and trading requirements could result in increased margining requirements which may increase the costs of hedging activity.  EME and MWG, through EMMT, use swaps to hedge commercial risks associated with the generation, purchase and sale of electricity and fuel to wholesale customers.  In addition, EMMT utilizes swaps as part of its proprietary trading activities.

New rules and regulations on clearing, trading, or other requirements under the Dodd-Frank Act have been enacted and other rules and regulations are under consideration.  The potential impact of those rules and regulations will depend on the content, which remains uncertain.

### 3.     Reliability Standards

The North American Electric Reliability Corporation (the "NERC") establishes and enforces reliability standards for the bulk power system.  EME and MWG believe they have taken appropriate steps to comply with current applicable NERC reliability standards.

### 4.     Transmission of Wholesale Power

EME's projects that sell power to wholesale purchasers other than the local utility to which the project may be interconnected require the transmission of electricity over power lines owned by others.  MWG utilizes power lines owned by others for the transmission of electricity.  The prices and other terms and conditions of transmission contracts are regulated by the FERC when the entity providing the transmission service is subject to FERC jurisdiction.

### 5.     PUHCA 2005

PUHCA 2005 applies to holding companies (including their affiliates) that own ten percent or more of the voting securities of public utilities, affirms the FERC's authority to deny or approve the pass-through of costs charged for inter-affiliate, non-power goods and services, establishes the FERC's authority over the books and records of holding companies and their affiliates, and, except for holding companies that own only qualifying facilities, allows state access to the books and records of holding companies and their affiliates.  A holding company that owns only EWGs is exempt from the FERC's books and records jurisdiction.  Since EME's domestic indirectly-owned generating facilities sell power at market-based rates, they are not affected by FERC's jurisdiction over inter-affiliate, non-power goods and services.  Since EME's domestic indirectly-owned generating facilities are EWGs or qualifying facilities, EME is not subject to FERC's books and records jurisdiction.

## C.     Environmental Matters and Regulations

Legislative and regulatory activities by federal, state and local authorities in the United States relating to energy and the environment impose numerous restrictions and requirements with respect to the operation of EME's existing facilities, including the MWG plants, and affect the timing, cost, location, design, construction, and operation of new facilities by EME's subsidiaries, as well as the cost of mitigating the environmental impacts of past operations.  In addition, the United States Environmental Protection Agency (the "U.S. EPA") and others have from time to time sought to involve EME and MWG in litigation related to facilities owned by EME's subsidiaries.  The EME facilities most affected by stringent environmental requirements are the MWG plants.

### 1.     Air Quality

The Clean Air Act (the "CAA"), which regulates air pollutants from mobile and stationary sources, has a significant impact on the operation of the MWG plants.  The CAA requires the U.S. EPA to establish concentration levels in the ambient air for six common air pollutants, or "criteria pollutants," to protect public health and welfare.  These concentration levels are known as National Ambient Air Quality Standards (the "NAAQS"). The six criteria pollutants are carbon monoxide, lead, $NO_X$, ozone, particulate matter, and $SO_2$.

Federal environmental regulations require states to adopt state implementation plans ("SIPs") for certain pollutants that detail how the state will attain the standards that are mandated by the relevant law or regulation.  The

SIPs must be equal to or more stringent than the federal requirements and must be submitted to the U.S. EPA for approval. Each state identifies the areas within its boundaries that meet the NAAQS ("attainment areas") and those that do not ("non-attainment areas"), and must develop a SIP both to bring non-attainment areas into compliance with the NAAQS and to maintain compliant air quality in attainment areas. If the attainment status of areas changes, states may be required to develop new SIPs that address these changes. Many of EME's and its subsidiaries' facilities are located in areas that have not attained NAAQS for ozone (affected by $NO_X$ emissions from power plants) and fine particulate matter (affected by $SO_2$ and $NO_X$ emissions from power plants).

On December 11, 2006, MWG entered into an agreement with the Illinois Environmental Protection Agency (the "Illinois EPA"), which was subsequently embodied in an Illinois rule, the CPS, to reduce mercury, $NO_X$ and $SO_2$ emissions at the MWG plants. The CPS requires MWG to achieve air emission reductions for $NO_X$ and $SO_2$, and those reductions should contribute to or effect compliance through SIPs with various existing U.S. EPA ambient air quality standards. It is possible that if ozone, particulate matter, $NO_X$, or $SO_2$ NAAQS requirements are lowered by U.S. EPA in the future, Illinois may implement regulations that are more stringent than those required by the CPS.

### a.     Nitrogen Oxide and Sulfur Dioxide

#### i.     Clean Air Interstate and Cross-State Air Pollution Rules

The CAIR, issued by the U.S. EPA on March 10, 2005, mandated significant reductions in $NO_X$ and $SO_2$ emission allowance caps under the CAA in 28 eastern states and the District of Columbia. In 2008, the United States Court of Appeals for the District of Columbia Circuit initially vacated the CAIR, but later remanded the CAIR to the U.S. EPA for the issuance of a revised rule. The CAIR remains in effect until a replacement regulation becomes effective.

On July 6, 2011, the U.S. EPA adopted CSAPR. CSAPR contemplated emissions reductions for annual $SO_2$ emissions and annual and ozone season $NO_X$ emissions in two phases: a first phase originally scheduled to be effective January 1, 2012 and, in most states subject to the program (including Illinois); and a second phase effective January 1, 2014 that requires additional reductions in annual $SO_2$ emissions. CSAPR, like the CAIR, is an allowance-based regulation that provides for emissions trading.

In August 2012, the United States Court of Appeals for the District of Columbia Circuit vacated the CSAPR and directed the U.S. EPA to continue administering the CAIR pending the promulgation of a valid replacement. The decision will be reviewed by the U.S. Supreme Court during its 2013-2014 term.

#### ii.     Revised NAAQS for $SO_2$.

In June 2010, the U.S. EPA finalized the primary NAAQS for $SO_2$ by establishing a new one-hour standard at a level of 75 parts per billion. In June 2011, the Illinois EPA submitted its initial recommended attainment/non-attainment area designations in connection with the standard. The Illinois EPA recommended designating parts of Tazewell County (where the Powerton plant is located) and Will and Cook Counties as non-attainment areas with this standard. The recommended designation for parts of Will and Cook Counties included the area where the Will County plant is located, but not the areas where MWG's other plants in those counties are located.

#### iii.     Illinois

All of MWG's Illinois coal-fired electric generating units are subject to the CPS, but MWG was granted a variance by the Illinois Pollution Control Board in April 2013 ("2013 Variance") that modifies certain of the CPS obligations. Under the CPS and the 2013 Variance, MWG must meet certain emission standards for its Illinois coal units, install specified pollution control technology on certain units by dates certain, and either install control equipment or shut down other units. The principal emission standards and control technology requirements for $NO_X$ and $SO_2$ under the CPS and 2013 Variance are described below.

- *$NO_X$ Emissions.* Beginning in 2012 and continuing in each calendar year thereafter, MWG must comply with an annual and seasonal $NO_X$ emission rate of no more than 0.11 lbs/million British thermal units ("Btu"). MWG's 2012 fleetwide $NO_X$ emission rate complied with this regulation.

- *SO$_2$ Emissions.* Pursuant to the 2013 Variance, MWG must comply with an SO$_2$ emissions cap system-wide (*i.e.*, at Joliet Units 6, 7, & 8; Powerton Units 5 & 6; Waukegan Units 7 & 8; and Will County Units 3 & 4) of 57,000 tons in 2013, 54,000 tons in 2014, 39,000 tons in 2015, and 37,000 tons in 2016. No other coal-fired units may operate from April 4, 2013 through December 31, 2016. Additionally, MWG must comply with a system-wide SO$_2$ emissions limit of 0.38 lb/mmBtu from January 1, 2015 through December 31, 2016. MWG must comply with the CPS overall SO$_2$ annual emission rate of 0.15 lbs/mmBtu in 2017, 0.13 lbs/mmBtu in 2018, and 0.211 lbs/mmBtu in 2019.

- *Specific Controls.* Under the CPS, MWG must permanently shut down or install flue gas desulfurization ("FGD") at Joliet Units 6, 7, and 8, Will County Units 3 and 4, and Powerton Unit 5 by December 31, 2018. The April 2013 Variance requires permanent shut down or installation of FGD and ESP upgrades on Powerton Unit 6 by December 31, 2014, FGD and ESP upgrades or a fabric filter at Waukegan Unit 7 by December 31, 2014, and FGD at Waukegan Unit 8 by May 31, 2015 (or a permanent shutdown of that unit).

Testing of dry sorbent injection using Trona on select MWG units has demonstrated significant reductions in SO$_2$ emissions. Use of dry sorbent injection technology in conjunction with low sulfur coal is expected to require substantially less capital and time to construct than the use of spray dryer absorber technology, but would likely result in higher ongoing operating costs and may consequently impair the competitiveness of MWG's plants, depending on competitors' costs.

The Sierra Club has filed a complaint with the Illinois Pollution Control Board alleging that MWG's emissions of SO$_2$ between 2010 and 2012 resulted in violations of air pollution control requirements of the Illinois Environmental Protection Act and the Board's regulations at Joliet, Powerton, Waukegan, and Will County. Sierra Club seeks civil penalties, a cease and desist order, and limits and reductions of SO$_2$ emissions. On November 13, 2013, the Sierra Club obtained an order of the Bankruptcy Court granting relief from the automatic stay [Docket No. 1584], allowing it to resume its action for declaratory and injunctive relief but prohibiting it from enforcing, at this time, any monetary penalties that may be awarded.

### b. Mercury/Hazardous Air Pollutants

#### i. Mercury and Air Toxics Standards Rule

In December 2011, the U.S. EPA announced the MATS rule, limiting emissions of hazardous air pollutants ("HAPs") from coal- and oil-fired electrical generating units. The rule became effective on April 16, 2012 with a compliance deadline of April 16, 2015 for existing units. In November 2012, the U.S. EPA issued proposed revisions to aspects of the regulation relating to new units. A number of parties have filed notices of appeal challenging the rule, although the only appeals that are currently moving forward relate to the standards applicable to existing units. EME and MWG do not expect these standards to require material changes to the approach for compliance with state and federal environmental regulations already contemplated for CPS compliance.

#### ii. Illinois

The CPS requires that, beginning in calendar year 2015, and continuing thereafter on a rolling 12-month basis, MWG must either achieve an emission standard of 0.008 lbs mercury/gigawatt-hours ("GWh") gross electrical output or a minimum 90 percent reduction in mercury for each unit (except Unit 3 at the Will County Station, which will be included in calendar year 2016). In 2012, MWG notified the Illinois EPA that all units except Waukegan Station Unit 7 and Will County Station Unit 3 were in compliance with these requirements. MWG is required to install cold side electrostatic precipitator or fabric filtration equipment on Waukegan Station Unit 7 by December 31, 2014 and on Will County Station Unit 3 by December 31, 2015 to comply with the CPS.

### c. Ozone

*National Ambient Air Quality Standards.* In January 2010, the U.S. EPA proposed a revision to the primary and secondary NAAQS for 8-hour ozone that it had finalized in 2008. The 8-hour ozone standard established in 2008 was 0.075 parts per million. In January 2010, the U.S. EPA proposed establishing a primary 8-

hour ozone NAAQS between 0.060 and 0.070 parts per million and a distinct secondary standard to protect sensitive vegetation and ecosystems.  In September 2011, President Obama announced that the proposed revision was being withdrawn. The ozone NAAQS established in 2008 remains in place, but the implementation process must be completed before the 0.075 parts-per-million standard can be enforced.  New primary and secondary ozone standards are expected in 2014.

In June 2012, the U.S. EPA designated the counties in Illinois where MWG's coal-fired power plants are located as non-attainment areas with the 2008 NAAQS.  Illinois has not yet submitted a SIP outlining how compliance with the 2008 NAAQS will be achieved.

### d.    Regional Haze

The regional haze rules under the CAA are designed to prevent impairment of visibility in certain federally designated areas.  The goal of the rules is to restore visibility in mandatory federal Class I areas, such as national parks and wilderness areas, to natural background conditions by 2064.  Sources, such as power plants, that are reasonably anticipated to contribute to visibility impairment in Class I areas may be required to install best available retrofit technology ("BART") or implement other control strategies to meet regional haze control requirements.

In July 2012, the U.S. EPA approved Illinois' regional haze SIP, which provided that the emission reductions that the MWG plants will be required to make pursuant to the CPS, discussed above in "—Nitrogen Oxide and Sulfur Dioxide—Illinois," satisfy the BART requirement.

### e.    New Source Review Requirements

The New Source Review ("NSR") regulations impose certain requirements on facilities, such as electric generating stations, if modifications are made to air emissions sources at the facility.  Since 1999, the U.S. EPA has pursued a coordinated compliance and enforcement strategy to address NSR compliance issues at the nation's coal-fired power plants.  The U.S. EPA has filed enforcement actions against MWG and Homer City alleging NSR violations.  Pursuant to the Plan, valid claims (if any) against MWG on account of these enforcement actions will be satisfied in full.  In addition, the Purchaser will assume EME's liability (if any) on account of these enforcement actions.

### f.    Odors and Particulates

Illinois residents in the vicinity of the Crawford and Fisk Plants have filed putative class action suits against MWG alleging that particulate, odor, and air contaminants from the plants have caused property damage, interference with use and enjoyment of property,  and emotional distress.  They seek compensatory damages and injunctive relief.  *See Paraday v. Midwest Generation, LLC*, No. 2012-CH-1575 (Cir. Ct. Cook Cnty. Ill.); *Bastida v. Midwest Generation, LLC*, No. 2012-CH-1576 (Cir. Ct. Cook Cnty. Ill.).

### g.    Permitting

MWG has challenged the operating permits issued by the Illinois Environmental Protection Agency for its plants.  MWG is arguing, among other things, that the operating permits lack statements of basis, are arbitrary and capricious, and unlawfully impose new substantive requirements.  *See, e.g.*, Complaint, *Midwest Generation, LLC v. Illinois EPA*, PCB 06-060 (Nov. 2, 2005).  These cases are PCB 06-060 (Will County), PCB 06-146 (Waukegan), PCB 06-058 (Joliet), and PCB 06-059 (Powerton).  The permits have been stayed pending the outcome of the appeals.  *See, e.g.*, Order, PCB 06-060 (Feb. 16, 2006).  In the meantime, the plants must continue to operate by the terms and conditions of their prior state operating permits.  *Id.*

MWG also has challenged a number of construction permits issued by the Illinois Environmental Protection Agency, arguing, among other things, that the permits impose conditions that have been appealed in the pending operating permit cases.  *See, e.g.*, Order Granting Stay, *Midwest Generation, LLC v. Illinois EPA*, PCB 10-98 (June 17, 2010); Order Granting Stay, *Midwest Generation, LLC v. Illinois EPA*, PCB 06-156 (July 20, 2006). The challenged conditions of these permits have been stayed as MWG and Illinois EPA negotiate new permit terms. *See* PCB 10-98 (Will County permit for installation and operation of 2,000-gallon above-ground gasoline storage tank); PCB 06-156 (Will County permit for construction and operation of wet dust extractor control devices); PCB

08-009 (Will County permit for construction of soda ash handling system); PCB 08-022 (Will County permit for installation of activated carbon injection ("ACI")); PCB 08-20 (Waukegan permit for installation of ACI); PCB 07-101 (Powerton permit for installation of wet dust extractors).

## 2.    Water Quality

### a.    Clean Water Act

Regulations under the federal Clean Water Act govern critical operating parameters at generating facilities, such as the temperature of effluent discharges and the location, design, and construction of cooling water intake structures at generating facilities.  In April 2011, the U.S. EPA published a rule proposing standards under the federal Clean Water Act that would affect cooling water intake structures at existing generating facilities.  The standards are intended to protect aquatic organisms by reducing capture in screens attached to cooling water intake structures ("impingement") and in the water volume brought into the facilities ("entrainment").  The regulations are expected to be finalized in 2013.  The required measures to comply with the proposed standards regarding entrainment are subject to the discretion of the permitting authority, and EME is unable at this time to assess potential costs of compliance, which could be significant for the MWG plants.

