UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Edison Mission Energy, et al.[1] | ) | Case No. 12-49219 |
| | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | Hon. Jacqueline P. Cox |

**Amended Memorandum Opinion (dkt. no. 1283)**

This matter is before the Court on the motion of the Sierra Club for entry of an order confirming that the automatic stay is not in effect, or, in the alternative, granting relief from the automatic stay (the "Motion"). *See* Bankruptcy Case no. 12-49219, dkt. no. 1283. For the reasons that follow, the Motion is Granted.

## I.    Jurisdiction and Venue

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C § 1334(a). A matter to determine the application of the automatic stay is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G). Venue is proper pursuant to 28 U.S.C. § 1408.

## II.    Facts and Background

Edison Mission Energy ("EME") together with its Debtor and non-Debtor affiliates, including Midwest Generation, LLC ("MWG"), is a leading independent power producing enterprise specializing in developing, operating, and selling energy and capacity from approximately 40 generating facilities in 12 states and the Republic of Turkey. The Debtors have

---

[1] The debtors in these chapter 11 cases include: Edison Mission Energy; Camino Energy Company; Chestnut Ridge Energy Company; Edison Mission Energy Fuel Services, LLC; Edison Mission Finance Co.; Edison Mission Fuel Resources, Inc.; Edison Mission Fuel Transportation, Inc.; Edison Mission Holdings Co.; Edison Mission Midwest Holdings Co.; EME Homer City Generation L.P.; Homer City Property Holdings, Inc.;  Midwest Finance Corp.; Midwest Generation EME, LLC; Midwest Generation, LLC; Midwest Generation Procurement Services, LLC; Midwest Peaker Holdings, Inc.; Mission Energy Westside, Inc.; San Joaquin Energy Company; Southern Sierra Energy Company; and Western Sierra Energy Company (the "Debtors").

approximately 925 employees and maintain headquarters in Chicago, Illinois and Santa Ana, California. (*See* Motion for Joint Administration of Lead Case, dkt. no. 717, p. 4.)

The Debtors are indirect subsidiaries and affiliates of non-Debtor Edison International Inc. ("EIX"). (*See* Declaration of Maria Rigatti, Senior Vice President and Chief Financial Officer of Edison Mission Energy ("Rigatti Declaration")). dkt. no. 6, p. 2, ¶ 6.  EME and its subsidiaries own and operate certain unregulated coal, wind, and gas power generating assets. *Id.* at ¶ 6.  MWG operates several coal-fired plants in Illinois, including the Joliet Generating Station in Joliet; the Powerton Generating Station in Pekin; the Waukegan Generating Station in Waukegan; and the Will County Generating Station in Romeoville (the "Coal Plants"). Motion, dk. no. 1283, p. 2. ¶ 4.

The Sierra Club is the nation's oldest and largest grassroots environmental organization. It has approximately 641,000 members, including approximately 23,000 members in Illinois. *See* Motion, p. 2.

On October 4, 2013, the Sierra Club filed the instant Motion seeking entry of an order either confirming that the automatic stay is not in effect due to Section 362(b)(4)'s police power exception, or, in the alternative, granting relief from the automatic stay to continue a regulatory action pending against MWG before the Illinois Pollution Control Board (the "IPCB Proceeding").

The Sierra Club initiated the IPCB Proceeding on December 15, 2012 by filing a complaint against MWG pursuant, in part, to a provision of the Illinois Environmental Protection Act (the "IEP Act") that prohibits the discharge or emission of "contaminants" that would cause or tend to cause air pollution (the "Complaint").[2] *See* 415 ILCS 5/9(a) (2012) which provides as follows:

Sec. 9. Acts prohibited. No Person shall:

(a) Cause or threaten or allow the discharge or emission of any contaminant into the environment in any State so as to cause or tend to cause air pollution in

---

[2]The citizen suit provision of the IEP Act provides, in part, that: "[a]ny person may file with the Board a complaint, meeting the requirements of subsection (c) of this Section, against any person allegedly violating this Act, any rule or regulation adopted under this Act, any permit or term or condition of a permit, or any Board order. . . ." *See* 415 ILCS 5/31(d) (2012).

Illinois, either alone or in combination with contaminants from other sources, or so as to violate regulations or standards adopted by the Board under this Act.

