# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| _____ | ) | |
| In re: | ) | Chapter 11 Cases |
| | ) | |
| EDISON MISSION ENERGY, <u>et al.</u>,[1] | ) | Case No. 12-49219 (JPC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |

## APPLICATION OF AKIN GUMP STRAUSS HAUER & FELD LLP, CO-COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF EDISON MISSION ENERGY, <u>ET</u> <u>AL.</u>, FOR FINAL ALLOWANCE OF COMPENSATION AND FOR REIMBURSEMENT OF  EXPENSES FOR SERVICES RENDERED <u>DURING THE PERIOD OF JANUARY 7, 2013 THROUGH MARCH 11, 2014</u>

Name of Applicant:   <u>Akin Gump Strauss Hauer & Feld LLP</u>

Authorized to Provide
Professional Services to:   <u>Official Committee of Unsecured Creditors of Edison Mission Energy, *et al.*</u>

Date of Order Authorizing Retention: <u>February 20, 2013 (*nunc pro tunc* to January 7, 2013)</u>

Period for which Compensation
and Reimbursement is sought:  <u>January 7, 2013 through March 11, 2014</u>

Amount of Fees Sought:  <u>$19,863,622.00</u>

Amount of Expense Reimbursement Sought:  <u>$566,989.92</u>

This is the Fourth Interim and Final Fee Application filed by Akin Gump Strauss Hauer & Feld LLP.

_____

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Edison Mission Energy (1807); Camino Energy Company (2601); Chestnut Ridge Energy Company (6590); Edison Mission Energy Fuel Services, LLC (4630); Edison Mission Finance Co. (9202); Edison Mission Fuel Resources, Inc. (3014); Edison Mission Fuel Transportation, Inc. (3012); Edison Mission Holdings Co. (6940); Edison Mission Midwest Holdings Co. (6553); EME Homer City Generation L.P. (6938); Homer City Property Holdings, Inc. (1685); Midwest Finance Corp. (9350); Midwest Generation EME, LLC (1760); Midwest Generation, LLC (8558); Midwest Generation Procurement Services, LLC (2634); Midwest Peaker Holdings, Inc. (5282); Mission Energy Westside, Inc. (0657); San Joaquin Energy Company (1346); Southern Sierra Energy Company (6754); and Western Sierra Energy Company (1447).  The Debtors' service address is:  3 MacArthur Place, Suite 100, Santa Ana, California 92707.

Pursuant to the Local Rules for the United States Bankruptcy Court, Northern District of Illinois, set forth below is a summary of the fees and expenses requested in the First Interim Fee Application, Second Interim Fee Application, Third Interim Fee Application and the respective Monthly Fee Statements for the Fourth Interim Compensation Period (each as defined herein):[2]

| Date Served | Period Covered | Fees Requested | Expenses Requested | Total Fees and Expenses Requested | Total Fees and Expenses Allowed | Total Fees and Expenses Previously Paid |
|---|---|---|---|---|---|---|
| 5/15/13 | 01/07/13 – 03/31/13 (First Interim Fee Application) | $4,831,500.50 | $110,493.92 | $4,941,994.42 | $4,941,994.42.  On July 3, 2013, the Court entered an order [ECF No. 999] approving all of the fees and expenses requested in the First Interim Fee Application | 100% of fees and 100% of expenses |
| 9/13/13 | 04/01/13 – 07/31/13 (Second Interim Fee Application) | $7,781,070.00 | $155,128.71 | $7,936,198.70 | $7,936,198.70.  On October 28, 2013, the Court entered an order [ECF No. 1439] approving all of the fees and expenses requested in the Second Interim Fee Application | 100% of fees and 100% of expenses |
| 1/14/14 | 08/01/13 – 11/30/13 (Third Interim Fee Application) | $4,712,536.75 | $209,785.99 | $4,922,322.74 | $4,922,322.74.  On February 25, 2014, the Court entered an order [ECF No. 2133] approving all of the fees and expenses requested in the Third Interim Fee Application | 100% of fees and 100% of expenses |
| 1/30/14 | 12/01/13 – 12/31/13 (December Monthly Fee Statement) | $924,384.00 | $25,475.88 | $949,859.88 | Subject to Court approval of this Application | Pursuant to the Interim Compensation Order, Akin Gump has received payment of 80% of the fees requested and 100% of the expenses |

---

[2]  The figures set forth in the table above do not reflect a voluntary reduction made by Akin Gump in this Application in the amount of $10,846.00, which represents the aggregate amount of fees billed by timekeepers who worked fewer than five hours on this matter during the Fourth Interim Compensation Period.

| Date Served | Period Covered | Fees Requested | Expenses Requested | Total Fees and Expenses Requested | Total Fees and Expenses Allowed | Total Fees and Expenses Previously Paid |
|---|---|---|---|---|---|---|
| | | | | | | requested in the December Monthly Fee Statement |
| 3/3/14 | 01/01/14 – 01/31/14 (January Monthly Fee Statement) | $797,029.00 | $22,411.01 | $819,440.01 | Subject to Court approval of this Application | Pursuant to the Interim Compensation Order, Akin Gump has received payment of 80% of the fees requested and 100% of the expenses requested in the January Monthly Fee Statement |
| 3/26/14 | 02/01/14 – 02/28/14 (February Monthly Fee Statement) | $656,652.75 | $37,103.44 | $693,756.19 | Subject to Court approval of this Application | Pursuant to the Interim Compensation Order, Akin Gump has received payment of 80% of the fees requested and 100% of the expenses requested in the February Monthly Fee Statement |
| 4/9/14 | 03/01/14 – 03/11/14 (March Monthly Fee Statement) | $171,295.00 | $6,590.97 | $177,885.97 | Subject to Court approval of this Application | Pursuant to the Interim Compensation Order, Akin Gump has received payment of 80% of the fees requested and 100% of the expenses requested in the March Monthly Fee Statement |

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 Cases |
| | ) | |
| EDISON MISSION ENERGY, et al.,[1] | ) | Case No. 12-49219 (JPC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**APPLICATION OF AKIN GUMP STRAUSS HAUER & FELD LLP, CO-**
**COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS OF EDISON MISSION ENERGY, ET AL.,**
**FOR FINAL ALLOWANCE OF COMPENSATION AND FOR**
**REIMBURSEMENT OF EXPENSES FOR SERVICES RENDERED DURING**
**THE PERIOD OF JANUARY 7, 2013 THROUGH MARCH 11, 2014**

Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"), co-counsel for the Official

Committee of Unsecured Creditors (the "Committee") of Edison Mission Energy, *et al.*, hereby

files this final application (the "Application") pursuant to section 330 of title 11 of the United

States Code (the "Bankruptcy Code"), the Local Rules for the United States Bankruptcy Court,

Northern District of Illinois (the "Local Rules"), applicable guidelines (the "Guidelines") issued

by the United States Trustee for the Northern District of Illinois, Eastern Division (the "U.S.

Trustee") and the terms of the *Debtors' Third Amended Joint Chapter 11 Plan of Reorganization*

*(With Technical Modifications)* [ECF No. 2201] (the "Third Amended Plan"), for final allowance

of compensation for services rendered during the period of January 7, 2013 through March 11,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Edison Mission Energy (1807); Camino Energy Company (2601); Chestnut Ridge Energy Company (6590); Edison Mission Energy Fuel Services, LLC (4630); Edison Mission Finance Co. (9202); Edison Mission Fuel Resources, Inc. (3014); Edison Mission Fuel Transportation, Inc. (3012); Edison Mission Holdings Co. (6940); Edison Mission Midwest Holdings Co. (6553); EME Homer City Generation L.P. (6938); Homer City Property Holdings, Inc. (1685); Midwest Finance Corp. (9350); Midwest Generation EME, LLC (1760); Midwest Generation, LLC (8558); Midwest Generation Procurement Services, LLC (2634); Midwest Peaker Holdings, Inc. (5282); Mission Energy Westside, Inc. (0657); San Joaquin Energy Company (1346); Southern Sierra Energy Company (6754); and Western Sierra Energy Company (1447). The Debtors' service address is: 3 MacArthur Place, Suite 100, Santa Ana, California 92707.

2014 (the "Compensation Period") and for reimbursement of expenses incurred in connection therewith. In support of the Application, Akin Gump states as follows:

## RELIEF REQUESTED

1.    By this Application, Akin Gump respectfully requests:  (a) final allowance and award of compensation for the professional services rendered by Akin Gump as attorneys for the Committee during the Compensation Period in the amount of $19,863,622.00, representing 31,862 hours of professional and paraprofessional services; and (b) reimbursement of expenses incurred in connection therewith during the Compensation Period in the amount of $566,989.92.[2] This Application is submitted pursuant to the terms of the Third Amended Plan, by which Akin Gump is seeking the final award and full payment, without any holdback of fees, of $19,863,622.00 in fees and $566,989.92 for reimbursement of expenses relating to services rendered on behalf of the Committee during the Compensation Period.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over the Application pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The bases for the relief requested herein are Bankruptcy Code section 330 and Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

3.    On December 17, 2012 (the "Petition Date"), seventeen of the Debtors (the "Initial Debtors") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Subsequently, on May 2, 2013, Edison Mission Finance Co., EME Homer City Generation L.P. and Homer City Property Holdings, Inc. (collectively, the "Homer City Debtors" and together

---

[2]  With respect to these amounts, as of the filing of this Application, Akin Gump has already received payment of $19,364,595.85 in fees and $566,989.92 in expenses.

2

with the Initial Debtors, the "Debtors") each filed voluntary petitions for relief under chapter 11
of the Bankruptcy Code.  On December 18, 2012, the Court entered an order [ECF No. 115]
approving procedural consolidation and joint administration of these chapter 11 cases pursuant to
Bankruptcy Rule 1015(b) (as amended by the Court's order entered on December 21, 2012 [ECF
No. 154] and supplemented by the Court's order entered on May 16, 2013 [ECF No. 771]).

4.    On January 7, 2013 (the "Committee Formation Date"), pursuant to Bankruptcy
Code section 1102, the U.S. Trustee appointed the Committee [ECF No. 202] (as amended on
January 18, 2013 [ECF No. 308]).   The Committee currently consists of nine members:
(a) Wells Fargo Bank, National Association, as Trustee; (b) Commonwealth Edison Co./Exelon
Corporation; (c) Clennon Electric; (d) The Bank of New York Mellon, as Trustee; (e) Peabody
Coalsales, LLC; (f) Nesbitt Asset Recovery, LLC/PSEG; (g) Geo. J. Beemsterboer, Inc.;
(h) Rowell Chemical Corporation; and (i) International Brotherhood of Boilermakers Local One.