In June 2013, the U.S. EPA proposed changes to the Steam Electric Guideline Regulation which sets discharge limits for various operations which discharge to waters of the United States.  The rule is schedule for issuance by May 2014.

### b.    Illinois

MWG is a party to an administrative rulemaking proceeding before the Illinois Pollution Control Board to determine whether more stringent thermal and other water quality standards for the Chicago Area Waterway System and Lower Des Plaines River, which supply cooling water to MWG's Will County and Joliet Stations, will be implemented.  The proposed thermal water quality standards, if adopted, are expected to affect the manner in which those stations use water for station cooling.  It is not possible to predict the timing for resolution of the proceeding, the final form of the rules, or specifically how it would impact the operation of each affected station; however, unless regulatory relief from the rules' application to the MWG stations is obtained, significant capital expenditures are likely.

### c.    Coal Combustion Wastes

U.S. EPA regulations currently classify coal ash and other coal combustion residuals as solid wastes that are exempt from hazardous waste requirements.  This classification enables beneficial uses of coal combustion residuals, such as for cement production and fill materials.  MWG currently provides a portion of its coal combustion residuals for beneficial uses.  In June 2010, the U.S. EPA published proposed regulations relating to coal combustion residuals that could result in more stringent requirements for the management and disposal of such materials.

Environmental groups have filed a complaint before the Illinois Pollution Control Board alleging that groundwater pollution has leached from coal-ash ponds at Joliet, Powerton, Waukegan, and Will County.  The plaintiffs allege that coal-ash ponds at those facilities have released contaminants into the groundwater, causing exceedances of state and federal standards for several pollutants including arsenic, boron, and selenium. They seek an order requiring MWG to modify its coal ash disposal practices and remediate groundwater contamination, as well as civil penalties.  *See Sierra Club v. Midwest Generation LLC*, PCB 13-15.

### d.    Climate Change

There have been a number of federal and state legislative and regulatory initiatives to reduce greenhouse gas ("GHG") emissions.  Any climate change regulation or other legal obligation that would require substantial reductions in GHG emissions or that would impose additional costs or charges for the GHG emissions could significantly increase the cost of generating electricity from fossil fuels, and especially from coal-fired plants, which could adversely affect EME's and MWG's businesses.

*i.      Federal Legislative/Regulatory Developments*

In June 2010, the U.S. EPA issued the Prevention of Significant Deterioration and Title V Greenhouse Gas Tailoring Rule (the "GHG Tailoring Rule"). This regulation generally subjects newly constructed sources of GHG emissions and newly modified existing major sources to the Prevention of Significant Deterioration ("PSD") air permitting program beginning in January 2011 (and later, to the Title V permitting program under the CAA); however, the GHG Tailoring Rule significantly increases the emissions thresholds that apply before facilities are subjected to these programs. The emissions thresholds for carbon dioxide ("$CO_2$") equivalents in the final rule vary from 75,000 tons per year to 100,000 tons per year depending on the date and whether the sources are new or modified.

In June 2012, the United States Court of Appeals for the District of Columbia Circuit dismissed the challenge by industry groups and some states to the GHG Tailoring Rule. In December 2012, petitions for rehearing by the full District of Columbia Circuit filed by states and industry groups were denied. In July 2012, the U.S. EPA published a final rule maintaining the $CO_2$ equivalent emissions thresholds (for purposes of PSD and Title V permitting) originally established in the GHG Tailoring Rule.

Regulation of GHG emissions pursuant to the PSD program could affect efforts to modify EME's and MWG's facilities in the future and could subject new capital projects to additional permitting or emissions control requirements that could delay such projects. In December 2010, the U.S. EPA announced that it had entered into a settlement with various states and environmental groups to resolve a long-standing dispute over regulation of GHGs from electrical generating units pursuant to the New Source Performance Standards in the CAA and would propose performance standards for emissions from new and modified power plants and emissions guidelines for existing power plants. In September 2013, the U.S. EPA issued proposed regulations governing GHG emissions from new electric generating stations. The U.S. EPA intends to issue proposed GHG emission standards for reconstructed and existing electric generating stations in June 2014 and to promulgate such standards in June 2015. States would be required to submit their implementation plans responding to such guidelines to the U.S. EPA one year after the regulations are promulgated.

Since January 2010, the U.S. EPA's Final Mandatory Greenhouse Gas Reporting Rule has required all sources within specified categories, including electric generation facilities, to monitor emissions and to submit annual reports to the U.S. EPA by March 31 of each year. EME's 2012 GHG emissions were approximately 29 million metric tons. MWG's 2012 GHG emissions were approximately 25 million metric tons.

*ii.      Regional Initiatives and State Legislation*

Regional initiatives and state legislation may also require reductions of GHG emissions, and it is not yet clear whether or to what extent any federal legislation would preempt them. If state and/or regional initiatives remain in effect after federal legislation is enacted, generators could be required to satisfy them in addition to federal standards.

EME's operations in California are subject to two laws governing GHG emissions. The first law, the California Global Warming Solutions Act of 2006 ("AB 32"), establishes a comprehensive program to reduce GHG emissions. AB 32 requires the California Air Resources Board (the "CARB") to develop regulations, effective in 2012, that would reduce California's GHG emissions to 1990 levels in yearly increments by 2020. In December 2011, the CARB regulation was officially published, establishing a California cap-and-trade program. The first compliance period under the regulations is for 2013 GHG emissions. CARB regulations implementing a cap-and-trade program, and the cap-and-trade program itself, continue to be the subject of litigation. In December 2011, a federal district court enjoined the Low Carbon Fuel Standard, another AB 32 program regulating the carbon content of transportation fuels, on constitutional commerce clause grounds.

The second law, SB 1368, required the CPUC and the California Energy Commission to adopt GHG emissions performance standards restricting the ability of California investor-owned and publicly owned utilities, respectively, to enter into long-term arrangements for the purchase of electricity. The standards that have been adopted prohibit these entities from entering into long-term financial commitments with generators that emit more than 1,100 pounds of $CO_2$ per MW-hour (the performance of a combined-cycle gas turbine generator). EME believes that all of its California facilities meet the SB 1368 standards.

21

### iii.  Litigation Developments

Litigation alleging that GHG is a public and private nuisance may affect EME and MWG whether or not they are named as defendants.  The law is unsettled on whether or not this litigation presents questions capable of judicial resolution or political questions that should be resolved by the legislative or executive branches.

In April 2013, the United States Court of Appeals for the Fifth Circuit dismissed, as to EME and three wholly owned EME subsidiaries, the plaintiffs' appeal of the Mississippi federal district court's dismissal of a lawsuit filed in March 2012 against a large number of defendants (including EME and the three subsidiaries). The plaintiffs had alleged that defendants' activities resulted in emissions of substantial quantities of GHG that have contributed to climate change and sea level rise, which in turn were alleged to have increased the destructive force of Hurricane Katrina.

### D.  The Debtors' Capital Structure and Prepetition Indebtedness

#### 1.  Corporate Structure

All of the Debtors are indirect subsidiaries and affiliates of non-Debtor EIX whose shares are publicly traded on the New York Stock Exchange.  Debtor EME is a Delaware corporation that functions as the parent company of its various Debtor and Non-Debtor Subsidiaries and affiliates.

#### 2.  Prepetition Indebtedness

The Debtors' principal prepetition capital structure consisted of (a) approximately $3.7 billion of senior unsecured notes, (b) approximately $345 million of sale-leaseback obligation certificates (the "PoJo Certificates") related to the Powerton-Joliet leveraged lease transactions, (c) $1.367 billion of intercompany notes issued by EME to MWG, and (d) letter-of-credit facilities for EME and Midwest Generation EME, LLC.  EME's project-level subsidiaries were also borrowers or issuers under approximately $1.2 billion of funded indebtedness that is nonrecourse to EME as well as certain letter of credit facilities.

As of the Petition Date, the Debtors and EME's project-level subsidiaries had approximately $5.4 billion in principal of funded debt.

#### a.  Senior Unsecured Notes

As of the Petition Date, EME had outstanding approximately $3.7 billion in principal of senior unsecured notes, comprised of:

- $500 million principal amount of 7.50-percent Senior Notes which were due June 15, 2013, with interest payments due semi-annually on June 15 and December 15 (the "2013 Notes");

- $500 million principal amount of 7.75-percent Senior Notes due June 15, 2016, with interest payments due semi-annually on June 15 and December 15 (the "2016 Notes");

- $1.2 billion principal amount of 7.00-percent Senior Notes due May 15, 2017, with interest payments due semi-annually on May 15 and November 15 (the "2017 Notes");

- $800 million principal amount of 7.20-percent Senior Notes due May 15, 2019, with interest payments due May 15 and November 15 (the "2019 Notes"); and

- $700 million aggregate principal amount of 7.625-percent Senior Notes due May 15, 2027, with interest payments due May 15 and November 15 (the "2027 Notes," and, together with the 2013 Notes, the 2016 Notes, the 2017 Notes, and the 2019 Notes, the "EME Senior Notes").

*i.*        *2013 Notes and 2016 Notes*

The 2013 Notes and the 2016 Notes were issued under an indenture, dated June 6, 2006, by and between EME and Wells Fargo Bank, National Association, as trustee, as supplemented from time to time thereafter.    The 2013 Notes and the 2016 Notes are unsecured and rank equally with EME's other unsecured senior indebtedness, including the 2017 Notes, the 2019 Notes and the 2027 Notes.

In addition to the default relating to the filing of the Chapter 11 Cases, on December 17, 2012, EME failed to make semiannual interest payments of an aggregate amount of $38.1 million.    As a result, the holders of 25 percent in aggregate principal amount of either of the 2013 Notes or the 2016 Notes had the right to accelerate their respective obligations under either of the 2013 Notes or the 2016 Notes, subject to the automatic stay under the Bankruptcy Code.

*ii.*        *2017 Notes, 2019 Notes, and 2027 Notes*

The 2017 Notes, the 2019 Notes, and the 2027 Notes were issued under an indenture, dated May 7, 2007, by and between EME and Wells Fargo Bank, National Association, as trustee, as supplemented from time to time thereafter.  The 2017 Notes, the 2019 Notes, and the 2027 Notes are unsecured and rank equally with EME's other unsecured senior indebtedness, including the 2013 Notes and the 2016 Notes.  Interest on the 2017 Notes, the 2019 Notes and the 2027 Notes is payable on May 15 and November 15 of each year.

In addition to the default relating to the filing of the Chapter 11 Cases, on November 15 2012, EME failed to make semiannual interest payments of an aggregate amount of $97.5 million, which were subject to a 30-day grace period.  EME did not make the payment within the grace period.  As a result, the holders of 25 percent in aggregate principal amount of any of the 2017 Notes, the 2019 Notes, or the 2027 Notes had the right to accelerate their respective obligations under any of the 2017 Notes, the 2019 Notes, or the 2027 Notes, subject to the automatic stay under the Bankruptcy Code.

### 3.        Sale-Leaseback Obligation Notes

In connection with the Powerton and Joliet Sale Leaseback, the owner lessors raised cash to effect the transaction by issuing PoJo Certificates to investor-certificate holders by way of a pass-through trust.  MWG pays rent to the lease indenture trustee, who distributes scheduled SLOB payments to the certificate holders.    EME guarantees these rent payments.

As of July 2, 2012, after which no principal payments were made, approximately $345 million principal of PoJo Certificates were outstanding, approximately $220.26 million related to the Powerton Lease and approximately $124.91 million related to the Joliet lease.

### 4.        Intercompany Notes

MWG loaned the sale-leaseback proceeds of the Powerton and Joliet Sale Leaseback to EME in exchange for the following intercompany notes in aggregate principal amount of $1.367 billion (the "Intercompany Notes"), which each accrue interest at 8.30 percent:

- $581,700,000 of Intercompany Notes due July 2, 2014;

- $285,849,200 of Intercompany Notes due January 2, 2015; and

- $499,450,800 of Intercompany Notes due January 2, 2016.

EME's obligations under the Intercompany Notes are general obligations of EME and are *pari passu* with EME's other unsecured obligations.

EME funds its payments of principal and interest due under the Intercompany Notes from distributions from its subsidiaries, including MWG, and cash on hand.  EME's payments under the Intercompany Notes assist MWG in the payment of its lease payments under the Powerton and Joliet Sale Leaseback.  As a result of the

Chapter 11 Cases, EME did not make the scheduled principal and interest payment of $61 million due on January 2, 2013. MWG determined that it was probable a loss would be realized in connection with this intercompany loan. MWG is unable to determine whether any future payments will be made under this intercompany loan agreement. As a result, MWG recorded a $1.4 billion charge, equal to the full carrying amount of the loan and accrued interest, during the fourth quarter of 2012. The Intercompany Notes mature simultaneously with the maturity of the PoJo Certificates under the Powerton Joliet Sale Leaseback.

### 5.   EME and Midwest Generation EME, LLC Letter of Credit Facilities

As of the Petition Date, EME was the account party on a $100 million cash collateralized letter of credit facility provided by DNB Bank ASA, which matures on June 30, 2014. Approximately $55 million of letters of credit had been issued under this facility, all of which were cash collateralized by EME.

As of the Petition Date, Midwest Generation EME, LLC was the account party on a $2 million cash collateralized letter of credit facility provided by Citibank, N.A., which matures on December 31, 2013. Approximately $2 million of letters of credit had been issued under this facility.

These letter of credit facilities at EME and Midwest Generation EME, LLC were refinanced after the Petition Date with a $75 million letter credit facility at Edison Mission Wind, which was completed in April 2013 and expires on April 30, 2016.

### 6.   PoJo Leveraged Leases

#### a.   Financing MWG's Entry into the PoJo Leases and Documents

Effective as of August 17, 2000, MWG entered into the PoJo Leases and Documents, pursuant to which MWG sold its Powerton Generating Station in Pekin, Illinois ("Powerton") and Units 7 and 8 of its Joliet Generating Station in Joliet, Illinois (collectively, "Joliet" and, collectively with Powerton, the "PoJo Facilities") to the PoJo Owner Lessors and simultaneously leased the Facilities from the PoJo Owner Lessors. In connection therewith, the PoJo Owner Lessors purchased the PoJo Facilities from MWG for approximately $1.367 billion in aggregate cash consideration.

To fund the $1.367 billion purchase price for the PoJo Facilities, the PoJo Owner Lessors used $237 million in equity funding from the PoJo Owner Participants and financed the remaining $1.147 billion of the purchase price by issuing two series of PoJo Certificates: (i) $333.5 million in 8.30 percent Series A Lessor Notes and (ii) $813.5 million in 8.56 percent Series B Lessor Notes. The Series A Lessor Notes have fully paid and are no longer outstanding. All of the Series B Lessor Notes were purchased by a Series B Pass Through Trust, which financed the purchase by issuing $813.5 million in 8.56 percent Series B Pass Through Certificates to unrelated third parties (as exchanged for an equal amount of registered certificates (the "Series B Certificates"). The Series B Certificates are held for the benefit of their respective holders by the Bank of New York Mellon, as Successor Pass Through Trustee (the "PoJo Pass Through Trustee"). As of the Petition Date, Series B Certificates in the aggregate principal amount of $345 million remained outstanding.

#### b.   Overview of the PoJo Leases and Documents

In connection with MWG's entry into the PoJo Leases and Documents, MWG simultaneously leased an undivided interest in Powerton and Joliet from the PoJo Owner Lessors pursuant to the applicable Facility Lease Agreements (collectively, the "PoJo Leases") and leased the facility sites with respect thereto to the respective PoJo Owner Lessors pursuant to certain facility site sublease agreements. Under the PoJo Leases, lease rent is paid in arrears in semi-annual payments to the PoJo Owner Lessors, which utilize such lease rent to support the principal and interest payments on the PoJo Certificates, which are secured by an assignment of, and first priority security interest in, substantially all of the Owner Lessor's assets, including the PoJo Leases and the PoJo Facilities. Approximately $75 million in lease rent became payable on each of January 2, 2013, and July 2, 2013. Absent early rejection or termination, the Powerton leases expire in 2034 and the Joliet leases expire in 2030.

In addition to MWG's obligations thereunder, EME is obligated under the PoJo Leases and Documents as follows:

24

- Under certain guarantees executed by EME in favor of the PoJo Owner Lessors and PoJo Owner Participants, EME unconditionally and irrevocably guarantees, as primary obligation and not merely as surety, MWG's payment of rent under the PoJo Leases and the other PoJo Leases and Documents, respectively.