Section 9 of the IEP Act encompasses the National Ambient Air Quality Standard ("NAAQS") for sulfur dioxide which was established by the United States Environmental Protection Agency ("EPA") to protect human health against excessive sulfur dioxide emissions. The NAAQS sets a maximum sulfur dioxide level of 75 parts per billion (the "EPA sulfur dioxide limit"). *See* 75 Fed. Reg. 35520, 35546-48 (June 22, 2010).

The IPCB, the policy making body on environmental issues in Illinois, has determined that Section 9 of the IEP Act is violated when predicted sulfur dioxide levels exceed EPA-adopted standards, such as the EPA sulfur dioxide limit. *Envt. Prot. Agency v. City of Springfield*, No. PCB 70-9, Opinion and Order at 8-9 (Ill. Pollution Control Board May 12, 1971).

To ensure compliance with air quality standards, the IPCB adopted a regulation which provides:

> No person shall cause or threaten or allow the discharge or emission of any contaminant into the environment in any State so as, either alone or in combination with contaminants from other sources, to cause or tend to cause air pollution in Illinois, or so as to violate the provisions of this Chapter, or so as to prevent the attainment or maintenance of any applicable ambient air quality standard.

35 Ill. Admin. Code § 201.141. Sulfur dioxide is defined as a "contaminant" within the meaning of this regulation. 35 Ill. Admin. Code. § 201.102. The EPA's sulfur dioxide limit is an "applicable ambient air quality standard." 75 Fed. Reg. 35520 (June 22, 2010).

The Sierra Club conducted an investigation and concluded that the MWG Coal Plants emit significant amounts of sulfur dioxide into the atmosphere, which chemicals pose a threat to human health and the environment when present in the air in sufficient concentrations.[3] Motion, p. 4, ¶ 9. Based upon these findings, the Sierra Club filed the Complaint against MWG with the

---

[3]According to a published Rules and Regulations decision, exposure to elevated concentrations of sulfur dioxide can result in adverse respiratory effects in asthmatics such as decreased lung function. *See* 75 Fed. Reg. 35520, 35546 (June 22, 2010).

IPCB. The Sierra Club alleges in the Complaint that the Coal Plants' sulfur dioxide emissions violate Illinois law by emitting sulfur dioxide at levels that would cause violations of the EPA sulfur dioxide limit and therefore, cause or threaten to cause "air pollution" as prohibited by Illinois law. *See* Motion, dkt. no. 1283, p. 4.

In the Complaint, the Sierra Club requests the imposition of penalties on MWG and an order requiring it to cease violating Illinois EPA regulations, by reducing and limiting sulfur dioxide emissions from its Coal Plants[4]. The primary relief sought in the IPCB Proceeding is: 1) a determination that MWG is violating state environmental laws and 2) entry of an order compelling MWG to comply with state laws by regulating and reducing sulfur dioxide emissions from its Coal Plants. The Sierra Club also seeks an award of civil penalties pursuant to 415 ILCS 5/42, payable to the Environmental Protection Trust Fund. *See* Motion, dkt. no. 1283, pp. 8-9, ¶¶ 20-22. Pursuant to the statute, the civil penalty is capped at "$50,000 for the violation and an additional civil penalty of not to exceed $10,000 for each day during which the violation continues."[5] 415 ILCS 5/42 (2012). The Sierra Club notes in its Motion that it is not seeking to enforce any civil penalty that may be awarded in the IPCB Proceeding. *See* Motion, p. 10, ¶ 22.

---

[4]MWG reports, in a conclusory fashion, that it has been granted a variance through December 31, 2016 to comply with Illinois' Combined Pollutant Standard. *See* Objection, dkt. no. 1320, p. 2, ¶ 2. MWG has not indicated in its Objection that the variance defeats the Sierra Club's claims in the Complaint. In any event, whether or not MWG's acts or omissions are consistent with the variance or other applicable regulations is an issue for determination by the Illinois Pollution Control Board.

[5]Section 42 of the statute provides, in relevant part:

> (a) Except as provided in this Section, any person that violates any
> provision of this Act or any regulation adopted by the Board, or
> any permit or term or condition thereof, or that violates any order
> of the Board pursuant to this Act, shall be liable for a civil penalty
> of not to exceed $50,000 for the violation and an additional civil
> penalty of not to exceed $10,000 for each day during which the
> violation continues; such penalties may, upon order of the Board or
> a court of competent jurisdiction, be made payable to the
> Environmental Protection Trust Fund, to be used in accordance
> with the provisions of the Environmental Protection Trust Fund
> Act.