5.    On the Committee Formation Date, pursuant to Bankruptcy Code section 1103(a),
the Committee selected Akin Gump to serve as co-counsel to the Committee.  On February 20,
2013, this Court entered an order [ECF No. 528] authorizing the Committee to employ and retain
Akin Gump as co-counsel, *nunc pro tunc* to the Committee Formation Date.

6.    On December 17, 2013, the Debtors filed the *Debtors' Second Amended Joint
Chapter 11 Plan of Reorganization* [ECF No. 1694] (the "Second Amended Plan") and the
*Second Amended Disclosure Statement for the Debtors' Joint Chapter 11 Plan of Reorganization*
(the "Second Amended Disclosure Statement").[3]   On December 18, 2014, the Court held a
hearing to consider the Second Amended Disclosure Statement.  On December 19, 2014, the

---

[3]  Prior to filing the Second Amended Plan, on November 15, 2013, the Debtors filed the *Debtors' Joint Chapter 11
Plan of Reorganization* [ECF No. 1588] and the *Disclosure Statement for the Debtors' Joint Chapter 11 Plan of
Reorganization* [ECF No. 1589], and on December 3, 2013, the Debtors filed the *Debtors' Amended Joint
Chapter 11 Plan of Reorganization* [ECF No. 1625] and the *Amended Disclosure Statement for the Debtors' Joint
Chapter 11 Plan of Reorganization* [ECF No. 1626].

Court entered an order [ECF No. 1718] (the "<u>Disclosure Statement Order</u>") approving the adequacy of the same and authorizing the Debtors to solicit acceptances of the Second Amended Plan, and thereafter the Debtors filed solicitation versions of the Second Amended Disclosure Statement [ECF No. 1721] and Second Amended Plan [ECF No. 1720].  Pursuant to the Second Amended Disclosure Statement, the original voting deadline was January 29, 2014.

7.   On February 19, 2014, the Debtors filed the *Notice of Filing of EIX Settlement Agreement* [ECF No. 2071] (the "<u>EIX Settlement</u>") and the *Debtors' Motion to Establish Certain Scheduling and Notice Procedures for Confirmation of the Debtors' Modified Plan and Granting Related Relief* [ECF No. 2074] (the "<u>Scheduling Motion</u>") by which the Debtors sought approval of the form of notice with respect to the EIX Settlement and establishment of certain scheduling procedures for confirmation.  After a hearing on the Scheduling Motion, on February 19, 2014, the Court entered an order [ECF No. 2094] (the "<u>Scheduling Order</u>") approving the relief requested in the Scheduling Motion and, among other things, setting the date for creditors to change their vote on the Third Amended Plan for March 6, 2014.  On February 20, 2014, the Debtors filed a version of the Third Amended Plan, which, among other things, incorporated the terms of the EIX Settlement [ECF No. 2110].  On March 11, 2014, the Debtors filed the final version of the Third Amended Plan.

8.   Following a hearing on March 11, 2014 (the "<u>Confirmation Date</u>"), this Court entered an order confirming the Third Amended Plan [ECF No. 2206] (the "<u>Confirmation Order</u>").  On April 1, 2014, the NRG Transaction (as defined herein) and the EIX Settlement were consummated, and the Third Amended Plan became effective (the "<u>Effective Date</u>").  On the Effective Date, pursuant to the Plan, the Committee dissolved except with regard to certain subject matters enumerated in Article XIII.D of the Third Amended Plan, including, but not

limited to, matters related to applications for Accrued Professional Compensation Claims (as defined in the Third Amended Plan).

## PRIOR FEE REQUESTS

9.   On May 15, 2013, Akin Gump filed its first interim fee application [ECF No. 761] (the "First Interim Fee Application") for compensation for services rendered and for reimbursement of expenses incurred in connection therewith during the period of January 7, 2013 through March 31, 2013 (the "First Interim Compensation Period").  On July 3, 2013, the Court entered an order [ECF No. 999] (the "First Interim Fee Order") granting interim allowance of 100% of fees and 100% of expenses requested in the First Interim Fee Application for a total interim allowance of $4,941,994.42.[4]

10.   On September 13, 2013, Akin Gump filed its second interim fee application [ECF No. 1199] (the "Second Interim Fee Application") for compensation for services rendered and for reimbursement of expenses incurred in connection therewith during the period of April 1, 2013 through July 31, 2013 (the "Second Interim Compensation Period").  On October 28, 2013, the Court entered an order [ECF No. 1439] (the "Second Interim Fee Order") granting interim allowance of 100% of fees and 100% of expenses requested in the Second Interim Fee Application for a total interim allowance of $7,936,198.70.[5]

11.   On January 14, 2014, Akin Gump filed its third interim fee application [ECF No. 1793] (the "Third Interim Fee Application" and together with the First Interim Fee Application and Second Interim Fee Application, the "Interim Fee Applications") for compensation for

---

[4]  This figure reflects two voluntary reductions made by Akin Gump in the First Interim Fee Application, which totaled $52,124.00:  (a) $42,198.00, which represented 50% of time billed to travel during the First Interim Compensation Period; and (b) $9,926.00, which represented the aggregate amount of fees billed by timekeepers who worked fewer than five hours on this matter during the First Interim Compensation Period.

[5]  This figure reflects two voluntary reductions made by Akin Gump in the Second Interim Fee Application, which total $50,180.00:  (a) $28,414.00, which represented 50% of time billed to travel during the Second Interim Compensation Period; and (b) $21,766.00, which represented the aggregate amount of fees billed by timekeepers who worked fewer than five hours on this matter during the Second Interim Compensation Period.

services rendered and for reimbursement of expenses incurred in connection therewith during the period of August 1, 2013 through November 30, 2013 (the "Third Interim Compensation Period"). On February 25, 2014, the Court entered an order [ECF No. 2133] (the "Third Interim Fee Order") granting interim allowance of 100% of fees and 100% of expenses requested in the Third Interim Fee Application for a total interim allowance of $4,922,322.74.[6]

12. In addition, pursuant to the *Order Approving Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Official Committee Members*, dated January 17, 2013 [ECF No. 331] (the "Interim Compensation Order"), Akin Gump served the following monthly fee statements on the Debtors, the U.S. Trustee and the appropriate notice parties for fees and expenses incurred after the Third Interim Fee Period and prior to the Confirmation Date (the "Fourth Interim Compensation Period"):

- Statement of Professional Fees for Services Rendered and Expenses Incurred for the Period of December 1, 2013 through December 31, 2013 (the "December Monthly Fee Statement") in the amounts of $924,384.00 for professional fees and $25,475.88 for expenses;

- Statement of Professional Fees for Services Rendered and Expenses Incurred for the Period of January 1, 2014 through January 31, 2014 (the "January Monthly Fee Statement") in the amounts of $797,029.00 for professional fees and $22,411.01 for expenses;

- Statement of Professional Fees for Services Rendered and Expenses Incurred for the Period of February 1, 2014 through February 28, 2014 (the "February Monthly Fee Statement") in the amounts of $656,652.75 for professional fees and $37,103.44 for expenses; and

- Statement of Professional Fees for Services Rendered and Expenses Incurred for the Period of March 1, 2014 through March 11, 2014 (the "March Monthly Fee Statement" and together with the December Monthly Fee Statement, January Monthly Fee Statement and February Monthly Fee Statement, the "Monthly Fee

---

[6] This figure reflects two voluntary reductions made by Akin Gump in the Third Interim Fee Application, which total $78,308.75: (a) $62,296.75, which represented 50% of time billed to travel during the Third Interim Compensation Period; and (b) $16,012.00, which represented the aggregate amount of fees billed by timekeepers who worked fewer than five hours on this matter during the Third Interim Compensation Period.

Statements"[7]) in the amounts of $171,295.00 for professional fees and $6,590.97 for expenses.

13.   Pursuant to the Interim Compensation Order, as of the date of this Application, Akin Gump has received payment of 80% of the fees requested and 100% of the expenses requested with respect to each Monthly Fee Statement.

14.   As stated in the Affirmation of Ira S. Dizengoff, Esq., annexed hereto as <u>Exhibit A</u>, all of the services for which final compensation is sought were rendered for or on behalf of the Committee solely in connection with these chapter 11 cases.   There is no agreement or understanding between Akin Gump and any other person for the sharing of compensation to be received for the services rendered in these chapter 11 cases.

15.   The Interim Fee Applications and Monthly Fee Statements are incorporated herein by reference.

**<u>SUMMARY OF SERVICES RENDERED</u>**

16.   Since the Committee Formation Date, Akin Gump has rendered professional services to the Committee as requested and as necessary and appropriate in furtherance of the interests of the Debtors' unsecured creditors.   The variety and complexity of the issues in these chapter 11 cases and the need to act or respond to such issues on an expedited basis in furtherance of the Committee's needs required the expenditure of substantial time by Akin Gump personnel from numerous legal disciplines on an as-needed basis.

17.   Akin Gump maintains written records of the time expended by attorneys and paraprofessionals in the rendition of their professional services to the Committee.   Such time records were made contemporaneously with the rendition of services by the person performing such services and in the ordinary course of Akin Gump's practice, and are presented in a form

---

[7]   The fees requested in the Monthly Fee Statements each reflected voluntary reductions made by Akin Gump with respect to 50% of time billed to travel during the applicable compensation period.  Such reductions total $44,236.25 in the aggregate for the Fourth Interim Compensation Period.

7

that is in compliance with the Local Rules.  A compilation showing the name of the attorney or paraprofessional, the date on which the services were performed, a description of the services rendered and the amount of time spent in performing the services during the Compensation Period is annexed hereto as <u>Exhibit B</u>.[8]  Additionally, attached hereto as <u>Exhibit C</u> is a schedule of the hours expended by the attorneys and paraprofessionals during the Compensation Period, their normal hourly rates and the value of their services, and attached hereto as <u>Exhibit D</u> is a schedule of Akin Gump's project categories, in accordance with the activity codes recommended by the Guidelines, and the total billed to each category during the Compensation Period.

18.  Akin Gump also maintains records of all actual and necessary out-of-pocket expenses incurred in connection with the rendition of its professional services, which are also available for inspection.  A schedule of the categories of expenses and amounts for which reimbursement is requested is annexed hereto as <u>Exhibit E</u>.

19.  The following summary of services rendered during the Compensation Period is not intended to be a detailed description of the work performed, as those day-to-day services and the time expended in performing such services are fully set forth in Exhibit B and in the attachments to the Interim Fee Applications.  Rather, it is merely an attempt to highlight certain of those areas in which services were rendered to the Committee, as well as to identify some of the problems and issues that Akin Gump was required to address during the Compensation Period.

(i)     <u>Case Administration</u>

20.  A portion of the services rendered during the Compensation Period related to the initial organization of the Committee and matters related thereto.  Specifically, in the days following the Committee's formation, Akin Gump spent time working with the Committee to develop appropriate bylaws to govern the Committee's conduct, helping the members of the

---

[8] Exhibit B contains such a compilation solely as it relates to the Fourth Interim Compensation Period.