- The PoJo Leases and Documents' participation agreements require EME, subject to certain conditions, to indemnify the PoJo Owner Lessors, the PoJo Owner Participants, the PoJo Equity Investors, the PoJo Pass Through Trustee, and certain other parties, for certain non-tax claims related to the PoJo Facilities.

- Finally, under certain tax indemnity agreements between EME and each of the PoJo Owner Participants, EME, subject to certain terms and conditions, agrees to indemnify each PoJo Owner Participant for the adverse tax consequences resulting from breaches of representations and warranties under the tax indemnity agreement and certain acts or omissions of MWG.

### E.    Tax Sharing Agreements

The "EIX Group," consisting of EIX and certain of its subsidiaries, files a consolidated federal income tax return that enables the group to be taxable as a group rather than as separate entities.[2]  Similarly, the EIX Group files unitary and similar state tax returns, including in particular in the state of California.[3]  Several tax sharing agreements (the "Tax Sharing Agreements") govern the payments by and among EIX and its subsidiaries with respect to tax liabilities and the use of losses and credits ("Tax Attributes").  For purposes of the Tax Sharing Agreements only, the taxable income and Tax Attributes of each subsidiary are generally calculated independently. Subsidiaries that generated taxable income are generally required to make payments to EIX either to cover their respective share of the group's cash tax liability or to the extent other members' Tax Attributes shelter their net income, as calculated on a standalone basis.  Correspondingly, subsidiaries that generated tax losses are compensated by other members of the group to the extent their Tax Attributes are used to shelter net income of such other members, as calculated on a standalone basis.

Specifically, under the master tax sharing agreement (the "Master Agreement") between EIX, SCE, and Edison Mission Group, Inc. (EME's "grandparent," "EMG"), subject to the SCE Priority described below, EIX makes payments to SCE and EMG for Tax Attributes attributable to their respective sub-groups if, when, and as such Tax Attributes are used to offset the taxable income of the EIX Group.  SCE and EMG, in turn, make payments to EIX in amounts equal to the assumed tax liability of their respective sub-groups determined on a separate company basis.  The tax sharing payments among EMG and its first tier subsidiaries, including Mission Energy Holding Company ("MEHC"), as well as among MEHC and its first tier subsidiaries, including EME, are governed by separate Tax Sharing Agreements that apply similar principles as the Master Agreement (other than the SCE Priority).

Certain provisions of the Master Agreement purport to give priority to the use of SCE's current Tax Attributes prior to the use of EMG's current Tax Attributes and, in certain circumstances, to the carryback and carryforward of SCE's current net operating losses before the carryback and carryforward of EME's current net operating losses (the "SCE Priority") irrespective of the regulatory usage of such losses.  In the case of a carryforward or carryback, the SCE Priority applies only to an actual reduction of the tax liability of the EIX Group.

In recent years, EME and its subsidiaries have generated significant Tax Attributes for tax purposes. However, other members of the EIX Group, in particular SCE and its subsidiaries, that normally generate net

---

[2]   Federal income tax law allows a parent corporation to file a consolidated tax return with corporate subsidiaries when the parent owns shares generally representing 80 percent of the vote and 80 percent of the value of all outstanding shares.  Many states follow similar rules providing for consolidated or combined tax returns.

[3]   The state rules may differ from the federal consolidated regime, including in particular in California, but the Tax Sharing Agreements apply both with respect to the federal and state level tax items.

taxable income have instead generated net taxable losses and other Tax Attributes. As a result, EME has not been compensated for a significant portion of the Tax Attributes generated by it and its subsidiaries. The extent to which EME will be compensated for these Tax Attributes is uncertain.

EME Tax Attributes were used to shelter some but not all of the EIX Group's taxable income in 2009. EME received $187 million in tax sharing payments for the use of its 2009 federal Tax Attributes. In 2010, the EIX Group was in an overall tax loss position. The 2010 Tax Attributes were carried back to 2008 and 2009 giving rise to a refund, of which EME's share was approximately $181 million. In 2011, the EIX Group was again in an overall tax loss position with both SCE and EME having significant Tax Attributes. The 2011 Tax Attributes were carried back for federal income tax purposes, offsetting all of the remaining 2009 income of the EIX Group and generating a carryforward. On a standalone basis, SCE's 2011 carryback was large enough to absorb all of its 2009 standalone income, which was previously offset in part by EME's 2009 and 2010 Tax Attributes. EIX asserted a purported right to a payment in alleged reimbursement of the carryback amount that was paid to EME for tax year 2009. In September of 2012, EME paid that amount to EIX. As set forth in the Standing Motion, as defined below, this payment is the subject of dispute.[4]

## VI.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    Macroeconomic Pressures Coincide with Debt Obligations

Two major factors contributed to the filing of these Chapter 11 Cases. First, state and federal regulatory regimes imposed rigorous emissions requirements on coal produced power, requiring the Debtors to make significant capital expenditures on their existing coal plants. Second, a confluence of economic and technological drivers encouraged increased natural gas production, which resulted in a surplus of cheap natural gas and caused wholesale electricity prices (and EME's resultant revenues) to plummet. These two factors—higher capital expenditure requirements and declining revenues—came at precisely the same time as debt interest payments and maturities were coming due.

This unforeseen squeeze on EME's income stream—combined with principal and interest payments—transformed EME's once-manageable environmental compliance capital expenditures into a threat to its continued existence.

### B.    Prepetition Reorganization Efforts

In recognition of EME's existing and anticipated continued financial distress, EME's board, management, and professional advisors began exploring various restructuring alternatives with its parent company, EIX, and the Holders of a majority of the EME Senior Notes by outstanding principal amount (the "Noteholder Group").

After approximately six months of vigorous, arm's-length negotiations that began in June 2012, EME, EIX, and the Noteholder Group reached an agreement on a transaction (the "Prepetition Settlement Transaction") designed to substantially deleverage EME's balance sheet. The parties' commitment to the Prepetition Settlement Transaction was memorialized in that certain Transaction Support Agreement, dated as of December 16, 2012 (the "Prepetition Transaction Support Agreement"). The Prepetition Transaction Support Agreement generally provided as follows:

- the cancellation of EIX's equity interests in EME and subsequent turnover of 100 percent of the equity interests in EME to holders of unsecured claims (including the holders of EME's $3.7 billion senior unsecured notes);

- subject to an investigation to be conducted during the first 150 days of the Chapter 11 Cases, the mutual release of claims between EME and EIX and its non-EME subsidiaries;

---

[4]    The Debtors' description of the Tax Sharing Agreements herein is for discussion purposes only, and all rights of the Debtors, the Committee, and the Noteholder Group with respect thereto are specifically reserved.

- EIX and certain of its subsidiaries would continue during the Chapter 11 Cases to provide EME and its subsidiaries with shared corporate support services including, among other things, a full suite of insurance and benefits programs, which, if terminated, would have been severely disrupting to the Debtors' businesses;

- the parties would work to document a master restructuring agreement and certain transition and shared services agreements to effectuate EME's ability to operate as a standalone business; and

- subject to diligence with respect to EME's and EIX's tax positions, the amendment and assumption of certain of the Tax Sharing Agreements to provide for payments through December 31, 2014.

The Prepetition Transaction Support Agreement contemplated certain key deadlines related to the parties' efforts to prepare and seek approval of definitive documents in support of the Prepetition Settlement Transaction. Ultimately, the parties were unable to satisfy these deadlines.  On July 25, 2013, certain noteholder parties thereto terminated the Prepetition Transaction Support Agreement, stating that these deadlines had not been met.

## VII.   ADMINISTRATION OF THE CHAPTER 11 CASES

### A.   First Day Motions and Certain Related Relief

The Debtors devoted substantial efforts to stabilizing their operations and preserving and restoring their relationships with vendors, customers, employees, landlords and utility providers that had been impacted by the commencement of these Chapter 11 Cases. As a result of these initial efforts, the Debtors minimized the negative impacts resulting from the commencement of these Chapter 11 Cases.

On the Petition Date, in addition to the voluntary petitions for relief Filed by the Debtors under chapter 11 of the Bankruptcy Code, the Debtors also Filed a number of first day motions and applications (collectively, the "First Day Motions") with the Bankruptcy Court.  Within a few days, the Bankruptcy Court entered several orders to, among other things:  (a) prevent interruptions to the Debtors' businesses; (b) ease the strain on the Debtors' relationships with certain essential constituents; and (c) allow the Debtors to retain certain advisors necessary to assist the Debtors with the administration of the Chapter 11 Cases (each, a "First Day Order").

#### 1.   Administrative Motions

To facilitate a smooth and efficient administration of these Chapter 11 Cases, the Bankruptcy Court entered the following procedural orders: (a) approving the notice, case management and administrative procedures to govern these Chapter 11 Cases [Docket No. 128]; (b) authorizing the joint administration of the Debtors' Chapter 11 Cases [Docket Nos. 115, 154, and 780]; (c) granting the Debtors an extension of time to File their Schedules [Docket No. 127]; (d) approving expedited procedures to reject or assume executory contracts and unexpired leases [Docket No. 323]; and (e) authorizing procedures for de minimis asset sales and the abandonment of de minimis assets [Docket No. 315].

#### 2.   Employment and Compensation of Advisors

To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Bankruptcy Court entered Final Orders, authorizing the Debtors to retain and employ the following advisors:  (a) GCG, Inc., as Notice Claims, and Solicitation Agent to the Debtors [Docket No. 126]; (b) Kirkland & Ellis LLP as counsel to the Debtors [Docket No. 321]; (c) McDonald Hopkins LLC as counsel to Debtor Camino Energy Company and as conflicts counsel to the Debtors [Docket No. 328]; (d) McKinsey Recovery & Transformation Services U.S., LLC, as Restructuring Advisor to the Debtors [Docket No. 329]; (e) Perella Weinberg Partners, as Investment Banker and Financial Advisor to the Debtors [Docket No. 524]; and (f) J.P. Morgan Securities LLC, as Financial Co-Advisor to the Debtors [Docket No. 1021]. On January 17, 2013, the Bankruptcy Court entered an order approving procedures for the interim compensation and reimbursement of expenses of Retained Professionals in the Chapter 11 Cases and members of the Committee [Docket No. 331].

### 3. Stabilizing Operations

Recognizing that any interruption of the Debtors' business, even for a brief period, would negatively affect customer and supplier relationships, revenues, and profits, the Debtors filed a number of First Day Motions to minimize the adverse effects of the commencement of the Chapter 11 Cases on their ongoing business operations. Thereafter the Bankruptcy Court entered a number of First Day Orders granting the Debtors authority to, among other things, pay certain prepetition claims and obligations and continue certain existing programs. Indeed the relief granted by the First Day Orders helped facilitate the Debtors smooth transition into the Chapter 11 Cases, allowed the Debtors to continue their operations without interruption, and prevented a decrease in confidence among suppliers, customers, and creditors as to the likelihood of the Debtors' successful emergence from the Chapter 11 Cases.

#### a. Employee Wages and Benefits

The Debtors believed that absent the ability to (a) pay certain prepetition claims relating to, among other things, wages, salaries, ordinary-course raises and other pay increases, bonuses and other compensation, payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, taxes and 401(k) contributions), health insurance, retirement health and related benefits, workers' compensation benefits, vacation time, leaves of absence, life insurance, short- and long-term disability coverage, and all other benefits that the Debtors and their Non-Debtor Subsidiaries have historically provided (collectively, the "Employee Compensation and Benefits") and (b pay all costs incident to the foregoing, their employees might have suffered undue hardship and sought alternative employment opportunities, perhaps with the Debtors' competitors. The loss of valuable employees would have been distracting at a critical time when the Debtors were focused on stabilizing their operations. Accordingly, the Bankruptcy Court entered orders authorizing the Debtors to pay and continue to pay the Employee Compensation and Benefits and authorizing and directing banks and financial institutions to honor all checks and electronic payment requests made by the Debtors related to the Employee Compensation and Benefits.

#### b. Cash Management Systems

As part of a smooth transition into these Chapter 11 Cases, the Debtors sought and the Bankruptcy Court entered certain orders authorizing the Debtors to (a) continue using the Debtors' existing cash management system, (b) maintain existing bank accounts and business forms, (c) continue intercompany transactions, and (d) grant superpriority administrative expense status to postpetition intercompany payments [Docket Nos. 116, 144, 671, & 768]. Further, the Bankruptcy Court deemed the Debtors' bank accounts debtors-in-possession accounts and authorized the Debtors to maintain and continue using these accounts in the same manner as those employed before the Petition Date without reference to their status as debtors-in-possession.

#### c. Critical Vendors

The Debtors rely on their vendors to, among other things, (a) assist the Debtors in complying with applicable governmental laws and regulations, (b) supply essential raw materials, specialized replacement parts and supplies, operations consumables, and certain other goods required to operate the Debtors' generating facilities and ensure continuous business operations, and (c) ensure the wide range of specialized equipment the Debtors utilize for energy production and pollution control operates in an effective, safe, and efficient manner. While the Debtors rely on over 500 vendors, approximately less than 4 percent of those vendors are critical to the Debtors' business, and, the disruption of their work would impede the Debtors' ability to continue operation. Therefore, the Bankruptcy Court entered a First Day Order authorizing the Debtors to (a) pay prepetition claims of certain critical vendors in the interim amount of $7.0 million and (b) implement procedures to address any vendors that repudiate or otherwise refuse to honor contractual obligations to the Debtors [Docket No. 118]. The Debtors obtained a Final Order authorizing them to pay their critical vendors in the aggregate amount of $8.2 million on January 17, 2013 [Docket No. 318]. The Debtors believe this critical vendor authority was necessary and served to limit disruptions to the Debtors' business and operations.

### d.    Lien Claimants

Before the Petition Date, and in the ordinary course of business, the Debtors contracted with certain domestic common carriers, shippers, truckers, and logistics management companies (the "Shippers") to ship, transport, and deliver raw materials, parts, and components to the Debtors. The Debtors use certain raw materials, such as coal, activated carbon, urea, fuel oil, and bulk chemicals, without which the Debtors cannot generate electricity or maintain compliance with environmental regulations. Additionally, the Debtors' generating facilities employ sophisticated generating equipment to monitor the facilities, move supplies within the facilities, and produce energy, which all require replacement parts, supplies, calibration devices, and other critical goods to continue operating, and an inability to acquire these parts from the Shippers could have resulted in a slow-down or shut-down of the Debtors operations at various facilities. Furthermore, the Debtors routinely transact business with a number of third-party contractors, repairmen, and manufacturers who may assert tooling, mechanics', and other possessory liens against the Debtors' or their customers' property (the "Third-Party Contractors," and together with the Shippers, the "Lien Claimants") and vendors who can assert liens against the Debtors and their property (such as equipment) if the Debtors failed to pay for the goods delivered or services rendered. These Third-Party Contractors perform various services for the Debtors, including manufacturing and repair of equipment, and manufacturing component parts necessary for the Debtors' energy production equipment. The Debtors were concerned that unless these Lien Claimants were paid outstanding prepetition amounts, many of these Lien Claimants would refuse to perform their ongoing obligations under their existing agreements with the Debtors, including installation, servicing, and warranty obligations, or may refuse to release goods in their possession, which would have had a material adverse effect on the Debtors' businesses. The Bankruptcy Court entered a First Day Order [Docket No. 119] and then, on January 17, 2013, a Final Order [Docket No. 310] authorizing, among other things, the Debtors to pay certain prepetition claims of Shippers and other Lien Claimants.