Rather, it seeks to pursue its requests for declaratory and injunctive relief and to liquidate the amount of civil penalties.

The Court notes that neither the Illinois Attorney General nor the Illinois Environmental Protection Agency has taken a position on the relief requested in the Motion herein.

### III.     Discussion

#### A.     Application of the Police Power Exception to the Automatic Stay

Generally, Section 362(a)(1) of the Bankruptcy Code provides that the filing of a petition for relief under the Bankruptcy Code operates as a stay, applicable to all entities, of:

> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title.

11 U.S.C. § 362(a)(1).

However, Section 362(b)(4) provides that the filing of a petition does not operate as a stay "of the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's policy or regulatory power." 11 U.S.C. § 362(b)(4). This exception requires both that: 1) the proceeding be brought by a governmental unit and (2) the proceeding be brought to enforce . . . police or regulatory power of the governmental unit. This exception was enacted in part to protect public health and safety.[6] *In re Herrera*, 194 B.R. 178, 185 (Bankr. N.D. Ill. 1996).

---

[6] The legislative history of Section 362(b)(4) indicates that the exception is "intended to be given narrow construction in order to permit governmental units to pursue actions to protect health and safety." *In re Benalcazar*, 283 B.R. 514, 530 (Bankr. N.D. Ill. 2002), citing 124 Cong. Rec. 32,395 (1978).

In deciding whether an action falls within the police power exception, courts must determine whether the action relates to matters of public safety and health as opposed to matters concerning the government's pecuniary interest. *In re Phillips*, 368 B.R. 733, 739 (Bankr. N.D. Ind. 2007). This requirement, also known as the "pecuniary purpose test," focuses on whether a governmental proceeding "relates to public safety and welfare, which favors application of the stay exception, or to the government's interest in the debtor's property, which does not." *Id.* at 739.

In its Motion, the Sierra Club acknowledges that it is not a governmental unit as defined by the Bankruptcy Code.[7] The Sierra Club nonetheless argues that its IPCB Proceeding may proceed under the police power exception, because it is acting as an agent of a government unit, which in this case is the Illinois Attorney General or the Illinois EPA.

In support, the Sierra Club relies principally on *Alpern v. Lieb*, 11 F.3d 689 (7th Cir. 1993), a Seventh Circuit decision which was decided in the context of sanctions imposed under Rule 11 of the Federal Rules of Civil Procedure. There, the Court opined:

> The Rule 11 sanction is meted out by a governmental unit, the court, though typically sought by a private individual or organization-a nongovernmental litigant, the opponent of the litigant to be sanctioned. There is no anomaly, given the long history of private enforcement of penal and regulatory law. The private enforcer, sometimes called a "private attorney general," can be viewed as an agent of the "governmental unit," the federal judiciary, that promulgated Rule 11 in order to punish unprofessional behavior. The fact that the sanction is entirely pecuniary does not take it out of section 362(b)(4).

11 F.3d at 690 (citing *In re Commonweath Cos.*, 913 F.2d 518, 522-23 (8th Cir. 1990)).

Herein, the Sierra Club contends that they too may be viewed as a "private attorney general." The Court disagrees. Nothing in *Alpern* suggests that the court intended a broader

---

[7]Section 101(27) of the Bankruptcy Code provides that "[t]he term "governmental unit" means United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States . . . a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government." 11 U.S.C. § 101(27).

application of its decision, outside the context of a sanctions proceeding. The *Alpern* decision notes that Rule 11 sanctions, although imposed by a government agent (the court), are typically sought by a private party. The court considered "the long history of private enforcement of penal and regulatory law" and concluded that the "private enforcer" or "private attorney general" of Rule 11 could be viewed as an agent of the federal judiciary. *Id.* at 690. Indeed, the cases cited in *Alpern* involved disciplinary proceedings either initiated or continued by the state bar or the court, both of which are governmental units within the meaning of Section 101(27) of the Bankruptcy Code.[8] *See, e.g., Papadakis v. Zelis*, 230 Cal.App.3d 1385 (1991) (sanctions imposed by the court as a result of an order to show cause for attorneys' litigation tactics falls within the police power exception); *O'Brien v. Fischel*, 74 B.R. 546, 550 (Bankr. D. Haw. 1987) (sanctions issued pursuant to a rule to show cause hearing issued by the court covered by the police power exception); *Wade v. State Bar of Az.*, 948 F.2d 1122 (9th Cir. 1991) (holding that state bar initiated attorney disciplinary proceedings are exempt from the automatic stay).