8

Committee to understand their role in these cases, assisting the Committee as a whole to understand its financial advisory needs and the need for local counsel, and aiding with the selection of appropriate advisors to meet those needs.

21.  Also during the Compensation Period, Akin Gump provided services related to the administrative matters of the Committee.  Akin Gump's attention to the Committee's continuing organizational and administrative needs during the Compensation Period enabled the Committee to continue to function as a coordinated group and to acquit its statutory and fiduciary duties to the Debtors' unsecured creditors.  These tasks included, among other things, preparing case calendars, pleadings charts, task lists and working group lists, and attending to general case diligence.  Akin Gump also regularly communicated with the Committee's other professionals to attend to staffing issues and tasks to ensure that Akin Gump was representing the Committee in the most efficient manner.

22.  In addition, Akin Gump reviewed and analyzed all motions filed by the Debtors and other parties in interest since the Petition Date, including, but not limited to, the "first day" motions filed by the Debtors for which interim relief was sought at the "first day" hearing (the "First Day Motions"), the Third Amended Plan and the Disclosure Statement and all prior versions thereof and pleadings related thereto, all pleadings and documents relating to the NRG Transaction (as defined and described further below) and EIX Settlement, and various other motions and applications (as described further below).  Akin Gump, in conjunction with the Committee's other professionals, conducted diligence on the subject matter of each such pleading to, among other things, ascertain the effect that the relief requested would have on the Debtors, the interests of the Debtors' unsecured creditors and the administration of the chapter 11 cases.  Akin Gump's diligence efforts included reviewing underlying documentation related to the applicable pleading, meeting with or holding conference calls with representatives of the

Debtors and third parties, including the professional advisors of the ad hoc committee of senior noteholders of Debtor Edison Mission Energy (the "Ad Hoc Group") and the U.S. Trustee, to address issues related to the relief requested, and working with the Committee's other professionals to ensure that the Committee had a complete understanding of the relief requested in all pleadings filed in these chapter 11 cases.

23.   Due to Akin Gump's experience in counseling creditors' committees, Akin Gump believes it was able to efficiently address all issues relating to case administration that arose during the pendency of these chapter 11 cases.

(ii)    Committee Meetings

24.   Throughout the Compensation Period, Akin Gump coordinated all Committee activities.  Akin Gump, together with the other Committee professionals, set the agenda for all weekly telephonic conferences with the Committee during the Compensation Period.  In addition to calls with the full Committee, Akin Gump had numerous telephonic conferences with individual Committee members.  These meetings and telephone conferences all served to keep the Committee and its members informed of all developments in these complex chapter 11 cases.

25.   Before its meetings with the Committee, Akin Gump reviewed each pending matter requiring the Committee's attention and all underlying documentation in connection therewith. During the Committee meetings, Akin Gump assisted the Committee in formulating a position with respect to each pending matter which required the Committee's attention.  In addition, during the Compensation Period, Akin Gump prepared and distributed to the Committee memoranda and other communications which summarized all matters requiring the Committee's attention.

26.   Through these meetings, telephone conferences and correspondence, Akin Gump assisted the Committee in fulfilling its fiduciary duty of making informed decisions regarding the

various issues that arose during the Compensation Period to further the interests of the Debtors'
unsecured creditors.

(iii)   <u>Court Hearings</u>

27.  Akin Gump attorneys appeared at all of the hearings held before this Court during
the Compensation Period in the main case and in the associated adversary proceedings.  In
preparing for Court hearings, Akin Gump reviewed all applicable motions and applications filed
with the Court, including any responses thereto, assisted the Committee in analyzing the same,
and then presented, as needed, the Committee's position at such hearings.

28.  Akin Gump's presence at court hearings has ensured that the Debtors' unsecured
creditors have a voice in these chapter 11 proceedings and has helped the Committee to protect
the interests of the Debtors' unsecured creditors.  After each hearing, Akin Gump provided a
summary of the proceedings to the Committee either in writing or orally at the following
Committee meeting.

(iv)   <u>Debtors' Retention of Professionals</u>

29.  During the Compensation Period, the Debtors filed applications for authorization to
retain legal counsel, investment bankers, and administrative agents (the "<u>Debtors' Retention
Applications</u>"), as well as authorization to employ professionals utilized in the ordinary course of
the Debtors' business.  Akin Gump reviewed and analyzed each of the Debtors' Retention
Applications and had numerous discussions with the Debtors and their professionals with respect
to such applications to ensure that (i) all professionals employed by the Debtors were necessary
to the administration of the Debtors' estates and (ii) the compensation proposed for each
professional employed by the Debtors was appropriate in light of the Debtors' financial
circumstances and value of the services to be performed by the professional.  In connection
therewith and as necessary, Akin Gump prepared detailed memoranda summarizing the key

11

terms of the professionals' retention to assist the Committee with its analysis regarding the applications.

30. In addition, on November 22, 2013 the Debtors filed the *Debtors' Motion to Pay Fees and Expenses of the Special Restructuring Advisor of the Ad Hoc Group of Edison Mission Energy Unsecured Noteholders* [ECF No. 1614] (the "Bluescape Retention Motion"). By the Bluescape Retention Motion, the Debtors sought authorization for Debtor Edison Mission Energy ("EME") to (a) enter into an engagement letter, term sheet, and indemnification agreement (collectively, the "Engagement Documents"), among EME, counsel to the Ad Hoc Group, and Bluescape Advisors LLC ("Bluescape"), (b) pay the fees, expenses, and costs of Bluescape in its capacity as the Ad Hoc Group's special restructuring advisor as provided for in the Engagement Documents (without the need for further motion, fee application, or order of the Court) and provide an escrow for same, and (c) comply with its obligations, including indemnification obligations, under the Engagement Documents. Akin Gump analyzed the proposed terms of the Bluescape engagement and discussed the same with the Debtors' counsel to ensure that the relief requested was in the best interests of the Debtors' estates and creditors. Akin Gump also prepared a memorandum summarizing the terms of Bluescape's retention to assist the Committee with its analysis regarding the relief requested in the Bluescape Retention Motion. On December 5, 2013, the Court held a hearing to consider the Bluescape Retention Motion and entered an order granting the Bluescape Retention Motion [ECF No. 1635].

(v)     Committee's Retention of Professionals

31. During the Compensation Period, Akin Gump assisted the Committee to select and retain financial advisors, local counsel, and an information agent to assist the Committee in carrying out its statutory duties. Specifically, Akin Gump (a) guided the Committee in the selection process of certain of the Committee's professionals, (b) helped the Committee to

negotiate the terms of retention of the same on behalf of the Committee, (c) took an active role in allocating work streams among the financial advisors in order to ensure against duplication of efforts, and (d) prepared or reviewed retention applications for each Committee professional.

32.    On the Committee Formation Date, the Committee selected Blackstone Advisory Partners L.P. ("Blackstone") and FTI Consulting, Inc. ("FTI") to serve as financial advisors. Akin Gump first helped to negotiate the terms of retention of these financial advisors on behalf of the Committee.  Akin Gump then worked with Blackstone and FTI to develop a protocol for dividing work between the two so as to avoid duplication of efforts and keep costs to a minimum.  Finally, Akin Gump memorialized this division of services by drafting retention applications reflecting the same for both Blackstone and FTI, and filing the retention applications on February 6, 2013.  The Committee's retention of Blackstone and FTI was approved by the Court on February 20, 2013.

33.    During the Compensation Period, the Committee also conducted a process to select an information agent to help the Committee communicate with and respond to its constituency, and otherwise to comply with its duties under applicable law.  Akin Gump compared the offers of various candidates, negotiated prices, and helped the Committee to select Garden City Group, Inc. ("GCG") as its information agent.  Akin Gump then drafted GCG's retention application and filed the same on February 6, 2013.  The Committee's retention of GCG was approved by the Court on February 20, 2013.

34.    During the Compensation Period, the Committee also conducted a process to select local counsel.  Akin Gump helped to interview various candidates and assisted the Committee in weighing the merits of each.  Ultimately, the Committee selected Perkins Coie LLP ("Perkins") as local counsel.  Perkins drafted its own retention application, which Akin Gump then reviewed

and helped to file on February 6, 2013. The Committee's retention of Perkins was approved by the Court on February 20, 2013.

35. In addition to assisting the Committee to select and retain other advisors, Akin Gump also drafted its own retention application and filed the same on February 6, 2013. To ensure compliance with Akin Gump's disclosure obligations under Bankruptcy Rule 2014, Akin Gump reviewed all declarations and/or affidavits filed by parties in interest in these cases and then prepared its own declarations (the "Declarations"). Akin Gump's initial Declaration was filed on February 6, 2013, as part of Akin Gump's retention application, and Akin Gump's retention was approved by the Court on February 20, 2013. To supplement its disclosures, Akin Gump also filed four supplemental Declarations throughout the pendency of these chapter 11 cases [ECF Nos. 745, 1110, 1386 and 2041], and also provided guidance to Blackstone and FTI with respect to their supplemental declarations.

(vi)   Review of Schedules and Statements

36. During the Compensation Period, Akin Gump reviewed, analyzed and summarized the Schedules of Assets and Liabilities and the Statements of Financial Affairs filed by the Debtors (collectively, the "Schedules and Statements") in order to, among other things, understand the state of the Debtors' businesses and analyze transactions that might be avoidable for the benefit of the Debtors' estates and unsecured creditors. Akin Gump further analyzed various amendments to the Schedules and Statements filed throughout the pendency of these chapter 11 cases, engaged in several discussions with the Debtors' counsel to better understand the amendments and prepared and sent summaries of the amendments to the Committee.

(vii)   NRG Transaction, Plan, Disclosure Statement and EIX Settlement

37. In August 2013, NRG Energy, Inc. ("NRG") and certain noteholders entered into a non-disclosure agreement to discuss a potential transaction involving the Debtors. These

14

discussions resulted in a term sheet proposal that reflected negotiations among NRG and the Ad Hoc Group, proposing NRG's acquisition of substantially all of EME's assets and equity interests in both Debtor and non-Debtor subsidiaries (the "<u>NRG Transaction</u>").  Akin Gump, along with the Committee's other professionals, spent significant time discussing and analyzing the terms of the proposed NRG Transaction, including the anticipated recoveries to unsecured creditors as a result of the NRG Transaction, and participated in numerous conference calls and meetings with NRG, its advisors, and the Ad Hoc Group's professionals.