### e.    Energy Trading

The Debtors' non-Debtor affiliate EMMT conducts hedging operations for itself and certain of the Debtors and their non-Debtor affiliates. Specifically, EMMT markets and trades energy, capacity, fossil fuels, emissions allowances, and other energy-related products and derivatives thereof. EMMT's trading businesses fall primarily into two categories: (a) sales of the Debtors' and certain non-Debtor affiliates' capacity, energy, and related products (either as agent or pursuant to "back-to-back" trades); and (b) market trades for EMMT's own proprietary trading book. EMMT also engages in certain purchase and sale transactions for the benefit of MWG and does so by entering into a sale or purchase contract with a third party and then a second sale or purchase contract with MWG on the same commercial terms as the contract with that third party. Many of EMMT's hedging and trading agreements contain defaults and/or other provisions that might have enabled its hedging and trading partners (collectively, the "Trading Counterparties") to terminate the agreements or request additional collateral, and certain of these provisions may have been triggered by the Debtors' chapter 11 filing. Despite the Debtors' prepetition efforts to mitigate the effects of an EME bankruptcy filing, the Debtors were concerned that certain Trading Counterparties would take actions adverse to EMMT and the Debtors as a result of EME's and MWG's bankruptcy filings. Therefore, the Bankruptcy Court entered a First Day Order [Docket No. 121] and then, on January 17, 2013, a Final Order [Docket No. 312] authorizing, among other things, the Debtors to continue operating under their trading contracts, enter into new trading contracts, and pledge collateral as necessary and appropriate under their trading contracts, provided notice was provided to the Committee.

### f.    Taxes and Fees

The Debtors believed that, in some cases, certain taxing, regulatory, and governmental authorities had the ability to exercise rights and remedies if the Debtors failed to remit certain taxes and fees. Accordingly, the Debtors sought entry of an order authorizing the Debtors to pay any fees and taxes to avoid harm to the Debtors' business operations. On December 18, 2012, the Bankruptcy Court entered a First Day Order authorizing the Debtors to pay taxes and fees [Docket No. 125], and on January 17, 2013, the Bankruptcy Court entered a Final Order authorizing the Debtors to pay taxes and fees [Docket No. 309].

### g.    Utilities

Section 366 of the Bankruptcy Code protects debtors from utility service cutoffs upon a bankruptcy filing while providing utility companies with adequate assurance that the debtors will pay for postpetition services. To

29

ensure uninterrupted utility service, the Debtors filed a First Day Motion seeking entry of an order approving procedures for, among other things, determining adequate assurance for utility providers and prohibiting utility providers from altering, refusing or discontinuing services without further order by the Bankruptcy Court [Docket No. 17]. On December 18, 2012, the Bankruptcy Court entered a First Day Order approving the relief requested in this motion [Docket No. 124] and on January 17, 2013, the Bankruptcy Court entered a Final Order approving the relief requested in this motion [Docket No. 311].

### h.    Claims Trading

As of the Petition Date, the Debtors had Tax Attributes consisting of Net Operating Losses ("NOLs") of approximately $2.4 billion and tax credits in connection with their renewable energy operations (the "Tax Credits") of approximately $230 million, all of which may be carried forward to future taxable years. These Tax Attributes could result in potential future tax savings to the Debtors of approximately $1.2 billion. As of the Petition Date, it was still too early to determine whether it would be necessary for the Debtors to seek relief requiring any Persons or Entities that have acquired claims to sell-down their claims below an amount that would entitle them to receive more than 4.5 percent of the equity of the reorganized Debtors. Nevertheless, the Tax Attributes are an extremely valuable asset to the Debtors' business and the failure to preserve such assets could have caused the Debtors' estates to suffer a significant tax liability to the detriment of the Debtors' stakeholders' interests. Accordingly, the Debtors sought entry of an order establishing a record date for notice and sell-down procedures for trading in claims against the Debtors' estates in order to preserve the Debtors' ability to formulate a plan of reorganization that maximizes the use of the Tax Attributes. On January 17, 2013, the Bankruptcy Court entered a Final Order establishing a record date for notice and sell down procedures for trading in claims against the Debtors [Docket No. 326].

### i.    Equity Trading

As described herein, the Tax Attributes could result in potential future tax savings to the Debtors of approximately $1.2 billion. Equity holders transferring their equity interests prior to the effective date of a chapter 11 plan may trigger an ownership change that could impair the value of these assets. The Debtors determined that they needed the ability to monitor, and possibly object to, certain changes in ownership of common stock to preserve flexibility in operating their business during the pendency of the Chapter 11 Cases, in crafting a chapter 11 plan and, finally, in maximizing their ability to reduce future federal income taxes by offsetting their post-reorganization income with the Tax Attributes. Accordingly, the Debtors sought to establish notification and hearing procedures for the transfers of equity interests and declarations of worthlessness with respect to the Debtor EME's Equity Securities, and thereby protect and preserve the Tax Attributes. Mission Energy Holding Company, the sole owner of the EME common stock, along with its direct parent, Edison Mission Group, and its indirect parent, EIX, consented to this request subject to certain reservations, and the Bankruptcy Court entered a First Day Order [Docket No. 123] and a Final Order [Docket No. 330] approving this request on December 18, 2012 and January 17, 2013, respectively.

### j.    Contract Rejection

As part of the Debtors' pre- and postpetition restructuring efforts, the Debtors evaluated the necessity and cost-efficiency of all of their executory contracts and unexpired leases, and as part of that process, the Debtors determined that certain contracts and related agreements were unnecessary, burdensome, and should be rejected as of the Petition Date. Specifically, these contracts and agreements related to raw material transportation and supply for Debtor MWG. Accordingly, on January 17, 2013, the Bankruptcy Court entered a Final Order approving the rejection of these contracts and related agreements effective as of the Petition Date [Docket No. 312]. The Debtors subsequently determined, in their business judgment, to reject certain additional contracts [Docket Nos. 601 and 688].

### k.    Shared Services

As of the Petition Date, certain of the Debtors and their non-Debtor affiliates received management, administrative, corporate, and support services from non-debtor affiliates and provided such services to non-Debtor affiliates pursuant to certain shared corporate services arrangements and services agreements (collectively, the "Intercompany Arrangements"). On December 18, 2012, the Bankruptcy Court entered a First Day Order approving the Intercompany Arrangements and granting the Debtors related relief as necessary [Docket No. 120]

and on February 5, 2013, the Bankruptcy Court entered a Final Order approving the Intercompany Arrangements and granting the Debtors related relief as necessary [Docket No. 400].  On November 6, 2013, the Bankruptcy Court entered an order authorizing the extension of the Intercompany Arrangements [Docket No. 1563] (the "Intercompany Arrangements Extension Order").  As a result of the Intercompany Arrangements Extension Order, the Intercompany Arrangements have been extended to the earlier of:  (i) the date the Bankruptcy Court enters an order confirming a chapter 11 plan in EME's Chapter 11 Cases, and (ii) March 31, 2014.

### l.        Surety Bonds

To continue certain of their business operations during the reorganization process, the Debtors needed to continue to be able to provide financial assurances to local governments, regulatory agencies, and other third parties to which, in the ordinary course of business, they provided prepetition financial assurances.  Before the Petition Date, the Debtors regularly accomplished this by posting surety bonds on account of:  (a) obligations owed to municipalities; (b) obligations related to environmental regulatory agencies; and (c) obligations relating to obtaining permits or licenses (collectively, the "Surety Bond Program").  Failure to provide, maintain, or timely replace these surety bonds would prevent the Debtors from undertaking essential functions related to their energy production operations and, consequently, would result in a detrimental effect to the Debtors' businesses.  Accordingly, the Debtors filed a First Day Motion requesting the Bankruptcy Court approve the Debtors' existing Surety Bond Program, including the existing cash collateral arrangements with the sureties under the Surety Bond Program, and potentially to provide additional collateral and acquire additional bonding capacity as needed in the ordinary course of their business [Docket No. 24].  On January 17, 2013 the Bankruptcy Court entered a Final Order approving the Surety Bond Program and such other related relief requested by the Debtors [Docket No. 325].

### m.       Tax Credit Agreements

Before the Petition Date, and in the ordinary course of business, EME made payments to Viento Funding II, Inc. ("Viento II") and High Lonesome Mesa, LLC ("High Lonesome") wind companies on account of federal and state renewable energy production tax credits (the "Tax Credits").  Viento II and High Lonesome are some of the Debtors' most valuable assets; however, the Chapter 11 Cases constituted an event of default under the Viento II and High Lonesome credit agreements.  Before the Petition Date, the Debtors were able to secure forbearance agreements (the "Forbearance Agreements") with the respective lenders under the Viento II and High Lonesome credit agreements in order to mitigate the effects of filing these Chapter 11 Cases, and the Debtors filed a First Day Motion seeking Bankruptcy Court approval for the Debtors' payments to Viento II and High Lonesome on account of the Tax Credits under the Forbearance Agreements [Docket No. 23].  On January 17, 2013, the Bankruptcy Court entered a Final Order approving the Debtors' payments to Viento II and High Lonesome under the Forbearance Agreements [Docket No. 324].  In July 2013, Viento II successfully refinanced its credit agreement and High Lonesome was granted a permanent waiver of default by its applicable bondholders.

### B.       Employee Incentive/Retention Plans

During the course of the Chapter 11 Cases, the Debtors developed and implemented certain employee incentive and retention plans.  The terms of these plans were approved by a compensation committee, composed solely of independent directors of the EME Board (the "Compensation Committee"), and the Compensation Committee was assisted by its compensation consultant, Hewitt Associates LLC (d/b/a Aon Hewitt) ("Aon Hewitt").  A summary of these incentive and retention plans is provided below.

### 1.       2013–2014 Compensation Plan

EME developed five incentive plans and one retention plan for 2013–2014.  The incentive plans largely represent a continuation of the EME's historical incentive plans subject to certain adjustments to take into account EME's financial circumstances and the filing of these Chapter 11 Cases.  EME established the retention plan, which

EME has not previously offered,[5] to retain certain critical, non-executive, non-insider mid-level employees.  These plans and the number of employees covered as of September 30, 2012, are described in greater detail as follows:

### a.    The STIP

The short-term incentive plan or "STIP" is available to more than 324 employees of Debtors EME, MWG, and Midwest Generation EME, LLC ("MWG EME"), approximately 49 management employees of non-Debtor Edison Mission Operation & Maintenance, Inc. ("EMOMI"), and approximately 74 non-energy trader employees of non-Debtor EMMT.  The STIP is a performance-based cash incentive program based on the attainment of certain corporate and individual performance targets.  The STIP is also offered to insiders.  The incentive pool for the STIP is accrued through (i) the achievement of six-month target goals for cash flow based on adjusted earnings before interest, taxes, depreciation, amortization, and restructuring and reorganization costs ("EBITDAR") and (ii) an upward or downward adjustment of up to 10 percent based on the achievement of better than industry-standard worker and facility safety targets.  The STIP includes six-month performance periods to allow for short-term goal-setting by the Compensation Committee.

### b.    The Union Plan

EME offers its approximately 436 union employees the ability to participate in a short-term, performance-based cash incentive program (the "Union Plan") based on the attainment of certain corporate performance targets.  The incentive pool for the Union Plan is accrued through the following performance measures:  (i) 50 percent by the achievement of six-month target goals for cash flow based on adjusted EBITDAR; (ii) 50 percent by the achievement of specific reliability measures at the Debtors' unionized coal facilities; and (iii) an upward or downward adjustment based on the achievement of certain industry-standard worker and facility safety targets.  The Union Plan includes six-month performance periods to allow for short-term goal-setting.

### c.    The EMOMI Plan

Non-Debtor Subsidiary EMOMI offers approximately 171 of its non-management employees the ability to participate in a short-term, performance-based cash incentive program (the "EMOMI Plan") based on the attainment of certain corporate and individual performance targets.  The incentive pool for the EMOMI Plan is accumulated through the following three measures of performance:  (i) 50 percent by the achievement of six-month target goals for cash flow based on adjusted EBITDAR; (ii) 50 percent by the achievement of specific EMOMI operating metrics, including the attainment of certain energy availability, corporate safety, and environmental compliance goals; and (iii) an upward or downward adjustment based on the achievement of certain industry-standard worker and facility safety targets.  The EMOMI Plan includes six-month performance periods to allow for short-term goal-setting.

### d.    The Trader Incentive Plan

Non-Debtor Subsidiary EMMT offers its nine proprietary energy trading employees the ability to participate in a cash-based incentive program (the "Trader Incentive Plan") based on the attainment of certain corporate and individual performance targets over annual performance periods.  During each annual performance period, EMMT establishes an aggregate incentive pool that is generally based on realized trading revenues net of specified costs, and EMMT's management recommends a proposed allocation of the incentive pool among participants in the Trader Incentive Plan.  In 2012, the incentive pool was based on 10 percent of EMMT's gross margin exceeding certain overhead and other expenses.  In 2013, the incentive pool will be based on 12 percent of EMMT's gross margin exceeding certain overhead and other expenses.

---

[5]    Although this retention plan is new, EME has in the past offered certain employees "one-off" retention opportunities.

### e.      The LTIP

EME offers a long-term incentive plan (the "LTIP") to 46 of its senior managers at the executive level, including insiders. The LTIP is designed to improve the Company's long-term stability and profitability by aligning management incentives with the Company's business objectives, while at the same time providing participants with competitive, market-based compensation. After consultation with Aon Hewitt, the Compensation Committee approved a shift to cash-based incentives under the 2013–2014 LTIP. In prior years, EME's incentive plans were administered and implemented by EIX and compensation under such long-term incentive plans was provided in the form of EIX stock. EME's current circumstances and potential separation from EIX made it impractical to continue offering long-term incentives in the form of EIX stock and necessitated the shift to the cash-based LTIP. The LTIP is designed to be earned over a two-year period, but the program may terminate before two years if the Debtors emerge from chapter 11 before December 31, 2014. The LTIP is performance-based, with awards linked to three operating and performance metrics: (i) the enterprise value of EME and MWG, (ii) reliability targets for the Company's coal, gas, and wind energy projects, and (iii) reduction of (a) EME general and administrative costs and (b) MWG controllable operations and maintenance expenses.

### f.      The Key Contributor Plan

EME's management, in consultation with the Compensation Committee, identified 45 employees for inclusion in a retention plan (the "Key Contributor Plan") from a group of non-executive employees from EME's internal salary bands H, I, and J who are not (and historically have not been) eligible to participate in EME's long-term incentive programs. These key employees provide critical services to EME's businesses, and their departure would cause serious disruptions to operations and would complicate the Debtors' restructuring efforts. EME assigned each key employee a retention amount denominated as a flat dollar value, which EME will distribute in two equal installments over 12 to 24 months after communicating the award to the employee. EME will only make payments under the Key Contributor Plan to those participants who remain employed by EME or its affiliates in good standing.

### 2.      Exit Plan

As part of the Plan Sponsor Agreement, the parties thereto agreed to support the Debtors' implementation of an incentive compensation plan related to the Debtors' pursuit of the NRG Transaction or a superior alternative as permitted under the Plan Sponsor Agreement (the "Exit Plan"). The Compensation Committee, with the assistance of the Debtors' legal and compensation advisors, specifically designed the Exit Plan to timely maximize the value, and minimize the costs, of all of the transactions contemplated by the Plan Sponsor Agreement. The Bankruptcy Court held a preliminary hearing on the Exit Plan on October 24, 2013 and, after a final hearing on November 6, 2013, the Bankruptcy Court entered an order approving the Exit Plan [Docket No. 1561].

The Exit Plan provides incentives for two distinct groups of participants—(a) in "Pool A", directors, officers, and other executive-level employees, including certain insiders and (b) in "Pool B", a limited group of up to 20 non-executive, non-insider employees. The reorganized Debtors will pay awards under the Exit Plan on the Effective Date. Pool A awards, not to exceed $6.4 million in the aggregate, will be awarded at the discretion of EME's Compensation Committee based upon a non-exhaustive list of qualitative performance goals set forth in the Exit Plan and without regard to employment status. Pool B awards, not to exceed $1.1 million in the aggregate, will be awarded based upon the degree of an employee's criticality and denominated as a percent of annual salary.

## VIII.    SIGNIFICANT EVENTS OF THE CHAPTER 11 CASES

### A.      EIX Investigation

When entering into the Prepetition Transaction Support Agreement, the Debtors did not have sufficient time to conduct the due diligence required to analyze in detail all of the benefits of the Prepetition Transaction Support Agreement (particularly the projected tax benefits) as compared to the value of the release provided in the Prepetition Transaction Support Agreement (particularly any claims and causes of action against EIX). Pursuant to the terms of the Prepetition Transaction Support Agreement, the Debtors retained the right (in what is known as a "fiduciary out") to terminate the Prepetition Transaction Support Agreement if EME determined after a thorough investigation that it was not in the Estates' best interests to proceed with the Prepetition Transaction Support

Agreement, particularly with respect to providing a general release of EIX. In addition, subject to the terms and conditions of the Prepetition Transaction Support Agreement, the Noteholder Group retained the right to terminate the Prepetition Transaction Support Agreement.