Here, however, the Court finds no analogous relationship between the Sierra Club and the Illinois EPA or the Illinois Attorney General as alluded to in *Alpern*. The Sierra Club has not asserted that either Illinois governmental body typically acts through private parties to enforce environmental regulations. Further, the record indicates that neither the Illinois EPA nor the Illinois Attorney General has requested or directed the Sierra Club to act in its stead. Thus, the Sierra Club's agency argument fails

The Court notes that in cases where suits initiated by private parties were allowed to proceed under the police power exception, either the governmental unit later joined in or commenced its own proceeding. For example, in *In re Halo Wireless Inc.*, 684 F.3d 581 (5th Cir. 2012), twenty suits were filed against a wireless service provider before the state public utility

---

[8]The court also cited *In re Revere Copper & Brass, Inc.*, 29 B.R. 584 (S.D.N.Y. 1983), which involved a citizen suit brought by an environmental public interest organization against a debtor pursuant to the Clean Water Act (not unlike the suit at issue herein). In *Revere*, the court held, relying in part on the legislative history of Section 362(b)(4), that the police power exception "excludes private attorney general actions." *Revere*, at 588. If the court intended its *Alpern* ruling to have the broad application advanced by the Sierra Club, it could have so indicated by rejecting or distinguishing the analysis set forth in the *Revere* decision.

commission by a number of local telephone companies alleging they were owed fees for use of their networks.  In the underlying bankruptcy case, the court heard evidence indicating that under a state statute, once a complaint is filed, the governmental unit becomes a party to the proceeding. *Id.* at 592.  The Court of Appeals held that although the proceeding at issue was initiated by private entities, the public policy exception applied because the suit was being prosecuted or continued by governmental units, which is explicitly contemplated within the text of Section 362(b)(4). *Id.* at 592.

Similarly, in *U.S. Int'l Trade Commission v. Jaffe*, 433 B.R. 538 (E.D. Va. 2010),  the court held that the automatic stay was not applicable to an action where a private party files a complaint but the government agency independently chooses to commence an investigation. *Jaffe*, 433 B.R. at 544.

Here, however, the record indicates that the Sierra Club independently initiated the IPCB Proceeding and to date, no Illinois governmental unit has intervened or indicated that it plans to commence an investigation.  A representative of the Illinois Attorney General's office appeared at the hearing of this Motion and made clear it did not take a position on the Motion.  In light of those circumstances, it is clear that the Sierra Club's decision to commence the IPCB Proceeding was an independent action, not done under the directive of any Illinois governmental unit. Thus, the police power exception of Section 362(b)(4) does not apply to the IPCB Proceeding.

Because the Court finds that the pending IPCB Proceeding was not "commenced or continued" by a governmental unit, the Court need not address whether the pecuniary purpose test has been satisfied.

While the police power exception to the imposition of the automatic stay for governmental units does not apply to actions brought by private groups, the Illinois Environmental Protection Act allows private citizens and associations to prosecute environmental actions.  *See* 415 ILCS 5/31(d) (footnote 2, herein).

**B.      Cause Exists to Lift the Automatic Stay**

The next issue for determination is whether the stay should be lifted for "cause" pursuant to Section 362(d)(1) to allow the Sierra Club to prosecute the IPCB Proceeding.

Section 362(d)(1) provides that:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection(a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest.

The term "cause" is not defined by the Bankruptcy Code.  Courts are directed to make this determination on a case by case basis. *In re Benalcazar*, 283 B.R. 514, 535-536 (Bankr. N.D.Ill. 2002).  The Seventh Circuit has adopted a three-part balancing test to determine whether cause exists to lift the stay: 1) whether any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit; 2) whether the hardship to the [non-bankruptcy party] by maintenance of the stay considerably outweighs the hardship of the debtor and 3) whether the creditor has a probability of prevailing on the merits. *In re Fernstrom*, 938 F.2d 731, 735 (7th Cir. 1991).

**1.      Prejudice to the Debtor**

Applying the first of the *Fernstrom* factors, the Sierra Club contends that MWG will not be greatly prejudiced because allowing the IPCB Proceeding to continue will merely expedite the Coal Plants' compliance with environmental regulations that will continue to be in effect upon the Debtors' emergence from bankruptcy.