38.  After the Debtors determined to pursue the NRG Transaction, Akin Gump, along with the Committee's other professionals, spent substantial time reviewing and providing comments on the asset purchase agreement (the "<u>Asset Purchase Agreement</u>") among EME, NRG Energy Holdings Inc. and NRG.  Akin Gump also devoted significant resources to negotiating the terms of the plan sponsor agreement with the Ad Hoc Group's professionals, the Debtors, NRG, and the PoJo Parties (as defined herein), which was ultimately executed on October 18, 2013 (the "<u>Plan Sponsor Agreement</u>").  In connection with the foregoing, Akin Gump commented on multiple drafts thereof, briefed the Committee on the progress of such drafts, and held numerous calls and/or in person meetings with the Committee, the Committee's other advisors, the Debtors, the Ad Hoc Group and other parties in interest.  Prior to the Debtors' filing thereof, Akin Gump also spent significant time reviewing and commenting on the *Debtors' Motion to Approve (I) Entry into the Plan Sponsor Agreement, (II) Sponsor Protections, and (III) Related Relief* [ECF No. 1375] (the "<u>Plan Sponsor Agreement Motion</u>") to ensure the Plan Sponsor Agreement Motion properly described the terms of the Plan Sponsor Agreement.

39.  On October 24, 2013, this Court held a hearing on the Plan Sponsor Agreement Motion and entered an order granting certain of the relief requested in the Plan Sponsor Agreement Motion [ECF No. 1424].  However, the Court adjourned the hearing with respect to

the proposed terms of the exit plan incentive program (the "Exit Plan").  Prior to the hearing on

the Exit Plan, Akin Gump reviewed the draft of the Debtors' supplement to the Plan Sponsor

Agreement Motion in support of the Exit Plan [ECF No. 1415], the U.S. Trustee's objection to

the Exit Plan [ECF No. 1503] and the draft of the Debtors' reply thereto [ECF No. 1522], and

provided summaries of the same to the Committee.  Following a hearing, on November 6, 2013

the Court entered an order approving the Exit Plan [ECF No. 1561].

40.  Following the approval of the Plan Sponsor Agreement Motion and Exit Plan, Akin

Gump participated in extensive negotiations with the Debtors and other parties in interest

regarding the terms of the Debtors' joint chapter 11 plan of reorganization (the "Plan"),

disclosure statement with respect thereto (the "Disclosure Statement") and the motion to approve

the adequacy of the Disclosure Statement and related solicitation procedures (the "Disclosure

Statement Motion").  In coordination with the Committee's other professionals and the indenture

trustee (the "Senior Notes Trustee") of the senior unsecured notes of EME, Akin Gump spent

substantial time reviewing and revising drafts of the Plan, Disclosure Statement, Disclosure

Statement Motion, the proposed order approving the Disclosure Statement (the "Proposed

Disclosure Statement Order") and the respective ballots, notices and other related solicitation

materials.  On November 15, 2013, and after substantial negotiations and corresponding

revisions, the Debtors filed the first versions of the Plan [ECF No. 1588], Disclosure Statement

[ECF No. 1589] and Disclosure Statement Motion [ECF No. 1590].  After further negotiations

and revisions, the Debtors subsequently filed amended versions of the Plan and Disclosure

Statement on December 3, 2013 [ECF Nos. 1625 and 1626], and again on December 17, 2013

[ECF Nos. 1694 and 1695], along with the revised Proposed Disclosure Statement Order and

related exhibits [ECF No. 1696].  The Court held a hearing on the Disclosure Statement Motion

on December 18, 2013 and thereafter entered the Disclosure Statement Order [ECF No. 1718].

16

On December 19, 2013, the Debtors filed the solicitation versions of the Second Amended Plan and Second Amended Disclosure Statement [ECF Nos. 1720 and 1721].

41.     Following the close of the solicitation of the Second Amended Plan, the Debtors, certain members of the Ad Hoc Group, and Edison International Inc. ("EIX") entered into the EIX Settlement, which resolved all pending litigation with EIX, including the Standing Motion, Renewed Joint Motion to Compel, Estimation Motion and Sixth Omnibus Claims Objection (each as defined and further described herein), and also resolved the claims against EIX that the Committee had identified in the Standing Motion.  Akin Gump reviewed, commented on and summarized several drafts of the EIX Settlement and the Third Amended Plan, which incorporated the terms of the EIX Settlement.  On February 19, 2014, the Debtors filed the executed version of the EIX Settlement and the Scheduling Motion, which sought approval of the form of notice with respect to the EIX Settlement and establishment of certain scheduling procedures for confirmation.  After a hearing on the Scheduling Motion, on February 19, 2014, the Court entered the Scheduling Order, approving the relief requested in the Scheduling Motion and, among other things, setting the date for creditors to change their vote on the Third Amended Plan for March 6, 2014.  On February 20, 2014, the Debtors filed a version of the Third Amended Plan, and filed a final version thereof on March 11, 2014.  Following a hearing on March 11, 2014, this Court entered the Confirmation Order, which both approved the EIX Settlement and confirmed the Third Amended Plan [ECF No. 2206], thereby resolving all pending litigation with EIX.

42.     After entry of the Confirmation Order, Akin Gump, together with the Committee's other advisors, continued to negotiate with the Debtors' and Ad Hoc Group's advisors on the form of documents ancillary to the Third Amended Plan, including the documents comprising the Plan Supplement (as defined in the Third Amended Plan) in advance of the Effective Date.

In particular, Akin Gump spent considerable time reviewing and negotiating the post-emergence corporate governance documents to ensure that the interests of the Debtors' unsecured creditors were adequately represented and protected. The Effective Date of the Plan occurred on April 1, 2014.

(viii)   <u>Sales Process</u>

43. Parallel with and as contemplated by the NRG Transaction, the Debtors continued the process of exploring a potential sale or sales of certain or substantially all of their assets (the "<u>Sales Process</u>") to other buyers. Akin Gump, together with the Committee's other advisors, played an active role in the Sales Process. During the Compensation Period, Akin Gump, among other things, had frequent calls with the Debtors' advisors to discuss and receive status reports regarding the Sales Process and analyzed the indicative bids received by the Debtors. As a result of the foregoing efforts, Akin Gump worked to ensure that the Sales Process was run to maximize the value of the Debtors' assets for the benefit of unsecured creditors in these cases.

(ix)   <u>EIX Investigation</u>

44. Prior to the Petition Date, EME began exploring restructuring options with two of EME's major stakeholders—EIX and the Ad Hoc Group. EME, EIX, and the Ad Hoc Group reached a settlement (the "<u>Prepetition Settlement Transaction</u>") memorialized in a Transaction Support Agreement (the "<u>TSA</u>"), dated as of December 16, 2012.[9] The TSA provided that, subject to various terms and conditions including, in particular, the EIX Investigation (as defined herein), the Debtors' estates would release EIX from any and all claims and causes of action in exchange for, among other things, (a) the cancellation of EIX's equity interests in EME, (b) the continuation of EME's tax sharing agreements through the end of 2014 and (c) EIX's assumption of certain employee and pension liabilities of EME and its subsidiaries. The TSA, however,

---

[9] On July 25, 2013, members of the Ad Hoc Group holding $2,420,459,000 of the senior unsecured notes issued by EME delivered a notice of termination of the TSA.

provided that the foregoing release of EIX was subject to an investigation of potential claims and causes of action against EIX and certain related parties as well as further diligence and analysis regarding potential tax benefits that could flow to EME from the continuation of the tax sharing agreements between EME and EIX (collectively, the "EIX Investigation").

45.   On January 2, 2013, in connection with the Prepetition Settlement Transaction, the Debtors filed a motion seeking authorization pursuant to Bankruptcy Rule 2004 to conduct an examination of EIX and related parties [ECF No. 186] (the "2004 Motion"). Upon reviewing the relief requested in the 2004 Motion, Akin Gump concluded that the proposed relief did not provide the Committee with sufficient authority that would enable it to play a meaningful role in the investigation of EIX. Unable to reach an agreement with the Debtors on this issue, Akin Gump filed on behalf of the Committee an objection to the 2004 Motion. Ultimately, after extensive discussions, the Debtors and the Committee were able to reach a consensual resolution, and on January 23, 2013, the Court entered an order that, among other things, authorized the Committee to examine EIX with respect to the Prepetition Settlement Transaction and compel the production of materials and the testimony of persons in furtherance thereof [ECF No. 339] (the "Final 2004 Order").

46.   Following the entry of the Final 2004 Order, Akin Gump commenced the EIX Investigation by conducting diligence on the Prepetition Settlement Transaction and analyzing potential claims and causes of action against EIX and related parties. To coordinate and focus the EIX Investigation, Akin Gump attorneys also participated in numerous conference calls with the respective professionals for the Ad Hoc Group, EME and EIX. As part of the EIX Investigation, Akin Gump attorneys from a number of different disciplines reviewed and analyzed over 147,000 documents (and over one million pages of documents) relating to numerous transactions, agreements and other related matters. Akin Gump attorneys also sought

additional production from EIX and EME to ensure that the EIX Investigation was comprehensive and that the Committee and its advisors had a complete understanding of the facts.

47. On August 1, 2013, and as a result of the facts learned through the EIX Investigation, Akin Gump, on behalf of the Committee, filed the *Motion of Official Committee of Unsecured Creditors of Edison Mission Energy, et al., Pursuant to 11 U.S.C. §§ 105(a), 1103(c) and 1109(b), for Entry of an Order (A) Granting Leave, Standing and Authority to Prosecute, and Sole Authority to Settle, Certain Claims on Behalf of the Debtors' Estates and (B) Authorizing the Committee to Direct and Control Certain Accounting Professionals* [ECF No. 1054] (the "Standing Motion") and attached thereto a draft complaint (the "Draft Complaint"). By the Standing Motion, the Committee requested Court approval to bring numerous claims and causes of action against EIX, certain of its non-debtor subsidiaries and affiliates and certain former officers and directors (collectively, the "EIX Defendants"). Objections to the Standing Motion were filed by the Debtors [ECF No. 1090] and KMPG LLP [ECF No. 1083], and the International Brotherhood of Electrical Workers Local 15 filed a statement in support of the Debtors' objection [ECF No. 1101]. Akin Gump reviewed, summarized and performed extensive legal research with respect to the foregoing. During the Compensation Period, Akin Gump researched additional potential claims and causes of action against EIX and discussed the same with the Debtors and the Ad Hoc Group.

48. Further, Akin Gump attorneys spent significant time reviewing the EIX privilege logs produced with respect to documents withheld from production by EIX. Following a detailed review of EIX's privilege logs, Akin Gump identified certain documents that the Committee believed were improperly withheld from production. Accordingly, during the Compensation Period, Akin Gump attorneys spent substantial time coordinating with the

Debtors' counsel in order to draft the *Joint Motion of Debtors and the Official Committee of Unsecured Creditors to Compel Production of Documents and Information Withheld on Privilege Grounds* [ECF No. 1162] (the "Original Joint Motion to Compel") and memorandum in support thereof [ECF No. 1163], which each were filed on September 5, 2013.  By the Original Joint Motion to Compel, the Debtors and the Committee sought the production of approximately 3,000 documents withheld by EIX in connection with the EIX Investigation. Akin Gump attorneys spent many hours reviewing and commenting on drafts of the Original Joint Motion to Compel, coordinating the review of EIX's privilege logs, and performing legal research to support the Original Joint Motion to Compel.  Further, Akin Gump reviewed, analyzed and performed legal research with respect to EIX's objection to the Original Joint Motion to Compel [ECF No. 1240], which was filed on September 12, 2013.