Accordingly, the parties to the Prepetition Transaction Support Agreement recognized and understood from the outset that, unless and until the transactions contemplated by the Prepetition Transaction Support Agreement were determined to be in the Debtors' best interests—after a detailed and thorough factual, financial, and legal investigation—such transactions would not proceed.

On January 2, 2013, the Debtors filed the *Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 2004 for Authorization to (A) Conduct Examination and (B) Issue Subpoenas for Attendance for Examination and Production of Documents* [Docket No. 186] (the "Rule 2004 Motion"), seeking authority for an investigation committee comprised solely of independent directors of EME's board or directors (the "Investigation Committee") to conduct a Rule 2004 examination of EIX and certain related parties (the "Examinees") to investigate and conduct diligence with respect to various aspects of the Prepetition Settlement Transaction. The Rule 2004 examination was essential to enable the Debtors to determine whether to move forward with the Prepetition Settlement Transaction.

On January 9, 2013, EIX filed an objection to the Rule 2004 Motion [Docket No. 214], contending, among other things, that the relief requested failed to safeguard certain of the Examinees' confidential, proprietary, and other sensitive nonpublic information. The Committee likewise objected to the Rule 2004 Motion [Docket No. 233], on the grounds that, among other things, the Debtors and the Committee should jointly conduct the Rule 2004 examination. Thereafter, the Debtors, the Committee, and the Examinees negotiated in good faith to resolve the objections. Those negotiations resulted in a stipulated protective order that established a framework for the Rule 2004 examination. On January 23, 2013, the Bankruptcy Court entered an order [Docket No. 339] authorizing EME and the Committee (together, the "Examination Parties") to jointly conduct a Rule 2004 investigation of the Examinees (the "Rule 2004 Order") pursuant to a stipulated protective order [Docket No. 340].

As part of that investigation, the Examination Parties served the Examinees with subpoenas for the production of documents in late January 2013. Specifically, the Examination Parties sought to obtain from the Examinees certain information and diligence, including with respect to intercompany transfers (under the tax sharing agreements or otherwise), potential claims against EIX and other parties to be released under the Prepetition Settlement Transaction, and various shared services and corporate governance matters. On January 28, 2013, the Debtors, in consultation with the Committee, filed the *Debtors' Motion to Compel Compliance with Examination Pursuant to Federal Rule of Bankruptcy Procedure 2004* [Docket No. 358] (the "January Motion to Compel"). The parties negotiated a resolution of the January Motion to Compel culminating with the entry of an order on February 12, 2013 [Docket No. 451].

The Examination Parties have conducted the Rule 2004 investigation for many months. On March 19, 2013, the Examination Parties served the Examinees with supplemental subpoenas. In response, the Examinees produced over 140,000 documents in response to the subpoenas. Additionally, the Examination Parties conducted depositions of certain of the Debtors' former directors. The Examination Parties have coordinated with each other on the investigation. Among other things, the Debtors' and the Committee's litigation teams have had regular conference calls and have closely consulted with respect to strategy and tactics. In addition, the Debtors' and the Committee's tax teams have had regular conference calls and other discussions. And, separate and apart from these scheduled meetings, the Debtors, the Committee, the Noteholder Group, and their respective advisors have held numerous meetings and discussions regarding the investigation.

Although the Rule 2004 Order directs EIX to produce all relevant materials, EIX withheld nearly 35,000 documents responsive to the subpoenas—and redacted thousands of others—on the purported basis that the documents are protected by the attorney-client privilege and/or the attorney work product doctrine. EIX's counsel also repeatedly instructed its witnesses not to answer questions during depositions on the same privilege and work product grounds.

Consequently, the Debtors and the Committee filed the *Joint Motion of Debtors and the Official Committee of Unsecured Creditors to Compel Production of Documents and Information Withheld on Privilege Grounds* [Docket No. 1162] on September 5, 2013 (the "September Motion to Compel"). On September 18, 2013, EIX filed

its objection to the September Motion to Compel [Docket No. 1240]. The Examination Parties have conferred with EIX's counsel though numerous letters and telephone conferences, but notwithstanding the parties' efforts to resolve their disputes, significant issues remain and the September Motion to Compel is pending before the Bankruptcy Court.

On July 25, 2013, the Noteholder Group terminated the Prepetition Transaction Support Agreement. On July 31, 2013, the Committee sought authority to prosecute, on behalf of the Debtors' Estates, certain claims (i.e., the EIX Litigation Claims) against, inter alia, EIX, certain of EIX's non-Debtor affiliates, and certain of EIX's directors and officers based on information ascertained during the Rule 2004 investigation [Docket No. 1054] (the "Standing Motion"). The Debtors objected to the Standing Motion [Docket No. 1090]. At present, the Standing Motion remains pending before the Bankruptcy Court.

The NRG Transaction creates a framework to resolve certain of the issues pertaining to the EIX Investigation. In accordance with the Plan Sponsor Agreement, the Debtors may not settle or otherwise compromise EIX Litigation Claims unless the following procedure has been completed:

- the Debtors shall invite Noteholders to become restricted in order to consider such proposed settlement;

- the Debtors shall use reasonable best efforts to agree to a confidentiality agreement with appropriate cleansing mechanisms with counsel to the Supporting Noteholders (which cleansing mechanism shall not result in dissemination of information that might be detrimental to the value of such litigation), such restriction period to last no more than seven (7) calendar days;

- the Debtors shall present any such proposed settlement or compromise to restricted Noteholders holding at least twenty-five percent (25%) of the aggregate face amount of the Notes (the "Restricted Noteholder Participants") with the advisors to the Supporting Noteholders and the Committee (including the Committee members) present in any such presentation and discussion; and

- if Noteholders holding more than fifty percent (50%) of the aggregate face amount of the Notes vote to reject such proposed settlement or compromise, then the Debtors shall not proceed with such proposed settlement, but if no such vote against the proposed settlement occurs, then the Debtors may proceed to seek approval of such settlement by appropriate motion, and any party may oppose such motion; provided that, if such approval is sought following the commencement of a solicitation of votes on the Plan, such solicitation shall be supplemented by notice of such proposed settlement, and the relevant objection and voting deadlines shall be extended by the number of days that such supplemental notice follows the start of the initial solicitation.

- The Committee, like other parties in interest, retains its rights to object to any proposed settlement or compromise of the EIX Litigation Claims.

In the event that the Debtors do not settle or compromise the EIX Litigation Claims before the Effective Date of the Plan, any and all claims of any of the Debtors or the Non-Debtor Subsidiaries against any of the EIX Litigation Parties shall be preserved and shall vest in Reorganized EME unless such claims or causes of action are specifically resolved or released pursuant to the Plan or other Final Order of the Bankruptcy Court. But even now, the Debtors continue to work with EIX and other stakeholders towards a mutually agreeable resolution of such disputes.

## B. Discussions Regarding Powerton and Joliet Stations

### 1. Preliminary Restructuring Discussions and Forbearance Agreements

Prior to the commencement of the Chapter 11 Cases, the Debtors did not believe that assumption of the PoJo Leases and Documents—absent a restructuring—was feasible in the face of (a) an operating loss at MWG of $253 million in 2012, (b) scheduled rent payments in excess of $500 million during the remaining terms of the PoJo Leases and Documents, including a payment schedule for January 2, 2013, shortly after the Petition Date, and (c) the

obligation to fund substantial capital expenditures at the PoJo Facilities that were necessary to comply with certain environmental regulations.  Pursuant to section 365(d)(4) of the Bankruptcy Code, the initial deadline for the Debtors to assume or reject unexpired leases, such as the PoJo Leases and Documents, was April 16, 2013, which was subsequently extended by order of the Bankruptcy Court to July 1, 2013 for the PoJo Leases and Documents [Docket No. 670].

In the weeks leading up to the Petition Date, MWG and EME engaged in extensive discussions with the PoJo Parties regarding potential restructuring alternatives.  These discussions led to entry into a Bankruptcy Court-approved forbearance agreement under which MWG agreed to pay approximately $7.1 million in deferred postpetition lease rent in exchange for the commitment of certain PoJo Parties to forbear from exercising remedies against MWG, EME, and certain other PoJo Parties [Docket No. 122].  The initial forbearance agreement was subsequently extended by the Bankruptcy Court through April 5, 2013 [Docket No. 630], clearing the way for EME, MWG, and the PoJo Parties to analyze and engage in discussions of a potential restructuring of the PoJo Leases and Documents.

### 2.    *Powerton and Joliet Extension Orders*

Following the expiration of the forbearance agreements, EME, MWG, and the PoJo Parties, along with the Committee, continued to engage in complicated restructuring discussions.  Given the size and complexity of the lease structure, the number of parties involved, and the short timeframe before the deadline to assume or reject the PoJo Leases and Documents, EME, MWG, and the PoJo Parties determined that they likely would not reach a final agreement, if at all, before the July 1, 2013 deadline pursuant to section 365(d)(4) of the Bankruptcy Code for MWG to assume the PoJo Leases and Documents.  To avoid assumption or rejection of the PoJo Leases and Documents, which could have impaired stakeholder value, and to enable the parties to continue to engage in restructuring discussions, MWG and EME presented the PoJo Parties with the terms of a proposal pursuant to which MWG and EME were willing to offer consideration to the PoJo Parties in exchange for their agreement to extend the deadline for MWG to assume or reject the PoJo Leases and Documents through September 30, 2013.  Alternatively, absent approval of the extension proposal, MWG requested authority to reject the PoJo Leases and Documents effective as of July 1, 2013.  Following further discussions between the parties, MWG, EME, and the PoJo Parties agreed to extend the deadline for MWG to assume or reject the PoJo Leases and Documents through September 30, 2013, which agreement was approved on June 27, 2013 [Docket No. 943] (the "First PoJo Extension Order").  The First PoJo Extension Order subsequently was extended through December 31, 2013 [Docket No. 1255] (the "Second PoJo Extension Order" and, collectively with the First PoJo Extension Order, the "PoJo Extension Orders").  During this time, MWG filed an application with the FERC requesting approval for the Owner Lessors to assume operational control of the PoJo Facilities in the event that the PoJo Leases and Documents were rejected.

Following entry of the PoJo Extension Orders, MWG and EME and their respective stakeholders continued to engage in discussions regarding the terms of a potential consensual restructuring of the PoJo Leases and Documents.  On August 9, 2013, MWG delivered a proposal to its various stakeholders with respect to the terms of a consensual restructuring of the Leases.  The parties, however, ultimately did not reach a consensual resolution regarding a restructuring of the PoJo Leases and Documents.

Pursuant to the Court's order approving the Plan Sponsor Agreement [Docket No. 1424], the time granted to MWG to assume or reject the PoJo Leases and Documents (and the time during which the PoJo Parties will continue to forbear from exercising certain remedies as set forth in the Second PoJo Extension Order) has been further extended on substantially similar terms and conditions as under the Term Sheet attached as Exhibit 1 to the Second PoJo Extension Order, through the earliest of (a) the Effective Date, (b) 14 days after the date of termination of the Plan Sponsor Agreement, and (c) July 31, 2014.

As discussed in greater detail below, the NRG Transaction contemplates that MWG, subject to certain modifications, will assume the PoJo Leases and Documents.  In addition, on the Effective Date, EME will pay the Agreed PoJo Cure Amount and the PoJo Restructuring Fees in full in Cash.  Accordingly, the NRG Transaction, if approved, would eliminate the need for EME and MWG to engage in further restructuring discussions with their stakeholders regarding the PoJo Leases and Documents or, potentially, to reject the PoJo Leases and Documents and litigate their respective obligations thereunder.

### C.    Chevron Dispute

On December 26, 2012, Chevron filed an adversary proceeding in the Bankruptcy Court (Case No. 12-01954) against the Debtors for declaratory and injunctive relief and a motion for relief from the automatic stay [Adversary Docket Nos. 1 and 6].

On January 18, 2013, the Bankruptcy Court entered an order denying Chevron's motion for injunction and relief from the automatic stay [Adversary Docket No. 39]. On February 4, 2013, Chevron filed an appeal from the Bankruptcy Court's denial of its motion for an injunction and relief from stay in the United States District Court for the Northern District of Illinois (Case No. 13-00848) [Dist. Ct. Docket No. 1]. On February 11, 2012, the Debtors filed a motion to dismiss Chevron's appeal [Dist. Ct. Docket No. 5]. On September 18, 2013 the District Court granted Debtors' motion to dismiss appeal of the injunction denial and permitted the appeal of the lift stay denial to proceed [Dist. Ct. Docket No. 50].

On July 7, 2013, Debtors Western Sierra Energy Company and Southern Sierra Energy Company filed a motion with the Bankruptcy Court [Docket No. 1017] seeking to assume the Kern River Agreement and the Sycamore Agreement. On September 16, 2013, the Bankruptcy Court issued its *Memorandum Opinion on Debtors' Motion to Assume Partnership Agreements* [Docket No. 1221] and entered the *Interim Order on Debtors' Motion to Assume Partnership Agreements* [Docket No. 1222], finding that there were no non-*ipso facto* defaults under the Kern River Agreement or the Sycamore Agreement, and further finding that assumption of the agreements is not barred under section 365(c)(1) of the Bankruptcy Code. However, out of an abundance of caution and in an effort to avoid interfering with the pending appeal on the motion to lift the stay, the Bankruptcy Court did not enter an order approving the Debtors' assumption of the agreement but, instead, set the matter for status hearing on November 6, 2013. On September 30, 2013, Chevron sought to consolidate the motion to assume the Kern River Agreement and Sycamore Agreement with the pending appeal on Chevron's motion to lift the stay [Dist. Ct. Docket No. 54]. On October 2, 2013, the District Court denied Chevron's request to combine the proceedings pending the Bankruptcy Court's entry of a final order on the motion to assume [Dist. Ct. Docket No. 58]. On November 6, 2013, the Bankruptcy Court entered a final order granting the Debtors' motion to assume the Kern River Agreement and the Sycamore Agreement [Docket No. 1564]. On November 12, 2013, Chevron filed a notice of appeal of that final order [Docket No. 1570].

### D.    Homer City

On May 2, 2013, EME Homer City Generation L.P. ("EMEHC"), Edison Mission Finance Co. ("Finance"), and Homer City Property Holdings, Inc. ("Property Holdings") each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court commencing chapter 11 cases (the "Homer City Chapter 11 Cases"). On May 15, 2013, the Bankruptcy Court (a) entered an order directing joint administration of the Homer City Chapter 11 Cases with the Chapter 11 Cases [Docket No. 771] and (b) entered an order applying certain orders in the Chapter 11 Cases be made applicable to the EMEHC, Finance, and Property Holdings [Docket No. 775]. Debtors Chestnut Ridge Energy Company ("Chestnut"), Mission Energy Westside, Inc. ("Westside"), and Edison Mission Holdings Co., along with EMEHC, Finance, and Property Holdings, are collectively referred to as the "Homer City Debtors" (and each a "Homer City Debtor").

The Homer City Debtors currently have no operating business and, pursuant to the Plan, will commence a wind down of their Estates. Below is a summary of the Homer City Debtors' Organizational Structure and the reasons the Homer City Debtors commenced their respective chapter 11 cases.

### 1.    The Homer City Debtors' Organizational Structure

EMEHC is a limited partnership formed under the laws of the Commonwealth of Pennsylvania. Westside is EMEHC's general partner and as of the Petition Date held a 0.1 percent partnership interest in EMEHC. As of the Petition Date, Chestnut held a 99.9-percent limited partnership interest in EMEHC. Property Holdings and Finance are each corporations formed under the laws of the State of California. Each Homer City Debtor is an indirect wholly-owned subsidiary of Debtor EME.