The Court agrees. Throughout these bankruptcy proceedings, the Debtors have maintained that environmental concerns are of great import and will have to be addressed in any plan of reorganization.  Allowing the IPCB Proceeding to continue will require MWG's compliance with environmental regulations that will still be in effect when MWG emerges from bankruptcy.  As noted in the Motion, on August 5, 2013, the U.S. EPA promulgated a regulation which designated the Will County and Powerton plants as being located in non-attainment areas

(areas that do not meet national air quality standards) based on existing air quality monitors. *See* 78 Fed. Reg. 47191, 47199 (Aug. 5, 2013). The regulation provides that by April 2015, Illinois must submit binding sulfur dioxide limits for those plants that ensure that the plants do not cause air quality violations. *Id.* at 47193. Through its Complaint, the Sierra Club seeks to ensure that Illinois will be protected from pollution in the interim while other statutory deadlines play out. Motion, dkt. no. 1283, p. 15, ¶ 33. MWG argues that allowing the IPCB Proceeding to proceed would be duplicative and wasteful. The Court fails to see how requiring MWG to take immediate action to address alleged environmental violations would be prejudicial to the Debtors. Such efforts would be beneficial to the Debtors' estates and their successors, including the prospective purchasers NRG Energy, Inc. and NRG Energy Holdings, Inc. ("NRG"), as resolution of these unavoidable problems is in all parties' best interests. *See* dkt. no. 1375, Motion to Approve Entry Into Plan Sponsor Agreement.[9]

The Sierra Club next argues that even if the Court were to deny the Motion, nothing prohibits it from bringing a post-petition suit pursuant to 28 U.S.C. § 959(a) to address the alleged continual sulfur dioxide emissions. The Court finds this argument to be persuasive. Section 959(a) of Title 28 provides that a debtor in possession must manage and operate its property in compliance with state law.[10] *See, e.g., Wilner Wood Products Co. v. State of Maine,*

---

[9]On October 18, 2013, Debtors filed a Motion to Approve (I) Entry Into Plan Sponsor Agreement, (II) Sponsor Protections, And (III) Related Relief. Therein, the Debtors sought Court approval of an agreement that contemplates NRG's acquisition of substantially all of EME's assets and equity interests in both Debtor and non-Debtor subsidiaries. *See* Case No. 12-49219, dkt. no. 1375.

NRG is one of the United States' largest power generation and retail electricity businesses, with power plants providing approximately 47,000 MW of generation capacity serving more than 2 million customers in 16 states. *See* dkt. no. 1375, p. 6 n. 4.

[10]Section 959(a) of Title 28 provides as follows:

> Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury.

*Dept. of Environmental Protection, et al.*, 128 B.R. 1, 2 (Bankr. D. Maine 1991) citing *Midlantic Nat'l Bank v. New Jersey Dept. Of Envtl. Protection*, 474 U.S. 494, 506 ("The intent of Congress is unmistakably clear: a debtor in possession . . . must manage and operate its property in compliance with State law. There is no exception for debtors who would be inconvenienced or burdened by State laws. The United States Supreme Court has indicated that this section is evidence of congressional intent that debtors in possession comply with states' environmental laws."); *In re Kish*, 41 B.R. 620, 625-26 (Bankr. E.D. Mich. 1984) (lawsuit filed by environmental group to enjoin trustee's post-petition conduct was allowed to continue pursuant to 28 U.S.C. § 959(a); group held not to be acting in violation of the automatic stay). In its Complaint, the Sierra Club alleges that MWG continues to violate both the IEP Act and the Illinois Administrative Code standards through its elevated sulfur dioxide emissions. Reply, dkt. no. 1327, p. 8. Because Section 959(a) permits post-petition suits against debtors, allowing the pending IPCB Proceeding to proceed now, rather than at some future time will not result in any prejudice to MWG.