49.  In order to focus all efforts on the NRG Transaction, Akin Gump negotiated several adjournments of the hearings on the Standing Motion and Original Joint Motion to Compel [ECF Nos. 1107, 1207, 1323, 1481 and 1700].  Further, in an effort to narrow the scope of the challenges in the Original Joint Motion to Compel, Akin Gump, in concert with the Debtors' counsel, spent a significant number of hours negotiating with EIX's counsel for the production of a significant majority of the challenged documents and participated in several "meet and confer" sessions.  Due to Akin Gump's and the Debtors' counsel's significant efforts, EIX agreed to produce many of the challenged withheld documents, and thereby limited the scope of the withheld documents challenged in the Original Joint Motion to Compel to approximately 300 documents.  In light of these successful negotiations, on December 20, 2013, the Debtors and the Committee withdrew the Original Joint Motion to Compel [ECF No. 1725] and filed a renewed motion to compel [ECF No. 1727] (the "Renewed Joint Motion to Compel") seeking the production of the remaining challenged documents.  On January 23, 2014, the Court entered an

21

order withdrawing the Original Joint Motion to Compel [ECF No. 1903]. Continuing to focus all efforts on the NRG Transaction, Akin Gump thereafter continued to negotiate several adjournments of the hearings on the Standing Motion and Renewed Joint Motion to Compel [ECF Nos. 1886, 1986, 2026, 2070].

50. As further described above, on February 19, 2014, the Debtors filed the executed version of the EIX Settlement [ECF No. 2071], which resolved all pending litigation with EIX including, but not limited to, the Standing Motion and the Renewed Joint Motion to Compel, as well as the claims identified by the Committee in the Standing Motion. On March 11, 2014, the Court entered the Confirmation Order, which approved the EIX Settlement as part of the confirmation of the Third Amended Plan [ECF No. 2206] and also ordered the withdrawal of the Standing Motion and Renewed Joint Motion to Compel [ECF Nos. 2212 and 2207].

(x)    MWG/PoJo

51. During the Compensation Period, Akin Gump analyzed issues related to the Midwest Generation group of Debtors (collectively "MWG")[10], and, together with the Committee's other professionals, explored various restructuring alternatives with respect to the Powerton and Joliet power generating facilities (the "PoJo Facilities") and the leases underlying those facilities (the "PoJo Facility Leases"). Prior to the development of the NRG Transaction, developing a strategy to maximize value from the PoJo Facilities, including whether to assume or reject the PoJo Facility Leases, was unquestionably one of the central issues in these chapter 11 cases. Accordingly, the Committee's professionals devoted substantial time to consider this issue.

52. As a result, Akin Gump and the Committee's other professionals performed extensive diligence to evaluate various options with respect to the PoJo Facilities and MWG.

---

[10] These Debtors include: Edison Mission Energy Fuel Services, LLC; Edison Mission Fuel Resources, Inc.; Edison Mission Fuel Transportation, Inc.; Edison Mission Midwest Holdings Co.; Midwest Finance Corp.; Midwest Generation EME, LLC; Midwest Generation, LLC; Midwest Generation Procurement Services, LLC; and Midwest Peaker Holdings, Inc.

Akin Gump reviewed the various complex underlying agreements and related documents relating to the PoJo Facilities, discussed and/or summarized applicable portions of the same, and began researching and analyzing the legal issues in relation thereto.  Moreover, in an effort to facilitate discussions among the various stakeholders, Akin Gump worked closely with the Committee's financial advisors to analyze various options with respect to the PoJo Facilities and to assess the impact of the various options on the Debtors' unsecured creditors.

53.   On June 10, 2013, the Debtors filed a *Motion for Entry of Order (I) Extending Time to Assume or Reject Powerton and Joliet Facility Leases and Related Agreements or, Alternatively, (II) Authorizing Rejection of Powerton and Joliet Facility Leases and Related Agreements* [ECF No. 851] (the "PoJo Extension Motion"), seeking to extend the deadline for MWG to assume or reject the PoJo Facility Leases or, alternatively, in the absence of a consensus on an extension, to reject the PoJo Facility Leases.

54.   In an effort to avoid rejection of the PoJo Facility Leases, Akin Gump, on behalf of the Committee, participated in extensive negotiations with the advisors to the Debtors, the Ad Hoc Group and MWG's other key stakeholders to reach a consensual resolution with respect to the terms on which MWG's deadline to assume or reject the PoJo Facility Leases would be extended.  During these months of negotiations, Akin Gump performed extensive diligence to evaluate whether entry into the proposed extension would be in the best interest of the Debtors' estates and unsecured creditors.  As a result of these extensive negotiations, on June 25, 2013, the Debtors filed a supplement to the PoJo Extension Motion, which set forth the agreed upon terms of the parties' agreement to extend the deadline to assume or reject the PoJo Facility Leases [ECF No. 925].  On June 27, 2013, the Court entered an order approving the terms of the parties' consensual resolution of the PoJo Extension Motion [ECF No. 943, as amended by ECF No. 1020].

55. Further, on September 11, 2013, the Debtors filed the *Debtors' Emergency Motion for Entry of Order (I) Further Extending Time to Assume or Reject Powerton and Joliet Facility Leases and Related Agreements or, Alternatively, (II) Authorizing Rejection of Powerton and Joliet Facility Leases and Related Agreements* [ECF No. 1176] (the "Second PoJo Extension Motion").  On September 19, 2013, the Court entered an order approving the Second PoJo Extension Motion, extending the deadline for MWG to assume or reject the PoJo Facility Leases through and including December 31, 2013 [ECF No. 1255].

56. Ultimately, the NRG Transaction resolved all issues with respect to the PoJo Facilities and PoJo Facility Leases.  During the development of the NRG Transaction, Akin Gump and the Committee's other advisors engaged in numerous calls and in-person meetings regarding the PoJo Facilities and PoJo Facility Leases with the respective advisors of the Debtors, the Ad Hoc Group, the indenture trustee and an ad hoc committee of certain pass-through certificates and the PoJo owner trusts and equity investors (the "PoJo Parties") in order to assist in the resolution of such issues.

57. Akin Gump kept the Committee members advised of all material developments regarding the foregoing through conference calls or in-person meetings with all or a portion of the Committee.  Akin Gump has also researched various legal questions that relate to these complex issues.  Akin Gump's analyses of these matters, with the assistance of the Committee's other professionals, has ensured that creditor recoveries were maximized in these cases.

(xi)     Regulatory Issues

58. During the Compensation Period, Akin Gump monitored and reviewed various filings with the Federal Energy Regulatory Commission ("FERC").  For example, on May 6, 2013, MWG filed its application with the FERC (the "MWG FERC Application"), requesting that FERC grant "approvals as may be deemed necessary to relinquish possession and control

over" the PoJo Facilities, in the event MWG determines to reject the PoJo Facility Leases.  After analyzing the relief requested in the FERC Application and discussing the same with the Committee, Akin Gump filed a motion on June 10, 2013 to intervene on behalf of the Committee, which preserved the Committee's ability to participate in the FERC proceeding but did not take a position on the FERC Application.

59.  After the development of the NRG Transaction, Akin Gump reviewed NRG and EME's application with FERC (the "Joint FERC Application"), which was filed on October 25, 2013, requesting that FERC grant all necessary approvals in connection with the NRG Transaction.  Further, Akin Gump monitored the progress of the MWG FERC Application.  On November 1, 2013, pursuant to MWG's request, FERC ordered that the MWG FERC Application be held in abeyance pending resolution of the Joint FERC Application.  Akin Gump also monitored various motions to intervene filed by certain parties with respect to the Joint FERC Application and also prepared its own motion to intervene on behalf of the Committee in order to preserve the Committee's ability to participate in the FERC proceeding.

60.  On December 9, 2013, the Monitoring Analytics, LLC, the Independent Market Monitor for PJM (the "Monitor") filed comments on the Joint FERC Application and filed additional comments on January 2, 2014 and January 21, 2014.  NRG and EME filed joint responses to each of the Monitor's comments and, on February 27, 2014, EME filed a further request for FERC to take expedited action with respect to the Joint FERC Application on February 27, 2014.  On March 18, 2014, FERC issued an order approving the Joint FERC Application.  Akin Gump monitored the various comments of the Monitor and responses by NRG and EME with respect to the Joint FERC Application, and kept the Committee apprised of all of the foregoing through email summaries and reports during the weekly Committee calls.

(xii)   Tax Issues

61.  During the Compensation Period, Akin Gump spent significant time addressing numerous tax issues relating to the Debtors' chapter 11 estates, including without limitation: (a) the implications of the audit adjustment proposed by the Internal Revenue Service (the "IRS") in connection with an audit of EME and its indirect subsidiary Edison Mission Energy Taupo Limited; (b) potential claims by the IRS; (c) the tax impact of the closure of San Onofre Nuclear Generating Station ("SONGS"); (d) the tax impact of EME's sale of certain wind development projects to Capistrano Wind Partners, LLC; (e) the impact that the foregoing issues may have under the Debtors' various tax sharing agreements; (f) the tax impact of the NRG Transaction; (g) the tax impact of the EIX Settlement; and (h) the tax implications of the Plan.

(xiii)   Exclusivity

62.  On April 15, 2013, the Debtors filed the *Debtors' Motion to Extend Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [ECF No. 680] (the "Exclusivity Extension Motion"), seeking to extend their exclusive periods to file a chapter 11 plan and to solicit votes for the plan by 10 months.  Akin Gump had numerous discussions with the Debtors and their professionals concerning the proposed length of the extension and prepared to oppose the relief requested by the Debtors, including preparing for depositions and making discovery requests related thereto.  Ultimately, the Debtors and the Committee were able to reach a consensual resolution.  On May 15, 2013, the Court entered an order granting the Committee's and the Debtors' stipulated extension of the Debtors' exclusive period by 6 months and 22 days [ECF No. 779].

63.  On October 18, 2013, consistent with the terms of the Plan Sponsor Agreement, the Debtors filed the *Debtors' Motion to Further Extend Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [ECF No. 1378] (the "Second Exclusivity Extension

26

Motion"), seeking to extend their exclusive periods to file a chapter 11 plan and to solicit votes

for the Plan through and including the earlier of (a) the latest dates permitted under the

Bankruptcy Code and (b) 30 days after any valid termination of the Plan Sponsor Agreement.