37

## 2. *Events Leading to Homer City Bankruptcy*

From December 2001 until December 14, 2012, EMEHC leased the Homer City Generating Station in Homer City, Pennsylvania (the "Homer City Facility") from eight owner lessors (collectively, the "Owner Lessors") pursuant to a sale-leaseback financing transaction (the "Homer City Sale-Leaseback Transaction"). In December 2001, EMEHC transferred the assets constituting the Homer City Facility to the Owner Lessors, which, in turn, leased the Homer City Facility back to EMEHC. EMEHC leased and operated the Homer City Facility until December 14, 2012, when, as discussed in greater detail below, EMEHC transferred the assets related to the Homer City Facility (and specified other assets and liabilities) to an affiliate of General Electric Capital Corporation ("GECC").[6]

To finance the Homer City Sale-Lease back Transaction, the Owner Lessors issued lessor notes (collectively, the "Lessor Notes") pursuant to certain lease indentures, which Lessor Notes were held by Homer City Funding, LLC ("Homer City Funding"), a special purpose financing entity (unaffiliated with the Debtors) that, in turn, issued bonds (collectively, the "Homer City Funding Bonds," the holders of such bonds, the "Homer City Funding Bondholders") pursuant to an indenture. Lease payments made by EMEHC serviced principal and interest payments on the Lessor Notes, which payments serviced principal and interest payments on the Homer City Funding Bonds, as well as payments to the Homer City Sale-Lease back Transactions' equity investors. As of June 30, 2012, approximately $640 million in aggregate principal amount of Homer City Funding Bonds were outstanding, which bonds were held and traded publicly by a number of different holders.

Facing increased regulatory requirements, EMEHC did not have, and did not expect to generate, sufficient capital to fund installation of flue-gas desulfurization equipment or "scrubbers" necessary to comply with anticipated regulatory deadlines, and the operative documents governing the Homer City Sale-Lease back Transaction limited EMEHC's ability to incur additional indebtedness. EMEHC, therefore, sought new equity capital to fund construction of the scrubbers. EMEHC and GECC, the indirect owner of seven of the eight Owner Lessors, entered into discussions regarding a potential restructuring of the Homer City Facility's capital structure, including a potential investment in the Homer City Facility for the scrubbers by GECC or an affiliate. These discussions were productive, and the parties entered into an implementation agreement to facilitate the transition of beneficial ownership of the Homer City Facility to an affiliate of GECC with the consent of Metropolitan Life Insurance Company, the indirect equity owner of the remaining Owner Lessor, pursuant to a master transaction agreement. The parties subsequently executed a definitive master transaction agreement that contemplated transferring the assets related to the Homer City Facility and specified other assets and liabilities to a GECC affiliate as part of a transaction consummated through a prepackaged bankruptcy of Homer City Funding. As of September 30, 2013, EMEHC had approximately $52,000 of cash on hand, whereas, Finance and Property Holdings have no cash on hand and do not maintain bank accounts.[7]

## 3. *GECC Homer City Adversary Proceeding*

On October 29, 2013, Homer City Generation, L.P. ("HCG"), the assignee of the Homer City Facility and a wholly-owned subsidiary of GECC, filed a complaint against Debtor EME Homer City Generation L.P. seeking approximately $6.7 million of excess bond collateral which it alleges is property of HCG and not the Debtors' estates. The proceeding is currently pending before the Bankruptcy Court.

---

[6]   Through a subordinated revolving intercompany loan, Finance provided financing commitments to EMEHC in connection with its operation of the Homer City Facility. Property Holdings previously owned certain real property adjacent to the Homer City Facility. Substantially all of Property Holding's assets were transferred to an affiliate of GECC.

[7]   Finance and Property Holdings do not have any known material liabilities other than certain contingent, unliquidated, and disputed claims related to a personal injury claim asserted by a personal injury plaintiff against the Homer City Debtors and certain non-Debtor affiliates, which is pending in the United States District Court for the Western District of Pennsylvania.

### E.    Exclusivity

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief (which may be extended by the Bankruptcy Court for a period of up to 18 months from the petition date) (the "Exclusive Filing Period").  If a debtor files a plan within this initial exclusive period, then the debtor has the exclusive right for 180 days from the petition date to solicit acceptances to the plan (which may be extended by the Bankruptcy Court for a period of up to 20 months from the petition date) (the "Exclusive Solicitation Period"). During these exclusive periods, no other party in interest may file a competing plan of reorganization, however, a court may extend these periods upon request of a party in interest for cause."

The Debtors' initial 120-day Exclusive Filing Period was initially scheduled to expire on April 16, 2013 with the initial 180-day Exclusive Solicitation Period set to expire on June 15, 2013.  On May 15, 2013 the Bankruptcy Court extended the Exclusive Filing Period to November 7, 2013 and the Exclusive Solicitation Period to January 6, 2014 [Docket No. 779].  On October 25, 2013, the Bankruptcy Court further extended the Exclusive Filing Period to the earlier of (a) June 17, 2014, and (b) 30 days after any valid termination of the Plan Sponsor Agreement, and the Exclusive Solicitation Period to the earlier of (x) August 17, 2014, and (y) 30 days after any valid termination of the Plan Sponsor Agreement [Docket No. 1423].

The Debtors filed the Plan and Disclosure Statement within the Exclusive Filing Period.

### F.    Sale Process and Stand Alone Plan

In an effort to preserve value for the Estates following the termination of the Prepetition Transaction Support Agreement, EME, in consultation with its advisors and other parties in interest, determined to begin a process to explore all potential restructuring options.  To assist in this process, EME retained J.P. Morgan Securities LLC ("J.P. Morgan") to serve as co-advisor with the Debtors' existing investment banker, Perella Weinberg Partners, to EME with respect to a potential sale of some or all of EME's assets and the Debtors officially launched their formal marketing and sale process on August 1, 2013.[8]  J.P. Morgan contacted and provided "teaser" information to 333 potentially interested parties. Seventy-six parties subsequently executed confidentiality agreements, received confidential information memoranda including detailed overviews of the businesses of EME and its Debtor and Non-Debtor Subsidiaries, and were granted access to certain diligence materials.  Of these seventy-six parties, twenty-nine submitted indicative bids on or about the initial bid deadline established by the Debtors as October 10, 2013.  Initial indications of interest included proposals for substantially all of the Debtors' assets, as well as proposals for certain assets.  J.P. Morgan, the Debtors, and their other advisors have evaluated, and continue to evaluate, each such proposal, and will continue to explore whether higher and better offers exist, as permitted under the Plan Sponsor Agreement.

Contemporaneously with the sale process, the Debtors and their advisors, including McKinsey Recovery & Transformation Services U.S. LLC, worked to develop a proposed standalone restructuring.  The standalone plan development process spanned several months and involved a top-to-bottom analysis of all of EME's business units and how best to position them to compete in the future in various business combinations.

While both the sale process and the standalone analysis remain ongoing, based on the information available to date, the Debtors believe the Plan Sponsor Agreement with NRG and the transactions contemplated therein provide the maximum value for the Debtors' estates.

### G.    NRG Transaction and Plan Sponsor Agreement

In August 2013, NRG and certain noteholders entered into a non-disclosure agreement to discuss a potential transaction involving the Debtors.  The Debtors were not a party to this non-disclosure agreement or a

---

[8]    See *Order Authorizing the Employment and Retention of J.P. Morgan Securities LLC as Financial Co-Advisor for the Debtors and Debtors in Possession* [Docket No. 1021].

participant in the discussions. Shortly thereafter, on September 9, 2013, NRG proposed the transaction to the Debtors on an unsolicited basis. The Debtors and their advisors then, at the direction of EME's board of directors, analyzed and explored the proposed NRG Transaction to determine if it would maximize the value of the Debtors' estates. At the same time, the Debtors considered the current state of their ongoing sale process, valuation considerations, and the ongoing planning around a potential standalone restructuring.

EME's board of directors ultimately determined and authorized the Debtors and their advisors to move forward in the negotiations with NRG, while at the same time continuing the ongoing sale process. Thus, the Debtors and their advisors engaged NRG (as well as certain of the Supporting Noteholders, the Committee, the PoJo Parties, and their respective advisors) in several rounds of in-person and telephonic meetings to negotiate the key elements of the transaction and ultimately the necessary documentation.

The Debtors' ongoing sale process provided for an indicative bid deadline of October 10, 2013. By the bid deadline, the Debtors received numerous bids from interested parties, including some for the sale of substantially all of the Debtors' assets as well as bids for individual assets. The Debtors and their advisors evaluated these indicative bids and—after reaching agreement with NRG and the other parties to the Plan Sponsor Agreement on the overall transaction—the Debtors, in consultation and collaboration with their major stakeholders, determined that it was in the best interests of the Debtors' Estates to proceed with the NRG proposal and enter into the Plan Sponsor Agreement. Nonetheless, pursuant to the terms of the Purchase Agreement, the Debtors may continue to actively market their assets until December 6, 2013, after which time, the Debtors may only accept a bid that is superior to the NRG Transaction.

On October 18, 2013, the Debtors, NRG, the Committee, the Supporting Noteholders, and the PoJo Parties reached agreement on the terms of the Plan Sponsor Agreement, the Purchase Agreement, the Plan Term Sheet, and the PoJo Term Sheet.

Specifically, the Debtors and the Debtor Subsidiaries, the Purchaser Parties, the PoJo Parties, the Committee, and the Supporting Noteholders entered into the Plan Sponsor Agreement, which calls for the parties to work toward the confirmation and consummation of the Plan, and the Purchase Agreement, whereby EME will transfer its operating businesses to the Purchaser in exchange for the Sale Proceeds. The Purchase Agreement includes the following principal terms:

- a purchase price of **$2.635 billion**, comprised of $2.285 billion in cash and $350 million in common stock of NRG Energy, Inc. (subject to certain adjustments pursuant to the Purchase Agreement);

- Purchaser's assumption of substantial prepetition Debtor and non-Debtor liabilities, ***including the PoJo Leases and Documents***;

- no diligence contingencies;

- very limited conditions to closing (e.g., certain government approvals);

- "go shop" rights for the Debtors to solicit alternative proposals—and continue their ongoing sale process—through December 6, 2013 (with a fiduciary out thereafter);

- if the Debtors do not consummate the sale with the Purchaser Parties, payment in certain circumstances of a break-up fee of $65 million plus Purchaser Parties' reasonable and documented out-of-pocket expenses; and

- EME's retention and control over claims and causes of action against EIX and other related parties.

Without limiting the Debtors' ability to exercise their fiduciary duties, the Plan Sponsor Agreement secures the commitment of the Purchaser Parties to effectuate the transaction, and each of the Debtors, the Committee, the Supporting Noteholders, and the PoJo Parties to support the proposed NRG sale and seek confirmation of the Plan.

On October 24, 2013, the Bankruptcy Court approved the Debtors' entry into the Plan Sponsor Agreement [Docket No. 1424].

### H.    Continuation of Intercompany Arrangements and Shared Services

As noted above, as of the Petition Date, certain of the Debtors and their non-Debtor affiliates received management, administrative, corporate, and support services from non-Debtor affiliates and provided other such services to non-Debtor affiliates pursuant to certain Intercompany Arrangements.  On February 5, 2013, the Bankruptcy Court entered a Final Order approving the Intercompany Arrangements and granting the Debtors related relief as necessary [Docket No. 400].

In the absence of approval of the settlement contemplated in the Prepetition Transaction Support Agreement, EIX committed to continue to provide Shared Services through December 31, 2013.  On July 25, 2013, the Noteholder Group sent EME and EIX a Notice of Termination of Transaction Support Agreement, which automatically rendered the Prepetition Transaction Support Agreement of no further force and effect [Docket No. 1040].  Following termination of the Prepetition Transaction Support Agreement, EME immediately began planning to transition all Shared Services to EME-administered, standalone health, welfare, retirement, and other benefit plans so that it could be prepared on and after January 1, 2014, to provide substantially similar services for itself and all of its subsidiaries if Shared Services were terminated.

Implementation of standalone programs and payroll functions proved challenging, both from an administrative and expense standpoint.  Moreover, after the October 18, 2013, announcement of the NRG Transaction contemplated by the Plan, it became even more challenging for EME to implement standalone plans, given that potential third-party payroll and benefits administrators realized that these standalone plans could potentially be in place for as few as three months.

In light of the foregoing, EME approached EIX to discuss a potential extension of Shared Services beyond December 31, 2013.  An extension would avoid implementation of mirror plans for a short duration at a likely massive cost to EME's estate, and at the same time allow EME to better focus its attention on the ongoing sale process and transition-related items with NRG over the next several months (as opposed to continuing a significant internal effort to construct standalone plans ahead of the December 31st termination).  Following arms'-length negotiations, on October 29, 2013, EIX agreed to extend shared services under the Intercompany Arrangements, through and including the earlier of:  (a) the date the Bankruptcy Court enters an order confirming a chapter 11 plan; or (b) March 31, 2014.  On November 6, 2013, the Bankruptcy Court authorized EME to enter into, and perform its obligations under, the extension agreement [Docket No. 1563].

## IX.    RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.    Certain Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

#### 1.    Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims, each encompassing Claims that are substantially similar to the other Claims in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.    *Failure to Satisfy Vote Requirements*

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### 3.    *The Debtors May Not Be Able to Secure Confirmation of the Plan*

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims would receive with respect to their Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan and the Plan Sponsor Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 4.    *Nonconsensual Confirmation*

In the event that any Impaired Class of Claims or Interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one Impaired Class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to Accrued Professional Compensation Claims.

### 5.    *The Debtors May Object to the Amount or Classification of a Claim*

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 6.    *Risk of Non-Occurrence of the Effective Date*

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 7.    *Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan*

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 8.    *Necessary Governmental Approvals May Not Be Granted*

Pursuant to the terms of the Purchase Agreement, consummation of the NRG Transaction depends upon approval of FERC under section 203 of the Federal Power Act, approval by the department of Justice under the Hart-Scott-Rodino Act, and all other approvals required by governmental authorities.  Failure by any governmental authority to grant a necessary approval  could prevent consummation of the NRG Transaction and Confirmation of the Plan.

### 9.    *Registration Statement for Stock Component of NRG Transaction May Not Be Effective*

Pursuant to the terms of the Purchase Agreement, consummation of the NRG Transaction depends on the effectiveness under the Securities Act of a registration statement on Form S-1 registering the offer and sale of the stock component of the Sale Proceeds and its issuance and distribution pursuant to the Plan by NRG.  Failure by the United States Securities and Exchange Commission to declare such registration statement effective, or the existence of actual or threatened legal proceedings that limit or suspend such effectiveness, could prevent consummation of the NRG Transaction and Confirmation of the Plan.

### 10.    *Releases, Injunctions, and Exculpations Provisions May Not Be Approved*

Article VIII of the Plan provides for certain releases, injunctions, and exculpations.  In addition to the releases in favor of the Released Parties, there is a limited release and injunction of certain Excluded Liabilities that may otherwise be asserted against the Purchaser Parties and the Acquired Companies.  These Excluded Liabilities will be paid or treated pursuant to the Plan.  However, the releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

### B.    **Risk Factors that May Affect the Value of Securities to be Issued Under the Plan**

### 1.    *Debtors Cannot State with Certainty What Recovery Will Be Available to Holders of Allowed Claims in Voting Classes*

The Debtors cannot know with certainty, at this time, the number or amount of Claims in Voting Classes that will ultimately be Allowed.  Accordingly, because certain Claims under the Plan will be paid on a Pro Rata basis, the Debtors cannot state with certainty what recoveries will be available to Holders of Allowed Claims in Voting Classes.

### 2. *Actual Amounts of Allowed Claims May Differ from the Estimated Claims and Adversely Affect the Percentage Recovery on Unsecured Claims*

The Claims estimates set forth in Article IV.C above, "What will I receive from the Debtors if the Plan is consummated?," are based on various assumptions. The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumptions prove to be incorrect. Such differences may adversely affect the percentage of recovery.

### 3. *Plan Sponsor Agreement May Terminate*

The Purchaser Parties, the PoJo Parties, the Committee, and the Supporting Noteholders have agreed to support the Plan; provided however, that certain conditions must be met, including, without limitation, that: (a) the filing and approval of this Disclosure Statement within the time periods specified in the Plan Sponsor Agreement; (b) the Confirmation of the Plan within the time periods specified in the Plan Sponsor Agreement; (c) the closing of the NRG Transaction within the time periods specified in the Plan Sponsor Agreement; and (d) an event giving rise to termination of the Plan Sponsor Agreement has not occurred (which events are set forth in the Plan Sponsor Agreement).