In its Objection, MWG does not address the 28 U.S.C. § 959(a) argument, but complains that granting stay relief will potentially disrupt its reorganization efforts and place "an unjustifiable strain on the time of Debtors' officers and employees . . . ." Objection, dkt. no. 1320, p. 10, ¶ 27. The Court might find this argument persuasive if these bankruptcy proceedings involved a debtor with limited resources. The Debtors are multi-national corporations with access to resources sufficient to address the IPCB Proceeding while simultaneously navigating the restructuring process. Beyond the general assertion that granting stay relief would be disruptive, MWG fails to discuss with any specificity how moving forward with the IPCB Proceeding will have an adverse impact on the Debtors' restructuring efforts. To the contrary, the Debtors' Motion to Approve (I) Entry Into Plan Sponsor Agreement, (II) Sponsor Protections, And (III) Related Relief, at page 3, paragraph 4, indicates that the purchase agreement includes "NRG's assumption of substantial prepetition and non-Debtor liabilities, including the PoJo leveraged leases." *See* dkt. no. 1375.

In light of the foregoing, the Court concludes that the continuation of the IPCB

---

28 U.S.C. § 959(a).

Proceeding will not result in great prejudice to MWG or to the Debtors' estate.

### 2.    Hardship to the Sierra Club

The Court must determine whether the hardship to the Sierra Club by maintenance of the automatic stay outweighs the hardship to MWG and the Debtors by modification of the automatic stay.

The Sierra Club submits that the hardship to the Sierra Club and Illinois residents who live near the Coal Plants will be significant, as without the relief requested herein, it will be unable to protect the residents of Illinois and ensure compliance with environmental regulations. The Court agrees.  The Court does not take a position as to whether the Coal Plants are indeed emitting elevated levels of pollutants into the air, however, the Court deems it important for the sake of public health to deal with these issues now, rather than wait to do so in the future.  The Court recognizes that the Sierra Club can bring an action post-petition under 28 U.S.C. § 959(a) to address alleged sulfur dioxide emissions; however, doing so would cause the Sierra Club to litigate the same action twice and to incur additional costs.  Allowing the IPCB Proceeding to continue will allow it to address important environmental issues which could have an adverse impact on the health of residents of Illinois.

In its Objection, MWG again contends that granting stay relief would cause it significant hardship, reasoning that these chapter 11 proceedings require its full attention.  For the same reasons articulated in the Court's discussion above, the Court does not find this argument compelling.  The Debtors have under their employ a team of highly qualified professionals.  The Court has little doubt that MWG and the related debtor entities have the resources necessary to defend the IPCB Proceeding contemporaneously with advancing their reorganization efforts in these bankruptcy cases.  Allowing the IPCB Proceeding to proceed to resolution will likely benefit MWG and the Debtors because, as explained above, environmental concerns will be addressed by the Debtors through a plan of reorganization, or by their successors in interest.  The Sierra Club seeks declaratory and injunctive relief; it does not ask to enforce civil monetary penalties that may be awarded by the IPCB. *See* Motion, dkt. no. 1283, p. 10, ¶ 22. Thus, allowing the IPCB Proceeding to continue will not conflict with the Bankruptcy Code's objective

of preserving the bankruptcy estate. *See Penn Terra, Ltd. v. Dep't of Envtl. Res.*, 733 F.2d 267, 278-79 (3d Cir. 1984) ("[S]uit brought by [Department of Environmental Resources] to compel Penna Terra to remedy environmental hazards was properly brought as an equitable action to prevent future harm, and did not constitute an action to enforce a money judgment."). Considering the environmental and ecological concerns raised in the Complaint, any hardship to MWG will be *de minimus* in comparison to the hardship to the Sierra Club and the people of Illinois were the automatic stay to remain in effect.

### 3.     Probability of Prevailing on the Merits

Finally, the Court must determine whether the Sierra Club is likely to prevail on the merits of the IPCB Complaint.  The Sierra Club alleges therein that during the years 2010 - 2011 (the years for which there was complete data prior to the Complaint) MWG violated EPA sulfur dioxide limits for thousands of hours each year. Motion, dkt. no. 1283, p. 5, ¶ 11. Additional data suggests that sulfur dioxide emissions continued to exceed allowable levels (as established by the EPA sulfur dioxide limit), meaning the Coal Plants continue to violate the EPA sulfur dioxide limit and Illinois law.  The Sierra Club's findings in this regard are based upon data submitted by MWG to the EPA. Motion, dkt. no. 1283, p. 5, ¶ 11.