Akin Gump reviewed and provided comments on the Second Exclusivity Extension Motion to

ensure that the relief requested was in compliance with the terms of the Plan Sponsor Agreement.

On October 24, 2013, the Court entered an order granting the relief requested in the Second

Exclusivity Extension Motion [ECF No. 1423].

(xiv)   EIX Shared Services

64.   On November 4, 2013, the Debtors filed their *Emergency Motion to Authorize*

*Extension of Intercompany and Shared Services Arrangements and Other Benefit Plans* [ECF

No. 1501] (the "EIX Shared Services Motion").   By the EIX Shared Services Motion, the

Debtors sought to extend shared corporate services arrangements and services agreements

(collectively, the "EIX Shared Services") that are administered by EME's corporate parent, EIX,

which were otherwise scheduled to expire on December 31, 2013.  The Debtors sought a further

extension of the EIX Shared Services to avoid the cost and time of implementing standalone

benefit plans and payroll administration, which became unnecessary after the NRG Transaction

was effectuated.  Prior to its filing, Akin Gump reviewed and provided comments on a draft of

the EIX Shared Services Motion to ensure that the relief requested therein was in the best

interests of the estates and creditors in these chapter 11 cases.  On November 6, 2013, the Court

held an emergency hearing on the EIX Shared Services Motion and thereafter entered an order

approving the extension of the EIX Shared Services through and including the earlier of: (a) the

date the Court enters an order confirming a chapter 11 plan in these chapter 11 cases; or

(b) March 31, 2014, subject to certain provisos [ECF No. 1563].

27

(xv)    <u>Financing</u>

65.  On May 29, 2013, the Debtors filed a *Motion to Approve Reaffirmation Agreement in Connection with Viento Funding II, Inc. Refinancing and Performance of All Obligations Thereunder* [ECF No. 832] (the "<u>Viento Refinancing Motion</u>"), by which EME sought Court approval of an agreement pursuant to which it reaffirmed a pledge of its stock in a non-debtor subsidiary Viento Funding II, Inc. ("<u>Viento</u>") in connection with the refinancing of a new credit facility (the "<u>Replacement Credit Facility</u>") for a project owned by Viento.  Before the filing of the Viento Refinancing Motion, Akin Gump reviewed and analyzed the proposed terms of the Replacement Credit Facility and had numerous discussions with the Debtors and their professionals to ensure that the relief requested was appropriate.  On June 19, 2013, the Court held a hearing to consider the Viento Refinancing Motion and entered an order granting the relief requested [ECF No. 898].

66.  On July 29, 2013, the Debtors filed a *Motion to Authorize Debtors' Entry into Cash Collateral Escrow Agreement with Kern River Gas Transmission Company and U.S. Bank, N.A.* [ECF No. 1047] (the "<u>Cash Collateral Escrow Motion</u>"), seeking to enter into a cash collateral escrow agreement with Kern River Gas Transmission Company and U.S. Bank, N.A.  Akin Gump and the Committee's other professionals analyzed the proposed cash collateral escrow agreement to ensure that the terms therein were appropriate and in the best interests of the Debtors' estates and creditors.  On August 21, 2013, the Court held a hearing to consider the Cash Collateral Escrow Motion and entered an order granting the relief requested [ECF No. 1132].

67.  On October 24, 2013, the Debtors filed the *Debtors' Motion for Entry of an Order (A) Authorizing Midwest Generation, LLC to Grant First Priority Liens on Unencumbered Assets and Second Priority Liens on Encumbered Assets in Connection with the MWG Bridge*

*Loan, and (B) Granting Related Relief* [ECF No. 1406] (the "MWG Bridge Loan Motion").  By the MWG Bridge Loan Motion, Debtor Midwest Generation, LLC ("MWG") sought Court approval to grant certain liens to EME in exchange for EME's provision of a delayed-draw term loan facility (the "MWG Bridge Loan") to MWG.  Before the filing of the MWG Bridge Loan Motion, Akin Gump reviewed and analyzed the proposed terms of the MWG Bridge Loan and had discussions with the Debtors, their advisors and counsel to the Ad Hoc Group to ensure the proposed terms' compliance with those set forth in the Plan Sponsor Agreement.  While the Committee supported the relief requested, the Committee filed a reservation of rights [ECF No. 1497] on November 1, 2013, reserving the Committee's legal and equitable rights with respect to the MWG Bridge Loan Motion, the MWG Bridge Loan and any definitive documentation for the MWG Bridge Loan.  On November 13, 2013, the Court held a hearing to consider the MWG Bridge Loan Motion and entered an order granting the relief requested therein [ECF No. 1573].

(xvi)   Cash Management

68.  On the Petition Date, the Debtors filed the *Debtors' Motion to Authorize Debtors to (A) Continue Using Cash Management System; (B) Maintain Existing Bank Accounts and Business Forms; (C) Maintain Existing Investment Practices; (D) Continue Intercompany Transactions; and (E) Grant Superpriority Administrative Expense Status to Postpetition Intercompany Payments* [ECF No. 8] (the "Cash Management Motion").  The Court granted the Cash Management Motion on an interim basis on December 18, 2012, and entered an amended interim order on December 20, 2012.  Shortly after the Committee Formation Date, as part of its diligence of First Day Motions on behalf of the Committee, Akin Gump reviewed the Cash Management Motion and highlighted to the Committee several areas of concern.  In the hope of resolving these issues, Akin Gump led the Committee's efforts to negotiate appropriate modifications to the relief requested in the Cash Management Motion.

29

69. During the course of these negotiations, Akin Gump engaged in diligence regarding the Debtors' existing cash management practices, revised and vetted numerous drafts of a proposed final order, and engaged in numerous calls with the Debtors, the Ad Hoc Group, and FTI regarding the same. In addition, as a final hearing on the Cash Management Motion became imminent, Akin Gump prepared, at the instruction of the Committee, an objection to the relief proposed therein. Ultimately, however, the Committee, the Debtors, and the Ad Hoc Group were able to reach a consensual resolution on all remaining issues, which was reflected in the *Order For Authorization to (A) Continue Using Cash Management System; (B) Maintain Existing Bank Accounts and Business Forms; (C) Maintain Existing Investment Practices; (D) Continue Intercompany Transactions; and (E) Grant Superpriority Administrative Expense Status to Postpetition Intercompany Payments* [ECF No. 768] (the "Cash Management Order").

70. Pursuant to the Cash Management Order, Akin Gump, in coordination with the Committee's other professionals, reviewed and analyzed, as applicable, reports and schedules regarding the Debtors' intercompany transfers, settlements, balances, investments and setoffs, as well as reports regarding the Debtors' cash bank balance and cash flow forecasts.

(xvii)   Claims Administration and Objections

71. On July 3, 2013, the Debtors filed the *Debtors' Motion to Approve (I) Omnibus Claims Objection Procedures and Filing of Substantive Omnibus Claims Objections and (II) Establishment of Procedures for Settling Certain Claims* [ECF No. 1003] (the "Claims Objection Procedures Motion"), seeking to establish uniform procedures (the "Claims Objection Procedures") for objecting to and settling certain claims. Before the filing of the Claims Objection Procedures Motion, Akin Gump reviewed the Debtors' proposed procedures and participated in the negotiation of such procedures to ensure that the Claims Objection Procedures provided the Committee with, among other things, (a) appropriate notice and consent rights with

respect to the Debtors' settlement of claims, (b) certain carveouts that excluded claims asserted by insiders and administrative claims from the Claims Objection Procedures and (c) appropriate thresholds for determining when the Debtors would be authorized to settle claims without the consent of the Committee and/or approval of the Court.  On July 17, 2013, the Court held a hearing to consider the Claims Objection Procedures Motion, which reflected Akin Gump's comments, and entered an order granting the relief requested in the Claims Objection Procedures Motion (the "Claims Objections Procedures Order") [ECF No. 1022].

72.   During the Compensation Period, the Debtors filed twenty-two omnibus claims objections [ECF Nos. 1211, 1213, 1215, 1297, 1640, 1748, 1835-1846, 1848, 1860, 1992 and 2219] (collectively, the "Omnibus Claims Objections").  Specifically in connection with the EIX Investigation and issues related thereto, on January 2, 2014, the Debtors filed the *Debtors' Sixth Omnibus Objection to Certain Proofs of Claim* [ECF No. 1748] (the "Sixth Omnibus Claims Objection") seeking to disallow and expunge certain proofs of claim filed by EIX (the "EIX Claims"), the Pension Benefit Guaranty Corporation (the "PBGC Claims") and the IRS (the "IRS Claims").  Also on January 2, 2014, the Debtors filed the *Debtors' Motion to Estimate Disputed Claims* [ECF No. 1747] (the "Estimation Motion") seeking to, in the alternative to the relief requested in the Sixth Omnibus Claims Objection, estimate the EIX Claims, PBGC Claims and IRS Claims for all purposes at $0.  EIX and the IRS filed responses to the Estimation Motion and Sixth Omnibus Claims Objection [ECF Nos. 1877, 1878 and 1879].[11]  The Court held several status conferences on the Estimation Motion and Sixth Omnibus Claims Objection.

73.   As further described above, on February 19, 2014, the Debtors filed the executed version of the EIX Settlement [ECF No. 2071], which resolved all pending litigation with EIX

---

[11] After negotiations with the Debtors, on February 12, 2014, the IRS withdrew the IRS Claims and, accordingly, the Debtors filed a partial withdrawal of the Estimation Motion solely with respect to the IRS Claims [ECF No. 2036].

including, but not limited to, the Estimation Motion and Sixth Omnibus Claims Objection.  On

March 11, 2014, the Court entered the Confirmation Order, which approved the EIX Settlement

as part of the confirmation of the Third Amended Plan [ECF No. 2206] and also ordered the

withdrawal of the Estimation Motion and Sixth Omnibus Claims Objection [ECF Nos. 2210 and

2209].

74.  Before the filing of the Omnibus Claims Objections, Akin Gump reviewed each of

the Omnibus Claims Objections to ensure that the relief requested therein was in the best

interests of the Debtors' estates and creditors, and to ensure that the Omnibus Claims Objections

were filed in compliance with the Claims Objections Procedures Order.  Akin Gump also

reviewed all replies to the Omnibus Claims Objections and communicated with the Debtors'

counsel to remain updated on the status and terms of any resolutions of such claims disputes.