To the extent that the terms or conditions of the Plan Sponsor Agreement are not satisfied, or to the extent events giving rise to termination of the Plan Sponsor Agreement occur, the Plan Sponsor Agreement may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituents. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

### 4. *A Liquid Trading Market for the Parent Common Stock and/or New Interests in Reorganized EME May Terminate or May Not Develop*

There can be no assurances that liquid trading markets for the New Interests or Parent Common Stock will develop or be maintained, respectively. The liquidity of any market for the New Interests and Parent Common Stock will depend, among other things, upon the number of holders of New Interests and Parent Common Stock, Reorganized EME's and NRG's financial performance, and the market for similar securities, none of which can be determined or predicted. Therefore, the Debtors cannot provide assurances that an active trading market will develop or continue, or if a market exists, what the liquidity or pricing characteristics of that market will be.

### 5. *Small Number of Holders or Voting Blocks May Control Reorganized EME*

Consummation of the Plan may result in a small number of holders owning a significant percentage of the shares of the New Interests. These holders may, among other things, exercise a controlling influence over Reorganized EME and have the power to elect directors and approve significant transactions.

### 6. *Impact of Interest Rates*

Changes in interest rates may affect the fair market value of the Debtors' assets and/or the distributions to Holders of Claims under the Plan.

## C. Disclosure Statement Disclaimer

### 1. *Information Contained Herein Is for Soliciting Votes*

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

### 2. *This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission*

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws. Neither the United States Securities and Exchange

Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

### 3.    Reliance on Exemptions from Registration

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with federal or state securities laws or other similar laws.

### 4.    No Legal or Tax Advice Is Provided to You by this Disclosure Statement

*This Disclosure Statement is not legal advice to you.*  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

### 5.    No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors, the Committee, and the Supporting Noteholders), nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Purchaser Parties, Holders of Allowed Claims, or any other parties in interest, nor (c) be deemed or construed as a finding of fact or conclusion of law with respect to any matter or controversy, including, without limitation, the matters described in Section V.E hereof, the validity of the Intercompany Notes, or the characterization of the PoJo Leases and Documents.

### 6.    Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtors, the Purchaser Parties, Reorganized EME, or the Post-Effective Date Debtor Subsidiaries, as the case may be, may seek to investigate, file, and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

### 7.    No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a Holder of an Allowed Claim or Interest for or against the Plan does not constitute a waiver or release of any Claims, Causes of Action, including Causes of Action against any "insider" as that term is defined in section 101(31) of the Bankruptcy Code, or rights of the Debtors, the Committee, the Supporting Noteholders, or the Purchaser Parties (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action, including Causes of Action against any "insider" as that term is defined in section 101(31) of the Bankruptcy Code, of the Debtors or their respective Estates are specifically or generally identified herein.

### 8.    Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

### 9.    Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has

not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 10.   *No Representations Outside This Disclosure Statement Are Authorized*

No representations concerning or relating to the Debtors, these Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors, the United States Trustee, and counsel to the Committee.

### D.   Liquidation Under Chapter 7

If no plan can be Confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and the Debtors' Liquidation Analysis is described herein and attached hereto as **Exhibit E**.

## X.   SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and voting deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit C**.

**The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan**.

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.

PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

### A.   Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against a debtor are entitled to vote on a chapter 11 plan. The table in section IV.C of this Disclosure Statement, which begins on page 4, provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim) under the Plan. As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims and Interests in Classes A3, A4, A5, B3, C3, C4, and C6 (collectively, the "Voting Classes").

The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are _**not**_ soliciting votes from Holders of Claims and Interests in Classes A1, A2, A6, A7, A8, B1, B2, B4, B5, B6, C1, C2, or C5. Additionally, the Disclosure Statement Order provides that certain Holders of Claims in the Voting Classes, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B.    Voting Record Date

**The Voting Record Date is December 16, 2013**.  The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee can vote as the Holder of a Claim.

### C.    Voting on the Plan

**The Voting Deadline is February 7, 2014, at 5:00 p.m. (prevailing Central Time)**.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed and delivered (either by using the return envelope provided, by first class mail, overnight courier or personal delivery) so that they are **actually received** on or before the Voting Deadline by the Debtors' voting and claims agent (the "Voting and Claims Agent") at the following address:

---

**DELIVERY OF BALLOTS**

**If by Regular Mail to:**

**Edison Mission Energy, et al.**
**c/o GCG**
**PO Box 9942**
**Dublin, OH 43017-5942**

**If by Hand-Delivery or Overnight Courier to:**

**Edison Mission Energy, et al.**
**c/o GCG**
**5151 Blazer Parkway, Suite A**
**Dublin, Ohio 43017**

If you received an envelope addressed to your nominee, please allow enough time when you return your ballot for your nominee to cast your vote on a ballot before the Voting Deadline.

---

### D.    Ballots Not Counted

**Except as otherwise provided by the Disclosure Statement Order, no ballot will be counted toward Confirmation if, among other things**:  (i) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (ii) it was transmitted by facsimile, email or other electronic means; (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the Schedules as contingent, unliquidated or disputed for which the applicable bar date has passed and no proof of claim was timely filed; (v) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (vi) it was sent to the Debtors, the Debtors' agents/representatives (other than the Voting and Claims Agent), an indenture trustee or the Debtors' financial or legal advisors instead of the Voting and Claims Agent; (vii) it is unsigned; or (viii) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

47

> **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS,
> PLEASE CONTACT THE VOTING AND CLAIMS AGENT TOLL-FREE AT (888) 909-0100.
> ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE
> NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

## XI.    CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (i) the Plan is accepted by all Impaired Classes of Claims, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the Class; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11; (ii) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11; and (iii) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in the class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that the holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **<u>Exhibit E</u>** and incorporated herein by reference is a liquidation analysis (the "<u>Liquidation Analysis</u>") prepared by the Debtors with the assistance of Perella Weinberg Partners, the Debtors' investment banker and financial advisor.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation under chapter 7 of the Bankruptcy Code of the Debtors' businesses would result in substantial diminution in the value to be realized by Holders of Claims as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

### C.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan.

Pursuant to the Plan, the Debtors' operating businesses and Assumed Liabilities will be transferred to the Purchaser in exchange for the Sale Proceeds, which shall be used, along with the other sources of funding for the Plan, to fund the orderly wind down of the Debtors' estates.  As such, the Debtors believe that the confirmation of the Plan is not likely to be followed by a further financial reorganization and, therefore, is feasible.

### D.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired"

under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[9]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by Holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have ***actually*** voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

### E.    Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; provided, however, that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right, in consultation with the Purchaser, the Committee, the Supporting Noteholders, and the PoJo Parties, to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.

### 1.    No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

---

[9]    A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

## XII.    CERTAIN SECURITIES LAW MATTERS

### A.    New Equity

As discussed herein, Reorganized EME will distribute New Interests to Holders of Allowed Claims in Class A3.  The Debtors believe that the New Interests to be "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable state securities laws ("Blue Sky Laws").

### B.    Issuance of New Interests Under the Plan; Resale of New Interests

#### 1.    *Exemptions from Registration Requirements of the Securities Act and State Blue Sky Laws*

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any applicable state Blue Sky Laws) will not apply to the offer or sale of stock, options, warrants or other securities by a debtor if:  (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.  In reliance upon these exemptions, the offer and sale of the New Interests under the Plan will not be registered under the Securities Act or any applicable state Blue Sky Laws.

To the extent that the issuance of the New Interests is covered by section 1145 of the Bankruptcy Code, the New Interests may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code.  In addition, the New Interests generally may be able to be resold without registration under applicable state Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of those states; however, the availability of those exemptions for any such resale cannot be known unless individual state Blue Sky Laws are examined.

The Plan contemplates the application of section 1145 of the Bankruptcy Code to the New Interests, but at this time, there can be no assurance that the issuance of the New Interests will be exempt from registration pursuant to section 1145 of the Bankruptcy Code and, in turn, whether any Person may freely resell New Interests without registration under the Securities Act, other federal securities laws, or applicable state Blue Sky Laws.  Recipients of the New Interests are advised to consult with their own legal advisors as to the applicability of section 1145 of the Bankruptcy Code to the New Interests and the availability of any exemption from registration under the Securities Act, other federal securities laws, or applicable state Blue Sky Laws.

#### 2.    *Resale of New Equity by Persons Deemed to be "Underwriters;" Definition of "Underwriter"*

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such Claim or Interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" any person directly or indirectly controlling or controlled by an issuer, or any person under direct or indirect common control with an issuer, of securities.  As a result, the reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or

50

indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer, director or significant shareholder of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly, with respect to officers and directors, if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Resales of the New Interests by Entities deemed to be "underwriters" (which definition includes "controlling Persons" of an issuer) are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act, state Blue Sky Laws, or other applicable law. Under certain circumstances, holders of New Interests who are deemed to be "underwriters" may be entitled to resell their New Interests pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met by the holder of the securities. The issuer of the New Interests, however, does not intend to file periodic reports under the Securities Act or seek to list the New Interests for trading on a national securities exchange. Consequently, "current public information" (as such term is defined in Rule 144) regarding the issuer of the New Interests is not expected to be available for purposes of sales of New Interests under Rule 144 by holders who are deemed to be "underwriters." Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person" of an issuer) with respect to the New Interests would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Interests and, in turn, whether any Person may freely resell New Interests. The Debtors recommend that potential recipients of New Interests consult their own counsel concerning their ability to freely trade such securities without compliance with the Securities Act, other federal securities laws, or applicable state Blue Sky Laws.

**XIII.    CERTAIN UNITED STATES INCOME TAX CONSEQUENCES OF THE PLAN**

The following is a summary of certain United States federal income tax consequences of the Plan to the Debtors and certain Holders of Allowed Claims. This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations thereunder ("Treasury Regulations") and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the Internal Revenue Service as to any of the tax consequences of the Plan discussed below. There can be no assurance that the Internal Revenue Service will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to Holders of Allowed Claims that are not United States persons (as such term is defined in the IRC) or that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, employees of any of the Debtors, persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction). Moreover, this summary does not purport to cover all aspects of United States federal income taxation that may apply to the Debtors, the reorganized Debtors, or Holders of Allowed Claims or Interests based upon their particular circumstances. Additionally, except as otherwise specified, this summary does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local, or foreign tax law.

If a partnership (or other entity treated as a partnership or other pass-through entity for United States federal income tax purposes) is a Holder, the tax treatment of a partner (or other owner) generally will depend upon the status of the partner (or other owner) and the activities of the entity. Partners (or other owners) of partnerships

(or other pass-through entities) that are Holders should consult their respective tax advisors regarding the United States federal income tax consequences of the Plan.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE UNITED STATES FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

**TREASURY DEPARTMENT CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE IRC.   TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR**

### A.      Certain United States Income Tax Consequences to the Debtors

#### 1.      *Debtors' Tax Attributes*

At December 31, 2013, the Debtors expect to have under the regulatory regime approximately [**$3,082**] million of federal NOL carryforwards and approximately [**$306**] million of federal tax credit carryforwards (of which, approximately [**$15**] million are AMT credit carryforwards that may be subject to reduction as discussed below in Section A.3). If the NRG Transaction is treated as a taxable sale of assets to the Purchaser (a "Taxable Transaction"), the Debtors expect to realize approximately [**$420**] million of federal gain, which will be offset by the Debtors' NOLs. As a result, the Debtors' NOLs available for carryforward would be reduced to approximately [**$2,662**] million. If the NRG Transaction is treated as a tax-free reorganization (a "Reorganization"), the Debtors will not realize any gain and, accordingly, the Debtors' NOLs would not be reduced as a result of the NRG Transaction. Based on a corporate federal income tax rate of 35 percent, the value of the Debtors' projected NOLs available for carryforward  is approximately [**$932**] million in the case of a Taxable Transaction and [**$1,079**] million in the case of a Reorganization. Thus, the total value of EME's federal NOL and credit carryforwards at the end of 2013, after reduction as a result of gain recognition in the NRG Transaction, but before any required reduction by excluded cancellation of indebtedness income, is projected to be approximately [**$1,238**] million in the case of a Taxable Transaction and [**$1,385**] million in the case of a Reorganization.

As discussed in Section V.E, as a result of the application of the Tax Sharing Agreements, the EIX Group has utilized more of the Debtors' federal tax attributes on a regulatory basis than EME has been compensated for. As of the end of 2013, the value of such used but uncompensated attributes is expected to be approximately [**$123**] million. If EME continued as a member of the EIX Group, the Tax Sharing Agreements remained in place, and the NRG Transaction was a Taxable Transaction, EME would be compensated for the [**$1,238**] million of the regulatory attribute carryforwards as well as the [**$123**] million of used but uncompensated attributes for a total of approximately [**$1,361**] million as those attributes would be used by the EIX Group under the terms of the Tax Sharing Agreements. If the NRG Transaction was a Reorganization, no gain would be recognized and the Purchaser would generally succeed to the Debtors' NOLs and credits, before any reduction by excluded cancellation of indebtedness income, and such NOLs and credits would not be available to the EIX Group.

In addition, at December 31, 2013, the Debtors expect to have uncompensated California Tax Attributes. Due to differences in federal and California income tax rules, the Debtors have higher basis in their assets for California income tax purposes, and, as a result, the NRG Transaction, if treated as a Taxable Transaction, would generate a loss of approximately [**$900**] million, rather than gain for California income tax purposes. Thus, after the NRG Transaction, and taking into account the offset of any federal deduction for California income taxes, the Debtors expect that the value of their uncompensated California Tax Attributes will be approximately [**$166**] million

based on a corporate California income tax rate of 8.84 percent. If EME were to continue as a member of the EIX Group, the Tax Sharing Agreements were to remain in place, and the NRG Transaction is treated as a Taxable Transaction, EME would be compensated for these Tax Attributes as they are used by the EIX Group under the terms of the Tax Sharing Agreements.

Under the Purchase Agreement for the NRG Transaction, EME and NRG have agreed to undertake steps such that the NRG Transaction will be considered a Taxable Transaction. Accordingly, unless EME and NRG subsequently agree to an alternative structure for the NRG Transaction, both EME and NRG intend to report the NRG Transaction as a Taxable Transaction for United States federal income tax purposes (as well as for relevant state and local income tax purposes). Assuming the NRG Transaction is treated as a Taxable Transaction, the aggregate value of EME's uncompensated federal and California attributes as of the end of 2013 is expected to be approximately [**$1,527**] million.

### 2. Cancellation of Debt Income

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. Under Section 108 of the IRC, a taxpayer is not required to include COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "Bankruptcy Exception"). Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its Tax Attributes by the amount of COD Income that it excluded from gross income. In general, Tax Attributes will be reduced in the following order: (a) NOLs; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits. Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the IRC.

The amount of COD Income to the Debtors is expected to equal approximately the amount of outstanding principal and accrued interest on the EME Senior Notes (through the date when the EME Senior Notes are cancelled) less $2,635 million of proceeds from the NRG Transaction. If EME receives any payments from EIX in respect of its Tax Attributes following the NRG Transaction and such payments are treated as capital contributions, such payments will reduce, dollar-for-dollar, the amount of COD Income to the Debtors, and accordingly, would preserve an equivalent amount of EME's Tax Attributes that would otherwise be reduced pursuant to the Bankruptcy Exception. Alternatively, such payments, or a portion thereof, may constitute taxable income to EME or Reorganized EME that, subject to the limitations discussed below, would be offset by and reduce EME's Tax Attributes. The federal income tax treatment of such payments, if any, is uncertain and Holders are urged to consult their own tax advisors regarding the consequences of such payments, if any, to EME and Reorganized EME.

### 3. Limitation of Tax Attributes

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, Reorganized EME's ability to use any remaining tax attributes post-emergence may be subject to certain limitations under the IRC. Generally, if the NRG Transaction is treated as a Taxable Transaction, Reorganized EME will succeed to EME's Tax Attributes after giving effect to any gain on the sale and reduction pursuant to excluded COD Income. If, however, the NRG Transaction is structured as a Reorganization, Reorganized EME would not generally succeed to any of EME's Tax Attributes.