MWG argues that the Sierra Club is seeking to directly enforce federal NAAQS guidelines, which are not enforceable on their own. *See* Objection, dkt. no. 1320, pp. 13-14, ¶¶ 37-38.  However, a cursory review of the Sierra Club's pleadings suggests otherwise.  Although the Illinois statutes at issue in the Complaint parallel the standards established by the EPA's NAAQS, the IPCB Proceeding is based upon two Illinois laws: 415 ILCS 5/9(a) and 35 Ill. Admin. Code § 201.141.  415 ILCS 5/9(a) is part of the IEP Act, and 35 Ill. Admin. Code § 201.141 is a regulation promulgated under the IEP Act to ensure compliance with air quality standards. Motion, dkt. no. 1283, p. 5, ¶ 12; Reply, dkt. no. 1327, p. 11, ¶ 25.

MWG next complains that the existing Illinois EPA rule-making process which addresses the new sulfur dioxide NAAQS obviates the need for the IPCB Proceeding.  Objection, dkt. no. 1320, p. 15, ¶ 40.  In support, MWG cites to the Federal Clean Air Act ("Clean Air Act"),

which requires that states develop and adopt plans that meet air quality standards. *See* 42 U.S.C. § 7410. The Federal Clean Air Act has been described as a "model of cooperative federalism." *Sierra Club v. Korleski*, 681 F.3d 342, 343 (6th Cir. 2012). Under the Clean Air Act, once the EPA develops air quality standards, the states bear "primary responsibility for assuring" they are met. *Id.* at 343; 42 U.S.C. § 7407(a). Areas that do not meet those standards are designated as "non-attainment" areas, whereas areas that do meet these standards are designated as "attainment" areas. Jay Haney, OPERATING IN A WORLD OF NON-ATTAINMENT: NATIONAL AMBIENT AIR QUALITY STANDARDS AND IMPLICATIONS FOR ENERGY DEVELOPMENT, Air Quality Modeling Group, ICF International, 2013 No. 1 RMMLP- INST PAPER No. 4, at 4 (2013).

On June 22, 2010, the U.S. EPA promulgated the new NAAQS for sulfur dioxide[11]. *See* 75 Fed. Reg. 35520 (June 22, 2010). According to a recent EPA Rules and Regulations decision on Air Quality Designations for the 2010 Sulfur Dioxide standard, Illinois has until April 6, 2015 to propose a plan for achieving attainment. *See* 78 Fed. Reg. 47191, 47193 (Aug. 5, 2013). The non-attainment areas must meet the new NAAQS standard for sulfur dioxide by October 4, 2018. 78 Fed. Reg. 47191, 47193 (Aug. 5, 2013).

In its Objection, MWG essentially argues that the Federal attainment provisions render the applicable Illinois statutes invalid or otherwise inapplicable. This argument is misguided. Although the Clean Air Act's attainment and non-attainment designation process differs from existing Illinois law which underlies the IPCB Complaint, both are equally enforceable. While the Clean Air Act non-attainment provisions contemplate developing implementation plans over several years to meet national standards (*See* 42 U.S.C. § 7407), Illinois law *immediately* prohibits emissions from any Illinois polluters that threaten public health and safety. *See* 415 ILCS 5/9(a) (2012). The regulatory scheme enacted by Illinois to protect against elevated sulfur dioxide concentrations goes beyond the floor set by the Federal Clean Air Act; Illinois law may require more than the minimum Federal requirements. The mere fact that the Illinois regulations are more stringent than federal guidelines and require compliance at an earlier point in time does not undermine their validity. Indeed, such variances are expressly permitted by Federal law. *See*

---

[11]42 U.S.C. § 7410(a)(1) sets forth the guidelines for state implementation plans for ambient air quality standards.

-14-

42 U.S.C. § 7416 (providing that states are permitted to adopt air pollution standards that are at least as stringent or more stringent than federal minimal requirements).

The Court concludes that the Sierra Club has a reasonable likelihood of prevailing on the merits.

## IV.    Conclusion

The Court finds that the police power exception does not apply herein, as the Sierra Club is not a "governmental unit" as defined by Section 362(b)(4) of Bankruptcy Code. The Court also finds that cause exists to lift the stay as to the pending Illinois Pollution Control Board Proceeding pursuant to Section 362(d)(1). At this time, the Sierra Club is prohibited from seeking to enforce any monetary penalty that may be awarded pursuant to 415 ILCS 5/42 or otherwise.

This amended opinion constitutes the Court's findings of fact and conclusions of law. A separate order was entered herein on November 13, 2013; that order stands.

**DATED:**     **November 19, 2013**          **ENTER:**

_____

**Jacqueline P. Cox**
**U.S. Bankruptcy Judge**