(xviii)  Insurance

75.  On May 29, 2013, the Debtors filed a *Motion for an Order (I) Authorizing Debtors*

*to Renew Employee Benefit Plan Liability Insurance Policy and (II) Modifying Automatic Stay to*

*Allow the Debtors to Pay Self-Insured Retentions and Defense Costs* [ECF No. 830] (the

"Insurance Policy Motion"), seeking to enter into a modified fiduciary insurance policy (the

"Renewed Policy") and modify the automatic stay to allow the Debtors to pay self-insured

retentions and defense costs under the Renewed Policy.  Akin Gump worked with the

Committee's professionals to review the Insurance Policy Motion and ensure that the relief

requested was a sound exercise of the Debtors' business judgment and in the best interests of the

Debtors' estates and creditors.  After determining that the Debtors' purchase of the Renewed

Policy was favorable to the Debtors' estates, the Committee, under the advisement of the

Committee's advisors, supported the relief requested in the Insurance Policy Motion.  On June

19, 2013, the Court held a hearing to consider the Insurance Policy Motion and approved the Insurance Policy Motion [ECF No. 897].

(xix)   <u>Lift Stay Litigation</u>

76.   During the Compensation Period, Akin Gump reviewed and analyzed each of the motions seeking relief from the automatic stay imposed by Bankruptcy Code section 362 that were filed by creditors of the Debtors' estates (collectively, the "<u>Lift Stay Motions</u>").   Akin Gump analyzed the relief requested in the Lift Stay Motions, reviewed all pleadings and underlying documentation and held conference calls with the Debtors' counsel to ascertain and understand the Debtors' positions.   In addition, Akin Gump prepared memoranda for the Committee on the subject matter of such motions and pleadings and recommended a course of action for the Committee with respect to each motion and pleading.   Akin Gump also filed several joinders and statements on behalf of the Committee in support of certain of the Debtors' objections to certain of the Lift Stay Motions.   Akin Gump attended all hearings related to the foregoing and kept the Committee apprised of all developments and orders related thereto.

(xx)   <u>Chevron Adversary Proceeding</u>

77.   During the Compensation Period, Akin Gump monitored the adversary proceeding commenced by Chevron Kern River Co. and Chevron Sycamore Cogeneration Company (collectively, "<u>Chevron</u>") and the pleadings filed in the main bankruptcy proceeding with respect to the Debtors' motion (the "<u>Assumption Motion</u>") for authorization to assume the partnership agreements governing two joint ventures between Chevron, on the one hand, and Debtor Southern Sierra Energy Company and Debtor Western Sierra Energy Company, on the other hand (the "<u>Partnership Agreements</u>").   After completing its review of the Assumption Motion and discussing the same with the Committee and counsel for the Debtors, Akin Gump filed a joinder to the Chevron Assumption Motion on August 19, 2013 [ECF No. 1111].   On August 14,

33

2013, Chevron filed an objection [ECF No. 1081] to the Chevron Assumption Motion.   On

August 21, 2013, the Court held a hearing to consider the relief requested in the Chevron

Assumption Motion.

78.   On September 16, 2013, this Court issued a memorandum opinion [ECF No. 1221]

and interim order [ECF No. 1222] finding no bar to the Debtors' assumption of the Partnership

Agreements.   This Court, however, declined to enter a final order granting the assumption due to

Chevron's pending appeal of this Court's denial of both (a) Chevron's request for a preliminary

injunction and (b) Chevron's motion to lift the automatic stay.

79.   Following the resolution of certain issues in the District Court, on October 9, 2013,

Chevron filed a motion to re-open and supplement the record in connection with the Assumption

Motion, on account of purportedly newly discovered evidence [ECF No. 1317] (the "Motion to

Re-Open").   On October 23, 2013, the Debtors filed a consolidated motion [ECF No. 1400]

requesting entry of a final order authorizing the assumption of the Partnership Agreements and

an objection to the Motion to Re-Open.   On November 6, 2013, the Court held a hearing on the

foregoing, and thereafter entered a final order [ECF No. 1564] granting the Debtors' Assumption

Motion and denying Chevron's Motion to Re-Open (the "Final Order").   On November 12, 2013,

Chevron appealed the Final Order [ECF No. 1570].

80.   With respect to Chevron's adversary proceeding, on October 15, 2013, the Debtors

filed a motion to dismiss the adversary proceeding [Adv. Pro. ECF No. 81].   On November 5,

2013, Chevron filed a response [Adv. Pro. ECF No. 87] as well as an amended complaint [Adv.

Pro. ECF No. 88].   The Debtors filed a motion to dismiss the amended complaint on December

2, 2013 [Adv. Pro. ECF No. 90] (the "Amended Motion to Dismiss").   The Court held a hearing

on the Amended Motion to Dismiss on December 18, 2014, and entered an order granting the

Amended Motion to Dismiss on January 21, 2014 [Adv. Pro. ECF No. 96] (the "Dismissal Order"). On January 23, 2014, Chevron appealed the Dismissal Order [Adv. Pro. ECF No. 97].

81. On March 7, 2014, the parties to the three pending Chevron appeals filed a motion with the District Court seeking approval of a joint tolling and standstill agreement (the "Standstill Motion") with respect to all pending litigation [Dist. Ct. ECF No. 65]. On March 7, 2014, the District Court entered an order granting the Standstill Motion [Dist. Ct. ECF No. 68], staying the Chevron appeals until July 1, 2014. Akin Gump reviewed, summarized and briefed the Committee on all of the foregoing during the Compensation Period.

(xxi)   Labor Issues/Employee Benefits and Incentive Plans

82. As part of the First Day Motions, the Debtors filed applications to approve employee incentive programs for non-insider employees [ECF No. 30] and insider senior employees [ECF No. 31] (collectively, the "Incentive Plan Motions"). The Incentive Plan Motions provided, among other things, for a short-term incentive plan (the "STIP") and a long-term incentive plan (the "LTIP") for the compensation of management and senior operational-level employees. Akin Gump reviewed and analyzed each of the Incentive Plan Motions and had numerous discussions with the Debtors and their professionals with respect to each to ensure that the relief requested was appropriate. While the Committee expressed concern regarding certain terms of the STIP and the LTIP, ultimately the Debtors and the Committee were able to reach a consensual resolution. The Court entered an order granting the Incentive Plan Motions on a final basis on March 20, 2013.

83. Further, on January 8, 2014, the Debtors filed a motion seeking authorization to terminate certain retiree benefits [ECF No. 1776] (the "Termination Motion"). On January 21, 2014, a group of certain affected retirees (the "Retiree Group") filed an objection thereto [ECF No. 1866]. At the hearing on the Termination Motion on January 22, 2014, the Court adjourned

the hearing on the Termination Motion, and thereafter the Retiree Group filed a motion to appoint an official retiree committee [ECF No. 1901] (the "Retiree Committee Motion"). On February 1, 2014, the Debtors filed a consolidated reply (the "Consolidated Reply") both in support of the Termination Motion and in opposition to the Retiree Committee Motion. Akin Gump reviewed the Termination Motion, Retiree Committee Motion and the Consolidated Reply, consulted with the Debtors regarding the foregoing, and provided summaries of the same to the Committee. On February 1, 2014 the Committee filed a statement in support of the Consolidated Reply [ECF No. 1964]. Concurrently therewith, the Ad Hoc Group also filed a statement in support of the Consolidated Reply [ECF No. 1965].

84. On February 4, 2014, the Court held a status conference on the Termination Motion and Retiree Committee Motion. After subsequent negotiations between the Debtors and Retiree Group and a further hearing held on February 11, 2014, the Court entered a stipulation and agreed order negotiated by the Debtors and the Retiree Group granting the withdrawal of the Retiree Committee Motion and setting a schedule with respect to the Termination Motion [ECF No. 2034]. On February 28, 2014, the Debtors filed a brief in further support of the Termination Motion [ECF No. 2144].

85. The dispute between the Debtors and the Retiree Group with respect to the Termination Motion continued after the Compensation Period. On March 14, 2014, the Retiree Group filed an objection to the Termination Motion [ECF No. 2217], and on March 21, 2014, the Debtors filed a reply in further support of the Termination Motion [ECF No. 2229]. On March 24, 2014, the Debtors filed a notice of continuance, continuing the hearing on the Termination Motion pending further notice in light of ongoing discussions between the Debtors and the Retiree Group [ECF No. 2232].

86. Additionally, on January 27, 2014, the Debtors filed the *Debtors' Motion for Approval of Settlement Between the Debtors and Certain Retirees Represented by International Brotherhood of Electrical Workers Local 459* [ECF No. 1922] (the "Retiree Settlement Motion"). On January 31, 2014, Homer City Generation, L.P. ("HCG") filed a response to the Retiree Settlement Motion [ECF No. 1961], and the Debtors filed a reply thereto on February 3, 2014 [ECF No. 1975]. After the Court held a hearing on the Retiree Settlement Motion on February 4, 2014, the Court entered an order approving the Retiree Settlement Motion on February 5, 2014 [ECF No. 1999]. On February 14, 2014, HCG appealed the order granting the Retiree Settlement Motion [ECF No. 2045] (the "HCG Appeal").

87. On March 14, 2014, the Debtors filed a motion to approve a settlement with HCG to, among other things, resolve HCG's pending adversary proceeding, HCG's proofs of claim and the HCG Appeal [ECF No. 2216] (the "HCG Settlement Motion"). On March 28, 2014, the Court held a hearing on the Settlement Motion and thereafter granted the relief requested therein [ECF No. 2255]. Akin Gump reviewed, summarized and briefed the Committee on all of the foregoing during the Compensation Period.

(xxii)  Due Diligence Review: General Corporate, Tax, Labor, Environmental, and Regulatory

88. During the Compensation Period, Akin Gump conducted an extensive review of the Debtors' pre-petition books, records, transactions and operations. Akin Gump spent considerable time and effort during the Compensation Period analyzing the Debtors' complex corporate structure, their significant contracts and relationships with non-debtor affiliates. This required detailed diligence and analysis by Akin Gump specialists in numerous subfields—including Corporate, Tax, Labor, Environmental and Regulatory—to enable the Committee to comprehend the Debtors' corporate, operational, legal and financial structure in order to appropriately acquit its fiduciary duty to the Debtors' unsecured creditors.

(xxiii)  Preparation of Monthly Billing Statements / Other Professionals'
Monthly Billing Statements

89.  During the Compensation Period, Akin Gump prepared its Monthly Fee Statements.

Akin Gump spent time reviewing each Monthly Fee Statement to ensure that each statement did

not disclose confidential or privileged information and complied with the Local Rules and

Guidelines.  Akin Gump also reviewed the monthly billing statements received from the other

professionals retained in these cases to identify any issues regarding such billing statements and

to ensure compliance with the Local Rules.