If the NRG Transaction is treated as a Taxable Transaction, following consummation of the Plan, the Debtors anticipate that any remaining Tax Attributes may be subject to limitation under Section 382 of the IRC by reason of the transactions pursuant to the Plan.

Under Section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs and built-in losses (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally is subject to an annual limitation. Under Section 383 of the IRC, a similar limitation applies to pre-change tax credits (the "Pre-Change Tax Credits," and together with the Pre-Change Losses, the "Pre-Change Tax Attributes"). As discussed in greater detail herein, the Debtors anticipate that the issuance of the New Interests pursuant to the Plan will result in an "ownership change" of EME for these purposes, and that Reorganized EME's use of its

Pre-Change Tax Attributes will be subject to limitation unless an exception to the general rules of Section 382 of the IRC applies.

### a.    General Section 382 Annual Limitation

This discussion refers to the limitation determined under Section 382 of the IRC in the case of an "ownership change" as the "Section 382 Limitation."  In general, the annual Section 382 Limitation on the use of Pre-Change Losses in any "post-change year" is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs, currently approximately 3.5 percent).  The Section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.  Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

The issuance under the Plan of the New Interests, along with the cancellation of existing EME Interests pursuant to the Plan, is expected to cause an ownership change with respect to EME on the Effective Date.  As a result, unless an exception applies, Section 382 of the IRC will apply to limit EME's use of any remaining Pre-Change Tax Attributes after the Effective Date.  This limitation is independent of, and in addition to, the reduction of Tax Attributes described in the preceding section resulting from the exclusion of COD Income.

### b.    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception").  Under the 382(l)(5) Exception, a debtor's Pre-Change Tax Attributes are not limited on an annual basis but, instead, the debtor's NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the debtor undergoes another ownership change within two years after consummation, then the debtor's Pre-Change Tax Attributes effectively are eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception").  When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change.  The 382(l)(6) Exception differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.  However, a debtor corporation to which the 382(l)(6) Exception applies is required to continue its business enterprise for the two-year period following the consummation, otherwise its Pre-Change Tax Attributes will be effectively eliminated in their entirety.

### 4.    Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20 percent rate to the extent such tax exceeds the corporation's regular United States federal income tax.  For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, except for certain AMT NOLs generated in taxable

years beginning or ending in 2008 or 2009, which can offset 100 percent of a corporation's AMT income, generally only 90 percent of a corporation's taxable income for AMT purposes may be offset by available NOLs (as computed for AMT purposes).

**5.** ***Summary Charts of Debtors' Tax Attributes***

The following charts summarize the Tax Attributes of EME estimated as of November 14, 2013, but taking into account the impact of an illustrative NRG Transaction as if it occurred on December 31, 2013 (and excluding, for the avoidance of doubt, the impact of the Restructuring).

The Tax Attributes are subject to ongoing review and material revision by EME, based on a number of factors, including without limitation, changes in facts and law with respect to regulatory, tax, accounting, bankruptcy, litigation, and other legal and financial matters concerning EME and its affiliates.

[*Tax Attributes Summary on Following Page*]

| Federal Net Operating Losses at 12/31/2013 | |
|---|---|
| 2011 Carryforward | $ 1,638,955,211 |
| 2012 Carryforward | $ 558,992,535[10] |
| 2013 Carryforward | $ 883,775,783[10] |
| Illustrative NRG Transaction Gain | $ (420,000,000)[11] |
| Total Unused Net Operating Loss Carryforwards | $ 2,661,723,529 |
| Illustrative Value of Net Operating Losses | $ 931,603,235[12] |
| | |
| Federal Tax Credits at 12/31/2013 | |
| 2009 Carryforward | $ 49,674,769 |
| 2010 Carryforward | $ 60,155,113 |
| 2011 Carryforward | $ 64,336,668 |
| 2012 Carryforward | $ 57,834,797[10] |
| 2013 Carryforward | $ 59,075,800[10] |
| Alternative Minimum Tax Carryforward | $ 14,983,117[13] |
| Total Tax Credit Carryforwards | $ 306,060,264 |

*[Tax Attributes Summary continued on following page.]*

---

[10] Except as otherwise expressly provided, the 2012 and 2013 tax calculations herein represent projections as of August 2013.

[11] EME's projected gain on account of the NRG Transaction, as more specifically described in the *Debtors' Motion to Approve (I) Entry Into Plan Sponso Agreement, (II) Sponsor Protections, and (III) Related Relief* [Docket No. 1375], assumes for purposes of this calculation only that EME will receive aggregate cash and stock consideration of $2.635 billion and that EME holds basis of approximately $2.215 billion in the assets to be transferred to NRG.

[12] The illustrative value of EME's federal NOLs equals EME's aggregate net operating loss carryforward balance, net of any gain from the NRG Transaction, multiplied by the current federal corporate income tax rate of 35 percent.

[13] It is possible that any carryforwards on account of EME's ATM liability may be reduced as a result of the NRG Transaction if the gain thereon exceeds EME's current NOLs. For purposes of the calculations in the Tax Attributes, such a reduction has not been made.

| Uncompensated Federal Attributes at 12/31/2013 | |
|---|---|
| Estimated Value of Uncompensated Federal Attributes | $   123,448,406[14] |

| California Net Operating Losses at 12/31/2013 | |
|---|---|
| 2011 Carryforward | $   941,239,061 |
| 2012 Carryforward | $   350,349,027[10] |
| 2013 Carryforward | $   787,625,000[10] |
| Illustrative NRG Transaction Loss | $   810,000,000[15] |
| Total California NOLs Not Yet Compensated | $ 2,889,213,088 |
| Federal Benefit Adjustment | ($ 1,011,224,581)[16] |
| Net California NOLs Not Yet Compensated (Adjusted for Federal Benefit) | $ 1,877,988,507 |
| Estimated Value of California NOLs | $   166,014,184[17] |

| Summary of Value of Tax Attributes at 12/31/2013 (Pre-COD Income) | |
|---|---|
| Federal NOLs | $   931,603,235 |
| Federal Tax Credits | $   306,060,264 |
| Used/Uncompensated Federal Attributes | $   123,448,406 |
| California NOLs | $   166,014,184 |
| Total Available | $ 1,527,126,089 |

*[Tax Attributes Summary continued on following page.]*

---

[14]   EIX and certain of its subsidiaries have not compensated EME for all of EME's Tax Attributes pursuant to the Tax Sharing Agreements.  The Tax Sharing Agreements grant priority to the tax attributes of SCE under certain circumstances.

[15]   Due to differences in applicable tax rules and regulations, EME's basis in its assets under applicable California law is higher than EME's federal basis in such assets. As a result, the NRG Transaction is expected to produce a loss for California tax purposes and such loss may increase the amount of available NOLs.  The amount shown represents an illustrative loss of $900 million apportioned to California assuming a 90 percent apportionment factor.

[16]   The value of California Tax Attributes is reduced by the  amount of the federal deduction (assuming 35 percent federal corporate income tax rate) that EIX would have claimed for its California corporate franchise tax liability if EME was not a member of the combined group and EME's attributes were not available to offset income of the group.

[17]   The Tax Attributes include a value of EME's NOLs under California law determined by multiplying the aggregate NOL carryforward balance (after adjustment for federal tax benefit), including losses from the NRG Transaction, by the current California corporate franchise tax of 8.84 percent.

| Estimated Cancellation of Debt Income Under the Plan | |
|---|---|
| Principal Amount of EME Senior Notes | $ 3,700,000,000 |
| Accrued/Unpaid Interest (as of 12/31/2013) | $ 426,474,362[10] |
| Total Outstanding | $ 4,126,474,362 |
| NRG Proceeds | $ 2,635,000,000 |
| COD Income Under the Plan | $ 1,491,474,362[18] |
| Federal Tax Effect of COD Income | $ 522,016,027 |
| California Tax Effect of COD Income (Adjusted for Federal Benefit) | $ 85,700,117[19] |
| **Summary of Value of Tax Attributes at 12/31/2013 (After-COD Income)** | |
| Net Value of Tax Attributes After COD Income | $ 919,409,946 |

### B.    Certain United States Income Tax Consequences to Holders of Claims

#### 1.    Consequences to Holders of Class A3, A4, and A5 Claims

Pursuant to the Plan and in full and final satisfaction of their Claims, Holders of Allowed Class A3, A4, and A5 Claims will, unless any such Holder agrees to less favorable treatment or any such Allowed Class A3, A4, and A5 Claim is assumed by the Purchaser as part of the NRG Transaction, receive their (a) Pro Rata distribution of the Net Sale Proceeds consisting of Cash and the Purchaser's stock consideration and (b) Pro Rata distribution of the New Interests.  The United States federal income tax consequences of the Plan to Holders of Allowed Class A3, A4, and A5 Claims will depend, in part, on (a) whether the Claims surrendered constitute "securities" for United States federal income tax purposes, (b) whether the NRG Transaction constitutes a Taxable Transaction or a Reorganization, (c) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years, (d) the manner in which the Holder acquired the Claim, (e) the length of time the Claim has been held, (e) whether the Claim was acquired at a discount, (f) whether the Holder had previously included in income accrued but unpaid interest with respect to the Claim and (g) the method of tax accounting of the Holder.

Whether a debt instrument constitutes a "security" is determined based on all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for United States federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an Interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

---

[18]    The Tax Attributes assume (strictly for illustrative purposes) that all proceeds of the NRG Transaction will be distributed to the holders of the EME Senior Notes.

[19]    The impact of California Tax Effect on COD Income is reduced by the amount of the federal deduction (assuming 35 percent federal corporate income tax rate) that EIX would claim in the future as a result of the reduction in California Tax Attributes and the corresponding increase in California taxable income.

If an Allowed Class A3, A4, or A5 Claim qualifies as a security and the NRG Transaction is a Taxable Transaction, the Holder of such Claim should recognize gain, if any, but not loss, to the extent of the Net Sale Proceeds received by such Holder. The amount of gain, if any, a Holder would recognize, should equal the lesser of the Net Sale Proceeds received and the difference between (1) the sum of the Net Sale Proceeds and the value of the New Interests received and (2) such Holder's adjusted basis, if any, in such Claim.  The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount, and whether and to what extent the Holder had previously claimed a bad debt deduction with respect to its Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange. To the extent that a portion of the consideration received by such Holder in satisfaction of such Holder's Class A3, A4, or A5 Claim is allocable to accrued but untaxed interest, the Holder may recognize ordinary income (as discussed in greater detail in "*Accrued but Untaxed Interest*" below).  A Holder's aggregate tax basis in the New Interests received in satisfaction of the Holder's Claim against EME that qualifies as a security, apart from amounts allocable to accrued but untaxed interest, generally should equal the Holder's tax basis in such surrendered Claim, *plus* any gain recognized, *minus* the fair market value of any Net Sale Proceeds received. The holding period of any such New Interests received under the Plan, apart from amounts allocable to accrued but untaxed interest, generally should include the holding period of such surrendered Claim. The Holder's basis in the Purchaser's stock received by such Holder as part of the Net Sale Proceeds should be the fair market value of such stock on the Effective Date and such Holder's holding period for such stock received should begin on the day following the Effective Date.[20]

If an Allowed Class A3, A4, or A5 Claim qualifies as a security and the NRG Transaction constitutes a Reorganization, the Holder of such Claim should recognize gain, if any, but not loss, to the extent of Cash received by such Holder. The United States federal income tax consequences to such Holder will be substantially similar to the consequences described above (substituting "Cash" for "Net Sale Proceeds"), that such Holder would have experienced if the NRG Transaction was a Taxable Transaction, except that such Holder's aggregate tax basis in the New Interests and the Purchaser's stock received in satisfaction of the Holder's Claim, apart from amounts allocable to accrued but untaxed interest, generally should equal the Holder's tax basis in such surrendered Claim, *plus* any gain recognized, *minus* the amount of any Cash received, and the holding period considerations discussed above will apply to New Interests as well as the Purchaser's stock received by such Holder.[21]

If an Allowed Class A3, A4, or A5 Claim does not qualify as a security, regardless of whether the NRG Transaction constitutes a Taxable Transaction or a Reorganization, the Holder of such Class A3, A4, or A5 Claim will be treated as exchanging such Claim for such Holder's Pro Rata distribution of the Net Sale Proceeds and New Interests in a taxable exchange under section 1001 of the IRC. Accordingly, each Holder of such Claim should recognize gain or loss equal to the difference between (a) the sum of the Cash, the fair market value of the Purchaser's stock and the fair market value of New Interests received in exchange for the Claim; and (2) such Holder's adjusted basis, if any, in such Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors discussed above with respect to Class A3, A4, or A5 Claims that constitute securities.  If recognized gain or loss is capital in nature, it generally would be long-term capital gain or loss if the Holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations.  To the extent that a portion of the consideration received in exchange for the Claim is allocable to accrued but untaxed interest, the Holder may recognize ordinary income (as discussed in greater detail in "*Accrued but Untaxed Interest*" below).  A Holder's tax basis in any New Interests and the Purchaser's stock received by such Holder should equal the fair market value of such stock as of the date such stock is distributed to the Holder. A Holder's holding period for the New Interests and the Purchaser's stock received should begin on the day following the Effective Date.

---

[20]    The statements made in this paragraph assume that Reorganized EME is treated as a corporation for United States federal income tax purposes.

[21]    The statements made in this paragraph assume that Reorganized EME is treated as a corporation for United States federal income tax purposes.

**2.**        ***Consequences to Holders of Allowed Class C3 and C4 Claims***

Pursuant to the Plan and in full and final satisfaction of their Claims, Holders of Allowed Class C3 and C4 Claims will receive Pro Rata distributions from the Homer City Wind Down Proceeds for the applicable Homer City Debtor.  A Holder of an Allowed Class C3 or C4 Claim will be treated as exchanging such Claim for its distribution of the Homer City Wind Down Proceeds, in a taxable exchange under section 1001 of the IRC.  Holders of such Claims would recognize gain or loss equal to the difference between (a) the fair market value of the Homer City Wind Down Proceeds received in exchange for such Holder's Claim, and (b) the Holder's adjusted tax basis in such Claim.  Any such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long term capital gain or loss if the Claims were held for more than one year by the Holder.  To the extent that a portion of any distribution of Homer City Wind Down Proceeds received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income.  See the discussions of accrued but untaxed interest and market discount below.

It is plausible that a Holder receiving the Homer City Wind Down Proceeds could treat the transaction as an "open" transaction for United States federal tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the proceeds ultimately received from the Homer City Wind Down Proceeds.  The open transaction doctrine only applies in rare and extraordinary circumstances, the United States federal income tax consequences of an open transaction are uncertain and highly complex, and a Holder should consult with its own tax advisor if it believes open transaction treatment might be appropriate.

**3.**        ***Accrued but Untaxed Interest***

A portion of the consideration received by Holders of Claims may be attributable to accrued interest on such Claims.  Such amount should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for United States federal income tax purposes.  Conversely, Holders of Claims may be able to recognize a deductible loss to the extent any accrued interest on the Claims was previously included in the Holder's gross income but was not paid in full by the Debtors.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for United States federal income tax purposes, while certain Treasury Regulations generally treat payments as allocated first to any accrued but unpaid interest and then as a payment of principal (which approach could have the effect of requiring the recognition of interest income even if a Holder of Allowed Claims has an overall loss).  The Internal Revenue Service could take the position that the consideration received by the Holder should be allocated in some way other than as provided in the Plan.  Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

**4.**        ***Market Discount***

Under the "market discount" provisions of the IRC, some or all of any gain realized by a Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market

discount that accrued thereon while the Allowed Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

### 5.        *Information Reporting and Backup Withholding*

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 28 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; <u>provided</u> that the required information is timely provided to the Internal Revenue Service.

The Debtors will withhold all amounts required by law to be withheld from payments made pursuant to the Plan.  The Debtors will comply with all applicable reporting requirements of the Internal Revenue Service.

**THE   UNITED   STATES   FEDERAL   INCOME   TAX   CONSEQUENCES   OF   THE   PLAN   ARE COMPLEX.    THE   FOREGOING   SUMMARY   DOES   NOT   DISCUSS   ALL   ASPECTS   OF   UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS**.

## RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  November 15, 2013

Respectfully submitted,

Edison Mission Energy,
on behalf of itself and each of the other Debtors

By:    /s/
Name:  [●]
Title:   [●]