(xxiv)  Creditor Inquiries

90.  Akin Gump fielded numerous email and telephone inquiries during the

Compensation Period from unsecured creditors to discuss the status of various pending matters

and to respond to their many questions about the bankruptcy process and the status of their

claims against the Debtors' estates.  Specifically, Akin Gump responded to a multitude of calls

from creditors upon the occurrence of various case milestones, including, without limitation:

(a) the filing of the Plan Sponsor Agreement; (b) the filing of the Third Amended Plan and

Disclosure Statement (and each of their predecessors); (c) the filing of the EIX Settlement; and

(d) the entry of the Confirmation Order.  In doing so, Akin Gump helped the Committee to

discharge its statutory duty to represent the interests of the Debtors' unsecured creditors.

(xxv)  Committee Website

91.  During the Compensation Period, Akin Gump worked with GCG to maintain a

website containing information regarding these chapter 11 proceedings.  In so doing, Akin Gump

helped the Committee to fulfill its statutory duty to disseminate information to creditors.

**FACTORS TO BE CONSIDERED IN AWARDING ATTORNEYS' FEES**

92.  The factors to be considered in awarding attorneys fees have been enumerated in In

re Red Carpet Corp. of Panama City Beach, 708 F.2d 1576, 1578 (11th Cir. 1983) (citing

38

Robinson v. Am. Benefit Life Ins. Co. (In re First Colonial Corp. of Am.), 544 F.2d 1291, 1298-

99 (5th Cir. 1977), reh'g denied, 547 F.2d 573, cert. denied, 431 U.S. 904 (1977), and have been

adopted by most courts.  Akin Gump respectfully submits that a consideration of these factors

should result in this Court's allowance of the full compensation sought.

(A)    The Time and Labor Required.  The professional services rendered by
Akin Gump on behalf of the Committee required the continuous
expenditure of substantial time and effort, under significant time
pressures. The services rendered required a high degree of professional
competence and expertise in order to be administered with skill and
dispatch.

(B)    The Novelty and Difficulty of Questions.  In this case, as in all others in
which the firm is involved, Akin Gump's effective advocacy and creative
approach have helped clarify a number of complex and novel issues.

(C)    The Skill Requisite to Perform the Legal Services Properly.  Akin Gump
believes that its recognized expertise in the area of corporate
reorganization, its ability to draw from highly experienced professionals in
other areas of Akin Gump's practice, and its creative approach to the
resolution of issues has contributed to the maximization of value for the
Debtors' unsecured creditors.

(D)    The Customary Fee.  The fee sought herein is based upon Akin Gump's
normal hourly rates for services of this kind.  Akin Gump respectfully
submits that the fee sought herein is not unusual given the magnitude and
complexity of these chapter 11 cases and the time expended in attending to
the representation of the Committee, and is commensurate with fees Akin
Gump has been awarded in other cases, as well as with fees charged by
other attorneys of comparable experience.   Akin Gump has also
voluntarily reduced its fees for travel time in light of the nature of these
chapter 11 cases.

(E)    Whether the Fee is Fixed or Contingent.  Pursuant to Bankruptcy Code
section 330, all fees sought by professionals employed under Bankruptcy
Code section 1103 are contingent pending final approval by this Court,
and are subject to adjustment dependent upon the services rendered and
the results obtained.  The collective efforts of the various parties in interest
and their respective professionals, including Akin Gump, have resulted in
the consensual resolution of each significant issue in these cases in a
relatively short period of time given the complexity of the Debtors'
chapter 11 cases.

(F)     <u>Time Limitations Imposed by Client or Other Circumstances</u>.  As set forth above, Akin Gump has been required to attend to certain issues arising in these chapter 11 cases in compressed and urgent time periods.

(G)     <u>The Amount Involved and/or Results Obtained</u>.  Through the efforts of Akin Gump, the Committee was active participant in these chapter 11 cases, and its constructive assistance, as well as criticism, greatly contributed to the efficient administration of these chapter 11 cases.

(H)     <u>The Experience, Reputation and Ability of the Attorneys</u>.  Akin Gump has a large and sophisticated financial restructuring practice and is playing and has played a major role in numerous cases of national import including, for example, the reorganization proceedings of:  <u>In re Allegiance Telecom, Inc.</u>; <u>In re Am. Commercial Lines LLC</u>; <u>In re ATA Holdings Corp.</u>; <u>In re Bally Total Fitness of Greater New York, Inc.</u>; <u>In re Calpine Corp.</u>; <u>In re Chemtura Corp.</u>; <u>In re Delta Air Lines, Inc.</u>; <u>In re Dynegy Holdings, LLC</u>; <u>In re Exide Techs., Inc.</u>; <u>In re Friendly's Ice Cream Corp., Inc.</u>; <u>In re Globalstar, LP</u>; <u>In re Hawker Beechcraft, Inc.</u>; <u>In re Hayes Lemmerz, Inc.</u>; <u>In re Heilig Meyers Co.</u>; <u>In re Kaiser Aluminum Corp.</u>; <u>In re Kimball Hill, Inc.</u>; <u>In re Loral Space & Commc'ns. Ltd.</u>; <u>In re LTV Steel Co., Inc.</u>; <u>In re Magellan Health Servs., Inc.</u>; <u>In re Nortel Networks, Inc.</u>; <u>In re Overseas Shipholding Grp., Inc.</u>; <u>In re Pegasus Satellite Television, Inc.</u>; <u>In re Pierre Foods, Inc.</u>; <u>In re Propex Inc.</u>; <u>In re Quebecor World (USA), Inc.</u>; <u>In re Solutia Inc.</u>; <u>In re Tower Auto., Inc.</u>; <u>In re TOUSA, Inc.</u>; <u>In re Venture Holdings Co., LLC</u>; <u>In re VeraSun Energy Corp.</u>; <u>In re Washington Mutual, Inc.</u>; <u>In re WorldCom, Inc.</u>; and <u>In re XO Commc'ns., Inc.</u>  Akin Gump's experience enables it to perform the services described herein competently and expeditiously.  In addition to its expertise in the area of corporate reorganization, Akin Gump has called upon the expertise of its partners and associates in other practice areas to perform the wide ranging scope of the legal work necessitated by these chapter 11 cases, including corporate, tax, litigation, labor, energy, environmental and regulatory.

(I)     <u>Nature and Length of Professional Relationship</u>.  Akin Gump was selected as co-counsel to the Committee on January 7, 2013.  The Court entered an order on February 20, 2013 [ECF No. 528], authorizing the Committee to employ Akin Gump, *nunc pro tunc* to January 7, 2013.  Akin Gump has been rendering services continuously to the Committee since January 7, 2013, and continuing through the Compensation Period, as necessary and appropriate.

## <u>ALLOWANCE OF COMPENSATION</u>

93.  The professional services rendered by Akin Gump required a high degree of professional competence and expertise so that the numerous issues requiring evaluation and determination by the Committee could be addressed with skill and dispatch and have, therefore,

required the expenditure of substantial time and effort.  Akin Gump respectfully submits that the services rendered to the Committee were performed efficiently, effectively and economically, and the results obtained to date have benefited not only the members of the Committee, but also the unsecured creditor body as a whole and the Debtors' estates.

94.  With respect to the level of compensation, Bankruptcy Code section 330 provides, in pertinent part, that the Court may award to a professional person "reasonable compensation for actual, necessary services rendered. . . ."  11 U.S.C. § 330(a)(1).  Further, Bankruptcy Code section 330(a)(3), provides that

> In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –
>
> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance and nature of the problem, issue, or task addressed; and
>
> (E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. §330(a)(3)(A).  The clear Congressional intent and policy expressed in this statute is to provide for adequate compensation in order to continue to attract qualified and competent bankruptcy practitioners to bankruptcy cases.

95.  The total time spent by Akin Gump attorneys and paraprofessionals during the Compensation Period was 31,862 hours.  The work involved, and thus the time expended, was carefully assigned in light of the experience and expertise required for a particular task.

96.   As shown by this Application and supporting documents, Akin Gump spent its time economically and without unnecessary duplication of time.  Exhibit C contains a schedule of the hours expended by the attorneys and paraprofessionals during the Compensation Period, their normal hourly rates and the value of their services.

97.   Pursuant to the Interim Compensation Order, Akin Gump's monthly fees are subject to a 20% holdback.  By this Application, Akin Gump respectfully requests final approval of all compensation earned during the Compensation Period, including all amounts subject to holdback and the fees requested in the February Fee Statement and March Fee Statement.

98.   Akin Gump incurred actual out-of-pocket expenses in connection with the rendering of professional services to the Committee during the Compensation Period in the amount of $566,989.92, for which Akin Gump respectfully requests approval of reimbursement in full.  The disbursements and expenses have been incurred in accordance with Akin Gump's normal practice of charging clients for expenses clearly related to and required by particular matters.  Akin Gump has endeavored to minimize these expenses to the fullest extent possible.

99.   Akin Gump's billing rates do not include charges for photocopying, telephone and facsimile charges, computerized research, travel expenses, "working meals," secretarial overtime, postage and certain other office services, because the needs of each client for such services differ.  Akin Gump believes that it is fairest to charge each client only for the services actually used in performing services for it.  In these proceedings, Akin Gump charges $.10 per page for internal duplicating.  Akin Gump does not charge for long distance telephone calls or facsimile transmissions, other than those made by an attorney while traveling.

100. No prior application has been made in this Court or in any other court for the relief requested herein for the Compensation Period.

**WHEREFORE**, Akin Gump respectfully requests that this Court enter an order substantially in the form attached hereto as Exhibit F:

(a)      approving the final allowance of $19,863,622.00 for compensation for professional services rendered by Akin Gump as co-counsel to the Committee during the Compensation Period;

(b)      approving and granting the final reimbursement of Akin Gump's expenses incurred in connection with rendering such services during the Compensation Period in the amount of $566,989.92;

(c)      authorizing and directing the Debtors to pay all accrued and unpaid fees and expenses of Akin Gump that arose during the Compensation Period in the amount of $499,026.15;[12] and

(d)      granting such other and further relief as this Court may deem just and proper.


Dated:    New York, New York
          April 30, 2014

                                        **AKIN GUMP STRAUSS HAUER & FELD LLP**


                                        **By:**    _/s/ Ira S. Dizengoff_
                                        Ira S. Dizengoff (admitted *pro hac vice*)
                                        Arik Preis (admitted *pro hac vice*)
                                        AKIN GUMP STRAUSS HAUER & FELD LLP
                                        One Bryant Park
                                        New York, New York 10036
                                        (212) 872-1000 (Telephone)
                                        (212) 872-1002 (Facsimile)
                                        idizengoff@akingump.com
                                        apreis@akingump.com

---

[12] This figure reflects a voluntary reduction made by Akin Gump in the Application of $10,846.00, which represented the aggregate amount of fees billed by timekeepers who worked fewer than five hours on this matter during the Fourth Interim Compensation Period.

43

- and –


James Savin (admitted *pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036-1564
(202) 887-4000 (Telephone)
(202) 887-4288 (Facsimile)
jsavin@akingump.com

*Co-Counsel for the Official Committee of
Unsecured Creditors*