## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EDISON MISSION ENERGY, et al.,[1] | ) | Case No. 12-49219 (JPC) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## OMNIBUS REPLY IN SUPPORT OF THE
## MOTION OF THE EME REORGANIZATION TRUST TO
## TERMINATE THE EME REORGANIZATION TRUST AND FOR
## ENTRY OF A FINAL DECREE CLOSING CERTAIN CHAPTER 11 CASES

The EME Reorganization Trust (the "Reorganization Trust"), as successor in interest to

Edison Mission Energy ("EME"), one of the above-captioned debtors (together with its debtor

affiliates, the "Debtors"), respectfully submits this reply (the "Reply")[2] to (i) *NRG's Limited*

*Objection to the Motion of the EME Reorganization Trust to Terminate the EME Reorganization*

*Trust and for Entry of a Final Decree* [Docket No. 2673] (the "NRG Objection") and (ii)

*Commonwealth Edison Company's Limited Objection to the EME Reorganization Trust's*

*Motion to Terminate the EME Reorganization Trust and for Entry of a Final Decree* [Docket No.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Edison Mission Energy (1807); Camino Energy Company (2601); Chestnut Ridge Energy Company (6590); Edison Mission Energy Fuel Services, LLC (4630); Edison Mission Finance Co. (9202); Edison Mission Fuel Resources, Inc. (3014); Edison Mission Fuel Transportation, Inc. (3012); Edison Mission Holdings Co. (6940); Edison Mission Midwest Holdings Co. (6553); EME Homer City Generation L.P. (6938); Homer City Property Holdings, Inc. (1685); Midwest Finance Corp. (9350); Midwest Generation EME, LLC (1760); Midwest Generation, LLC (8558); Midwest Generation Procurement Services, LLC (2634); Midwest Peaker Holdings, Inc. (5282); Mission Energy Westside, Inc. (0657); San Joaquin Energy Company (1346); Southern Sierra Energy Company (6754); and Western Sierra Energy Company (1447).  The mailing address of the Reorganization Trust is: EME Reorganization Trust, c/o Akin Gump Strauss Hauer & Feld LLP, Attn: James Savin, 1333 New Hampshire Avenue NW, Washington, DC 20036.

[2] Capitalized terms used but not otherwise defined in this Motion will have the meanings ascribed to them in the *Motion of the EME Reorganization Trust to Terminate the EME Reorganization Trust and for Entry of a Final Decree Closing Certain Chapter 11 Cases* [Docket No. 2667] (the "Motion").

2669] (the "ComEd Objection" and, together with the NRG Objection, the "Objections").  In support of this Reply, the Reorganization Trust respectfully represents and sets forth as follows:

## REPLY

1.    By the Motion, the Reorganization Trust seeks entry of a Final Decree authorizing the termination of the Reorganization Trust and closing certain of the chapter 11 cases.  By the Objections, the NRG Parties (as defined below) and ComEd (as defined below) raise certain limited objections to the relief sought in the Motion.  Each of the Objections should be resolved or overruled as set forth below, and the Final Decree should be entered.

2.    The Reorganization Trust was not created for the purpose of serving as a document repository for NRG, a bargaining tool in ongoing negotiations between ComEd and NRG or as a backstop for ComEd in the event that the NRG Parties do not satisfy their obligations under the Plan.  The Reorganization Trust has completed its work and is ready to terminate and make a final distribution to its Beneficiaries.

### A.    The NRG Objection

3.    By the NRG Objection, NRG Energy and the Post-Effective Date Debtor Subsidiaries (collectively, and including the Purchaser, the "NRG Parties") assert that the termination of the Reorganization Trust should be conditioned upon satisfaction of certain document preservation obligations contained in the Purchase Agreement (as defined in the Plan). *See* NRG Objection at ¶ 1.  The document preservation obligations relate to certain Trust Records comprised of historical hard copy and electronic books and records of EME and its former subsidiaries.[3]

---

[3]    A copy of the Purchase Agreement is attached hereto as Exhibit A.

4.    Since shortly after filing the Motion and becoming aware of the NRG Parties' desire to have the applicable Trust Records preserved, the Reorganization Trust has engaged in good faith discussions with the NRG Parties in an effort to resolve the NRG Objection on a consensual basis.  Unfortunately, however, the parties have not been able to reach an agreement with respect to the terms for the continued preservation of the applicable Trust Records.

5.    While the Reorganization Trust is willing to pre-pay the cost of continuing to store the applicable Trust Records, there is a dispute between the parties arising from the failure of the NRG Parties to agree to honor their obligations under the Purchase Agreement to pay all costs and expenses relating to (i) accessing or copying such Trust Records, or (ii) support provided by the Reorganization Trust through the provision of access to Trust Records in connection with the NRG Parties' defense of certain litigation.

6.    Under section 9.12 of the Purchase Agreement, the NRG Parties are required to pay all costs and expenses relating to accessing or copying any books and records maintained by the Reorganization Trust.  In particular, while the NRG Parties have omitted the applicable provisions from the excerpt contained in the NRG Objection, section 9.12 of the Purchase Agreement provides that "[w]hile such books and records remain in existence, each Party shall allow the other Parties, their representatives, attorneys and accountants, *at the requesting Party's expense*, access to the books and records upon reasonable request and advance notice and during normal business hours . . . ."  *See* Purchase Agreement at § 9.12 (emphasis added).  In addition, section 9.12 of the Purchase Agreement provides that "[u]pon expiration of [the preservation period] for any specific books and records pertaining to the Business, each Party shall notify the other of its request to make copies of or take possession of such books and records and shall be provided reasonable opportunity to do so *at the requesting Party's sole cost*."  *See id.* (emphasis

added).  Accordingly, the plain term of the Purchase Agreement obligate the NRG Parties to pay

all costs and expenses relating to accessing or copying any books and records maintained by the

Reorganization Trust.

7.    Under section 9.10 of the Purchase Agreement, the NRG Parties are required to

pay all costs and expenses incurred by the Reorganization Trust in connection with any support

provided by the Reorganization Trust to the NRG Parties relating to their defense of certain

litigation, including any costs and expenses relating to providing access to books and records

(whether to the NRG Parties or to third parties pursuing claims against the NRG Parties)

maintained by the Reorganization Trust.  Section 9.10(a) of the Purchase Agreement provides:

> In the event and for so long as any Party or any of its Affiliates or any of its or
> their Related Persons actively is contesting or defending against any Legal
> Proceeding in connection with (i) any transaction contemplated by this Agreement
> or the Ancillary Agreements or (ii) any fact, situation, circumstance, status,
> condition, activity, practice, plan, occurrence, event, incident, action, failure to
> act, or transaction on or prior to the Closing Date involving EME, any Homer
> City Debtor, any Acquired Company or the Business (other than, for the
> avoidance of doubt, litigation between the Parties with respect to this Agreement
> or the Transaction), the other Parties will reasonably cooperate with the contesting
> or defending Party and its counsel in the contest or defense, make available its
> personnel, and ***provide*** such testimony and ***access to its books and records*** as
> shall be necessary in connection with the contest or defense, ***all at the sole cost
> and expense of the contesting or defending Party***.

Purchase Agreement at § 9.10 (emphasis added).  Thus, in the event that the Reorganization

Trust provides access to books and records in connection with the NRG Parties' defense of any

litigation (including in the event that access to such books and records is requested by third

parties pursuing claims against the NRG Parties), the plain terms of the Purchase Agreement

require the NRG Parties to pay all costs and expenses incurred by the Reorganization Trust in

connection therewith.

8.      The dispute between the parties is further complicated by a conflict between the terms of the Purchase Agreement and the Reorganization Trust Agreement.[4]  On the one hand, the Purchase Agreement provides that both the Purchaser and EME shall preserve certain books and records for seven years after the date of the closing of the sale of substantially all of EME's assets to the Purchaser (*i.e.*, until April 1, 2021).  *See* Purchase Agreement at § 9.12.  In contrast to the terms of the Purchase Agreement, the Reorganization Trust Agreement requires the Reorganization Trust to dissolve upon the earlier of (i) the unanimous determination of the Managing Trustees and (ii) the third anniversary of the Effective Date (*i.e.*, April 1, 2017).  *See* Reorganization Trust Agreement at § 6.1.  Moreover, the ability of the Managing Trustees to extend the term of the Reorganization Trust is limited by the fact that any such extension may adversely impact the Reorganization Trust's status as a grantor trust for federal income tax purposes or require the Reorganization Trust to register with the U.S. Securities and Exchange Commission as an investment company, which would cause the Reorganization Trust to incur significant costs and administrative burdens.  *See id.*  Further, the Reorganization Trust Agreement provides that "[t]he Managing Trustees shall not unduly prolong the duration of the Reorganization Trust and shall at all times endeavor to . . . effect the distribution of the Trust Assets to the Beneficiaries in accordance with the terms [of the Reorganization Trust Agreement] as soon as practicable in light of the terms of the Trust Assets."  *See id.*  Accordingly, under the terms of the Reorganization Trust Agreement, the Reorganization Trust was never intended to exist until April 1, 2021 and may not be able to reasonably do so under applicable law.

---

[4]     A copy of the Reorganization Trust Agreement is attached hereto as <u>Exhibit B</u>.

9.     In order to (i) provide the NRG Parties with a reasonable opportunity to obtain access to, or copies of, the Trust Records in accordance with the document preservation obligations under the Purchase Agreement while ensuring that the NRG Parties honor their obligations to pay all costs and expenses related thereto and (ii) permit the Reorganization Trust to terminate and distribute its remaining assets to the Beneficiaries of the Reorganization Trust in a timely manner, the Reorganization Trust submits that the Final Decree should include the following terms:

- In connection with the termination of the Reorganization Trust, the Reorganization Trust will (i) pre-pay the cost of storing the Trust Records until December 31, 2017 (the "Termination Date")[5] to the document storage vendor(s) maintaining such records or otherwise retain sufficient funds to pay the cost of storing the Trust Records until the Termination Date and (ii) appoint a designee (the "Reorganization Trust Designee") who shall be responsible for receiving and processing requests for access to, or copies of, the Trust Records under section 9.12 or section 9.10 of the Purchase Agreement.  Upon pre-payment of the cost of storing the Trust Records until the Termination Date or otherwise retaining sufficient funds to pay the cost of storing the Trust Records until the Termination Date, the Reorganization Trust shall have no further obligation to pay any costs or expenses relating to, or arising from, providing access to, or copies of, the Trust Records under sections 9.12 or 9.10 of the Purchase Agreement.

- In accordance with sections 9.12 and 9.10 of the Purchase Agreement, and regardless of whether requests for books and records are submitted by (i) the NRG Parties or (ii) third parties (each, a "Third Party Litigant") in any Legal Proceeding (as defined in the Purchase Agreement) being contested or defended by the NRG Parties in connection with any matters addressed in section 9.10 of the Purchase Agreement, the NRG Parties shall be required to pay, in advance, any and all costs and expenses relating to, or arising from, accessing or copying the Trust Records, which, for the avoidance of doubt, shall include any and all costs and expenses relating to, or arising from, (a) conducting searches of any electronic or hard copy documents or records, (b) reviewing any electronic or hard copy documents or records for relevance or privilege, (c) processing, compiling or copying any electronic or hard copy documents for review or production or (d) any other similar matters relating to providing access to, or copies of, the Trust Records, in each case unless such costs and expenses are paid,

---

[5]   In the alternative, if the Court determines that the Trust Records must be maintained for a longer period of time, the Reorganization Trust will pre-pay the cost of storing the Trust Records until April 1, 2021, subject to the remaining terms described herein.

in advance, by any Third Party Litigant who has requested access to, or copies of, any of the Trust Records.

- Notwithstanding any provision of the Purchase Agreement, including, without limitation, section 9.12 of the Purchase Agreement, the Reorganization Trust Designee is authorized and directed to cause the destruction of all of the Trust Records on the Termination Date or as soon thereafter as is reasonably practicable.

- Except for receiving and processing requests for access to, or copies of, the Trust Records under sections 9.12 or 9.10 of the Purchase Agreement, the Reorganization Trust Designee shall not be required to perform any other services or litigation support obligations under the Purchase Agreement. In addition, the Reorganization Trust Designee shall not have or incur any personal liability or loss in connection with the serving as the Reorganization Trust Designee, and the Reorganization Trust Designee shall not be required or compelled to take any action, assume any obligation or pay any costs or expenses (including, without limitation, in connection with any Legal Proceedings being contested or defended by the NRG Parties or any other legal proceedings) that would cause the Reorganization Trust Designee to have or incur any personal liability or loss. For the avoidance of doubt, nothing contained in the Final Decree shall be deemed to impair any right to reimbursement held by the Reorganization Trust (or the Reorganization Trust Designee) under any section of the Purchase Agreement, including sections 9.12 and 9.10 of the Purchase Agreement, in the event that any applicable costs or expenses are not paid by the NRG Parties or any Third Party Litigant.

10. Absent the inclusion of the foregoing terms in the Final Decree, the NRG Parties would be permitted to inappropriately shift the costs and expenses of accessing the Trust Records to the Reorganization Trust, which would harm the Reorganization Trust and its Beneficiaries by requiring the Reorganization Trust to hold back significant sums from the final distribution in order to cover unknown costs and expenses arising from the NRG Parties' speculative need for access to the Trust Records.

11.     In the event that the NRG Parties are unwilling to be bound by the foregoing terms, the Reorganization Trust submits that it should be authorized to destroy all Trust Records upon entry of the Final Decree.[6]

**B.      The ComEd Objection**

12.     By the ComEd Objection, Commonwealth Edison Company ("ComEd") requests that the Final Decree be modified to provide that the NRG Parties have assumed any and all liability for the Specified ComEd Claims pursuant to the terms of the Plan.  *See* ComEd Objection at ¶ 6.  In the absence of such modifications, ComEd contends that the Reorganization Trust should not be terminated until such time as the Specified ComEd Claims are satisfied.  *See* ComEd Objection at ¶ 7.

13.     As an initial matter, the Reorganization Trust rejects any assertion that it may have any liability to ComEd on account of the Specified ComEd Claims.  First, on January 21, 2015, the Court entered an order [Docket No. 2562] approving a stipulation [Docket No. 2551-1] (the "ComEd Stipulation") between the Reorganization Trust and ComEd resolving certain rejection damages claims (the "Agency Agreement Claims") asserted by ComEd.  As set forth in the ComEd Order and the ComEd Stipulation, the Reorganization Trust and ComEd agreed that "[u]pon payment of $13.75 million to [ComEd], the Reorganization Trust shall not have any further liability to ComEd on account of the Agency Agreement Claims *or any other basis*." [Docket Nos. 2551-1, 2562] (emphasis added).  Moreover, as part of the ComEd Stipulation, the Reorganization Trust and ComEd acknowledged their belief that "liability with respect to the [Specified ComEd Claims] was transferred to [the NRG Parties] under the Plan and the Purchase

---

[6]     Contemporaneously herewith, the Reorganization Trust has filed two forms of an amended proposed Final Decree, including (i) one form of Final Decree that includes the terms for preservation of the Trust Records set forth herein and (ii) an alternative form of Final Decree that authorizes the Reorganization Trust to destroy all Trust Records upon entry of the Final Decree.

Agreement." [Docket No. 2551-1 at n.4). Further, the Reorganization Trust and ComEd agreed that "[t]o the extent that the [Specified ComEd Claims] are ultimately allowed, any and all liability shall be borne solely by [the NRG Parties] to the extent provided by the Plan and the Purchase Agreement." [Docket Nos. 2551-1 at pg. 3, 2562].[7]

14.     Second, regardless of the terms of the ComEd Stipulation, the Reorganization Trust agrees that liability for the Specified ComEd Claims was transferred to the NRG Parties under Article V.E of the Plan.

15.     Based on the foregoing, the Reorganization Trust believes that the modifications to the Final Decree requested by ComEd are unnecessary and reflective of the parties' positioning in the ongoing negotiations between ComEd and NRG. Nevertheless, the Reorganization Trust does not object to the modifications requested by NRG, and the proposed Final Decree has been modified to include the language requested by ComEd, if the Court determines that such modifications are appropriate.

## **RESERVATION OF RIGHTS**

16.     The Reorganization Trust reserves all of its rights to supplement this Reply at the hearing on the Motion or to seek any other or further relief against NRG or ComEd in the event that the Final Decree is not entered.

---

[7] The Reorganization Trust reserves all of its rights to enforce the terms of the ComEd Order and the ComEd Stipulation or to seek any other or further relief against ComEd in the event that the Final Decree is not entered.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Reorganization Trust respectfully requests that the Court (i) overrule the Objections, (ii) enter a Final Decree in one of the two forms filed with the Court and (iii) grant such other relief as may be just and necessary under the circumstances.

Dated:  December 21, 2016
      Chicago, Illinois

By:  ___/s/ James Savin_____

James Savin (admitted *pro hac vice*)
Kevin M. Eide (admitted *pro hac vice*)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
1333 New Hampshire Avenue, N.W.
Washington, DC 20036-1564
(202) 887-4000 (Telephone)
(202) 887-4288 (Facsimile)

and

David F. Staber (admitted *pro hac vice*)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
1700 Pacific Avenue
Suite 4100
Dallas, TX 75201
(214) 969-2800 (Telephone)
(214) 969-4343 (Facsimile)

and

David M. Neff
Brian Audette
**PERKINS COIE LLP**
131 South Dearborn Street, Suite 1700
Chicago, Illinois 60603-5559
(312) 324-8400 (Telephone)
(312) 324-9400 (Facsimile)

*Co-Counsel to the EME Reorganization Trust*

## Exhibit A

**Purchase Agreement**

ASSET PURCHASE AGREEMENT

by and among

EDISON MISSION ENERGY

NRG ENERGY HOLDINGS INC.

and

NRG ENERGY, INC.

October 18, 2013

# TABLE OF CONTENTS

**Page**

ARTICLE 1 PURCHASE AND SALE OF THE TARGET HOLDINGS .................................................. 2

    1.1    Purchase and Sale of the Target Holdings ................................................ 2

    1.2    Purchase Price.................................................................................................. 2

    1.3    True-Up on Estimated Purchase Price. .................................................. 3

    1.4    Target Assets................................................................................................... 4

    1.5    Excluded Assets ............................................................................................. 4

    1.6    Assumed Liabilities ...................................................................................... 6

    1.7    Excluded Liabilities ...................................................................................... 8

    1.8    Contribution of Certain Excluded Assets and Excluded Liabilities................... 9

    1.9    The Closing .................................................................................................... 9

ARTICLE 2 CLOSING ACTIONS AND DELIVERIES ...................................................................... 9

    2.1    EME Deliveries .............................................................................................. 9

    2.2    Purchaser Parties' Deliveries .................................................................... 10

ARTICLE 3 CONDITIONS TO CLOSING............................................................................................ 10

    3.1    Conditions to Parties' Obligations ......................................................... 10

    3.2    Conditions to Purchaser Parties' Obligations ..................................... 11

    3.3    Conditions to EME's Obligations ........................................................... 12

    3.4    Waiver of Condition; Frustration of Closing Conditions ................. 12

    3.5    No Other Conditions .................................................................................. 12

ARTICLE 4 COVENANTS ...................................................................................................................... 12

    4.1    General ............................................................................................................ 12

    4.2    Access ............................................................................................................. 13

    4.3    Sales of Excluded Assets; Permitted Asset Disposals; Non-Core Assets........ 14

    4.4    Conduct of EME and the Acquired Companies .................................. 14

    4.5    Assumed Contracts and Cure Amounts ................................................ 15

    4.6    Solicitation. ................................................................................................... 17

    4.7    HSR; Antitrust Laws; Governmental Approvals; Actions In Connection with Receipt of Certain Governmental Approvals ................................................ 19

    4.8    Pre-Closing Reorganizations ................................................................... 20

    4.9    Casualty Loss ................................................................................................ 21

    4.10    Registration and Listing of Parent Common Stock ........................... 21

    4.11    Retained Chapter 5 Causes of Action .................................................... 23

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF EME ..................................................... 23

    5.1    Organization and Corporate Power........................................................ 23

    5.2    Authorization; No Breach ......................................................................... 23

    5.3    Board Approvals .......................................................................................... 24

5.4    Representations and Warranties Regarding the Acquired Companies ............................ 24

ARTICLE 6 REPRESENTATIONS AND WARRANTIES OF PURCHASER PARTIES ..................... 26

6.1    Organization and Corporate Power ........................................................................ 26

6.2    Authorization; No Breach ..................................................................................... 26

6.3    Board and Shareholder Approvals ......................................................................... 26

6.4    Certain Arrangements .......................................................................................... 26

6.5    Financing; Availability of Funds ........................................................................... 27

6.6    Investment Experience; Information ...................................................................... 27

6.7    Adequate Assurance of Future Performance .......................................................... 27

6.8    Status of Purchaser ............................................................................................. 27

ARTICLE 7 TERMINATION ......................................................................................................... 27

7.1    Termination ....................................................................................................... 27

7.2    Effect of Termination .......................................................................................... 30

ARTICLE 8 BANKRUPTCY PROCEDURES ................................................................................. 31

8.1    Bankruptcy Actions ............................................................................................ 31

8.2    Approval ............................................................................................................ 32

ARTICLE 9 ADDITIONAL AGREEMENTS .................................................................................. 32

9.1    Survival ............................................................................................................. 32

9.2    Press Release and Public Announcements ............................................................. 33

9.3    Confidentiality ................................................................................................... 33

9.4    Consents ............................................................................................................ 33

9.5    Tax Matters ........................................................................................................ 34

9.6    Employee Benefits and Employment Matters ........................................................ 36

9.7    Directors' and Officers' Indemnification .............................................................. 39

9.8    Expenses ............................................................................................................ 40

9.9    Support Obligations ............................................................................................ 40

9.10    Litigation Support .............................................................................................. 41

9.11    Cancellation of Intercompany Accounts ................................................................ 41

9.12    Post-Closing Record Retention and Access ........................................................... 41

9.13    Insurance ........................................................................................................... 42

9.14    Use of Name and Trademarks .............................................................................. 42

9.15    Certain Arrangements ......................................................................................... 43

9.16    Parent Guarantee ................................................................................................ 43

9.17    Non-Solicitation and No-Hire .............................................................................. 43

ARTICLE 10 MISCELLANEOUS ................................................................................................. 43

10.1    Amendment and Waiver ...................................................................................... 44

10.2    Notices .............................................................................................................. 44

10.3    Assignment ........................................................................................................ 46

| 10.4 | Severability | 46 |
| 10.5 | Mutual Drafting | 46 |
| 10.6 | Captions | 46 |
| 10.7 | Complete Agreement | 46 |
| 10.8 | Schedules | 46 |
| 10.9 | No Additional Representations; Disclaimer | 47 |
| 10.10 | Counterparts | 48 |
| 10.11 | GOVERNING LAW; CONSENT TO JURISDICTION; ARBITRATION | 48 |
| 10.12 | Payments Under Agreement | 49 |
| 10.13 | Third-Party Beneficiaries and Obligations | 49 |
| 10.14 | Waiver of Bulk Sales Laws | 49 |
| 10.15 | WAIVER OF JURY TRIAL | 49 |
| 10.16 | Relationship of Parties | 50 |
| 10.17 | Specific Performance | 50 |
| 10.18 | Usage | 50 |

Exhibits

Exhibit A – Bill of Sale
Exhibit B – Assignment and Assumption Agreement
Exhibit C – Governmental Approvals
Exhibit D – PoJo Term Sheet
Exhibit E – PoJo Leases and Documents
Exhibit F – Agreed PoJo Cure Amount

Schedules

Schedule of Partially-Owned Companies
Schedule of Purchased Interests
Schedule of Wholly-Owned Companies
Schedule 1.5 – Excluded Assets
Schedule 1.6 – EME Assumed Liabilities
Schedule 4.4 - Conduct of EME and the Acquired Companies
Schedule 5.2(b) - No Breach
Schedule 5.4(a) - Good Standing
Schedule 5.4(b) - Capitalization
Schedule 5.4(d) - No Conflicts
Schedule 6.2(b) - Purchaser No Breach
Schedule 6.5 - Available Credit Facilities
Schedule 9.6(a) – Eligible Employees
Schedule 9.6(f) - Severance
Schedule 9.9 - Support Obligations
Schedule 9.14 - Edison Marks
Schedule 9.17 - Non-Solicitation and No Hire Employees

ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of October 18, 2013, by and among Edison Mission Energy, a Delaware corporation (as in existence on the date hereof, as a debtor-in-possession in the Chapter 11 Cases, "EME"), NRG Energy, Inc., a Delaware corporation ("Parent"), and NRG Energy Holdings Inc., a Delaware corporation ("Purchaser" and together with Parent, the "Purchaser Parties"). Purchaser, Parent and EME are sometimes referred to in this Agreement individually as a "Party" and collectively as the "Parties."

WHEREAS, EME, directly or indirectly through one or more other Persons, owns, licenses and leases assets used in the operation of the Business;

WHEREAS, on December 17, 2012 (the "Petition Date"), EME and the Debtor Subsidiaries filed voluntary petitions for relief (the "Chapter 11 Cases") under the Bankruptcy Code in the Bankruptcy Court;

WHEREAS, EME owns, directly or indirectly, all of the outstanding equity interests (the "Wholly-Owned Equity Interests") of the Subsidiaries set forth on the Schedule of Wholly-Owned Companies attached hereto (the "Wholly-Owned Companies");

WHEREAS, EME owns, directly or indirectly, the equity interests (the "Partially-Owned Equity Interests" and collectively, with the Wholly-Owned Equity Interests, the "Target Equity Interests") of the Subsidiaries and other Persons set forth on the Schedule of Partially-Owned Companies attached hereto (the "Partially-Owned Companies" and collectively, with the Wholly-Owned Companies, the "Acquired Companies");

WHEREAS, EME owns the Target Assets;

WHEREAS, EME intends to effect (a) the transfer of the Acquired Companies and the Target Assets to Purchaser (including, such that the assets and liabilities of the Acquired Companies shall, other than the Excluded Assets and Excluded Liabilities or as otherwise provided herein, remain assets and liabilities of the Acquired Companies from and after the Closing) and (b) the assignment and assumption of certain Assumed Liabilities by Purchaser and, where applicable, by the Acquired Companies, by (i) the transfer of the Target Equity Interests of the Acquired Companies listed on the Schedule of Purchased Interests attached hereto (such Target Equity Interests, the "Purchased Target Interests" and together with the Target Assets, the "Target Holdings")) and (ii) the transfer of Target Assets to Purchaser, in each case on the terms and subject to the conditions specified herein and in accordance with a plan of reorganization under Chapter 11 of the Bankruptcy Code, containing terms substantially consistent with, and other terms not materially inconsistent with, those set forth on that certain plan term sheet attached as an exhibit to the Plan Sponsor Agreement (the "Plan Term Sheet") (such plan of reorganization, the "Plan");

WHEREAS, the Transaction (as defined below) is subject to the authorization of the Bankruptcy Court pursuant to, inter alia, Section 1129 of the Bankruptcy Code and is expected to be consummated on or after the date on which the Plan becomes effective (the "Plan Effective Date");

WHEREAS, the board of directors of EME has approved this Agreement and the transactions contemplated hereby (including the Transaction (as defined below)) and by the Ancillary Agreements (as defined below) upon the terms and conditions set forth herein and therein;

WHEREAS, the board of directors of each Purchaser Party has approved this Agreement and the transactions contemplated hereby (including the Transaction) and by the Ancillary Agreements upon the terms and conditions set forth herein and therein; and

WHEREAS, the Parties, the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "UCC") and certain holders of Notes issued by EME (the "Supporting Noteholders") have agreed to support the transactions contemplated hereby in accordance with the terms of that certain Plan Sponsor Agreement executed contemporaneously herewith and to which this Agreement is attached as an exhibit (the "Plan Sponsor Agreement").

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties and covenants herein contained, and intending to be legally bound, the Parties hereto hereby agree as follows:

ARTICLE 1
PURCHASE AND SALE OF THE TARGET HOLDINGS

1.1     Purchase and Sale of the Target Holdings.  On the terms and conditions set forth in this Agreement, the Plan and the Confirmation Order, at, and effective as of, the Closing, Purchaser shall (a) purchase from EME, and EME shall sell to Purchaser, all of its right, title and interest in and to the Purchased Interests and the Target Assets, (b) pay to EME the Stock Purchase Price and the Estimated Cash Purchase Price, (c) assume from EME, and EME shall assign to Purchaser, all of the EME Assumed Liabilities, and (d) cause each Debtor Subsidiary that is an Acquired Company to assume all of the Debtor Subsidiary Assumed Liabilities (collectively, the "Transaction").

1.2     Purchase Price.

(a)     When used herein, (i) the "Adjusted Base Purchase Price" means the result equal to (w) the Base Purchase Price, minus (x) the Permitted Asset Disposal Purchase Price, minus (y) the Excess Loss Amount, plus (z) the Agreed Incremental Tax Attribute Value (if any), (ii) the "Base Purchase Price" means $2,635,000,000 (TWO BILLION SIX HUNDRED THIRTY FIVE MILLION DOLLARS), (iii) the "Cash Purchase Price" means the result equal to (v) the Adjusted Base Purchase Price minus the Stock Purchase Price Numerator, plus (w) the amount (if any) by which Closing Cash exceeds the Cash Target, minus (x) the amount (if any) by which the Cash Target exceeds Closing Cash, plus (y) the amount (if any) by which the Debt Target exceeds Closing Debt, minus (z) the amount (if any) by which Closing Debt exceeds the Debt Target, (iv) the "Stock Purchase Price Numerator" means $350,000,000 (THREE HUNDRED FIFTY MILLION DOLLARS), being the aggregate portion of the Adjusted Base Purchase Price to be paid in Parent Common Stock, and (v) the "Stock Purchase Price" means 12,671,977 (TWELVE MILLION SIX HUNDRED SEVENTY-ONE THOUSAND NINE HUNDRED SEVENTY SEVEN) shares of Parent Common Stock, which number of shares the Parties agree was initially determined by dividing (A) the Stock Purchase Price Numerator, by (B) $27.62, being the volume-weighted average trading price for the Parent Common Stock during the 20 trading days immediately preceding the date of this Agreement and as such number of shares of Parent Common Stock is equitably adjusted after the date hereof to reflect any split, combination, merger, recapitalization, extraordinary dividend or other transaction affecting the Parent Common Stock or the value thereof on or after the date hereof.  For the avoidance of doubt, all obligations of the Purchaser Parties in respect of the PoJo Leases and Documents hereunder are in addition to, and not in full or partial satisfaction of, payment of the Adjusted Base Purchase Price.

(b)     Not later than three (3) Business Days prior to the Closing, EME shall deliver to Purchaser its reasonable and good faith estimate of the amount of Closing Cash (the "Estimated Closing

2

Cash") and the amount of Closing Debt (the "Estimated Closing Debt"), together with any estimated adjustments to the Cash Target (as so adjusted, the "Estimated Cash Target"), the Debt Target (as so adjusted, the "Estimated Debt Target") and the Adjusted Base Purchase Price (the "Estimated Adjusted Base Purchase Price") necessitated in accordance with the definitions thereof and on the basis thereof and other facts known to happen after delivery thereof, EME's calculation of the Estimated Cash Purchase Price, together with recent bank screen shots, recent statements or other reasonable documentation providing back-up for such Estimated Closing Cash and Estimated Closing Debt calculations. When used herein, the "Estimated Cash Purchase Price" means the result equal to (i) the Estimated Adjusted Base Purchase Price minus the Stock Purchase Price Numerator, plus (ii) the amount (if any) by which Estimated Closing Cash exceeds the Estimated Cash Target, minus (iii) the amount (if any) by which the Estimated Cash Target exceeds Estimated Closing Cash, plus (iv) the amount (if any) by which the Estimated Debt Target exceeds Estimated Closing Debt, minus (v) the amount (if any) by which Estimated Closing Debt exceeds the Estimated Debt Target.

       1.3    True-Up on Estimated Purchase Price.

       (a)    On or prior to the 20th Business Day after the Closing, Purchaser shall deliver to EME a statement (the "True-Up Statement") setting forth its good faith calculation of Closing Cash, Closing Debt, the Cash Target, the Debt Target and the Adjusted Base Purchase Price, together with reasonable back-up therefor and in each case calculated in accordance with the terms of this Agreement, and on the basis thereof, its calculation of the Cash Purchase Price. During the twenty Business Day period immediately following delivery of the True-Up Statement (the "Review Period"), EME and its Related Persons shall be permitted to review the information utilized by Purchaser in the preparation of the True-Up Statement and otherwise shall be provided with reasonable access during normal business hours to the books, records and employees of Purchaser and its Affiliates (including Transferred Employees) for such purpose and to assist in the review of the True-Up Statement and any Notice of Disagreement, and otherwise in connection with the matters contemplated by this Section 1.3 (including any dispute relating to the True-Up Statement and/or any of the calculations set forth on any of the foregoing).

       (b)    The True-Up Statement and the resulting calculation of the Cash Purchase Price therefrom and the components thereof shall become final and binding upon the Parties on the second Business Day following the Review Period unless EME provides written notice of its disagreement (a "Notice of Disagreement") to Purchaser prior thereto. Any Notice of Disagreement shall (x) specify the nature and amount of any disagreement so asserted, and (y) only include disagreements based on mathematical errors or based on the True-Up Statement and/or the calculations reflected and/or derived therefrom not being calculated in accordance with this Agreement. If a timely Notice of Disagreement is received by Purchaser, then the calculation of Cash Purchase Price and the components thereof (as revised in accordance with clause (1) or (2) below) shall become final and binding upon the Parties on the earlier of (1) the date EME and Purchaser resolve in writing any and all differences they have with respect to any and all matters specified in any and all Notice of Disagreements and (2) the date any and all matters properly in dispute are finally resolved in writing by the Bankruptcy Court (with it being understood and agreed that if all such differences are not resolved on or prior to the 10th Business Day after delivery of the Notice of Disagreement (or such later date as agreed between Purchaser and EME), then either Party may petition the Bankruptcy Court for resolution of all such disputes. When used herein, the "Final Cash Purchase Price" shall mean the Cash Purchase Price, as finally determined in accordance with this Section 1.3(b).

       (c)    If the Estimated Cash Purchase Price is less than the Final Cash Purchase Price (such shortfall, the "Shortfall Amount"), Purchaser shall, within five (5) Business Days after the Final Cash Purchase Price becomes final and binding on the Parties under this Section 1.3, deliver the Shortfall

Amount to EME, by wire transfer of immediately available funds to the account where the Estimated Cash Purchase Price was sent (or such other bank account as may have been designated in writing by EME). If the Estimated Cash Purchase Price is greater than the Final Cash Purchase Price (such excess, the "Excess Amount"), EME shall, within five (5) Business Days after the Final Cash Purchase Price becomes final and binding on the Parties under this Section 1.3, deliver the Excess Amount to Purchaser, by wire transfer of immediately available funds to an account designated in writing by Purchaser.

1.4     Target Assets. In addition to the transfer of the Purchased Interests (and thereby EME's direct and indirect interests in other Acquired Companies and the Acquired Companies' interests in their respective assets (other than Excluded Assets)), without duplication of its obligations under Section 1.1 of this Agreement, on the terms and subject to the conditions specified in this Agreement, at the Closing, EME shall transfer, convey and assign to Purchaser, and Purchaser shall accept from EME, the transfer, conveyance and assignment of all EME's right, title and interest in and to all (i) Cash of EME, (ii) other assets of EME (including Available Contracts), used in the operation of the Business, as conducted as of the date hereof, in the ordinary course of business consistent with past practice and (iii) such other of EME's assets that are identified as, and agreed in writing by the Parties to be, "Target Assets"; provided that, in no event shall the Target Assets include the Excluded Assets. If at any time after the Closing, EME is in possession of any Target Asset or receives any payment, refund, reimbursement, credit or set-off from any Person in respect of any Target Asset, or otherwise acquires or possesses any rights, entitlements or assets in respect of the Target Assets, such payments, refunds, reimbursements, credits or set-offs as applicable (or any savings therefrom), shall be held by EME in trust for the benefit of Purchaser and, promptly following the receipt thereof, EME shall pay over any such amounts to Purchaser without set-off or deduction of any kind and/or shall, at Purchaser's cost, execute and deliver any instruments of transfer or assignment that are necessary to transfer and assign to Purchaser or its designee, or otherwise vest Purchaser or its designee with title to, such assets, payments, refunds, reimbursements credits or set-offs (or any savings therefrom).

1.5     Excluded Assets. Notwithstanding anything to the contrary in this Agreement, Purchaser is not purchasing any assets of the Homer City Debtors or any of the following assets of EME (collectively, the "Excluded Assets"):

    (a)     the Intercompany Accounts;

    (b)     any bank accounts of EME and the Homer City Debtors; provided that EME is nevertheless responsible for transferring EME Cash to Purchaser as required in Section 1.4;

    (c)     the Rejected Contracts and each other contract or agreement rejected by EME or any Debtor Subsidiary prior to the date hereof;

    (d)     the Employee Benefit Plans set forth on Schedule 1.5 (the "Excluded Employee Benefit Plans") and any assets related to any Excluded Employee Benefit Plan;

    (e)     the EIX Litigation Claims;

    (f)     all rights under insurance policies and all claims, refunds, adjustments, proceeds and recoveries, and any other rights and benefits, under such policies (other than rights of the Acquired Companies with respect to the Transferred Policies (subject to the rights of EME and Subsidiaries that are not transferred to Purchaser to make claims against such Transferred Policies in accordance with the terms hereof));

    (g)     all Retained Books and Records;

(h)        all Claims, refunds, adjustments, proceeds and recoveries, and any other rights of and benefits to, EME and any Acquired Company under or with respect to any Excluded Asset;

(i)        every asset of EME that would constitute a Target Asset (if owned immediately prior to the Closing) to the extent conveyed or otherwise disposed of during the period from the date hereof until the Closing Date (i) in the ordinary course of business, (ii) at the direction of the Bankruptcy Court or (iii) as otherwise permitted by the terms of this Agreement;

(j)        except to the extent otherwise transferred or conveyed to Purchaser pursuant to a Tax Attributes Agreement, if any, all Tax losses, Tax loss carry forwards, Tax credits and rights to receive Tax  refunds or credits, Tax refunds and credits from net operating loss carry backs (excluding Tax refunds and credits of the Acquired Companies relating to carry backs from taxable periods, or portions of taxable periods, ending after the Closing Date), or other similar Tax assets, in all cases, with respect to any and all Taxes of EME, any Homer City Debtor or Taxes of the Acquired Companies for taxable periods or portions thereof ending on or before the Closing Date, including interest receivable with respect to any of the foregoing, and all rights to the foregoing under any Tax sharing agreements with EIX or any Non-EME Subsidiary (collectively, the "Tax Attributes");

(k)        all claims or other rights of, or benefits to, EME and the Debtor Subsidiaries arising out of or relating in any way to the Chapter 11 Cases or any of the transactions contemplated thereby or entered into as a consequence thereof; provided, however, that the Plan shall provide that all Claims and causes of action arising under chapter 5 of the Bankruptcy Code, other than any such Claims and causes of action against any of the EIX Litigation Parties, shall be released as of the Plan Effective Date; provided further, that with the prior written consent of the Parent, which consent shall not be unreasonably withheld, the proponents of the Plan (other than Parent) may identify additional Persons in a schedule to the Plan Supplement that shall not be released of any Liability in relation to such Claims and causes of action.

(l)        any other obligations of or with respect to or associated with EIX Litigation Parties, including, receivables from EIX, shared services, Tax sharing payments and rights under insurance policies of EIX Litigation Parties;

(m)        all shares of capital stock or other equity interests issued by any of the Homer City Debtors;

(n)        all assets of the Homer City Debtors;

(o)        all claims or other rights of, or benefits to, EME arising under this Agreement and the Ancillary Agreements;

(p)        all claims or other rights of, or benefits to, EME, whether arising out of events occurring prior to, on or after the Closing Date, including any rights under or pursuant to all warranties, representations, indemnities, agreements to hold harmless and guarantees made by any Person but, in each of the foregoing cases of this clause (p), only to the extent they relate to either Excluded Liabilities or Excluded Assets;

(q)        all claims or other rights of, or benefits to, EME against or with respect to any director, officer, stockholder or other Related Person of, or any former director, officer, stockholder or other Related Person of, EME (whether or not asserted prior to the Closing Date), including any claims or other rights of, or benefits to, EME against any such Person or any third

party for indemnification, contribution, subrogation or reimbursement for expenses advanced or indemnification provided to any director, officer, stockholder or other Related Person of, or any former director, officer, stockholder or other Related Person of, EME;

(r)    all contracts and agreements with EIX Litigation Parties not necessary for the operation of the Business; and

(s)    all other assets set forth on Schedule 1.5.

If at any time after the Closing, Purchaser or any Acquired Company is in possession of any Tax Attribute or Excluded Asset or receives any payment, refund, reimbursement, credit or set-off from any Person in respect of any Tax Attribute or other Excluded Asset, or otherwise acquires or possesses any rights, entitlements or assets in respect of the Tax Attributes or other Excluded Assets, such payments, refunds, reimbursements, credits or set-offs as applicable (or any savings therefrom), shall be held by Purchaser or such Acquired Company, as applicable, in trust for the benefit of EME and, promptly following the receipt thereof, Purchaser or such Acquired Company, as applicable, shall pay over any such amounts to EME without set-off or deduction of any kind and/or shall, at EME's cost, execute and deliver any instruments of transfer or assignment that are necessary to transfer and assign to EME or its designee, or otherwise vest EME or its designee with title to, such assets, payments, refunds, reimbursements credits or set-offs (or any savings therefrom).  If, however, the rights of Purchaser or an Acquired Company to a Tax Attribute or other Excluded Asset subsequently is denied or disallowed, EME promptly will reimburse Purchaser or the Acquired Company for the monetary amount of such denial or disallowance.

1.6    Assumed Liabilities.

(a)    At, and effective as of, the Closing, and on the terms and conditions set forth in this Agreement, the Plan and the Confirmation Order, in addition to the payment of the Stock Purchase Price plus the Estimated Cash Purchase Price by Purchaser in accordance with Section 1.1 and as additional consideration for the Target Holdings, (i) Purchaser shall, and Parent shall cause Purchaser to, irrevocably assume and agree to faithfully pay, perform, discharge and fulfill, and if applicable, comply with, in each case when due or required, all of the EME Assumed Liabilities in accordance with their respective terms and (ii) Purchaser shall cause each Debtor Subsidiary that is an Acquired Company to irrevocably assume and agree to faithfully pay, perform, discharge and fulfill and, if applicable, comply with, in each case when due or required, all of such Debtor Subsidiary's respective Debtor Subsidiary Assumed Liabilities. Without limiting the foregoing, Purchaser shall, and Parent shall cause Purchaser to, pay, perform and discharge all EME Assumed Rejection Liabilities and all Debtor Subsidiary Assumed Rejection Liabilities on the date on which such liability becomes Allowed.  Each of Parent and Purchaser, on behalf of itself and each of the Acquired Companies, waives all rights of contribution, indemnification, reimbursement, subrogation or other rights against EME and the Homer City Debtors with respect to the Assumed Liabilities.

(b)    When used herein, "EME Assumed Liabilities" means the following Liabilities of EME:

(i)    all trade and vendor accounts payable and accrued liabilities arising from or out of the operation of the Business prior to the Closing (including prior to the Petition Date);

(ii)    all Liabilities of EME under the PoJo Leases and Documents, as modified pursuant to Section 9.4(b) hereof, including any Tax indemnity agreements and guarantees associated therewith and as more fully described in the Support Obligations;

(iii)     all Cure Amounts and other Liabilities with respect to Assumed Contracts, other than the Agreed PoJo Cure Amount;

(iv)     all Liabilities arising from the rejection of the Rejected Contracts (the "EME Assumed Rejection Liabilities"); provided that the "EME Assumed Rejection Liabilities" shall not include the Excluded Rejection Liabilities;

(v)     all Liabilities agreed to be assumed by Purchaser or for which Purchaser has agreed to be, or to cause the Acquired Companies to be responsible, in accordance with this Agreement (including as provided in Article 9 hereof) and the Ancillary Agreements;

(vi)     all Liabilities with respect to the ownership or operation of the Acquired Companies and the Target Assets from and after the Closing;

(vii)     all Liabilities relating to any Legal Proceedings or Claims for which EME is liable relating to a Liability, Legal Proceeding or Claim asserted against any Acquired Company (except to the extent that such Liabilities of such Acquired Company are Excluded Liabilities or to the extent that EME is a primary obligor for such Liability or has Liability as a result of acts separate and apart from what is alleged in the Legal Proceeding or Claim against the Acquired Company);

(viii)     all Liabilities of EME or the Acquired Companies with respect to the Legal Proceedings set forth on Schedule 1.6; and

(ix)     other Liabilities set forth on Schedule 1.6.

(c)     When used herein, "Debtor Subsidiary Assumed Liabilities" means the following Liabilities:

(i)     subject to the discharge, release, and injunction provisions of the Plan, all Liabilities of the Debtor Subsidiaries that are Acquired Companies for Claims that are Allowed; provided that nothing herein shall include any Excluded Liabilities;

(ii)     all Cure Amounts and other Liabilities of the Debtor Subsidiaries that are Acquired Companies with respect to Assumed Contracts, other than the Agreed PoJo Cure Amount;

(iii)     all Liabilities of the Debtor Subsidiaries that are Acquired Companies related to the rejection of the Rejected Contracts (the "Debtor Subsidiary Assumed Rejection Liabilities"); provided that the "Assumed Rejection Liabilities" shall not include the Excluded Rejection Liabilities;

(iv)     all Liabilities of the Debtor Subsidiaries that are Acquired Companies agreed to be assumed by Purchaser or for which Purchaser has agreed to be, or to cause the Debtor Subsidiaries that are Acquired Companies or the Acquired Companies generally, to be responsible, in accordance with this Agreement (including Section 9.6 hereof) and the Ancillary Agreements; and

(v)     all Liabilities of the Debtor Subsidiaries that are Acquired Companies with respect to the ownership or operation of the Acquired Companies and the Target Assets from and after the Closing.

(d)     Without limiting the other provisions of this Agreement, it is acknowledged and agreed that, subject to the terms of any release and injunction with respect to Excluded Liabilities contained in the Plan, as approved by the Confirmation Order, each Acquired Company that is not a Debtor Subsidiary shall, from and after the Closing, pay and remain responsible for the timely discharge and payment of its Liabilities.

1.7     <u>Excluded Liabilities</u>.  Notwithstanding <u>Section 1.6</u>, neither Purchaser nor Parent nor any Acquired Company shall assume or be liable or responsible for, and EME (or, in the case of <u>Section 1.7(i)</u>, the Homer City Debtors) shall retain and be responsible for, in accordance with the Plan, the Excluded Liabilities.  Furthermore, neither the Purchaser Parties nor any Acquired Company shall, as provided in the Plan, from and after the Closing, be liable or responsible for the Excluded Liabilities. When used herein, the "<u>Excluded Liabilities</u>" means the following Liabilities of EME, the Homer City Debtors, and the Wholly-Owned Companies:

(a)     all Liabilities of EME that are not EME Assumed Liabilities;

(b)     all Liabilities under the Notes;

(c)     all Excluded Employee Liabilities or Liabilities under any Replicated Plans (other than the EME Severance Plans and other Employee Benefit Plans for which Purchaser or an Acquired Company is responsible in accordance with <u>Section 9.6</u>);

(d)     all Liabilities for rejection damages arising from the rejection of executory contracts or unexpired leases of EME or any Debtor Subsidiaries on or before the date of this Agreement or any rejection of such agreements after the date of this Agreement without the prior written consent of Purchaser (the "<u>Excluded Rejection Liabilities</u>");

(e)     all Liabilities asserted by EIX or other intercompany Liabilities to the extent they are not between Acquired Companies, other than Liabilities under ordinary course shared services and other operating arrangements;

(f)     the Agreed PoJo Cure Amount;

(g)     other than the EME Assumed Rejection Liabilities and the Debtor Assumed Rejection Liabilities, all Liabilities arising from or related to the Excluded Assets;

(h)     the Excluded Tax Liabilities;

(i)     all Liabilities of and relating to the Homer City Debtors or the Chapter 11 Cases relating to the Homer City Debtors or relating to or arising from the 1,884 MW Homer City coal-fired generation facility and associated facilities located in Indiana County, Pennsylvania;

(j)     all Liabilities and obligations incurred by the UCC, the Supporting Noteholders, EME or any of its Subsidiaries relating to legal services, accounting services, financial advisory services, investment banking services or any other professional services to the extent performed in furtherance of the Transaction or the Chapter 11 Cases; and

(k)     other Liabilities for which EME has agreed to remain responsible in accordance with this Agreement and the Plan, including professional and administrative fees and expenses for which EME has agreed to be responsible pursuant to the Plan.

1.8    Contribution of Certain Excluded Assets and Excluded Liabilities.  At the Closing, and upon the terms and conditions set forth in this Agreement, the Plan and the Confirmation Order EME shall cause the Wholly-Owned Companies to, transfer, convey and assign to EME, all of their right, title and interest in and to all of the Excluded Assets, to EME, and EME shall accept the transfer, conveyance and assignment from the Wholly-Owned Companies to EME of the Excluded Assets (the "Excluded Assets Contribution").  EME shall be responsible for all Taxes and other costs associated with the transactions taken pursuant to this Section 1.8.

1.9    The Closing.  Unless this Agreement shall have been terminated prior thereto pursuant to Article 7, the consummation of the Transaction will be effected (the "Closing") and shall occur at the offices of Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, at 9:00 a.m. local time on the Plan Effective Date (assuming the satisfaction or waiver by the appropriate Party of all the conditions contained in Article 3 (other than conditions which by their terms or their nature are to be performed or measured as of the Closing Date (provided such conditions are satisfied at the Closing or waived by the applicable Party))) and the Closing shall be effective as of 12:01 a.m. local time on the Closing Date.  The date on which the Closing occurs is sometimes referred to as the "Closing Date".  Each Party will, and will cause its Affiliates to, at the Closing execute and deliver the agreements, documents, certificates and other deliveries (including the Ancillary Agreements) required hereunder to be executed and/or delivered at the Closing by such Party and/or such Affiliates of such Party or for which such execution and/or delivery is a condition to another Party's obligations to consummate the Closing.

ARTICLE 2
CLOSING ACTIONS AND DELIVERIES

2.1    EME Deliveries.  At the Closing, EME shall, or, if applicable, shall cause one of its Subsidiaries to, deliver the following documents, consistent with the terms of this Agreement:

(a)    a bill of sale with respect to the Target Assets, duly executed by EME, in the form of Exhibit A attached hereto;

(b)    an assignment and assumption agreement with respect to the EME Assumed Liabilities, duly executed by EME, in the form of Exhibit B attached hereto;

(c)    to the extent any of the Purchased Interests are certificated, the certificates evidencing such Purchased Interests (but in the case of certificates representing Purchased Interests for Viento Funding II, Inc., only if the pledge thereon has been released), together with an assignment separate from certificate or other instrument reasonably acceptable to the Parties as may necessary to cause the assignment or transfer of the Purchased Interests;

(d)    certificates of title, assignments of contracts and other instruments of transfer, conveyance and assignment as and to the extent agreed by EME and Purchaser as be necessary to evidence the transfer, conveyance and assignment to Purchaser of EME's right, title and interest in and to the Target Assets (collectively, the "Additional Conveyance Documents");

(e)    such assignments of Contracts and other instruments of assumption as and to the extent necessary to evidence the valid and effective assumption by Purchaser of the Assumed Liabilities (collectively, the "Additional Liabilities Assumption Documents");

(f)    such bills of sale, assignment and assumption and other conveyance documents as may be determined by the Parties to be necessary to executed to effectuate the Excluded Assets Contribution; and

9

(g)      an affidavit of non-foreign status from EME that complies with Section 1445 of the Code.

2.2    <u>Purchaser Parties' Deliveries</u>.  At the Closing, the Purchaser shall (and Parent shall cause Purchaser to) deliver the following items, consistent with the terms of this Agreement:

(a)      an amount equal to the Estimated Cash Purchase Price by wire transfer of immediately available funds into an account to be specified in the Confirmation Order (the "<u>EME Account</u>");

(b)      the Stock Purchase Price;

(c)      an assignment and assumption agreement with regard to the Assumed Liabilities, duly executed by Purchaser, in the form of <u>Exhibit B</u> attached hereto;

(d)      each of the Additional Conveyance Documents and Additional Liabilities Assumption Documents; and

(e)      such bills of sale, assignment and assumption and other conveyance documents as may be determined by the Parties to be necessary to executed to effectuate the Excluded Assets Contribution.

ARTICLE 3
<u>CONDITIONS TO CLOSING</u>

3.1    <u>Conditions to Parties' Obligations</u>.  The obligation of the Purchaser Parties, on the one hand, and EME, on the other hand, to consummate the Closing is subject to the satisfaction or, to the extent such waiver is permitted by Law, waiver by the Parties, on or prior to the Closing Date, of the following conditions as of immediately prior to the Closing:

(a)      <u>No Violation of Order</u>.  No Order shall have been enacted, entered, promulgated or enforced by any Governmental Authority with jurisdiction over the transactions contemplated by this Agreement which prohibits or seeks to prohibit the consummation of the transactions contemplated by this Agreement.

(b)      <u>Plan and Confirmation Order</u>.  The Plan shall have become effective pursuant to the Confirmation Order, and such Confirmation Order shall not then be subject to a stay.

(c)      <u>Governmental Approvals</u>.

(i)      The waiting period (and any extension thereof), or any necessary approval, as applicable, related to the transactions contemplated by this Agreement under the HSR Act shall have been received, terminated or shall have expired, as applicable; and

(ii)      any required approval of FERC under Section 203 of the Federal Power Act shall have been obtained; and

(iii)      all other authorizations, consents, Orders or approvals of, or expiration of waiting periods imposed by, any Governmental Authority and set forth on <u>Exhibit C</u> shall have been obtained from the appropriate Governmental Authorities (such approvals set forth in subsections (i) through (iii), collectively, the "<u>Governmental Approvals</u>"); <u>provided</u> that, for the

10

avoidance of doubt, in no event shall the Governmental Approvals include relief or other authorization, consent, Order or approval of IPCB, any other environmental regulatory agency or any other Governmental Authority for variances or waivers with respect to the coal-fired facilities owned by MWG or otherwise with respect to the Target Assets or any assets of any Acquired Companies.

        (d)    <u>Effectiveness of Form S-1</u>.  The Form S-1 shall have become effective under the Securities Act and shall not be subject to any actual or threatened Legal Proceeding or Order that limits or suspends such effectiveness.

        (e)    <u>No Termination of Agreement</u>.  This Agreement shall not have been terminated in accordance with <u>Section 7.1</u>.

Any condition specified in this <u>Section 3.1</u> may be waived prior to Closing only by a written instrument signed by EME and Purchaser.

        3.2    <u>Conditions to Purchaser Parties' Obligations</u>.  The obligation of the Purchaser Parties to consummate the Closing is subject to the satisfaction or waiver by Purchaser of each of the following additional conditions, as of immediately prior to the Closing:

        (a)    <u>EME Performance of Covenants</u>.  The covenants and agreements of EME to be performed as of or prior to the Closing shall have, in the aggregate, been performed in all material respects, except to the extent of changes or developments contemplated by the terms of this Agreement.

        (b)    <u>Collective Bargaining Agreements</u>.  EME shall not have renewed or extended any Collective Bargaining Agreement other than on terms previously disclosed to Purchaser and/or its legal counsel in writing and otherwise on terms materially consistent with the existing Collective Bargaining Agreements and in no event shall the term of any such renewed or extended Collective Bargaining Agreement expire or terminate after December 31, 2014.

        (c)    <u>EME Material Adverse Effect</u>.  Since the date of this Agreement, no EME Material Adverse Effect shall have occurred and be continuing.

        (d)    <u>Event of Loss or Taking</u>.  Since the date of this Agreement, (i) no Walnut Creek Loss shall have occurred and be continuing and (ii) no Event of Loss shall have occurred and be continuing that, either individually or in the aggregate, after the application of any insurance proceeds and/or condemnation awards to the extent received, involves aggregate Restoration Costs and Condemnation Value as of the Closing Date in excess of twenty percent (20%) of the Stipulated Transaction Value.

        (e)    <u>EME Closing Deliveries</u>.  EME shall have delivered those documents, agreements, instruments and all other deliverables set forth in <u>Section 2.1</u> above.

        (f)    <u>Absence of Leverage Event</u>.  Since the date of this Agreement, neither EME nor any of its Subsidiaries shall have increased the principal amount of its respective Debt, whether recourse or non-recourse, or otherwise materially restructured any of its debt obligations (collectively, a "<u>Leverage Event</u>") without the express written consent of Purchaser; <u>provided</u>, however, that a Leverage Event may occur without the consent of Purchaser and without failure of this condition to the extent (i) such Debt is an Excluded Liability, (ii) such Debt is MWG Permitted Debt, (iii) capitalization of interest to principal in accordance with the governing documents for such Debt, or (iv) EME reasonably determines in good faith

that such Leverage Event is in the best interests of or necessary for the continued ordinary course operation of EME or such Subsidiary.

(g) <u>Consent of the PoJo Parties</u>. Since the date of this Agreement, there have been no defaults or events of default under the PoJo Leases and Documents other than those waived under the PoJo Term Sheet and there has been no rejection of the PoJo Leases and Documents.

Any condition specified in this <u>Section 3.2</u> may be waived prior to Closing only by a written instrument signed by Purchaser.

3.3 <u>Conditions to EME's Obligations</u>. The obligation of EME to consummate the Closing is subject to the satisfaction or waiver by EME of each of the following additional conditions as of immediately prior to the Closing:

(a) <u>Purchaser Parties' Performance of Covenants</u>. The covenants and agreements of the Purchaser Parties to be performed as of or prior to the Closing shall have, in the aggregate, been performed in all material respects, except to the extent of changes or developments contemplated by the terms of this Agreement.

(b) <u>Purchaser Parties' Closing Deliveries</u>. The Purchaser Parties shall have delivered those documents, agreements, instruments and all other deliverables set forth in <u>Section 2.2</u> above.

(c) <u>Listing of Parent Common Stock</u>. The Parent Common Stock being issued as the Stock Purchase Price shall have been approved for listing on the New York Stock Exchange, subject to official notice of issuance.

Any condition specified in this <u>Section 3.3</u> may be waived prior to Closing only by a written instrument signed by EME.

3.4 <u>Waiver of Condition; Frustration of Closing Conditions</u>. All conditions to the Closing shall be deemed to have been satisfied or waived from and after the Closing. Neither Purchaser or Parent nor EME may rely on the failure of any condition set forth in this <u>Article 3</u> to be satisfied if such failure was caused by such Party or such Party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the Transaction.

3.5 <u>No Other Conditions</u>. For the avoidance of doubt, except as set forth in <u>Sections 3.1</u>, <u>3.2</u> and <u>3.3</u> of this Agreement, there are no other conditions precedent to Closing for any Party, including conditions precedent relating to due diligence, environmental contingencies, financing, or Legal Proceedings (including the Chevron Litigation).

ARTICLE 4<br>COVENANTS

4.1 <u>General</u>.

(a) Subject to the terms and conditions of this Agreement, except to the extent that a different standard is specified herein (in which case such standard shall apply with respect to the covenant so specified), each of the Parties will use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable in order to consummate and make effective the transactions contemplated by this Agreement and by the Ancillary Agreements as promptly as practicable (including satisfaction, but not waiver, of the conditions to Closing set forth in

<u>Article 3</u> and approval of the Orders and the Plan contemplated hereby). Nothing herein shall obligate any Party to take any action to the extent such Party is prohibited from doing so by Law or Order prior to the entry of the PSA Order or the Confirmation Order (as applicable).

(b)     Without limiting the generality of the Purchaser Parties' obligations under <u>Section 4.1(a)</u>, the Purchaser Parties shall (i) all times after the date hereof, maintain sufficient cash on hand and available undrawn commitments under the Available Credit Facilities in order to satisfy, and for the purpose of satisfying, their obligations hereunder when required, and (ii) satisfy on a timely basis all conditions for drawing that are within its control applicable to the Purchaser Parties under the Applicable Credit Facilities. The Purchaser Parties may not (A) replace or amend any Available Credit Facility if such replacements or amendments, individually or in the aggregate, would prevent, delay or impair the availability of the borrowings thereunder or the consummation of the Transaction when required by this Agreement or (B) terminate or materially reduce commitments under any Available Credit Facility. Notwithstanding anything in this <u>Section 4.1(b)</u> or elsewhere in this Agreement to the contrary, each of the Purchaser Parties affirms that it is not a condition to the Closing or to any of its obligations under this Agreement that the Purchaser Parties obtain debt or other financing for or related to any of the transactions contemplated by this Agreement.

4.2     <u>Access</u>. After the date hereof and until the earlier of the Closing and the date that this Agreement is terminated in accordance with its terms, EME shall (in its reasonable discretion) grant or cause to be granted to Purchaser and its authorized representatives reasonable access, during normal business hours and upon reasonable notice, to the personnel and facilities of EME and the other Acquired Companies solely for purposes of transition planning. In the event that EME elects to provide such access, the Parties shall cooperate so that (a) such access does not unreasonably interfere with the normal operations of EME or any of the Acquired Companies; (b) such access occurs in such a manner as EME reasonably determines to be appropriate to protect the confidentiality of the information sought; (c) all requests for access to EME and/or any of the Acquired Companies are directed to Maria Rigatti and/or Daniel McDevitt (the "<u>EME Designated Contacts</u>"), or such individuals as EME may designate in writing from time to time; (d) such access and disclosure is provided in such a manner and subject to such additional agreements as EME reasonably determines to protect against significant competitive harm to EME and/or any of the Acquired Companies if the transactions contemplated by this Agreement are not consummated, to avoid the breach of any third party agreement by EME or any of the Acquired Companies or to protect against in the loss of attorney-client privilege for any information so disclosed; and (e) neither Purchaser nor its Related Persons is provided access to or receives any information if such access or disclosure is restricted pursuant to and/or prohibited by any applicable Laws or any Governmental Authority (including the HSR Act and other Antitrust Laws, FERC, or Laws regarding employee rights of privacy); <u>provided</u> that if EME reasonably determines that certain information to be provided is commercially sensitive, EME may require that such information be provided pursuant to a mutually acceptable and reasonable "clean team" arrangement (whereby no one who serves on the clean team has been or will be involved in any manner in decision-making competitive to the Business prior to Closing and whereby members of the clean team will be permitted to convey results to their superiors and other parties subject to reasonable constraints on the conveyance of specific marketing, selling or pricing information). Other than the EME Designated Contacts or as expressly provided in this <u>Section 4.2</u>, Purchaser is not authorized to and shall not (and shall cause its Related Persons not to) contact any officer, director, employee, supplier, lessee, lessor, licensee, licensor, distributor, lender, customer or other material business relation of EME or any of the Acquired Companies regarding this Agreement or the Transaction prior to the Closing without the prior written consent of EME, such consent not to be unreasonably withheld, conditioned, or delayed, and shall not seek any variances or waivers with respect to any Acquired Company from the IPCB or any other Governmental Authority prior to the Closing. Parent shall, and shall cause Purchaser and Purchaser's Related Persons and its Related Persons to, abide

Case 12-49219 Doc 2675-1 Filed 12/11/16 Entered 12/11/16 12:55:58 Desc Main
Exhibit E - Purchase Agreement Page 29 of 125

Case 12-49219 Doc 2675-1 Filed 12/11/16 Entered 12/11/16 12:55:58 Desc Main
Exhibit E - Purchase Agreement Page 19 of 75

by the terms of the Confidentiality Agreement with respect to such access and any information furnished to it, the Purchaser or their respective Related Persons pursuant to this <u>Section 4.2</u>.

4.3    <u>Sales of Excluded Assets; Permitted Asset Disposals; Non-Core Assets</u>.  As a material inducement to EME to execute and deliver this Agreement, it is expressly acknowledged and agreed that EME may, without breach of this Agreement, (a) market the Excluded Assets, the Non-Core Assets and the assets included in Permitted Asset Disposals, for sale, transfer, and conveyance, (b) provide information for third parties with respect thereto, and (c) sell, transfer and/or convey, and otherwise take acts with respect thereto that (but for this <u>Section 4.3</u> and <u>Section 4.6(e)</u>) would be a breach of this Agreement if not consented to by Purchaser.  In the event that EME executes a definitive agreement for the sale, transfer or conveyance of any Excluded Assets, Non-Core Assets or other assets included in a Permitted Asset Disposal, or to the extent that EME or any Acquired Company is required to sell, transfer or convey any assets as a result of any Order of a Governmental Authority in connection with the Chevron Litigation, such sale, transfer and conveyance shall have the effects provided for in this Agreement, such assets shall no longer be subject to the provisions of this Agreement and any Acquired Company sold, transferred or conveyed shall no longer be an "Acquired Company" for purposes of this Agreement. All liabilities of EME or any Acquired Company with respect to such Excluded Assets and Non-Core Assets or assets included in a Permitted Asset Disposal transferred to third party buyers and all Liabilities of any Acquired Company transferred to a third party as a result of any Order of a Governmental Authority in connection with the Chevron Litigation, whether by Law, Contract or otherwise, in connection with such transaction shall, pursuant to this Agreement, become "Excluded Liabilities."  In furtherance of the foregoing, each Party shall cooperate and execute such amendments or waivers to this Agreement and additional filings or amendments to filings with Governmental Authorities as are reasonably requested by the other Parties with respect to such sale, transfer or conveyance.

4.4    <u>Conduct of EME and the Acquired Companies</u>.  Except as otherwise agreed in writing by the Parties or as required with respect to EME or the Debtor Subsidiaries by an Order of the Bankruptcy Court, without the prior written consent of Purchaser (not to be unreasonably withheld, conditioned or delayed) and, if required, the authorization of the Bankruptcy Court (after notice and a hearing), from the date hereof until the earlier to occur of (x) the Closing or (y) the date this Agreement is terminated in accordance with its terms, EME shall not, and shall cause its Subsidiaries to not, except as required or expressly permitted pursuant to the terms hereof or as set forth on <u>Schedule 4.4</u>:

(a)    materially change the accounting, billing, cash management, inventory, and spare parts practices used by EME and its Subsidiaries (including with respect to the timing and frequency of collection of receivables and payment of payables) from present practices;

(b)    except as provided in <u>Section 4.8</u> or to the extent that such action in the aggregate would not require payment by Purchaser or any Acquired Company after the Closing in excess of $500,000, (i) make, revoke, or change any Tax election, (ii) amend any Tax return or file a claim for a Tax refund, (iii) settle or compromise any assessment or deficiency of Taxes, (iv) initiate or conclude any Tax administrative or judicial proceeding involving Taxes or (v) change any method of Tax accounting or any Tax policy;

(c)    except (x) as necessary to substantially mirror or replicate any Employee Benefit Plan (other than any "employee benefit pension plan" as defined in Section 3(2) or ERISA) that is intended to be qualified under Section 401(a) of the Code) sponsored and maintained by EIX or any Non-EME Subsidiaries under which  EME or any Acquired Company is required to cease participation effective as of January 1, 2014 (collectively, the "<u>Replicated Plans</u>"), (y) to the extent the same would be Excluded Liabilities, or (z) as set forth or permitted under <u>Section 9.6</u>, (i) increase the compensation or other benefits (including the granting of discretionary bonuses) payable or provided to directors, officers

or employees other than in the ordinary course consistent with past practice or required under the terms of any Employee Benefit Plan or applicable Law; (ii) enter into, adopt, amend modify (including acceleration of vesting), or terminate any bonus, profit sharing, incentive, compensation, severance, retention, termination, option, appreciation right, performance unit, stock equivalent, share purchase agreement, pension, retirement, deferred compensation, employment, or other employee benefit agreement, trust plan, fund or other arrangement for the compensation, benefit or welfare of any director, officer or employee in any manner, other than in the ordinary course consistent with past practice or required under the terms of any Employee Benefit Plan or applicable law; or (iii) enter into or amend any Collective Bargaining Agreement except as provided in Section 3.2(b);

(d)     except as permitted under Section 4.8, amend or otherwise make any changes to the Organizational Documents;

(e)     materially increase the VaR limits, notional limits or other risk limits;

(f)     waive, release, assign, settle or compromise any material Claims of EME or any of the Acquired Companies against a third party outside the ordinary course of business to the extent such Claim is a Target Asset hereunder or requires material payment by Purchaser or any Acquired Company after the Closing or materially impedes the operation of the Business after the Closing; provided, for the avoidance of doubt that nothing in this Section 4.4(f) shall limit the rights of EME or its Subsidiaries to bring, file, prosecute, waive, release, assign, settle or compromise any of the EIX Litigation Claims or any other Excluded Asset or Non-Core Asset to the extent such Non-Core Asset is sold, transferred or conveyed prior to the Closing Date in accordance with this Agreement and no such consent of Purchaser shall be required if the subject matter of the Claim is a commercially sensitive matter; or

(g)     cause any assets or Liabilities of the Homer City Debtors to be sold, transferred, assigned, conveyed or assumed by EME or any Acquired Company.

4.5     Assumed Contracts and Cure Amounts.

(a)     Not later than twenty (20) Business Days prior to the filing of the Plan Supplement, EME shall assemble and deliver to Purchaser a comprehensive list of all executory contracts, collective bargaining agreements, unexpired leases of real and personal property and other contracts which are assumable and assignable in connection with the Plan to which EME and the Debtor Subsidiaries that are Acquired Companies are party (the "Available Contracts"), together with proposed Cure Amounts ("Proposed Cure Amounts") related thereto (the "Available Contract List").

(b)     Contemporaneously with the delivery of the Available Contract List to Purchaser, EME shall provide notice (the "Available Contracts Notice") to all counterparties to the Available Contracts of (i) the Proposed Cure Amounts (if any), (ii) the identity of the party to which Available Contracts may be assumed and/or assigned, as applicable, (which shall be Purchaser in the case of Available Contracts to which EME is a party and the Acquired Company party thereto in the case of the other Available Contracts), (iii) the procedures for filing objections to the Proposed Cure Amounts, and (iv) the process by which related disputes will be resolved by the Bankruptcy Court. The Available Contracts Notice shall serve as notice of the potential assumption and/or assignment of the Available Contracts listed therein, along with the potential assignment of such Available Contracts to the assignees listed therein (where applicable), and the Proposed Cure Amounts. The deadline for non-Debtor counterparties to all Available Contracts to object to the Proposed Cure Amounts shall be on or before the date that is ten (10) Business Days prior to the Plan Confirmation Hearing (the "Cure Amount Objection Deadline").

(c)     Not later than ten (10) Business Days prior to the deadline for entities entitled to vote on the Plan to submit votes to accept or reject the Plan, Purchaser shall deliver to EME, and EME shall file promptly thereafter, (i) the list of Available Contracts that EME shall seek to assume and assign to Purchaser and that the Debtor Subsidiaries that are Acquired Companies shall seek to assume (the "Assumed Contracts," and the list related thereto, the "Assumed Contracts List"), in each case as part of the Schedule of Assumed Executory Contracts and Unexpired Leases (as defined in the Plan) and (ii) the list of Available Contracts that EME and the Debtor Subsidiaries that are Acquired Companies shall seek to reject (the "Rejected Contracts," and the list related thereto, the "Rejected Contracts List"), as part of the Schedule of Rejected Executory Contracts and Unexpired Leases (as defined in the Plan).  For the avoidance of doubt, the Assumed Contract List for the Acquired Companies shall include the Non-Rejectable Contracts and shall become incorporated into and shall be, and shall be deemed to be, included within the Schedule of Assumed Executory Contracts and Unexpired Leases (as defined in the Plan) for all purposes.  Any executory contract or unexpired lease that is not expressly listed on the Assumed Contracts List shall be deemed rejected unless and until the Purchaser Parties amend the Assumed Contracts List consistent with Section 4.5(e).

(d)     In the Plan and Confirmation Order, subject to the Bankruptcy Code, applicable Law and Bankruptcy Court approval, EME and the Debtor Subsidiaries shall seek authorization for:

(i)     EME to assume and assign to Purchaser the Assumed Contracts to which EME is party;

(ii)     the Debtor Subsidiaries that are Acquired Companies to assume the Assumed Contracts to which any Debtor Subsidiary that is an Acquired Company is party; and

(iii)     EME and the Debtor Subsidiaries that are Acquired Companies to reject the Rejected Contracts,

in each case pursuant to and in accordance with Section 365 of the Bankruptcy Code.

(e)     Purchaser shall have the right to amend the Assumed Contracts List at any time prior to the Confirmation Hearing to remove any Available Contract (other than the Non-Rejectable Contracts) from the Assumed Contracts List, and, without limiting the obligations of the Purchaser Parties hereunder and under the Plan with respect to Rejection Liabilities, any Available Contracts so removed shall be Excluded Assets for purposes of this Agreement and shall be included in the Excluded Asset Contribution and the Rejected Contracts List and the Schedule of Rejected Executory Contracts and Unexpired Leases (as defined in the Plan); provided that Purchaser may not remove any Non-Rejectable Contract from the Assumed Contracts List.  EME shall promptly amend the Schedule of Assumed Executory Contracts and Unexpired Leases (as defined in the Plan) to reflect the changes made by Purchaser to the Assumed Contracts List in accordance with this Section 4.5(e).

(f)     If any objection to the assumption or assignment of any Assumed Contracts or to any Cure Amount is timely filed, the Bankruptcy Court may hold a hearing with respect to such objection either at (i) the Confirmation Hearing, or (ii) at such other date as the Bankruptcy Court shall designate prior to the Closing Date (unless otherwise agreed by EME and Purchaser).  If any such objection relating to a Cure Amount is not resolved prior to Closing, the Purchaser Parties shall have the right to challenge such objection with the Bankruptcy Court and the Purchaser shall pay the amount as finally resolved by the Bankruptcy Court.

(g)     At or prior to the Closing, to the extent required by applicable Law, each of the Purchaser Parties shall provide adequate assurance of the future performance of each Assumed Contract.  Without limiting the generality of the foregoing, on the Plan Effective Date, as adequate assurance of

future performance under the PoJo Leases and Documents, unless otherwise agreed by the Purchaser Parties and the PoJo Parties, Purchaser shall deliver to each Owner Lessor a guarantee in substantially the form of the existing guarantee executed by EME in favor of such parties and shall execute a Tax indemnity agreement substantially in the form of the Tax indemnity agreement executed by EME as part of the PoJo Leases and Documents or, in each case, in a form otherwise agreed to by the Purchaser Parties and the PoJo Parties.

(h)     Purchaser shall, and Parent shall cause Purchaser to, on or prior to the assumption and assignment by EME to Purchaser or the assumption by any Acquired Company of any Assumed Contract and in any event not later than the Closing, cure any and all defaults under such Assumed Contract that are required to be cured under the Bankruptcy Code, so that such Contracts may be assumed and assigned by EME to Purchaser or assumed by any other Acquired Company, as applicable, in accordance with the provisions of Section 365 of the Bankruptcy Code; provided that, notwithstanding anything herein to the contrary, EME shall (or shall cause MWG to) pay (and Purchaser shall have no responsibility for payment of) the Agreed PoJo Cure Amount when required in accordance with the Plan.

4.6     Solicitation.

(a)     Notwithstanding any other provision of this Agreement to the contrary, during the period beginning on the date of this Agreement and continuing until the Solicitation Period End-Date, EME and its Related Persons shall have the right, directly or indirectly, to (i) solicit, initiate, facilitate or encourage any inquiries regarding, or the making of any proposal or offer that constitutes, an Acquisition Proposal, including by way of providing access to the directors, officers, employees, agents, properties, books and records of EME and its Subsidiaries and information and (ii) continue, enter into and maintain discussions or negotiations with respect to Acquisition Proposals or other proposals that could lead to Acquisition Proposals, or otherwise cooperate with or assist or participate in, or facilitate any such discussions or negotiations. For purposes of this Agreement, "Solicitation Period End-Date" means 11:59 p.m. (CST) on December 6, 2013. Purchaser shall not, and shall cause each of Affiliates not to, actively interfere with or prevent the participation of any Person, including any officer or director of EME or any of its Subsidiaries or other Target Companies and any bank, investment bank or other potential provider of debt or equity financing, in the making of any Acquisition Proposal or any negotiations or discussions permitted by this Section 4.6.

(b)     EME shall, and shall cause its Subsidiaries to, and shall use its reasonable best efforts to cause its Related Persons to, promptly after the Solicitation Period End-Date, cease any existing solicitations, discussions or negotiations with any Persons that may be ongoing with respect to any Acquisition Proposals or any proposal reasonably likely to result in an Acquisition Proposal and cause any physical or virtual data room to no longer be accessible to or by any Person. From the Solicitation Period End-Date until the earlier to occur of the Closing and the termination of this Agreement in accordance with its terms, EME and its Subsidiaries shall not, and EME shall use its reasonable best efforts to cause its Related Persons not to, directly or indirectly, (A) initiate, solicit or knowingly encourage, facilitate or assist any inquiries or the making of any proposal or offer that constitutes, or may reasonably be expected to lead to, an Acquisition Proposal, (B) engage in, continue or otherwise participate in any discussions or negotiations regarding any proposal or offer that constitutes, or may reasonably be expected to lead to, an Acquisition Proposal, or provide any non-public information or data to any Person relating to EME or any of its Subsidiaries, or afford to any Person access to the business, properties, assets or personnel of EME or any of its Subsidiaries, (C) except as otherwise provided in Section 4.6(d), enter into any other acquisition agreement, merger agreement or similar definitive agreement, letter of intent or agreement in principle with respect thereto or any other agreement relating to an Acquisition Proposal (an "Alternative Acquisition Agreement"), or (D) otherwise knowingly

facilitate any effort or attempt to make an Acquisition Proposal, other than, in each case, to request information from the Person making any such Acquisition Proposal for the sole purpose of EME's board of directors and Related Persons informing themselves about the Acquisition Proposal that has been made and the Person that made it or to notify any Person of EME's obligations under this Section 4.6.

(c)     From and after the date of this Agreement, EME shall provide the Purchaser, as promptly as reasonably practicable, and in no event later than two (2) Business Days after receipt thereof by EME or its Related Persons, a copy of each bona fide written Acquisition Proposal. Purchaser shall, and shall cause its Related Persons to, keep such Acquisition Proposal (and the terms thereof and identity of the proponent thereof) confidential in accordance with the Confidentiality Agreement.

(d)     Subject to the requirements of Section 4.6(b), prior to the time the Confirmation Order is entered, EME may terminate this Agreement pursuant to Section 7.1(c)(i) and enter into an Alternative Acquisition Agreement if EME receives one or more Acquisition Proposals that is a, or are, binding, written offer(s) capable of acceptance that EME, acting through its board of directors, concludes in good faith, after consultation with its independent financial advisors and outside legal counsel, individually or taken together, constitute(s) a Superior Proposal; provided that, in order to terminate this Agreement to enter into a definitive agreement with respect to such Acquisition Proposal(s) that, individually or in the aggregate, constitute a Superior Proposal:

(i)     EME, acting through its board of directors, must determine in good faith, after consultation with its independent financial advisors and outside legal counsel, that failure to do so would reasonably be expected to be inconsistent with the fiduciary duties of the board of directors of EME under applicable Law and EME shall not have breached its obligations under this Section 4.6 in any material respect;

(ii)     EME shall have provided prior written notice to Purchaser, at least five (5) Business Days in advance of such termination (such period, the "Notice Period"), advising Purchaser of the intention to terminate this Agreement pursuant to Section 7.1(c)(i) in favor of one or more of the Acquisition Proposals for which notice had been provided in accordance with Section 4.6(c);

(iii)     during the Notice Period, (i) EME shall have reviewed with Purchaser any changes to the terms and conditions of this Agreement or the Transaction proposed by Purchaser (or as to other proposals made by Purchaser) and with respect to which Purchaser has proposed to give irrevocable binding effect and (ii) not make public disclosure regarding any Acquisition Proposal(s) or seek Bankruptcy Court approval thereof; and

(iv)     the board of directors of EME shall have considered in good faith the changes to this Agreement and the Transaction offered by Purchaser (or other proposals made by Purchaser), and shall have concluded, after consultation with its independent financial advisor(s) and outside legal counsel that the Acquisition Proposal(s) constituting such Superior Proposal would continue to constitute a Superior Proposal even if such changes or other proposals in accordance with the immediately foregoing clause (iii) were to be given effect; provided that, if any material amendment or material revision is made to the Acquisition Proposal(s) that EME, acting through its board of directors, has determined to be a Superior Proposal, EME shall be required to deliver a new written notice to Purchaser with respect to each successive material amendment or material revision and to comply with the requirements of this Section 4.6 with respect to such new written notice, and the Notice Period shall recommence (except that, without limiting or amending the provisions of Section 4.6(b), the Notice Period shall be reduced from five (5) Business Days to two (2) Business Days).

(e)     Nothing contained in this Section 4.6 or otherwise in this Agreement shall be deemed to prohibit or restrict EME, its board of directors or any committee thereof or any of their respective Related Persons from (i) complying with its disclosure obligations under U.S. federal or state Law with regard to an Acquisition Proposal, (ii) complying with its disclosure obligations if, in the good faith judgment of the board of directors of EME, after consultation with outside legal counsel, failure to disclose would reasonably be expected to be inconsistent with its obligations under applicable Law, (iii) complying with its duties (including duties of candor and other fiduciary duties) to the Bankruptcy Court and to its stakeholders, (iv) waiving any "standstill" or "non-collusion" provision or other provision of any confidentiality agreement to which EME or any of its Subsidiaries is party to the extent that EME determines such waiver would assist in the making of an Acquisition Proposal, or (v) taking any other action otherwise prohibited or restricted by this Section 4.6 with any Person with respect to any of the Non-Core Assets, assets being sold as part of the Permitted Asset Disposals or the Excluded Assets or any assets that EME or any Subsidiary is required to sell, transfer or convey as a result of any Order of a Governmental Authority in connection with the Chevron Litigation.

4.7     HSR; Antitrust Laws; Governmental Approvals; Actions In Connection with Receipt of Certain Governmental Approvals.

(a)     Each Party hereto agrees to use reasonable best efforts to prepare and file, as promptly as reasonably practicable (and in any event within ten (10) Business Days after the date hereof; provided that if the applicable Governmental Authorities are not open on such date, the filings shall be made on the first Business Day such Governmental Authorities are open for business to accept such filings thereafter), all filings (or portion thereof that such Party is responsible for) necessary or desirable to obtain the Governmental Approvals (including filing of a Notification and Report Form pursuant to the HSR Act and making other required filings pursuant to other Antitrust Laws and the filings and applications required by FERC as described on Schedule 5.2(b) (the "FERC Filings")) and the Purchaser Parties shall bear the cost of all such filing fees.  Each Party shall supply as promptly as reasonably practicable any additional information and documentary material that may be requested pursuant to or in connection with the HSR Act, the FERC Filings or otherwise in connection with the Governmental Approvals and shall use reasonable best efforts to take and diligently pursue such actions as may be required by Governmental Authorities as a condition to securing the Governmental Approvals as soon as reasonably practicable.  Without limiting the generality of the foregoing, each of EME and Purchaser shall hold separate or divest all such assets of EME or Purchaser, as applicable, and shall take such other actions as may be necessary to obtain the agreement or consent of any Governmental Authority to the Transactions, in each case, on such terms as may be required by such Government Entity, subject to Section 4.7(e) of this Agreement.  The Parties shall work together in good faith to cause the EMRA Approval to be granted prior to Closing, but in the event that the EMRA Approval is not obtained prior to the Closing Date, such interests requiring approval for transfer shall not be transferred at Closing but shall be transferred as soon as practicable upon receipt of the EMRA Approval.

(b)     Subject to all applicable confidentiality requirements and all applicable Laws, the Parties shall, in connection with the efforts referenced in this Section 4.7 to obtain all requisite approvals and authorizations for the transactions contemplated by this Agreement, use its reasonable best efforts to (i) cooperate in all respects with each other in connection with any filing or submission and in connection with any investigation or other inquiry, including any Legal Proceeding initiated by a private party; (ii) keep the other Parties reasonably informed of any communication received by such Party from, or given by such Party to any applicable U.S. or foreign Governmental Authority (in each case to the extent permitted by such Governmental Authority), and of any communication received or given in connection with any Legal Proceeding by a private party, in each case regarding any of the transactions contemplated hereby and thereby; (iii) permit the other Parties a reasonable opportunity to review (except with regard to personal-identifying information) any communication before providing it to a Governmental Authority;

19

and (iv) consult with each other in advance of any meeting or conference with, any such Governmental Authority or, in connection with any Legal Proceeding with any other Person, and to the extent permitted by such applicable Governmental Authority or other Person, give the other Parties the opportunity to have a representative attend and participate in such meetings and conferences; provided, however, that a Party hereto may request entry into a joint defense agreement as a condition to providing any such materials and that, upon receipt of that request, the Parties shall work in good faith to enter into a joint defense agreement to create and preserve attorney client privilege in a form and substance mutually acceptable to the Parties as promptly as practicable.

(c)     If any objections are asserted, concerns are raised, or any suit is instituted (including by a private party) with respect to the transactions contemplated hereby in connection with the approvals referenced in <u>Section 4.7(a)</u>, each Party shall use reasonable best efforts to resolve such objections, concerns or challenges as such Governmental Authority or private party may have to such transactions, including to vacate, lift, reverse or overturn any Order, whether temporary, preliminary or permanent, so as to permit consummation of the transactions contemplated by this Agreement as promptly as practicable and shall otherwise use reasonable best efforts to obtain the Governmental Approvals.

(d)     Each Purchaser Party further agrees that, prior to the Closing Date, it and its Affiliates will not enter into any other contract or agreement to acquire or market or control the output of, nor acquire or market or control the output of, electric generation facilities or uncommitted generation capacity, if the proposed acquisition or the ability to market or control output of such additional electric generation facilities or uncommitted generation capacity could reasonably be expected to increase the market power attributable to such Purchaser Party and its Affiliates in a manner materially adverse to approval of the Transaction or which would otherwise prevent or materially interfere with or materially delay the consummation of the Transaction.

(e)     Notwithstanding anything to the contrary contained in this <u>Section 4.7</u>, neither EME nor either Purchaser Party shall be required to sell or hold separate and neither EME nor either Purchaser Party shall (without the consent of the other) sell or hold separate any of its businesses, products and assets to the extent such results in an EME Material Adverse Effect or a material adverse effect on the Parent and its Subsidiaries, taken as a whole.

(f)     In the event that this Agreement is terminated in accordance with <u>Article 7</u>, the Parties shall use reasonable best efforts to withdraw promptly all pending filings with respect to the Governmental Approvals.

4.8     <u>Pre-Closing Reorganizations</u>.  Prior to the Closing Date and upon no less than ten (10) Business Days' notice to Purchaser regarding the same, EME, any of its Subsidiaries and any of their respective Affiliates may, and may permit any Subsidiary to, make such other organizational and structural changes and enter into such transactions with any other Subsidiary or Affiliate of EME, in each case, as may be reasonably required or desirable to consummate or expedite the transactions contemplated by this Agreement, a Tax Attributes Agreement, if any, or the Plan, or to satisfy the requirements of applicable Law, including conversion or merger of corporations to or with limited liability companies or limited partnerships, transferring assets of the Subsidiaries to newly-formed entities, making particular Tax elections, and/or incorporating new entities and making contributions in exchange for share capital thereof (the "<u>Pre-Closing Reorganizations</u>"); <u>provided</u> that EME and its Subsidiaries (i) shall use reasonable best efforts to minimize Taxes and other Liabilities to the extent payable as a result of any Pre-Closing Reorganizations and (ii) may not implement the Pre-Closing Reorganizations without the prior written consent of Purchaser to the extent that such Pre-Closing Reorganizations will result in Taxes or

other Liabilities in excess of $500,000 for which EME is not responsible.  Except as provided in Section 9.5(c), EME shall bear all Taxes and other costs related to the Pre-Closing Reorganizations.

4.9     Casualty Loss.  Except as otherwise provided in this Section 4.9, from the date of this Agreement through the Closing, all risk of loss or damage to the property of EME and the Acquired Companies shall be borne as provided in this Section 4.9.  If during the period from the date of this Agreement through the Closing, any property or asset of EME or any of the Acquired Companies suffers any damage, destruction, or unavailability or unsuitability for the intended purpose by fire, weather conditions, or other casualty (each such event, an "Event of Loss"), or are taken by a Governmental Authority by exercise of the power of eminent domain (each, a "Taking"), then the following provisions of this Section 4.9 shall apply:

(a)     If the sum of all Restoration Costs and Condemnation Value, in the aggregate, is less than or equal to ten percent (10%) of the Stipulated Transaction Value, the Event of Loss or Taking shall have no effect on the transactions contemplated hereby (e.g., there shall be no adjustment to the Base Purchase Price or delay in the Closing).

(b)     Without limiting any applicable termination rights of the Parties hereunder, upon the occurrence of any one or more Events of Loss and/or Takings involving aggregate Restoration Costs and Condemnation Value in excess of ten percent (10%) of the Stipulated Transaction Value (a "Major Loss"), EME shall, as soon as is practicable, provide written notice of such Major Loss.  Purchaser shall have, in the case of a Major Loss relating to one or more Events of Loss, the option, exercised by notice to EME, to direct EME to restore, repair or replace, or to direct EME to cause the applicable Acquired Company to restore, repair or replace, the damaged property or assets prior to Closing to a condition reasonably comparable to their prior condition or to exercise its rights under Section 4.9(c).  If Purchaser elects to have such property or assets so restored, repaired or replaced, which election shall be made by notice to EME prior to the Closing Date and as soon as practicable following receipt of notice of the Major Loss, EME will complete or cause to be completed the repair, replacement or restoration of the damaged property or assets prior to the Closing and the Closing Date shall be postponed for the amount of time reasonably necessary to complete the restoration, repair or replacement of such property or assets as reasonably agreed among Purchaser and EME (including, if necessary, the extension of the Termination Date for a period not to exceed sixty (60) days to allow for the restoration, repair or replacement of such property or assets); provided that EME shall have no responsibility to cause such repair, replacement or restoration unless the costs thereof are covered by insurance or Purchaser.  If Purchaser elects not to cause the restoration, repair or replacement of the property or assets affected by a Major Loss, or such Major Loss is the result in whole or in part of one or more Takings or is otherwise not capable of being restored, repaired or replaced, the provisions of Section 4.9(c) will apply.

(c)     In the event that Purchaser provides written notice to EME that it has elected not to request the restoration, repair or replacement of a Major Loss, or in the event that EME fails to complete the restoration, repair or replacement within the period of time agreed upon by the Parties pursuant to Section 4.9(b), or in the event that a Major Loss is the result in whole or in part of one or more Takings or is otherwise not capable of being restored, repaired or replaced, then, if the Closing occurs, the Adjusted Base Purchase Price shall be adjusted in accordance with Section 1.2 to provide Purchaser the benefit of any Excess Loss Amount.

4.10     Registration and Listing of Parent Common Stock.

(a)     As promptly as reasonably practicable (but in any event not later than the fifth (5th) Business Day) following the date of this Agreement, Parent shall prepare and file with the SEC a registration statement on Form S-1 to be filed with the SEC by Parent in connection with the offering and

issuance of Parent Common Stock at the Closing and the distribution of the Parent Common Stock (including the prospectus used in connection therewith and any amendments or supplements to such registration statement and such prospectus, the "Form S-1"). None of the information provided by Parent or its Subsidiaries (other than, for the avoidance of doubt, the portion thereof based on information supplied by EME for inclusion or incorporation by reference therein, with respect to which no representation is made by Parent or any of its Subsidiaries) for inclusion or incorporation by reference in the Form S-1 will, at the time the Form S-1 becomes effective under the Securities Act, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading. The Form S-1 (other than the portion thereof based on information supplied by EME for inclusion or incorporation by reference therein, with respect to which no representation is made by Parent or any of its Subsidiaries) will comply as to form in all material respects with the requirements of the Securities Act and the rules and regulations promulgated thereunder. Parent shall use reasonable best efforts to cause the SEC to declare the Form S-1 effective under the Securities Act as promptly as reasonably practicable after such filing (and in any event not later than the Plan Effective Date) and shall take such actions as necessary (including by the filing of such amendments or supplements thereto) to keep the Form S-1 effective and compliant with the Securities Act with respect to the disposition of all Parent Common Stock covered by the Form S-1 until at least the thirtieth (30th) day after the Plan Effective Date and shall take such other actions as is necessary to ensure that the Parent Common Stock will be, when issued and for such thirty (30) day period, unrestricted and freely transferable. Parent shall also take any action required to be taken under any applicable state securities Laws in connection with the issuance and reservation of shares of Parent Common Stock at the Closing.

(b)     No filing of, or amendment or supplement to, the Form S-1 and no responses to any oral or written request by the SEC with respect to the Form S-1, will be made by Parent, without providing EME (and its Related Persons) a reasonable opportunity to review and comment thereon (and Parent shall consider all such comments in good faith). Parent will advise EME promptly after it receives oral or written notice of the time when the Form S-1 has become effective or any supplement or amendment has been filed, the issuance of any stop order, the suspension of the qualification of the Parent Common Stock issuable in connection with the Transactions for offering or sale in any jurisdiction, or any oral or written request by the SEC with respect to the Form S-1 or comments thereon or requests by the SEC for additional information, and will promptly provide EME with copies of any written communication from the SEC or any state securities commission and will use reasonable best efforts to promptly respond to any such request or comments by the SEC (subject to this Section 4.10(b)). If at any time prior to the Effective Time any information relating to Parent or EME, or any of their respective Affiliates, officers or directors, is discovered by Purchaser, Parent or EME which should be set forth in an amendment or supplement to any of the Form S-1, so that any of such documents would not include any misstatement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, the party which discovers such information shall promptly notify the other parties hereto and an appropriate amendment or supplement describing such information shall be promptly filed with the SEC.

(c)     Parent shall, at all times from and after the date hereof, reserve out of its authorized, but unissued, shares of capital stock a sufficient number of shares of Parent Common Stock for the issuance of the Stock Purchase Price at the Closing. Parent shall cause all shares of Parent Common Stock when issued to be (i) duly authorized, validly issued, fully paid and non-assessable, (ii) issued free and clear of all Liens and preemptive rights, and (iii) unrestricted and freely transferable, and shall take any actions necessary so that no rights under any rights plan or state takeover Law or similar arrangement or Law shall be triggered by the issuance or distribution of the Parent Common Stock hereunder and in accordance with the Plan.

(d)     Parent shall cause the Parent Common Stock being issued as the Stock Purchase Price to be approved for listing on the New York Stock Exchange, subject to official notice of issuance, on the Plan Effective Date.

4.11     <u>Retained Chapter 5 Causes of Action</u>.

(a)     Not later than the date on which a motion seeking approval of the Disclosure Statement is filed with the Bankruptcy Court, EME shall assemble and deliver to Purchaser a comprehensive list of all Persons which EME intends to include in the Plan Supplement as provided in <u>Section 1.5(k)</u>.

(b)     Purchaser shall notify EME no less than fifteen (15) Business Days prior to the deadline for entities entitled to vote on the Plan to submit votes to accept or reject the Plan if Purchaser does not consent to the inclusion of any Person that would otherwise be identified in the Plan Supplement as provided in <u>Section 1.5(k)</u>.

4.12     <u>Updates on Available Cash</u>.  From time to time after the date hereof, after the reasonable request of the Purchaser, EME shall provide Purchaser with an update on the amount of Cash as of a recent date that is unrestricted cash or cash equivalents of EME and its Wholly-Owned Subsidiaries that is not subject to restrictions on dividend or distribution (whether under Law, Contract or otherwise).  To the extent permitted by Law, the Plan, the Confirmation Order and the terms of Contracts to which EME and its Wholly-Owned Subsidiaries, nothing herein shall limit Purchaser's right to use, from and after the Closing, such unrestricted cash to the extent included in Closing Cash; <u>provided</u> that nothing herein shall be construed to require that there be a minimum amount of such unrestricted cash included in Closing Cash or to otherwise limit the Purchaser Parties' representations, warranties, covenants or agreements hereunder.


ARTICLE 5
REPRESENTATIONS AND WARRANTIES OF EME

EME hereby represents and warrants to Purchaser that, as of the date of this Agreement and except in all cases as Deemed Disclosed or as set forth in the Schedules:

5.1     <u>Organization and Corporate Power</u>.  EME is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware.  EME is qualified to do business in each jurisdiction in which the failure to so qualify would have an EME Material Adverse Effect. Subject to any necessary authority from the Bankruptcy Court, EME has all requisite corporate power and authority necessary to own and operate its properties and to carry on its business as now conducted, and, subject to the Bankruptcy Court's entry of the PSA Order and the Confirmation Order and the receipt of the Governmental Approvals set forth in <u>Schedule 5.2(b)</u>, to enter into this Agreement and consummate the transactions contemplated hereby.

5.2     <u>Authorization; No Breach</u>.

(a)     This Agreement has been duly executed and delivered by EME and, subject to the Bankruptcy Court's entry of the PSA Order and the Confirmation Order, constitutes a valid and binding obligation of EME, enforceable in accordance with its terms, except as limited by the application of the Remedies Exceptions.  Subject to the Bankruptcy Court's entry of the PSA Order and the Confirmation Order, each Ancillary Agreement to which EME or any Subsidiary is a party, when executed and delivered by EME or such Subsidiary, shall have been duly executed and delivered by EME

or such Subsidiary, and shall constitute a valid and binding obligation of EME or such Subsidiary, enforceable in accordance with its terms, except as limited by the application of the Remedies Exceptions.

(b)     Assuming receipt of the Governmental Approvals set forth on <u>Schedule 5.2(b)</u> and the Bankruptcy Court's entry of the PSA Order and the Confirmation Order, EME's execution, delivery and performance of this Agreement and EME's and the other Subsidiary's execution, delivery and performance of each Ancillary Agreement to which EME and/or any other Subsidiary is a party, and the consummation of the transactions contemplated hereby and thereby, will not, except as set forth on <u>Schedule 5.2(b)</u>:

(i)     violate or conflict with any provision of the certificate of organization or incorporation, as applicable, or the bylaws or operating agreements (or equivalent organizational documents) (collectively, the "<u>Organizational Documents</u>") of EME and/or any Subsidiary;

(ii)     violate, result in any material breach of, or constitute (with or without due notice or lapse of time or both) a default under any material power purchase agreement, material long-term fuel supply agreement, material transportation agreement, material turbine and major equipment service agreement, or project finance credit agreement to which EME and/or Subsidiary is a party;

(iii)     violate, result in any material breach of, or constitute (with or without due notice or lapse of time or both) a default under any other Contract to which EME and/or any Subsidiary is a party, other than any violation, breach or default as would not reasonably be expected to have an EME Material Adverse Effect; or

(iv)     violate any Law or Order applicable to EME and/or any Subsidiary;

except in each case as would be cured, remedied or discharged without any Liability to Purchaser or the Wholly-Owned Companies and the Partially Owned Companies that are Subsidiaries (except as contemplated by the terms of this Agreement), pursuant to the Plan, the PSA Order or the Confirmation Order, and subject to the assumption and rejection process set forth in <u>Section 4.5</u> with regard to Available Contracts.

5.3     <u>Board Approvals</u>.   The board of directors of EME, by resolutions duly adopted at a meeting duly called and held, has approved the transactions contemplated by this Agreement and by the Ancillary Agreements, including the Transaction, and has declared the advisability of the Transaction and approved this Agreement and the Ancillary Agreements.  Subject to the Bankruptcy Court's entry of the PSA Order and the Confirmation Order, no approval of the shareholder of EME nor any other corporate approvals are required for EME, and no other corporate proceedings on the part of EME are necessary, to authorize, execute or deliver this Agreement or the Ancillary Agreements or consummate the transactions contemplated hereby or thereby.

5.4     <u>Representations and Warranties Regarding the Acquired Companies</u>.

(a)     <u>Organization; Good Standing; Qualification</u>.   Except as set forth on <u>Schedule 5.4(a)</u>, each of the Acquired Companies is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization or formation.  Each of the Acquired Companies is qualified to do business in each jurisdiction in which the failure to so qualify would have an EME Material Adverse Effect.  Subject to any necessary authority from the Bankruptcy Court, each of the Wholly-Owned Companies and the Partially-Owned Companies that are Subsidiaries, and, to the Knowledge of EME, the other Partially-Owned Companies that are not Subsidiaries of EME has all requisite corporate power and authority necessary to own and operate its properties and to carry on its business as now conducted.

(b)     Capitalization.   The Wholly-Owned Equity Interests and the Partially-Owned Equity Interests of Subsidiaries of EME have been, and to the Knowledge of EME, the other Partially-Owned Equity Interests of Persons that are not Subsidiaries of EME have been, validly issued and are fully paid and non-assessable.  All of the Wholly-Owned Equity Interests and the Partially-Owned Equity Interests of Subsidiaries of EME have been, and to the Knowledge of EME, the other Partially-Owned Equity Interests of Persons that are not Subsidiaries of EME have been, duly authorized and were not issued in violation of any preemptive rights.  Except as set forth on Schedule 5.4(b) (to the extent applicable), there are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights, preemptive rights or similar rights with respect to the Wholly-Owned Equity Interests or the Partially-Owned Equity Interests of Subsidiaries of EME or, to the Knowledge of EME, the other Partially-Owned Equity Interests of Persons that are not Subsidiaries of EME.

(c)     Authorization, etc.     Subject to the Bankruptcy Court's entry of the PSA Order and the Confirmation Order, each Ancillary Agreement to which a Partially-Owned Company that is not a Subsidiary of EME is a party, when executed and delivered by such Partially-Owned Company, shall, to the Knowledge of EME, have been duly executed and delivered by such Partially-Owned Company and shall constitute a valid and binding obligation of such Partially-Owned Company, enforceable in accordance with its terms, except as limited by the application of the Remedies Exceptions.

(d)     No Conflicts.     Assuming receipt of the Governmental Approvals set forth on Schedule 5.2(b) and the Bankruptcy Court's entry of the PSA Order and the Confirmation Order, the execution, delivery and performance of this Agreement by any Partially-Owned Company that is not a Subsidiary of EME and such Partially-Owned Company's  execution, delivery and performance of each Ancillary Agreement to which it is a party, and the consummation of the transactions contemplated hereby and thereby, will not, to the Knowledge of EME and except as set forth on Schedule 5.4(d):

(i)     violate or conflict with any provision of the Organizational Documents of such Partially-Owned Company;

(i)     violate, result in any material breach of, or constitute (with or without due notice or lapse of time or both) a default under any material power purchase agreement, material long-term fuel supply agreement, material transportation agreement, material turbine and major equipment service agreement or project finance credit agreement to which such Partially-Owned Company is a party;

(ii)     violate, result in any material breach of, or constitute (with or without due notice or lapse of time or both) a default under any other Contract to which such Partially-Owned Company is a party, other than any violation, breach or default as would not reasonably be expected to have an EME Material Adverse Effect; or

(iii)     violate any Law or Order applicable to any Partially-Owned Company;

except in each case as would be cured, remedied or discharged without any Liability to Purchaser or the Partially Owned Companies that are not Subsidiaries of EME (except as contemplated by the terms of this Agreement), pursuant to the Plan, the PSA Order or the Confirmation Order, and subject to the assumption and rejection process set forth in Section 4.5 with regard to Available Contracts.

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES OF PURCHASER PARTIES

As an inducement to EME to enter into this Agreement, the Purchaser Parties hereby represents and warrants that as of the date of this Agreement and, except as previously disclosed to EME in writing:

6.1    Organization and Corporate Power.    Each of Purchaser and Parent is a corporation, validly existing and in good standing under the Laws of Delaware and is qualified to do business in each jurisdiction in which the failure to so qualify would have a material adverse effect on Purchaser and its Subsidiaries, taken as a whole.    Each of Purchaser and Parent has all requisite corporate or other organizational power and authority necessary to own, lease and operate its properties and assets and to carry on its business as now conducted and to enter into this Agreement and consummate the transactions contemplated hereby.

6.2    Authorization; No Breach.

(a)    This Agreement has been duly executed and delivered by the Purchaser Parties and constitutes a valid and binding obligation of the Purchaser Parties, enforceable in accordance with its terms, except as limited by the application of the Remedies Exceptions. Each Ancillary Agreement to which any Purchaser Party is a party, when executed and delivered by such Purchaser Party, shall constitute a valid and binding obligation of Purchaser, enforceable in accordance with its terms, except as limited by the application of the Remedies Exceptions.

(b)    Assuming receipt of the Governmental Approvals set forth on Schedule 6.2(b), Purchaser Parties' execution, delivery and performance of this Agreement and the Ancillary Agreements to which such Purchaser Party is a party, and the consummation of the transactions contemplated hereby and thereby, will not: (i) violate or conflict with any provision of the Organizational Documents of Purchaser or Parent, (ii) violate, result in any material breach of, constitute (with or without due notice or lapse of time or both) a default under any material Contract to which a Purchaser Party is a party, by which it is bound or to which any of its properties or assets is subject, other than any violation, breach or default as would not reasonably be expected to have a material adverse effect on Purchaser and its Subsidiaries, taken as a whole; or (iii) violate any Law or any Order applicable to such Purchaser Party.

6.3    Board and Shareholder Approvals.    The board of directors of Parent and Purchaser, by resolutions duly adopted, has approved the transactions contemplated by this Agreement and by the Ancillary Agreements, including the Transaction, has unanimously declared the advisability of the Transaction and approved this Agreement and the Ancillary Agreements.    No approval of the shareholders of the Parent nor any other corporate approvals are required for the Purchaser Parties, and no other corporate proceedings on the part of the Purchaser Parties are necessary, to authorize, execute or deliver this Agreement or the Ancillary Agreements or consummate the transactions contemplated hereby or thereby.

6.4    Certain Arrangements.    As of the date hereof, other than the Plan Sponsor Agreement, the Restructuring Support Agreement dated October 2, 2013 and the associated term sheets (which is being superseded and terminated in its entirety by the Plan Sponsor Agreement), any non-disclosure agreements with the parties to the Plan Sponsor Agreement (which are being superseded and terminated in their entirety by the Plan Sponsor Agreement), and Parent's arrangements with Barclay's and Deutsche Bank in connection with this Transaction, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between a Purchaser Party or any of its Affiliates or any of its or their Related Persons, on the one hand, and any member of the management of EME or any of the Acquired Companies or the board or directors of EME, any holder of equity or debt securities of EME or the

Acquired Companies, or any lender or creditor of EME or the Acquired Companies, on the other hand, (a) relating in any way to the acquisition of the Target Holdings or the transactions contemplated by this Agreement or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of EME to entertain, negotiate or participate in any Acquisition Proposal.

6.5     Financing; Availability of Funds.   On the date hereof, Parent, on a consolidated basis, has, and at all times after the date hereof will have (and will cause Purchaser to have at Closing) sufficient cash on hand and available undrawn commitments under the credit facilities to which Parent is party listed on Schedule 6.5 (the "Available Credit Facilities") in order to consummate the transactions contemplated by this Agreement and to perform its obligations hereunder (including the payment of all amounts hereunder when required) and no such undrawn commitments under the Available Credit Facilities are scheduled to terminate before the Termination Date.   True and correct copies of the Available Credit Facilities have been made available to EME.   Drawdowns under the Available Credit Facilities are not subject to any conditions other than as set forth in the Available Credit Facilities and, as of the date hereof, Parent reasonably believes that all conditions to drawdown under the Available Credit Facilities, to the extent within Parent's or its Affiliates' control, will be satisfied when required in order to allow the Purchaser Parties to satisfy their obligations when required hereunder. Immediately after giving effect to the transactions contemplated hereby, each of the Purchaser Parties will be able to pay its and, cause the Acquired Companies' to pay their, debts as they become due and the fair saleable value of the assets of the Purchaser Parties and the Acquired Companies, taken as a whole, will exceed the liabilities (including contingent liabilities) of the Purchaser Parties and the Acquired Companies, taken as a whole. Immediately after giving effect to the transactions contemplated hereby, each of the Purchaser Parties will have adequate capital to carry on its businesses.

6.6     Investment Experience; Information.   Purchaser is an "accredited investor" within the meaning of the Securities Act and acknowledges that it can bear the economic risk of its investment in the Purchased Interests, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Target Assets and the Acquired Companies on the terms contemplated hereby.

6.7     Adequate Assurance of Future Performance.   Purchaser has provided and/or Parent will cause Purchaser to be able to provide, at or prior to the Closing Date, adequate assurance of its future performance under each Assumed Contract to the parties thereto (other than EME or its Affiliates, as applicable) in satisfaction of Section 365(f)(2)(B) of the Bankruptcy Code.

6.8     Status of Purchaser.   100% of the issued and outstanding capital stock of Purchaser is (and at Closing will be) owned by NRG Acquisition Holdings Inc., a Delaware corporation and 100% of the issued and outstanding capital stock of NRG Acquisition Holdings Inc. is (and at Closing will be) owned by Parent.   Parent is not in control of Purchaser for purposes of Section 368 of the Code.

ARTICLE 7
TERMINATION

7.1     Termination.   Notwithstanding anything to the contrary contained herein, except for a termination pursuant to Section 7.1(a)(i), this Agreement may be terminated only by written notice to the other Parties when permitted in this Article 7.   As part of any such termination notice, the terminating Party shall specify the provision pursuant to which the Agreement is being terminated.

(a)     Mutual Termination Right.   This Agreement may be terminated at any time prior to Closing as follows:

(i)      by mutual written consent of each of EME, on the one hand, and the Purchaser Parties, on the other hand;

(ii)      by the Purchaser Parties or EME:

(1)      on or after April 1, 2014, unless prior to such termination, the Confirmation Order has been entered by the Bankruptcy Court;

(2)      on or after the first (1st) Business Day following the date on which the Bankruptcy Court enters an order denying the confirmation of the Plan;

(3)      on or after the first (1st) Business Day following the Termination Date;

(4)      if any Governmental Authority shall (x) enter a Final Order denying, or otherwise deny in any final and non-appealable manner, any Governmental Approval or (y) enter a Final Order enjoining or declaring illegal the consummation of the transactions contemplated hereby;

(5)      on any date after the Bankruptcy Court, upon motion thereof in accordance with Section 9.4(b) hereof, (i) makes a determination that the Cure Amounts under the PoJo Leases and Documents is greater than the Agreed PoJo Cure Amount, (ii) fails to approve the modifications to the PoJo Leases and Documents set forth in Section 9.4(b) or alternative terms agreed to in writing by the Parties, or (iii) fails to grant any other relief necessary to effectuate the terms and conditions with respect to the PoJo Leases and Documents contemplated hereby or alternative terms and conditions agreed to in writing by the Parties;

(6)      upon termination of the Plan Support Agreement pursuant to Section 21 thereof; or

(7)      on any date after one of the conditions precedent to either Party's obligations under Article 3 shall have become impossible of fulfillment unless, prior to such termination the Party or Parties entitled to waive the applicable condition precedent has or have, as applicable, irrevocably waived such condition in writing.

Notwithstanding the foregoing, no right of termination shall be available to any Party pursuant to Section 7.1(a)(ii) if the right to terminate arises from such Party's material breach of this Agreement.

(b)      <u>Termination by the Purchaser Parties</u>.  This Agreement may be terminated by the Purchaser Parties prior to Closing as follows:

(i)      after the date hereof, unless prior to such termination, EME has filed a motion seeking entry of the PSA Order and seeking an expedited hearing on such motion to occur on or before October 25, 2013;

(ii)     on or after November 8, 2013, unless prior to such termination, the PSA Order has been entered by the Bankruptcy Court;

(iii)     on or after November 16, 2013, unless prior to such termination, EME has filed the Plan, the Disclosure Statement and a motion seeking entry of the Confirmation Order and the Disclosure Statement Order;

(iv)     on or after December 20, 2013, unless prior to such termination, the Bankruptcy Court has entered the Disclosure Statement Order;

(v)     after such date as the Bankruptcy Court approves a plan of reorganization for EME and the Debtor Subsidiaries that does not provide for approval of the Transaction;

(vi)     after such date as EME or any Subsidiary has entered into one or more definitive agreements or sought Bankruptcy Court approval to sell, convey or otherwise transfer any asset(s) for consideration in excess of $25,000,000 individually or $50,000,000 in the aggregate outside of the ordinary course of business and other than as part of a Permitted Asset Disposal or the sale of an Excluded Asset or Non-Core Asset or the sale, transfer or conveyance of any assets by EME or any Subsidiary as a result of any Order of a Governmental Authority in connection with the Chevron Litigation;

(vii)     after such date as the Bankruptcy Court has entered an Order authorizing the rejection of the PoJo Leases and Documents; and

(viii)     if there has been one or more violations or breaches by EME of any covenant or agreement of EME contained in this Agreement and (a) such violation or breach has not been waived by the Purchaser Parties and (b) such violation or breach is not capable of being cured (and the Parties acknowledge and agree that failure to consummate the Transaction when required shall not be deemed not capable of being cured) or, if capable of being cured, shall not have been cured prior to the earlier of (x) the Termination Date and (y) 20 Business Days after written notice of such violation or breach from Purchaser to EME; provided that the right of termination pursuant to this Section 7.1(b)(ix) shall not be available to the Purchaser Parties (x) unless the Purchaser Parties have delivered written notice to EME of such breach or violation within 15 calendar days of the later of (A) its alleged occurrence or (B) the date on which the Purchaser Parties become aware thereof (and, in which case, the alleged breach or violation shall be deemed waived) or (y) at any time that the Purchaser Parties have violated or is in breach of any covenant or agreement hereunder if such breach has prevented satisfaction of any of EME's conditions to Closing hereunder and has not been waived by EME or, if capable of being cured, has not been cured by the Purchaser Parties.

Notwithstanding the foregoing, no right of termination shall be available to Purchaser pursuant to clauses (ii), (iii) or (iv) of this Section 7.1(b) if the right to terminate arises from Purchaser's material breach of this Agreement.

(c)     Termination by EME.  This Agreement may be terminated by EME at any time before Closing:

(i)     at any time prior to entry of the Confirmation Order, if EME, acting through its board of directors, determines that there is a Superior Proposal (as long as EME is not then in breach of its obligations under Section 4.6); or

(ii)     if there has been one or more violations or breaches by the Purchaser Parties of any covenant or agreement of the Purchaser Parties contained in this Agreement and (a) such violation or breach has not been waived by EME and (b) such violation or breach is not capable of being cured (and the Parties acknowledge and agree that failure to consummate the Transaction when required shall not be deemed not capable of being cured) or, if capable of being cured, shall not have been cured prior to the earlier of (x) the Termination Date and (y) 20 Business Days after written notice of such violation or breach from EME to the Purchaser Parties; provided that the right of termination pursuant to this Section 7.1(c)(ii) shall not be available to EME (x) unless it has delivered written notice to the Purchaser Parties of such breach or violation within 15 calendar days of the later of its alleged occurrence or the date EME becomes aware thereof (and, in which case, the alleged breach or violation shall be deemed waived) or (y) at any time that EME has violated or is in breach of any covenant or agreement hereunder if such breach has prevented satisfaction of any of Purchaser's conditions to Closing hereunder and has not been waived by the Purchaser Parties or, if capable of cure, has not been cured by EME.

7.2     Effect of Termination.

(a)     Effect of Termination.  If this Agreement is validly terminated pursuant to Section 7.1, then this Agreement shall be null and void and have no further legal effect (except for this Section 7.2, Section 4.7(f), Section 9.3, Section 9.8, Section 9.17 and Article 10 (each, a "Surviving Provision"), each of which shall survive termination), and none of Purchaser, Parent, EME, or any of their respective Related Persons shall have any liability or obligation arising under or in connection with this Agreement; provided that no such termination shall affect or limit any rights or remedies of (i) the Purchaser Parties against EME for the Break-Up and Expense Reimbursement as and when provided in Section 7.2(b), (ii) EME against the Purchaser Parties for Losses suffered from any breach by the Purchaser Parties arising prior to such termination or (iii) the Purchaser Parties or EME for breach of a Surviving Provision after termination.  Notwithstanding anything to the contrary contained herein, if the Bankruptcy Court denies EME's motion for entry of the PSA Order, this Agreement shall automatically terminate and be of no further force or effect without liability to any Party hereto.

(b)     Break-Up Fee; Expense Reimbursement.  If, and only if, this Agreement is terminated by the Purchaser Parties pursuant to Section 7.1(a)(i)(6), Section 7.1(b)(v), Section 7.1(b)(vi), or Section 7.1(b)(viii) or EME pursuant to Section 7.1(a)(ii)(1), Section 7.1(a)(ii)(6) or Section 7.1(c)(i) then EME shall pay to Purchaser, as and when required by this Section 7.2(b), by wire transfer of immediately available funds, a cash fee equal to the sum of (x) $65,000,000 (the "Break-Up Fee"), plus (y) an amount equal to Purchaser's reasonable, documented out-of-pocket expenses (other than fees to the extent triggered, in whole or in part, as a result of payment of the Break-Up Fee) incurred prior to the termination of this Agreement (the "Expense Reimbursement"), with such Break-Up Fee and Expense Reimbursement to be paid upon the closing of a transaction (including an alternative plan of reorganization) involving a material portion of the assets of EME and the Acquired Companies and such Break-Up Fee and Expense Reimbursement shall constitute an administrative expense of EME in the Chapter 11 Cases.  EME acknowledges that the Break-Up Fee and Expense Reimbursement are in consideration of the real and substantial benefits conferred by Purchaser upon the bankruptcy estates of EME and the Debtor Subsidiaries by providing a minimum floor upon which EME and its Debtor Subsidiaries and their creditors were able to rely, and in consideration of the time, expense and risks associated with serving as such a purchaser, including legal fees and expenses and other expenses related to the negotiation and preparation of this Agreement and of all related transactional documentation.  EME and the Purchaser Parties agree and stipulate that the Purchaser Parties have provided a mutual benefit to the estates of EME and the Debtor Subsidiaries by increasing the likelihood that the best possible price for the Target Holdings shall be received and that the Break-Up Fee and Expense Reimbursement are reasonable and appropriate in light of the size and nature of the proposed sale transactions and

comparable transactions, the commitments that have been made and the efforts that have and shall be expended by the Purchaser Parties and were necessary to induce the Purchaser Parties to pursue the transactions contemplated hereby under the terms of this Agreement.  The Parties acknowledge and agree that the Break-Up Fee and Expense Reimbursement constitute liquidated damages and not a penalty and are the sole and exclusive remedy of the Purchaser Parties and their Affiliates for monetary damages against EME or any Related Person under this Agreement or otherwise related to the Transaction.  Without limiting its rights against EME under Section 10.17 of this Agreement, the Purchaser Parties shall not, and shall cause each of its Affiliates not to, bring any claim, right or cause of action for monetary damages against or seek any other remedy from, EME or any of its Related Persons (other than for payment of the Break-Up Fee and Expense Reimbursement when payable hereunder), whether at equity or in Law, for breach of contract, in tort or otherwise, in connection with the transactions contemplated hereby, and any claim, right or cause of action for monetary damages (other than for payment Break-Up Fee and Expense Reimbursement when due and payable hereunder) by the Purchaser Parties or any other Person against EME or any of its Related Persons is expressly waived and disclaimed by EME.

(c)      Acknowledgments.  Each of the Parties acknowledge that the covenants and agreements in this Section 7.2 are an integral part of the transactions contemplated hereby and without such covenants and agreements, neither Party would have entered into this Agreement.

## ARTICLE 8
## BANKRUPTCY PROCEDURES

8.1      Bankruptcy Actions.

(a)      EME shall use reasonable best efforts to obtain entry by the Bankruptcy Court of (i) an Order approving entry by EME into the Plan Sponsor Agreement and this Agreement providing that: (1) EME's obligations under this Agreement and the Ancillary Agreements in respect of the Break-Up Fee and Expense Reimbursement shall survive confirmation of any chapter 11 plan in the Chapter 11 Cases; and (2) EME shall not be permitted to amend, modify, reject or otherwise terminate its obligations in respect of the Break-Up Fee and Expense Reimbursement under this Agreement (such Order, the "PSA Order") on an expedited basis and (ii) if the PSA Order has been entered, an Order, acceptable to Parent in its reasonable discretion, confirming the Plan (such Order, the "Confirmation Order").  EME shall (A) file all pleadings with the Bankruptcy Court as are necessary or appropriate to secure entry of the PSA Order and (B) serve such pleadings on all parties known to EME to be potentially entitled to notice of such pleadings under applicable provisions of the Bankruptcy Code and related rules, and shall diligently pursue the obtaining of such orders.

(b)      Subject to entry of the PSA Order, EME shall (i) use reasonable best efforts to obtain an order (the "Disclosure Statement Order") approving the disclosure statement related to the Plan (the "Disclosure Statement") (which Disclosure Statement and Disclosure Statement Order may not contain any provisions which are inconsistent in any material respect with this Agreement), (ii) commence solicitation on the Plan, and (iii) subject to the provisions of Section 4.6 and use reasonable best efforts to (A) facilitate the solicitation, confirmation and consummation of the Plan and the transactions contemplated hereby and by the Ancillary Agreements, (B) obtain the Confirmation Order and (C) consummate the Plan.

(c)      Each Purchaser Party shall promptly take all actions as are reasonably requested by EME to assist in obtaining the Bankruptcy Court's entry of the PSA Order and, as applicable, the Plan, the Disclosure Statement, the Confirmation Order, the Disclosure Statement Order or any other Order

reasonably necessary in connection with the transactions contemplated by this Agreement and by the Ancillary Agreements as promptly as practicable, including furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making such Purchaser's Party's employees and representatives available to testify before the Bankruptcy Court for the purposes of, among other things providing necessary assurances of performance by the Purchaser Parties under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy the liabilities and obligations of the Acquired Companies following the Closing.  In the event that the entry of the PSA Order or, as applicable, the Plan, the Disclosure Statement, the Confirmation Order, the Disclosure Statement Order or any other Order reasonably necessary in connection with the transactions contemplated by this Agreement is appealed, EME shall use its reasonable best efforts to defend against such appeal and the Purchaser Parties shall use their best efforts to cooperate with EME in such appeal.

8.2     Approval.  Notwithstanding anything in this Agreement to the contrary, each Purchaser Party acknowledges and agrees that no obligations of EME hereunder shall be enforceable against EME or the Debtor Subsidiaries or any of their respective Related Persons until the entry of the PSA Order. EME's obligations under this Agreement and the Ancillary Agreements and in connection with the transactions contemplated hereby and thereby are subject to entry of and, to the extent entered, the Orders of the Bankruptcy Court in the Chapter 11 Cases (including entry of the PSA Order, the Disclosure Statement Order and the Confirmation Order).  Nothing in this Agreement shall require EME or its Related Persons to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

ARTICLE 9
ADDITIONAL AGREEMENTS

9.1     Survival.

(a)     The representations and warranties and covenants and agreements set forth in this Agreement, any Ancillary Agreement or in any certificate, agreement or other document delivered in connection with this Agreement to the extent contemplating or requiring performance prior to the Closing, shall terminate effective as of immediately prior to the Closing such that no claim for breach of any such representation or warranty, detrimental reliance or other right or remedy (whether in contract, in tort or at Law or equity) may be brought after the Closing, and each covenant and agreement of EME and Purchaser to the extent contemplating or requiring performance prior to the Closing shall terminate effective immediately as of the Closing such that no claim for breach or non-performance of any such covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at Law or equity) may be brought after the Closing.  Any covenant or agreement of any Party in this Agreement that requires performance at or after the Closing shall survive the Closing until the expiration of the statute of limitations for breach of contract with respect to such covenant or agreement and nothing in this Agreement shall be deemed to limit any rights or remedies of any person for breach of any such covenant or agreement (with it being understood that nothing herein shall limit or affect Purchaser's or any of its Affiliates' liability for the failure to pay the Stock Purchase Price or Cash Purchase Price or other amounts when required hereunder, assume the Assumed Liabilities or pay other amounts as required under this Agreement).  Each Party waives the right to seek rescission of the Transactions or to have the Transactions contemplated hereby rescinded.

(b)     Each Purchaser Party (on its behalf and on behalf of its Related Persons) acknowledges and agrees that, from and after the Closing, to the fullest extent permitted under applicable Law, any and all rights, claims and causes of action it may have against EME, any Homer City Debtor or their respective Affiliates or their respective Related Persons relating to the operation of EME or its

32

Subsidiaries or the Business or relating to the subject matter of this Agreement, the Ancillary Agreements and the Schedules and the transactions contemplated hereby and thereby, whether arising under or based upon any Law or Order (including any right, whether arising at Law or in equity, to seek indemnification, contribution, cost recovery, damages, or any other recourse or remedy, including as may arise under common law or other Law), except to the extent provided herein with respect to Excluded Liabilities, are hereby waived. Furthermore, without limiting the generality of this Section 9.1, no claim shall be brought or maintained by or on behalf of Parent, Purchaser or any of their respective Affiliates or their or their respective Related Persons against EME, any Homer City Debtor or any of their Affiliates or their respective Related Persons, and no recourse shall be sought or granted against any of them, by virtue of or based upon any alleged misrepresentation or inaccuracy in or breach of any of the representations, warranties or covenants of EME or any other Person set forth or contained in this Agreement, the Ancillary Agreements, any certificate, agreement or other documents delivered hereunder, the subject matter of this Agreement, the Business, the ownership, operation, management, use or control of the businesses of EME, its Affiliates or any of the Subsidiaries, any of their assets, any of the transactions contemplated hereby or any actions or omissions at or prior to the Closing, except in the case of fraud.

(c) Furthermore, without limiting the generality of this Section 9.1, each Purchaser Party hereby waives, on behalf of itself and its Affiliates and its or their Related Persons (including, after the Closing, the Acquired Companies), any right, whether arising at Law or in equity, to seek contribution, cost recovery, damages, or any other recourse or remedy from EME and the Homer City Debtors and each of their Affiliates and their respective Related Persons, and hereby releases each such Person from any claim, demand or liability, with respect to any environmental, health, or safety matter (including any matter arising under any Law).

9.2     Press Release and Public Announcements. Except as contemplated by this Agreement, no Party shall make any press release or public announcement concerning the transactions contemplated by this Agreement without the prior written approval of the other Parties, unless a press release or public announcement is required by Law or Order of the Bankruptcy Court. If any such announcement or other disclosure is required by Law or Order of the Bankruptcy Court, the disclosing Party shall (to the extent practicable) give the non-disclosing Party prior notice of, and a reasonable opportunity to comment on, the proposed disclosure. The Parties acknowledge that EME will file this Agreement with the Bankruptcy Court in connection with obtaining the PSA Order. Notwithstanding anything to the contrary contained herein, nothing contained herein or in any Ancillary Agreement shall prevent, or otherwise limit, EME or the Acquired Companies from communicating with customers, vendors and other third-party business relations in connection with the Chapter 11 Cases and in furtherance of the transactions contemplated hereby and by the Ancillary Agreements.

9.3     Confidentiality. Each Party acknowledges that certain information provided to such Party or its Related Persons in connection with the Transaction is subject to the terms of the Confidentiality Agreement, dated as of September 30, 2013, by and between Parent and EME (as amended from time to time in accordance with its terms, the "Confidentiality Agreement"), the terms of which are hereby incorporated herein by reference. Insofar as the Confidentiality Agreement may have limited either Party from disclosing or using the terms of this Agreement or the discussions between the Parties in respect thereof, each Party acknowledges and agrees that the Confidentiality Agreement is waived to allow disclosure of such terms and discussions for the matters described in Section 9.2 and other matters contemplated by this Agreement.

9.4     Consents.

(a) The Purchaser Parties acknowledge that certain consents to the transactions contemplated by this Agreement may be required from parties to contracts, leases, licenses or other

agreements to which EME and/or its Subsidiaries are party (including the Permits and the Assigned Contracts) and such consents have not been obtained and may not be obtained. EME shall, and shall cause its Subsidiaries to, cooperate as reasonably requested by the Purchaser Parties in Purchaser Parties' efforts to obtain such consents; <u>provided</u> that (i) no such cooperation shall require EME or any other Person to expend any money, grant any concession or institute any Legal Proceeding, and (ii) receipt of any consent shall not be a condition to Closing for the Purchaser Parties and nor shall the Purchaser Parties be entitled to delay the Closing while awaiting any consent. The Purchaser Parties agree that neither EME (nor any assignee of its rights hereunder) nor any of its Affiliates nor any of their respective Related Persons shall have any liability whatsoever to Purchaser, Parent and/or any of their respective Subsidiaries or their respective Affiliates or their or their respective Related Persons (and neither Purchaser or Parent nor any of their respective Subsidiaries nor their respective Affiliates nor their respective Related Persons shall be entitled to assert any claims against EME (nor any assignee of its rights hereunder) or its Affiliates or its or their Related Persons) arising out of or relating to the failure to obtain any consents that may have been or may be required in connection with the transactions contemplated by this Agreement or because of the default, acceleration or termination of or loss of right any such contract, lease, license or other agreement as a result thereof.

(b)     On the date hereof, Parent and various PoJo Parties have executed the agreements attached hereto as <u>Exhibit D</u> (the "<u>PoJo Term Sheet</u>") setting forth certain agreements regarding, and modifications and amendments to, the PoJo Leases and Documents (the "<u>PoJo Lease Modifications</u>") and providing for the other matters set forth in the PoJo Term Sheet. Each of the Purchaser Parties and EME hereby agree to satisfy such provisions of the PoJo Term Sheet and other provisions of this Agreement with respect to the PoJo Leases and Documents as are within their respective control and covenant and agree to use, and to cause their respective Subsidiaries to use, reasonable best efforts to negotiate, execute and deliver such amendments and other modifications to the PoJo Leases and Documents as may be reasonably necessary to implement the PoJo Lease Modifications, in each case as promptly as practicable after the date hereof. Each party shall seek the approval of each other PoJo Party as necessary to implement the PoJo Lease Modifications and satisfy the other provisions hereof with respect to the PoJo Leases and Documents and shall seek to obtain such approvals of the Bankruptcy Court as may be reasonably necessary such that no Party will have a termination right pursuant to <u>Section 7.1(a)(ii)(5)</u> of this Agreement and that the conditions set forth in <u>Article 3</u> hereof regarding the PoJo Leases and Documents are satisfied.

(c)     EME has informed the Purchaser that it has pledged the Purchased Interests in Viento Funding II, Inc. (the "<u>Viento Shares</u>") to support certain borrowings of Viento II Funding, Inc. (the "<u>Viento Holdco Debt</u>"). Prior to Closing, EME shall use reasonable best efforts to deliver to the Purchaser a pay-off letter in customary form from the agent with respect to the Viento Holdco Debt. Purchaser shall have the right, but not the obligation, to repay the Viento Holdco Debt or cause the Viento Holdco Debt to be repaid promptly at or after Closing and EME shall cooperate to cause the delivery of the certificate representing the Viento Shares promptly after repayment of the Viento Holdco Debt on the terms and subject to the conditions of the pay-off letter; <u>provided</u> that, without limiting the adjustment for Closing Debt provided in <u>Article 1</u> of this Agreement, there shall be no purchase price adjustment or obligation of EME to repay the Viento Holdco Debt or cause the Viento Holdco Debt to be repaid at or prior to the Closing.

9.5     <u>Tax Matters</u>.

(a)     <u>Tax-Sharing Agreements</u>. Any Tax-sharing and similar agreements between EME (or any of its Affiliates) and any of the Acquired Companies shall be terminated prior to the Closing Date and shall have no further effect for any taxable year (whether the current year, a future year, or a past year).

(b)     Returns for Periods Through the Closing Date. EME shall include the income of the Business on EME's consolidated federal and state Income Tax Returns for all periods through the end of the Closing Date and pay any federal or state Income Taxes attributable to such income. Purchaser shall reimburse EME for any Taxes attributable to such income, and shall otherwise be responsible for Taxes, that are not Excluded Tax Liabilities.  Purchaser and the Acquired Companies shall furnish Tax information reasonably requested by EME for inclusion in EME's federal and state consolidated Income Tax Return for the period that includes the Closing Date in accordance with the Acquired Companies' past custom and practice. The income of the Business shall be apportioned to the period up to and including the Closing Date and the period after the Closing Date by closing the books of the Business as of the end of the Closing Date.

(c)     Taxable Sale of Assets. Except to the extent otherwise agreed to pursuant to any Tax Attributes Agreement, the transfer of the Target Holdings is, subject to the remaining provisions of this Section 9.5(c), intended to be treated for all federal and state Income Tax purposes as the taxable sale of the Target Assets, the assets of each of the Wholly-Owned Companies, and EME's direct or indirect share of the assets of each of the Partially-Owned Companies (the "Asset Sale Treatment"), and EME intends to retain all of the existing Tax Attributes that constitute Excluded Assets. In order to accomplish this, EME will, use its commercially reasonable efforts to seek any third party consent required under any material Contract to which it is party and, subject to receipt of such third party consent, (i) convert (including by merger, if necessary) each of the Wholly-Owned Companies to a limited liability company disregarded as an entity separate from its owner or a limited partnership that is not separately taxed, (ii) take such other actions within its control to cause each Partially-Owned Company that is treated as a partnership for tax purposes, and each Wholly-Owned Company that is converted to a limited partnership under clause (i), to have in place an election under Section 754 of the Code, and (iii) undertake any other transactions contemplated pursuant Section 4.8 of this Agreement that may help to achieve the results contemplated by the immediately foregoing sentence, in each case insofar as relates to Acquired Companies organized under the Laws of a jurisdiction other than the United States or a Subsidiary of a Person organized under the Laws of a jurisdiction other than the United States, to the extent practicable and commercially reasonable; provided that in no event shall EME be required to take any action if such action would result in Taxes, fees and costs being paid by EME or, prior to the Closing, any Acquired Company in excess of $500,000 unless the Purchaser agrees to pay and be responsible for such excess Taxes, fees and costs; provided that EME shall be responsible for payment of such excess Taxes, fees or costs to the extent (A) the amount of such excess Taxes, fees or costs were triggered because of other Pre-Closing Reorganizations or (B) on or prior to the 10th Business Day referred to in Section 4.8, the Purchaser delivers written notice to EME objecting to all or any portion of the Pre-Closing Reorganizations related to the Asset Sale Treatment (in which case, EME may to the extent permitted by the last sentence of Section 4.8, but shall not be required to, implement the portion so objected to as long it is responsible for and pays all Taxes, fees other costs related to the conversion of the Wholly-Owned Companies or the Asset Sale Treatment with respect to the portion so objected to).  Notwithstanding the foregoing, EME shall not be required to take any action that would it cause it or any Acquired Company to breach any material Contract to which it is a party unless the Purchaser has agreed to be responsible for any resulting Liabilities arising therefrom.  Except to the extent otherwise agreed to pursuant to any Tax Attributes Agreement, the Purchaser Parties (1) covenant that Purchaser will not be controlled by Parent for purposes of Section 368 of the Code on the Closing Date and will not become controlled by Purchaser during the two-year period following the Closing Date, (2) agree that the Stock Purchase Price and Estimated Cash Purchase and other cash consideration owing to EME hereunder shall be contributed by Parent, to NRG Acquisition Holdings Inc. and then by NRG Acquisition Holdings Inc. to Purchaser and then paid by Purchaser to EME, (3) agree that the Target Holdings are being purchased directly by Purchaser and are not being transferred to Purchaser on behalf of any other party, and (4) agree to report the purchase of the Target Assets by Purchaser as a taxable asset purchase for all federal and state Income Tax purposes.

(d)     <u>Indemnification for Post-Closing Transactions</u>.  The Purchaser Parties agree to indemnify EME for any additional Tax owed by EME (including Tax owed by EME due to this indemnification payment) resulting from any transaction engaged in by the Acquired Companies not in the ordinary course of business occurring on the Closing Date after Purchaser's purchase of Target Equity Interests.

9.6     <u>Employee Benefits and Employment Matters</u>.

(a)     <u>Schedule 9.6(a)</u> identifies, as of the date hereof, each Eligible Employee, on a no-name basis, including job title, personnel area, work location, and company name.  Prior to the Closing Date, EME shall provide Parent with an updated <u>Schedule 9.6(a)</u> as changes to the list occur from time to time, but no more than seven (7) Business Days following the change.  Parent shall evaluate its personnel needs and shall consider offering employment (but shall not be required to offer employment) to Eligible Employees on a case by case basis.  Not less than fifteen (15) Business Days prior to the anticipated Closing Date, Parent shall provide to EME a list of Eligible Employees (the "<u>Selected Employees</u>") to whom, after entry of the Disclosure Statement Order, Purchaser or one of Parent's Affiliates shall offer employment, which offers of employment shall be contingent upon and effective as of the Closing Date.  All offers of employment by Parent or by an Affiliate of Parent to Selected Employees shall be subject to successful completion of Parent's or its Affiliate's drug screening, testing and background check requirements or other reasonable procedures and receipt from EME of a completed Form I-9 proving eligibility for employment in the United States on the Closing Date (the "<u>Purchaser Employment Conditions</u>").  Selected Employees offered employment shall have not less than seven (7) Business Days to accept or reject the offer in writing with the seventh (7th) Business Day of such period to occur prior to the Closing Date.  Each Selected Employee who accepts Parent's or Parent's Affiliate's offer of employment and who satisfies the Purchaser Employment Conditions shall, effective as of the Closing Date, commence employment with Parent or Parent's Affiliate's on terms and conditions substantially comparable in the aggregate to those terms and conditions of similarly situated employees of Parent or Parent's Affiliate.  Any Eligible Employee who is not offered employment by Parent or Parent's Affiliate prior to the Closing Date, who does not accept such offer of employment, or who is not hired due to the failure to satisfy the Purchaser Employment Conditions is hereinafter referred to as an "<u>Excluded Employee</u>." Nothing in this Agreement shall require or be construed or interpreted as requiring Parent, the Acquired Companies or any of their Affiliates to continue the employment of any of the Eligible Employees following the Closing Date or prevent Parent, Purchaser, the Acquired Companies or any of their Affiliates from changing the terms and conditions of employment of any Transferred Employees following the Closing Date. All employment offers made by Parent or any of its Affiliates to any Selected Employee shall be contingent on the Closing.  In the event that this Agreement is terminated or the Closing does not occur, all such employment offers shall be null and void.

(b)     Except as provided in <u>Section 9.6(f)</u> of this Agreement, EME shall be solely responsible for any severance, change in control payments or parachute payments owed to Business Employees (including any Excluded Employees) which are payable solely as a result of the consummation of the Transaction pursuant to the terms of any agreements, plans or programs entered into or sponsored by EME or any of its Subsidiaries prior to the Closing with any such Business Employees.

(c)     With respect to such Transferred Employees who are covered by a Collective Bargaining Agreement (collectively, "<u>Union Employees</u>"), Parent shall (or cause its Affiliates to, as appropriate) otherwise assume and thereafter be bound by and comply with each Collective Bargaining Agreement presently applying to the Union Employees, and such employees shall be credited with their period of service with EME and the other Acquired Companies and their respective predecessors for all purposes of the Collective Bargaining Agreements.

(d)     During the period beginning on the Closing Date and ending on the first anniversary of the Closing Date (the "<u>Benefit Period</u>"), Parent shall, or shall cause any Acquired Company or an Affiliate to provide each Transferred Employee who continues to be employed with the Parent, an Acquired Company or an Affiliate with (A) base salaries and wage rates and cash bonus opportunities on a comparable basis and (B) benefit plans, programs and arrangements (other than equity based compensation, retiree medical and defined benefit plans) which are substantially similar in the aggregate to those provided by Parent or its Affiliates to its similarly situated employees during the Benefit Period; <u>provided</u>, <u>however</u>, that the Parties agree that Parent shall or shall cause an Acquired Company or one of its Affiliates to provide each Union Employee with compensation and benefits (including vacation benefits) in accordance with the terms of any Collective Bargaining Agreement.

(e)     Except as otherwise provided in this <u>Section 9.6</u> or otherwise specifically assumed in this Agreement, neither Parent, Purchaser nor any Affiliate of Parent or Purchaser shall assume any Employee Benefit Plan or any other plan, program or arrangement of EME or any Affiliate of EME (other than the Acquired Companies) that provides any compensation or benefits to current or former employees or current or former independent contractors or consultants of EME or any Affiliate of EME (other than the Acquired Companies).  None of Parent, Purchaser, any Affiliate of Parent or Purchaser nor any Acquired Company shall be responsible with respect to any Excluded Employee Liabilities nor shall have any responsibility for, and EME shall retain all responsibility related to, any and all employment or employee benefit-related matters, obligations, liabilities or commitments of EME (other than (x) any such obligations, liabilities or commitments of EME as the Purchaser Parties have expressly agreed to assume hereunder and (y) for the avoidance of doubt, any such obligations, liabilities, and commitments of the Acquired Companies other than Excluded Employee Liabilities).

(f)     Other than with respect to an Eligible Employee listed in <u>Schedule 9.6(f)</u>, (i) if any Transferred Employee that is not a Union Employee (x) is terminated without Cause (as defined in the EME Severance Plan) at any time after the date hereof and ending on the one (1) year period following the Closing Date or (y) resigns his employment at any time after accepting the Offered Terms and prior to the one (1) year anniversary of the Closing Date because Purchaser or one of its Related Persons imposes, proposes or attempts to make adverse changes to the Offered Terms or (ii) with respect to any Excluded Employee who is involuntarily terminated by EME or any Affiliate of EME on or after the Closing Date (regardless of whether such Excluded Employee (A) was not offered employment pursuant to <u>Section 9.6(a)</u>, (B) rejects an offer of employment from Parent or Parent's Affiliate; provided, however, that an Eligible Employee that rejects an offer of employment that contains substantially similar terms as such Eligible Employee's current employment terms (including principal location of employment not further than 50 miles from such Eligible Employee's principal place of employment as of the Closing Date and substantially similar base salary and wages) (the "<u>Offered Terms</u>"), shall not be included under this clause (B), or (C) fails to satisfy the Purchaser Employment Conditions and thus does not become a Transferred Employee), Parent shall, or shall cause one of its Affiliates to, pay severance compensation to such employee that is at least as much as the maximum cash severance and other compensation such employee would have received under the EME Severance Plan based on such employee's (1) base salary immediately prior to the date hereof or, if greater, such employee's base salary as of the date of termination and (2) aggregate service (taking service recognized under severance programs of EME and the Acquired Companies or any of their Affiliates and post-Closing service with Parent and such Acquired Companies into account)) as of the date of termination, and such other amount as may be required under applicable Law.

(g)     Parent agrees that from and after the Closing Date, Parent will, or will cause one of the Acquired Companies to, grant to all Transferred Employees credit for any service with EME and the Acquired Companies (or any of their Affiliates) and its predecessors earned prior to the Closing Date for purposes of (A) eligibility and vesting and (B) post-Closing paid time off accrual and determination of

severance amounts under any benefit plan, program or arrangement established or maintained by Parent, Purchaser, the Acquired Companies or their respective Affiliates for the benefit of the Transferred Employees (the "Purchaser Plans"). In addition, Parent hereby agrees that Parent, Purchaser, the Acquired Companies and their respective Affiliates shall use commercially reasonable efforts to (x) waive for Transferred Employees who are not Union Employees all pre-existing condition exclusion and actively-at-work requirements and similar limitations, eligibility waiting periods and evidence of insurability requirements under any Purchaser Plans that are Employee Welfare Benefit Plans; provided that, in the case of life insurance benefits, evidence of insurability requirements shall only be waived with respect to the same level of coverage the Transferred Employees had in effect immediately prior to the Closing date, and (y) shall cause any deductibles, co-insurance and out-of-pocket covered expenses incurred on or before the Closing Date by any Transferred Employee or Acquired Company Employee (or dependent or beneficiary thereof) to be taken into account for purposes of satisfying applicable deductible, coinsurance and maximum out-of-pocket provisions after the Closing Date under any Purchaser Plan that is an Employee Welfare Benefit Plan. Prior to the Closing, EME and the Acquired Companies shall cause the Transferred Employees to provide all cooperation reasonably necessary for Parent to satisfy its obligations under this Section 9.6(g). Notwithstanding anything to the contrary in the foregoing, with respect to the issues set forth in this subsection (g), Transferred Employees who are Union Employees shall be treated in accordance with the terms of their applicable Collective Bargaining Agreement.

(h) Parent shall recognize and credit each Transferred Employee with up to a maximum of 40 hours for any vacation time accrued but not yet used prior to the Closing Date (the "Days Off Accrual"); provided, however, that the Parties agree that on or immediately preceding the Closing Date, EME or any applicable Affiliate shall pay out all amounts of accrued but unused vacation for each Transferred Employee in an amount equal to the greater of, (i) the amount required to the paid out as required by Law or applicable Collective Bargaining Agreement or (ii) the amount necessary to reduce each such Transferred Employee's accrued but unused vacation balance to 40 hours (collectively, the "Paid Vacation Liability"); provided further that to the extent the terms of any Collective Bargaining Agreement and this Section 9.6(h) are inconsistent, the terms of the Collective Bargaining Agreement shall dictate how accrued vacation is treated with respect to the Union Employees. As of the Closing Date or as soon as administratively practical following the Closing Date, the Parent shall reimburse EME, in cash, for all Paid Vacation Liabilities. The respective Transferred Employees shall be entitled to either use the Days Off Accrual on terms substantially similar to those in effect under the applicable Collective Bargaining Agreement or paid time off policy of Parent or, consistent with such applicable Collective Bargaining Agreement or paid time off policy, receive payment in respect of such Days Off Accrual upon the Transferred Employee's termination of employment with Parent or such Acquired Company.

(i) Except as provided in Sections 9.6(j) and (k), effective as of the date of this Agreement through the Closing Date, EME shall not establish or adopt any employee benefit plan intended to be qualified under Section 401(a) of the Code without obtaining prior written authorization from Parent.

(j) The Parties agree that between the date hereof and December 31, 2013, EME shall establish and adopt a "defined contribution plan" (as such term is defined in Section 3(34) of ERISA) which is intended to be qualified under Section 401(a) of the Code (the "EME 401(k) Plan"), which shall be similar to the Edison 401(k) Savings Plan (the "EIX 401(k) Plan"); provided, however, that any modifications to the EME 401(k) Plan that are different from the terms of the EIX 401(k) Plan shall be limited to such changes as would not result in a material increase in cost or Liability to the Acquired Companies. As soon as is reasonably practicable following January 1, 2014, EIX (or its applicable Affiliate) shall cause the trustee of the EIX 401(k) Plan to transfer account balances related to the Business Employees (including any outstanding loans) from the EIX 401(k) Plan to the EME 401(k)

Plan in accordance with the requirements of Sections 411(d)(6) and 414(l) of the Code. Effective as of the Closing Date, EME shall assign to Parent or one of its Affiliates and Parent or one of its Affiliates shall assume from EME, sponsorship of the EME 401(k) Plan. Parent (or its Affiliate that sponsors the EME 401(k) Plan) may amend the EME 401(k) Plan at any time following the Closing Date (which may include merging such plan into a defined contribution plan maintained by Parent or one of its Affiliates), subject to any applicable requirements under the Collective Bargaining Agreement.

(k)     To the extent MWG is required to cease participation under the Edison International Retirement Plan for Bargaining Unit Employees of Midwest Generation, LLC (the "EIX Midwest Gen Plan") as of December 31, 2013 (or such later date that occurs prior to the Closing Date, as applicable, the "Termination Date"), as soon as practicable following the execution of this Agreement, and notwithstanding any provision herein to the contrary, the Parties shall commence, and shall cooperate in connection with, the drafting of a separate plan document and related contracts thereto that shall be substantially similar to the EIX Midwest Gen Plan (the "Mirror Pension Plan") to be sponsored by MWG and for which MWG shall remain responsible at and immediately after the Closing to provide certain benefits to Transferred Employees employed by Midwest Generation, LLC who are represented by Local 15 of the International Brotherhood of Electrical Workers (the "Midwest Gen Union Employees") as required under the terms of the Collective Bargaining Agreement. All Liabilities associated with the Mirror Pension Plan shall be Debtor Subsidiary Assumed Liabilities. Subject to this Section 9.6(k), the Mirror Pension Plan shall be effective as of the Termination Date and provide benefits that are substantially identical to the benefits provided as of Termination Date to the Midwest Gen Union Employees under the EIX Midwest Gen Plan as required under the Collective Bargaining Agreement, it being understood that in no event shall the Mirror Pension Plan be construed to provide any duplication of benefits with respect to any accrued benefits or other obligations otherwise required to be provided to the Midwest Gen Union Employees under the EIX Midwest Gen Plan. In furtherance of the foregoing, the benefits to be provided under the Mirror Pension Plan shall be determined based on such Midwest Gen Union Employee's (i) total credited service (A) as determined under the EIX Midwest Gen Plan and (B) with the Purchaser Parties, less (ii) the benefit such Midwest Gen Union Employee is entitled to receive under the terms of the EIX Midwest Gen Plan then in effect and based on such employee's credited service under the EIX Midwest Gen Plan as of the Closing Date.

(l)     EME and Parent acknowledge and agree that all provisions contained in this Section 9.6(l) are included for the sole benefit of EME, Parent and Purchaser, and that nothing contained herein, express or implied, is intended to (i) confer upon any Person (including any Business Employee) any right to continued employment for any period or continued receipt of any specific employee benefit, (ii) constitute an amendment to or any other modification of any employee benefit plan, program or agreement of any kind or (iii) create any third party beneficiary or other rights in any other Person, including any Business Employees (or representatives thereof), former Business Employees, any participant in any benefit plan or any dependent or beneficiary thereof. Nothing in this Agreement shall be interpreted as limiting the power of Parent, Purchaser, any Acquired Company or any of their Affiliates to amend or terminate any particular employee benefit plan, program, agreement or policy.

9.7     Directors' and Officers' Indemnification. Following the Closing until the six (6) year anniversary thereof, Parent shall (a) cause the Acquired Companies not to amend, repeal or otherwise modify the Acquired Companies' constitutive documents as in effect at the Closing, in any manner that would adversely affect the rights thereunder of individuals who are or were directors or officers of the Acquired Companies and (b) cause the Acquired Companies to honor and pay, the indemnification, advancement of expenses and exculpation provisions of each of the Acquired Companies' constitutive documents as in effect at the Closing, in any manner; provided, that all rights to indemnification in respect of any action pending or asserted or any claim made within such period shall continue until the disposition of such action or resolution of such claim. Parent shall not cancel or otherwise reduce

39

coverage under any "tail" insurance policies purchased by the Acquired Companies prior to the Closing; provided that no payments shall be required of the Acquired Companies or the Purchaser Parties with respect to such policies after the Closing.

9.8     Expenses.  Except as otherwise provided herein, each of the Parties hereto shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby, including any legal, accounting, banking, consulting and advisory fees, whether or not the transactions contemplated hereby are consummated, the performance of their respective obligations hereunder or otherwise required by applicable Law.  EME shall bear fees and expenses of its Related Persons and on behalf of the Supporting Noteholders and the UCC and otherwise in accordance with the Plan.

9.9     Support Obligations.

(a)     The Purchaser Parties recognize that EME has provided credit support to and/or on behalf of the Acquired Companies and the Business and may have to (but shall not be obligated to) provide other credit support in connection with the transactions contemplated by this Agreement (collectively, the "Support Obligations").  Effective on the Closing Date, Purchaser shall either (i) cause EME to receive a full and unconditional release of each of the Support Obligations set forth on Schedule 9.9 or otherwise provided after the date of this Agreement (the "Closing Support Obligations") or (ii) fully cash collateralize or provide a letter of credit for each of the Closing Support Obligations which is not released at the Closing for the benefit of EME; provided that Purchaser shall not have any obligations in respect of a Closing Support Obligation to the extent the credit support was included in the calculation of Closing Cash.  As promptly as practicable after the Closing Date, Purchaser shall use reasonable best efforts to effect the full and unconditional release of EME from all Closing Support Obligations which are cash collateralized or supported with a letter of credit instead of released at the Closing, as well as any other Support Obligations which remain outstanding (the "Remaining Support Obligations").  EME shall, and shall cause the Acquired Subsidiaries to, cooperate as reasonably requested by the Purchaser Parties in Purchaser Parties' efforts to obtain such releases from the Support Obligations; provided that (a) no such cooperation shall require EME or any other Person to expend any money, grant any concession or institute any Legal Proceeding, and (b) receipt of any release shall not be a condition to Closing for the Purchaser Parties and nor shall the Purchaser Parties be entitled to delay the Closing while awaiting any release.

(b)     Purchaser and EME shall use their reasonable best efforts to cause the beneficiary or beneficiaries of the Remaining Support Obligations to terminate and redeliver to EME as soon as practicable, each original copy of each original guaranty, letter of credit or other instrument constituting or evidencing such Remaining Support Obligations, as well as to redeliver to EME and its Affiliates or lenders, as applicable, any cash collateral in respect of the Remaining Support Obligations which was originally provided by EME and such Affiliates or lenders, and to take such other actions as may be required to terminate such Remaining Support Obligations.

(c)     For so long as the Remaining Support Obligations are outstanding, Purchaser shall indemnify, defend and hold harmless EME from and against any and all Losses incurred by any such indemnified Persons in connection with the Remaining Support Obligations.

(d)     It is acknowledged and agreed that, among other things, the Closing Support Obligations include the EME guarantee and Tax indemnity agreements provided in connection with the PoJo Leases and Documents and that Purchaser shall take such actions such that, at the Closing, it shall execute and deliver to the appropriate counterparties thereto, a Tax indemnity agreement and guarantee in substantially the form executed by EME, or as otherwise agreed by the PoJo Parties, and take such other actions and execute such other agreements as necessary to cause EME to be released from all Support

Obligations with respect to the PoJo Leases and Documents. At the Closing, Parent shall provide an irrevocable and unconditional guarantee of all payments and performance of all obligations of Purchaser with respect to such guarantee and Tax indemnity agreement for the benefit of the PoJo Parties.

(e)     Notwithstanding anything in this Agreement to the contrary, during the period from the date of the PSA Order until the Closing Date, Purchaser shall have the right to contact and have discussions with each beneficiary of a Support Obligation in order to satisfy its obligations under this Section 9.9; provided that (i) Purchaser shall give EME prior written notice before making any such contact, (ii) EME shall have the right to have one of its representatives present on the telephone line or in person, as applicable, during any such contact or discussion, and (iii) Purchaser shall cause such representatives to comply with all procedures and protocols regarding such contacts and discussions that may be reasonably established by EME and delivered to Purchaser in writing.

9.10    Litigation Support.

(a)     In the event and for so long as any Party or any of its Affiliates or any of its or their Related Persons actively is contesting or defending against any Legal Proceeding in connection with (i) any transaction contemplated by this Agreement or the Ancillary Agreements or (ii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving EME, any Homer City Debtor, any Acquired Company or the Business (other than, for the avoidance of doubt, litigation between the Parties with respect to this Agreement or the Transaction), the other Parties will reasonably cooperate with the contesting or defending Party and its counsel in the contest or defense, make available its personnel, and provide such testimony and access to its books and records as shall be necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Party.

(b)     Without limiting the generality of Section 9.10(a), the Parties agree that the EIX Litigation shall be prosecuted and controlled by EME (as reorganized pursuant to the Plan). Purchaser shall not (i) seek any term, or the implementation of any term in any manner, that requires the approval, consent or cooperation of any EIX Litigation Party, or gives any EIX Litigation Party a veto right, such that any EIX Litigation Party could demand the settlement or reduction in value of the EIX Litigation; or (ii) take any other action that would undermine the conduct of the EIX Litigation by EME. To the extent that any Acquired Company is a necessary party for purposes of the successful pursuit of the EIX Litigation by EME, Purchaser will require such Acquired Company to reasonably cooperate with reorganized EME, as applicable, as necessary or desirable for such successful pursuit; provided, however, that reorganized EME shall reimburse such Acquired Company for the reasonable out of pocket costs it incurs in connection with such cooperation.

9.11    Cancellation of Intercompany Accounts. EME and Purchaser agree that, as provided in the Plan, (a) EME shall be released of all obligations and Liabilities in respect of the MWG Intercompany Notes as of the Closing and (b) all intercompany payables and Liabilities between EME or any of the Homer City Debtors, on the one hand, and an Acquired Company, on the other hand (such intercompany payables and Liabilities, the "Intercompany Accounts") shall be settled, cancelled or rendered unenforceable at or prior to the Closing in accordance with the Plan. For the avoidance of doubt, no EIX Litigation Claims shall be impacted through cancellation of the Intercompany Accounts.

9.12    Post-Closing Record Retention and Access. Each of Purchaser and EME shall keep and preserve in an organized and retrievable manner, at the headquarters for the Business or any other location at which a portion of the Business is conducted and any such books or records are stored (in the case of Purchaser) and at the headquarters of EME (in the case of EME) the books and records in its possession for seven (7) years from the Closing Date. Upon expiration of such period for any specific

41

books and records pertaining to the Business, each Party shall notify the other of its request to make copies of or take possession of such books and records and shall be provided reasonable opportunity to do so at the requesting Party's sole cost. While such books and records remain in existence, each Party shall allow the other Parties, their representatives, attorneys and accountants, at the requesting Party's expense, access to the books and records upon reasonable request and advance notice and during normal business hours, subject to the Confidentiality Agreement. Without limiting the generality of the foregoing, from and after the Closing, each Party shall provide the other Parties and their Affiliates and their authorized representatives with reasonable access (for the purpose of examining and copying), during normal business hours, to any books and records and other materials relating to periods prior to the Closing Date (a) in connection with general business purposes, whether or not relating to or arising out of this Agreement or the transactions contemplated hereby (including the preparation of Tax Returns, amended Tax Returns or claim for refund (and any materials necessary for the preparation of any of the foregoing), or in each case pro formas thereof) and financial statements for periods ending on or prior to the Closing Date, (b) in connection with the management and handling of any Legal Proceeding, whether such Legal Proceeding is a matter with respect to which indemnification may be sought hereunder, and (c) to comply with the rules and regulations of the Internal Revenue Service, the SEC or any other Governmental Authority; provided that nothing herein shall require any Party or their Affiliates to provide access to or disclose any information if such access or disclosure would be in violation of applicable Laws or regulations of any Governmental Authority. The obligations of the respective Parties with respect to such records shall include maintaining, for at least the retention period specified above, computer systems permitting access (subject to applicable Laws or regulations of any Governmental Authority) to any of such records which are stored in electronic form in a fashion which is not less efficient than current access methods.

9.13 <u>Insurance</u>. From and after the Closing, Purchaser shall, to the extent commercially practicable, assist EME and the Homer City Debtors in submitting all general liability and casualty loss claims or other claims against or relating to EME, the Homer City Debtors and/or any of their Affiliates that are not Acquired Companies for which insurance coverage is then available to any such Persons under any insurance policies owned by or transferred to any of the Acquired Companies prior to the Closing (collectively, the "<u>Transferred Policies</u>") for coverage under the Transferred Policies to the extent such claims relate to events occurring prior to the Closing (subject to deductibles, self-insured retentions and policy limits of such Transferred Policies) (each such claim, a "<u>Covered EME Claim</u>"); provided that "Covered EME Claims" shall also include claims of Acquired Companies under Transferred Policies to the extent relating to Excluded Liabilities. After the Closing, Purchaser shall, or shall cause its Affiliates to, permit EME and its Affiliates to submit such Covered EME Claims for processing in accordance with the Transferred Policies to the same extent as such Persons were entitled prior to the Closing. It is understood and agreed that EME shall be responsible for satisfying any deductibles, self-insured retentions and other retained amounts on insurance coverage with respect to such Covered EME Claims made by EME. Purchaser and its Subsidiaries shall provide EME and its Affiliates with reasonable cooperation regarding the processing of any Covered EME Claim. Purchaser shall provide EME with sixty (60) days' prior written notice of cancellation of any Transferred Policy (other than an expiration in accordance with its terms).

9.14 <u>Use of Name and Trademarks</u>. As soon as practicable after the Closing Date, but in no event more than sixty (60) days thereafter, the name of each Acquired Company that includes the name "Edison" shall be changed to names that do not include "Edison" or the other names, marks or logos set forth on <u>Schedule 9.14</u>, whether alone or in combination with any other words, phrases or designs or any derivatives, abbreviations, acronyms or other formatives based on or including any of the foregoing or any marks or logos confusingly similar thereto (collectively, the "<u>Edison Marks</u>") and Purchaser shall not use the Edison Marks (including in any domain names or in any signage or rolling stock). The Parties

shall discuss in good faith mechanisms such that use of the Edison Marks will cease at or prior to Closing or, failing that, a date sooner than the prescribed above.

9.15    Certain Arrangements.  From the date hereof and until the entry of the Confirmation Order, unless EME otherwise agrees in writing and except as may be required by the terms of this Agreement and other than the Plan Sponsor Agreement and Parent's arrangements with Barclay's and Deutsche Bank in connection with this Transaction, neither Parent or Purchaser nor their respective Affiliates or any of their or their Affiliates' respective Related Persons shall enter into any Contract, undertaking, commitment, agreement or obligation, whether written or oral, with any member of the management of EME, the Homer City Debtors or any of the Acquired Companies or the board or directors of EME (except as provided in Section 9.6), any holder of equity or debt securities of EME or the Acquired Companies, or any lender or creditor of EME or the Acquired Companies (a) relating in any way to the acquisition of the Target Holdings or the transactions contemplated by this Agreement or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of EME to entertain, negotiate or consummate any Acquisition Proposal.

9.16    Parent Guarantee.  Parent hereby agrees to cause Purchaser to comply with and perform each and every of its covenants and agreements hereunder.  Without limiting the generality of the foregoing, Parent agrees to cause Purchaser to pay the Estimated Cash Purchase Price, the Stock Purchase Price and other amounts required to be paid by Purchaser hereunder, in each case when required hereunder.  Parent agrees that such guarantee is a guarantee of payment and performance, and not of collection, and that EME and each Homer City Debtor are entitled to enforce this Agreement and may proceed directly against Parent, whether or not it has instituted a Legal Proceeding against the Purchaser and whether or not such Legal Proceeding has been resolved.  Purchaser covenants and agrees that, from and after the Closing, it shall cause each of its post-Closing Subsidiaries and the Acquired Companies to comply with each of the terms of this Agreement or any other agreement entered into in connection with the transactions contemplated hereby to which it is party or subject.

9.17    Non-Solicitation and No-Hire.  From the date hereof until the earlier of (a) the first anniversary of the date hereof and (b) the Closing Date, each Purchaser Party will not, and will cause each of its Subsidiaries not to, directly or indirectly, solicit for employment or engagement or employ or engage any individual who is now or was during the six months prior to such proposed solicitation, hire or engagement, engaged or employed by EME, any Homer City Debtor and any Acquired Company, without obtaining the prior written consent of EME; provided that, the restrictions in this Section 9.17 shall continue to apply after the Closing Date with respect to the employees listed on Schedule 9.17. Notwithstanding the foregoing, nothing herein shall restrict or preclude any Purchaser Party's or its Subsidiaries' right to make generalized searches for employees by use of advertisements in any medium or to engage firms to conduct such searches, so long as such search firms do not target or focus on EME or the Acquired Companies, or to employ or engage any individual who (i) is not or was not a management-level employee or key employee of EME, any Homer City Debtor and/or any Acquired Company, and (ii) either (a) with whom neither Purchaser Party nor any of its Subsidiaries (nor any Related Persons on their behalf) had substantive contact, directly or indirectly, or who were specifically identified to such Purchaser Parties or any of their Subsidiaries or any of their respective Related Persons during the period of its investigation of EME and evaluation of the Transaction, or (b) approached the Purchaser Party or its Subsidiary.  Notwithstanding anything to the contrary contained herein, from and after the date the Disclosure Statement Order is entered, nothing in this Section 9.17 shall prohibit Parent, Purchaser or any of their respective Affiliates from taking any action permitted by Section 9.6 hereof.

ARTICLE 10
MISCELLANEOUS

43

10.1    <u>Amendment and Waiver</u>.  This Agreement may be amended or any provision of this Agreement may be waived; <u>provided</u> that any amendment or, except as provided in <u>Section 7.1</u>, waiver shall be binding only if such amendment or waiver is set forth in a writing executed by the Party against whom enforcement is sought.  No course of dealing between or among any Persons having any interest in this Agreement shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any Person under or by reason of this Agreement.  Any waiver by any Party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, is not deemed to be nor construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

10.2    <u>Notices</u>.  All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) if personally delivered, on the date of delivery, (b) if delivered by express courier service of international standing (with charges prepaid), on the first Business Day following the date of delivery to such courier service, (c) if deposited in the United States mail, first-class postage prepaid, on the fifth Business Day following the date of such deposit, or (d) if delivered by facsimile, upon confirmation of successful transmission, (i) on the date of such transmission, if such transmission is completed at or prior to 5:00 p.m., local time of the recipient Party on a Business Day, on the date of such transmission, and (ii) on the next Business Day following the date of transmission, if such transmission is completed after 5:00 p.m., local time of the recipient Party, on the date of such transmission or is transmitted on a day that is not a Business Day.  All notices, demands and other communications hereunder shall be delivered as set forth below, or pursuant to such other instructions as may be designated in writing by the Party to receive such notice:

|  |  |
|---|---|
| <u>Notices to EME</u>: | Edison Mission Energy |
| | 3 MacArthur Place, Suite 100 |
| | Santa Ana, California 92707 |
| | Attention: President |
| | Telephone: (714) 513-8000 |
| | Facsimile: (949) 225-7700 |
| | |
| with a copy (which shall not constitute notice) to: | Kirkland & Ellis LLP |
| | 300 North LaSalle Street |
| | Chicago, Illinois 60654 |
| | Attention:  James H.M. Sprayregen, P.C. |
| | David R. Seligman, P.C. |
| | Telephone:  312-861-2000 |
| | Facsimile:  312-861-2200 |

with a copy (which shall not constitute notice) to counsel for the UCC at:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attn: Ira S. Dizengoff and Arik Preis
Fax:  (212) 872-1002

and

Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Attn: James R. Savin
Fax:  (202) 887-4288

with a copy (which shall not constitute notice) to counsel for the Supporting Noteholders at:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, New York 10036
Attn.: Keith H. Wofford
Fax: 212.596.9090

and

Ropes & Gray LLP
800 Boylston Street
Boston, Massachusetts 02199
Attn.: Stephen Moeller-Sally
Fax: 617.951.7050

<u>Notices to Purchaser Parties</u>:

NRG Energy, Inc.
211 Carnegie Center
Princeton, NJ 08540-6213
Attention:  Brian Curci
Telephone: 609.524.5171
Facsimile: 609.524.4501

with a copy (which shall not constitute notice) to:

Baker Botts L.L.P.
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2400
Attention: Elaine M. Walsh
Telephone: 202.639.1141
Facsimile: 202.585.1042

-and-

Baker Botts L.L.P.
2001 Ross Avenue
Dallas, Texas 75201
Attention: C. Luckey McDowell
Telephone: 214.953.6571
Facsimile: 214.661.4571

10.3 <u>Assignment</u>. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties hereto and their respective heirs, successors and permitted assigns; <u>provided</u> that neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned (including by operation of Law) by a Party without the prior written consent of the other Parties. For all purposes hereof, a transfer, sale or disposition of a majority of the voting capital stock or other voting interests of a Party (whether by contract or otherwise) shall be deemed an assignment hereunder. No assignment, even if consented to, of any obligations hereunder shall relieve the Purchaser Parties of any of their respective obligations under this Agreement, including their obligation to pay the Cash Purchase Price and the Stock Purchase Price and assume the Assumed Liabilities.

10.4 <u>Severability</u>. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision survives to the extent it is not so declared, and all of the other provisions of this Agreement remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of the date this Agreement was executed or last amended.

10.5 <u>Mutual Drafting</u>. This Agreement is the result of the joint efforts of EME and Purchaser, and each of them and their respective counsel have reviewed this Agreement and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the Parties, and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and therefore there shall be no construction against either Party based on any presumption of that Party's involvement in the drafting thereof.

10.6 <u>Captions</u>. The captions used in this Agreement and descriptions of the Schedules are for convenience of reference only and do not constitute a part of this Agreement and shall not be deemed to limit, characterize or in any way affect any provision of this Agreement, and all provisions of this Agreement shall be enforced and construed as if no caption or description of the Schedules had been used in this Agreement.

10.7 <u>Complete Agreement</u>. The Confidentiality Agreement, this Agreement and the Ancillary Agreements contain the complete agreement between the Parties with respect to the transactions contemplated hereby and supersede and replace all prior and contemporaneous understandings, agreements or representations by or among the Parties, written or oral, with regard to such transactions. No such prior understandings, agreements or representations, including any earlier drafts of this Agreement, shall affect in any way the meaning or interpretation of this Agreement. The Schedules and any documents and instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein.

10.8 <u>Schedules</u>. The disclosures in the Schedules are qualified in their entirety by reference to specific provisions of this Agreement, and are not intended to constitute, and shall not constitute, representations or warranties. Notwithstanding anything to the contrary contained in this Agreement or in the Schedules, each Section of the Schedules shall be deemed to qualify the corresponding Section of this Agreement and any other Section of this Agreement to which the application of such disclosure is reasonably apparent on its face (including with respect to a particular representation and warranty that may not make a reference to the Schedules). The inclusion of information in the Schedules shall not be construed as or constitute an admission or agreement that such information is material to EME, its

46

Subsidiaries or the Business or that such information constitutes a violation of applicable Laws or a breach of any Contract. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. Neither the specifications of any dollar amount in any representation, warranty or covenant contained in this Agreement nor the inclusion of any specific item in the Schedules is intended to imply that such amount, or higher or lower amounts, or the item so included or other items, are or are not material or would or would not cause, or be expected to cause, a Material Adverse Effect, and no Party shall use the fact of the setting forth of any such amount or the inclusion of any such item in any dispute or controversy between the Parties as to whether any obligation, item or matter not described herein or included in the Schedules is or is not material for purposes of this Agreement. Further, neither the specification of any item or matter in any representation, warranty or covenant contained in this Agreement nor the inclusion of any specific item in the Schedules is intended to imply that such item or matter, or other items or matters, are or are not in the ordinary course of business, and no Party shall use the fact of setting forth or the inclusion of any such items or matter in any dispute or controversy between the Parties as to whether any obligation, item or matter not described herein or included in the Schedules is or is not in the ordinary course of business for purposes of this Agreement.

10.9    No Additional Representations; Disclaimer.

(a)    Each Party acknowledges and agrees that none of the other Parties hereto, nor any Person acting on behalf of any Party hereto or any of their respective Affiliates or representatives has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding such Party or any of its Subsidiaries or their respective businesses or assets, except as expressly set forth in this Agreement or as and to the extent required by this Agreement to be set forth in the Schedules. Purchaser further agrees that none of EME nor any of its Affiliates or representatives will have or be subject to any liability to Purchaser or any other Person resulting from the distribution to Purchaser, or Purchaser's use of, any such information and any information, document or material made available to Purchaser or its Affiliates or representatives in connection with the Transactions.

(b)    Each Party acknowledges and agrees that except for the representations and warranties expressly set forth in Article 5 and Article 6, the Transaction is being consummated AS IS, WHERE IS AND WITH ALL FAULTS AND WITHOUT ANY WARRANTIES OF MERCHANTABILITY, QUALITY, CONDITION, USAGE, SUITABILITY OR FITNESS FOR INTENDED USE OR OTHER EXPRESSED OR IMPLIED WARRANTY. Each Party acknowledges and agrees that it is consummating the Transaction without any representation or warranty, express or implied, by the other Parties hereto or any of their Affiliates or representatives, except for the representations and warranties expressly set forth in Article 5 and Article 6 hereof.

(c)    Purchaser acknowledges and agrees that (i) it has not relied on any representation, warranty, covenant or agreement of EME or its respective Related Persons, other than the express representations, warranties, covenants and agreements of EME set forth in Article 5, (ii) Purchaser has made its own investigation of the Target Holdings and Assumed Liabilities and, based on such investigation and its own conclusions derived from such investigation, has elected to proceed with the transactions contemplated hereby and (iii) no material or information provided by or communications made by (or on behalf of) EME or its Affiliates or their respective Related Persons will create any representation or warranty of any kind, whether express or implied, with respect to the Target Holdings and the title thereto, the operation of the Target Holdings, the Assumed Liabilities, the Business or the prospects (financial and otherwise), risks and other incidents of the Business.

10.10   Counterparts. This Agreement may be executed in multiple counterparts (including by means of telecopied or electronically transmitted signature pages), all of which taken together shall constitute one and the same Agreement.

10.11   GOVERNING LAW; CONSENT TO JURISDICTION; ARBITRATION.   THIS AGREEMENT AND EACH ANCILLARY AGREEMENT (AND ANY CLAIMS, CAUSES OF ACTION, ACTIONS, CONTROVERSIES OR DISPUTES THAT MAY BE BASED UPON, ARISE OUT OF OR RELATE HERETO OR THERETO, TO THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY, TO THE NEGOTIATION, EXECUTION OR PERFORMANCE HEREOF OR THEREOF, OR TO THE INDUCEMENT OF ANY PARTY TO ENTER HEREIN AND THEREIN, WHETHER FOR BREACH OF CONTRACT, TORTIOUS CONDUCT OR OTHERWISE AND WHETHER PREDICATED ON COMMON LAW, STATUTE OR OTHERWISE) SHALL IN ALL RESPECTS BE CONSTRUED, PERFORMED AND ENFORCED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE (WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF, AND WITHOUT THE REQUIREMENT TO ESTABLISH COMMERCIAL NEXUS IN A DELAWARE COUNTY), EXCEPT TO THE EXTENT THAT THE LAWS OF SUCH STATE ARE SUPERSEDED BY THE BANKRUPTCY CODE.   FOR SO LONG AS EME IS OR MAY BE SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT, THE PARTIES HERETO IRREVOCABLY ELECT AS THE SOLE JUDICIAL FORUM FOR THE ADJUDICATION OF ANY MATTERS ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT AND EACH ANCILLARY AGREEMENT (AND ANY CLAIMS, CAUSES OF ACTION, ACTIONS, CONTROVERSIES OR DISPUTES THAT MAY BE BASED UPON, ARISE OUT OF OR RELATE HERETO OR THERETO, TO THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY, TO THE NEGOTIATION, EXECUTION OR PERFORMANCE HEREOF OR THEREOF, OR TO THE INDUCEMENT OF ANY PARTY TO ENTER HEREIN AND THEREIN, WHETHER FOR BREACH OF CONTRACT, TORTIOUS CONDUCT OR OTHERWISE AND WHETHER PREDICATED ON COMMON LAW, STATUTE OR OTHERWISE), AND CONSENT TO THE EXCLUSIVE JURISDICTION OF, THE BANKRUPTCY COURT. ALL DISPUTES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS SHALL BE SUBMITTED TO THE BANKRUPTCY COURT (UNLESS THE ANCILLARY AGREEMENTS SPECIFY TO THE CONTRARY) AS LONG AS EME IS OR MAY BE SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT.  IN THAT CONTEXT, AND WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH OF EME AND PURCHASER BY THIS AGREEMENT IRREVOCABLY AND UNCONDITIONALLY: (1) SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY ACTION RELATING TO THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION SHALL BE HEARD AND DETERMINED IN THE BANKRUPTCY COURT; (2) CONSENTS THAT ANY SUCH ACTION MAY AND SHALL BE BROUGHT IN SUCH COURT AND WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OR JURISDICTION OF ANY SUCH ACTION IN ANY SUCH COURT OR THAT SUCH ACTION WAS BROUGHT IN AN INCONVENIENT COURT AND AGREES NOT TO PLEAD OR CLAIM THE SAME; (3) AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION MAY BE EFFECTED BY MAILING A COPY OF SUCH PROCESS BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO SUCH SERVICE AGENT (AS DEFINED BELOW) ON BEHALF OF PURCHASER AT SERVICE AGENT'S ADDRESS PROVIDED BELOW; AND (4) AGREES THAT NOTHING IN THIS AGREEMENT OR ANY ANCILLARY AGREEMENT SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF

48

PROCESS IN ANY OTHER MANNER PERMITTED BY THE LAWS OF THE STATE OF NEW YORK.

NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY (i) TO THE EXTENT THE BANKRUPTCY COURT REFUSES TO HEAR ANY CASE, ACTION OR DISPUTE ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY ANCILLARY AGREEMENT, AND/OR AFTER EME IS NO LONGER SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT OR IF THE BANKRUPTCY COURT OTHERWISE PERMITS, THEN (ii) SUCH CASE OR DISPUTE SHALL THEN BE FINALLY SETTLED BY BINDING ARBITRATION IN CHICAGO, ILLINOIS UNDER THE RULES OF ARBITRATION OF THE INTERNATIONAL CHAMBER OF COMMERCE BY ONE ARBITRATOR APPOINTED IN ACCORDANCE WITH THE SAID RULES IN CHICAGO, ILLINOIS; PROVIDED, HOWEVER, THAT THIS PARAGRAPH SHALL NOT PRECLUDE ANY CLAIM FOR SPECIFIC PERFORMANCE OR OTHER INJUNCTIVE RELIEF FROM BEING ASSERTED IN ANY COURT OF COMPETENT JURISDICTION IF THE CONDITIONS IN CLAUSE (i) OF THIS PARAGRAPH ARE OTHERWISE SATISFIED.

10.12  Payments Under Agreement.  Each Party agrees that all amounts required to be paid hereunder shall be paid in United States currency and without discount, rebate or reduction and subject to no counterclaim or offset on the dates specified herein (with time being of the essence).

10.13  Third-Party Beneficiaries and Obligations.  This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective successors and assigns.  Each of the Supporting Noteholders, the PoJo Parties and the UCC are intended third party beneficiaries of this Agreement and have the right to enforce the terms of this Agreement against the Parties; provided that the rights under this sentence shall terminate and be of no further force or effect automatically upon termination of the Plan Support Agreement for any reason.  Except as expressly set forth herein, nothing in this Agreement is intended to or shall confer upon any Person other than the Parties hereto or their respective successors and permitted assigns, any rights, remedies or liabilities under or by reason of this Agreement, other than (a) the provisions of this Agreement which are specifically for the benefit of the Related Persons of EME and the Homer City Debtors, each of which is an express third-party beneficiary of each such provision, entitled to enforce such provision in accordance with its terms and (b) current and former officers, directors and employees are express third-party beneficiaries of Section 9.7, entitled to enforce the terms thereof in accordance with their terms.

10.14  Waiver of Bulk Sales Laws.  Each of the Parties acknowledges and agrees that neither EME nor any of its Subsidiaries will comply with, and hereby waives compliance by EME and its Subsidiaries with, any "bulk sales," "bulk transfer" or similar Law relating to the transactions contemplated hereby.

10.15  WAIVER OF JURY TRIAL.  THE PARTIES TO THIS AGREEMENT EACH HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO A JURY TRIAL OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (I) ARISING UNDER THIS AGREEMENT OR THE ANCILLARY AGREEMENTS OR (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR THE ANCILLARY AGREEMENTS OR ANY OF THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE.  THE PARTIES TO THIS AGREEMENT EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY

FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

10.16    <u>Relationship of Parties</u>.  Except as specifically provided herein, none of the Parties will act or represent or hold itself out as having authority to act as an agent or partner of the other Parties or in any way bind or commit the other Parties to any obligations or agreement.  Nothing contained in this Agreement will be construed as creating a partnership, joint venture, agency, trust, fiduciary relationship or other association of any kind, each Party being individually responsible only for its obligations as set forth in this Agreement.  The Parties' respective rights and obligations hereunder are limited to the contractual rights and obligations expressly set forth herein on the terms and conditions set forth herein.

10.17    <u>Specific Performance</u>.  Each Party acknowledges and agrees that irreparable damage for which damages, even if available, would not be an adequate remedy would occur in the event that any of the provisions of this Agreement (including the taking of such actions as are required of such Party hereunder to consummate and cause the consummation of the Transaction) were not performed by such Party in accordance with their specific terms or were otherwise breached by any Party.  It is accordingly agreed that each Party shall be entitled (in addition to any other remedy that may be available to it, whether at Law or in equity, including monetary damages, except as limited by this Agreement) to seek and obtain (a) an Order of specific performance or other equitable relief to enforce the observance and performance of such covenant or obligation, and (b) an injunction or other equitable relief restraining such breach or threatened breach, in each case without proof of damages or otherwise; <u>provided</u> that, without limiting the termination rights of each Party pursuant to <u>Section 7.1</u>, prior to termination of this Agreement, EME shall seek specific performance, injunctive relief or other equitable relief prior to seeking monetary damages from the Purchaser Parties.  The Parties further agree that the provisions of <u>Section 7.2</u> are not intended to and do not adequately compensate for the harm that would result from a breach of this Agreement and shall not be construed to diminish or otherwise impair in any respect any party's right to specific enforcement and that the rights granted under this <u>Section 10.17</u> are an integral part of this Agreement and that the Parties would not have executed and delivered this Agreement without the provisions of this <u>Section 10.17</u> and the rights granted to such Party hereunder.  Each Party further agrees that neither party shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this <u>Section 10.17</u>.  Each Party agrees that it waives the defense that there is an adequate remedy at Law, or that any award of specific performance, injunctive relief or other equitable relief is not an appropriate remedy for any reason at Law or in equity, with respect to any claim pursued pursuant to this <u>Section 10.17</u>.  After valid termination of this Agreement, the right of specific performance provided for in <u>Section 10.17</u> shall only be available with respect to the Surviving Provisions.

10.18    <u>Usage</u>.

(a)    Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

(b)    Words denoting any gender shall include all genders.  Where a word is defined herein, references to the singular shall include references to the plural and vice versa.

(c)    A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

(d)    All references to "$" and dollars shall be deemed to refer to United States currency unless otherwise specifically provided.

(e)     All references to a day or days shall be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(f)     Any reference to any agreement or contract referenced herein or in the Schedules shall be a reference to such agreement or contract, as amended, modified, supplemented or waived.

(g)     The phrase "to the extent" means "the degree by which" and not "if."

(h)     The definitions on <u>Annex I</u> are incorporated into this Agreement as if fully set forth at length herein and all references to a "Section" in such <u>Annex I</u> are references to such Section of this Agreement.

*  *  *  *

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first written above.

EDISON MISSION ENERGY

By: Pedro Pizarro
Its: President

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first written above.

NRG ENERGY, INC.

By: _Christopher S. Sotos_
Its: _SVP - Strategy & M&A_

NRG ENERGY HOLDINGS INC.

By: _Christopher S. Sotos_
Its: _Vice President_

ANNEX 1

<u>DEFINITIONS</u>

For purposes of this Agreement, the following terms shall have the following meanings:

"<u>Acceptable Appraiser</u>" means an independent third-party appraiser mutually agreed by both Parties or, if such agreement is not reached within 10 Business Days after demand therefor by either Party, by the Bankruptcy Court upon petition of either Party.

"<u>Accounting Principles</u>" means (i) in the case of Closing Cash, the accounting principles, methodologies, practices, estimation techniques, assumptions, policies and other principles used in the calculation of the various components of Cash in the preparation of the consolidated balance sheet for EME and its Subsidiaries included with EME's Form 10Q for the fiscal quarter ended March 31, 2013 and (ii) in the case of Closing Debt, the accounting principles, methodologies, practices, estimation techniques, assumptions, policies and other principles used in the calculation of the various components of Debt in the preparation of the July monthly operating report for EME and its Subsidiaries filed with the Bankruptcy Court; <u>provided</u> that such monthly report is, with respect to the components of Debt, prepared consistent with GAAP.

"<u>Acquired Companies</u>" shall have the meaning set forth in the Recitals.

"<u>Acquired Company Employee</u>" means any individual who is employed by an Acquired Company as of the Closing Date.

"<u>Acquisition Proposal</u>" means, other than with respect to any assets proposed to be included as part of any Permitted Asset Disposal, any Non-Core Assets, any Excluded Assets or any assets that EME or any Acquired Company is required to sell, transfer or convey as a result of any Order of a Governmental Authority in connection with the Chevron Litigation, any bona fide proposal or offer relating to (a) a merger, joint venture, partnership, consolidation, dissolution, liquidation, tender offer (including a self-tender offer), recapitalization (including a leveraged recapitalization or extraordinary dividend), reorganization, share exchange, business combination or similar transaction involving EME (or any Acquired Company or Acquired Companies), (b) the acquisition of outstanding shares of any class of capital stock of EME, (c) the acquisition, outside of the ordinary course of business, of assets of EME (or any Acquired Company or Acquired Companies), including, for this purpose, the outstanding assets and equity interests of the Acquired Companies, or (d) any other transaction the consummation of which would reasonably be expected to interfere with or prevent the Transactions, and in each case other than the transactions contemplated by this Agreement.

"<u>Additional Conveyance Documents</u>" shall have the meaning set forth in <u>Section 2.1</u>.

"<u>Additional Liabilities Assumption Documents</u>" shall have the meaning set forth in <u>Section 2.1</u>.

"<u>Adjusted Base Purchase Price</u>" shall have the meaning set forth in <u>Section 1.2(a)</u>.

"<u>Affiliate</u>" means any Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified, and the term "<u>control</u>" (including the terms "<u>controlled by</u>" and "<u>under common control with</u>") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Affiliated Group" means any affiliated group within the meaning of Code § 1504(a) or any similar group defined under a similar provision of state, local, or foreign Law.

"Agreed Incremental Tax Attribute Value" shall have the meaning set forth in a Tax Attributes Agreement, if any.

"Agreed PoJo Cure Amount" means (i) the sum of all amounts due under the Facility Leases, including, without limitation, all accrued and unpaid (x) Basic Lease Rent due and payable on any Rent Payment Date occurring prior to the Plan Effective Date (including interest on any overdue principal and overdue interest at the Overdue Rate) and (y) Supplemental Lease Rent minus (ii) the sum of all payments made in respect of Rent pursuant to any forbearance, extension, or other agreement with any of the PoJo Parties including the "Initial Payment" made under the Forbearance Agreement by and among the PoJo Parties dated December 16, 2012. Capitalized terms used in this definition but not otherwise defined herein shall have the meanings set forth in the PoJo Leases and Documents. For the avoidance of doubt, the Parties agree that the Agreed PoJo Cure-Amount is reflected on, and will be calculated as set forth on**, Exhibit F.

"Agreement" shall have the meaning set forth in the Preamble.

"Allowed" means (i) a Claim or interest that is (a) listed in the bankruptcy schedules filed in the Chapter 11 Cases as of the Plan Effective Date as not disputed, not contingent, and not unliquidated, or (b) evidenced by a valid proof of claim, filed by the applicable bar date and no longer subject to EME or any Debtor Subsidiary or Purchaser Parties' rights to file an objection to such proof of claim, or (ii) a Claim that is expressly allowed pursuant to the Plan or any stipulation approved by or as otherwise set forth in a Final Order of the Bankruptcy Court.

"Alternative Acquisition Agreement" shall have the meaning set forth in Section 4.6(a).

"Ancillary Agreements" means the Plan, the PSA Order, and the Confirmation Order, the agreements among the Parties contemplated thereby, and any other agreement to be entered into by the Parties or their Affiliates in connection with the transactions contemplated hereby or thereby on or after the date hereof.

"Antitrust Law" means, collectively, the HSR Act, title 15 of the United States Code §§ 1-7, as amended (the Sherman Act), Title 15 of the United States Code §§ 12-27 and Title 29 of the United States Code §§ 52-53, as amended (the Clayton Act), the Federal Trade Commission Act (15 U.S.C.§ 41 et seq.), as amended, the Anti-Monopoly Law and its implementing regulations, and the rules and regulations promulgated thereunder, and any other Laws and Orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition, as such of the foregoing are enacted and in effect as of the date hereof, including any International Competition Laws.

"Asset Sale Treatment" shall have the meaning set forth in Section 9.5(c).

"Assumed Contract" shall have the meaning set forth in Section 4.5(c).

"Assumed Contracts List" shall have the meaning set forth in Section 4.5(c).

"Assumed Liabilities" means the EME Assumed Liabilities and the Debtor Subsidiary Assumed Liabilities.

"Assumed Rejection Liabilities" shall have the meaning set forth in Section 1.6(c).

"Available Contract List" shall have the meaning set forth in Section 4.5(a).

"Available Contracts" shall have the meaning set forth in Section 4.5(a).

"Available Contracts Notice" shall have the meaning set forth in Section 4.5(b).

"Available Credit Facilities" shall have the meaning set forth in Section 6.5.

"Available Proceeds" means insurance proceeds or condemnation awards paid to EME and/or an Acquired Company in respect of a Casualty or Condemnation Loss and, after the Closing, Purchaser and/or an Acquired Company that, as of the Closing Date, has not yet been spent on repairs or restoration or otherwise reinvested in operating assets.

"Bankruptcy Code" means Title 11 of the United States Code, as amended.

"Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Illinois or such other court having jurisdiction over the Chapter 11 Cases originally administered in the United States Bankruptcy Court of the Northern District of Illinois.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"Base Purchase Price" shall have the meaning set forth in Section 1.2(a).

"Basic Lease Rent" shall have the meaning given to such term in the PoJo Leases and Operative Documents.

"Benefit Period" shall have the meaning set forth in Section 9.6(d).

"Break-Up Fee" shall have the meaning set forth in Section 7.2(b).

"Business" means the power generation business, including wind, gas, and coal, and energy marketing and trading business of EME and its Subsidiaries.

"Business Day" means any day, other than a Saturday, Sunday, or any other date on which banks located in Chicago, Illinois are closed for business as a result of federal, state or local holiday.

"Business Employee" means any current or former employee of EME or any Acquired Company (including, for the avoidance of doubt, any individual who (i) is not actively at work by reason of illness, paid time off, short-term disability, long-term disability, workers' compensation or other leave of absence or (ii) is, or is expected to become, an employee of EME or any Acquired Company) or who is otherwise set forth on Schedule A-1.

"Cash" means the sum, without duplication, of (i) the aggregate amount of cash and cash equivalents, restricted cash and cash equivalents, and margin and collateral deposits of EME and the Acquired Companies to the extent the same would be included on a consolidated balance sheet for EME prepared using the Accounting Principles and (ii) to the extent not included in (i), the aggregate amount of cash and cash equivalents, restricted cash and cash equivalents and margin and collateral deposits of any Partially-Owned Company multiplied by the percentage of outstanding equity interests of such Partially-Owned Company owned (before giving effect to the transactions contemplated hereby), directly or

indirectly, by EME; provided that, for purposes of clause (ii) foregoing, to the extent that there is more than one class of equity, the portion that would be received by EME or any of its Subsidiaries if such aggregate amount was distributed at the time of determination in complete liquidation, dissolution or winding up of such Partially-Owned Company.

"Cash Purchase Price" shall have the meaning set forth in Section 1.2(a).

"Cash Target" means the amount equal to (a) $1,063,000,000, minus (b) the aggregate amount paid by EME or any of its Subsidiaries in respect of Basic Lease Rent due and payable on or after January 2, 2014, plus (c) the Available Proceeds received in respect of a Casualty or Condemnation Loss, plus (d) the proceeds received in the event that EME or any Acquired Company is required to sell, transfer or convey assets as a result of any Order of a Governmental Authority in connection with the Chevron Litigation.

"Casualty or Condemnation Loss" means an Event of Loss or a Taking.

"Chapter 11 Cases" shall have the meaning set forth in the Recitals.

"Chevron Litigation" means the adversary proceeding styled Chevron Kern River Co. v. Southern Sierra Energy Co., No. 12-01954 (JPC) (Bankr. N.D. Ill.), the appeal styled Chevron Kern River Co. v. Southern Sierra Energy Co., No. 13-00848 (CRN) (N.D. Ill.), together with any related appeals, and any other contested matter or dispute arising in connection with the Chapter 11 Cases (including litigation stemming from Debtors' motion to assume gas partnership agreements) between or among: Southern Sierra Energy Company, Western Sierra Energy Company, any of the other Debtors, or any of the Non-Debtor Subsidiaries, on one hand; and Chevron Corporation or any Affiliated thereof, on the other.

"Claims" means all claims, defenses, cross claims, counter claims, debts, suits, remedies, liabilities, demands, rights, obligations, damages, expenses, rights to refunds, reimbursement, recovery, indemnification or contribution, attorneys' or other professionals' fees and causes of action whatsoever, whether based on or sounding in or alleging (in whole or in part) tort, contract, negligence, gross negligence, strict liability, bad faith, contribution, subrogation, respondeat superior, violations of federal or state securities Laws, breach of fiduciary duty, any other legal theory or otherwise, whether individual, class, direct or derivative in nature, liquidated or unliquidated, fixed or contingent, whether at Law or in equity, whether based on federal, state or foreign law or right of action, foreseen or unforeseen, mature or not mature, known or unknown, disputed or undisputed, accrued or not accrued, contingent or absolute (including all causes of action arising under Sections 510, 544 through 551 and 553 of the Bankruptcy Code or under similar state Laws including fraudulent conveyance claims, and all other causes of action of a trustee and debtor-in-possession under the Bankruptcy Code) or rights of set-off.

"Closing" shall have the meaning set forth in Section 1.9.

"Closing Cash" means the excess of (i) amount of Cash as of 12:00 a.m. on the Closing Date, minus (ii) the amount of Cash specifically associated with the Non-Core Assets as of such time, but specifically excludes any Cash received by EME or any of the Acquired Companies with respect to the sale, transfer or conveyance of any such Non-Core Assets after the date hereof and prior to such time. For the avoidance of doubt, the amount of Cash specifically associated with the Non-Core Projects at March 31, 2013 was approximately $5,100,000 and it is intended that clause (ii) of this definition would be calculated in a manner consistent therewith.

"Closing Date" shall have the meaning set forth in Section 1.9.

"Closing Debt" means the aggregate amount of Debt as of 12:00 a.m. on the Closing Date.

"Closing Support Obligations" shall have the meaning set forth in Section 9.9(a).

"Code" means the Internal Revenue Code of 1986, as amended.

"Collective Bargaining Agreements" means a collective bargaining agreement or similar agreement covering any Acquired Company Employee, as may be amended from time to time.

"Condemnation Value" means the value (as determined by an Acceptable Appraiser) of the property subject to a Taking, less any condemnation award received by EME or any of an Acquired Company.

"Confidentiality Agreement" shall mean that certain confidentiality agreement dated September 30, 2013 between EME and Purchaser.

"Confirmation Hearing" means a hearing in front of the Bankruptcy Court seeking approval of the Confirmation Order.

"Confirmation Order" shall have the meaning set forth in Section 8.1(a).

"Contract" means any contract, agreement, indenture, note, bond, mortgage, loan, instrument, lease, license, commitment or other arrangement, understanding, undertaking, commitment or obligation, whether written or oral, other than Real Property Leases.

"Covered EME Claim" shall have the meaning set forth in Section 9.13.

"Cure Amount Objection Deadline" shall have the meaning set forth in Section 4.5(b).

"Cure Amounts" means, with respect to any Available Contract, the amount of cash necessary to pay in full and otherwise satisfy in full all amounts and other consideration that pursuant to Sections 365 and 1123 of the Bankruptcy Code shall be required to cure any defaults on the part of EME or the Acquired Companies pursuant to such Available Contract as a prerequisite to the assignment and assumption of such Available Contract pursuant to Sections 365 and 1123 of the Bankruptcy Code, as such amount is finally determined pursuant to Section 4.5.

"Days Off Accrual" shall have the meaning set forth in Section 9.6(h).

"Debt" means the aggregate principal amount of debt for borrowed money of EME's Subsidiaries to the extent the same would be included on a consolidated balance sheet for EME prepared using the Accounting Principles; provided that "Debt" shall not include (a) any debt for borrowed money or other liability of MWG and its Subsidiaries (including any MWG Permitted Debt), (b) any "intercompany" indebtedness (including any debt for borrowed money owed by any Acquired Company to any other Acquired Company) or (c) any Excluded Liabilities.

"Debt Target" means $1,545,000,000, minus any Debt transferred or being transferred (including through the sale of a Person holding such Debt) in connection with the sale, conveyance or transfer of any Permitted Asset Disposal, or the sale, conveyance or transfer of any Non-Core Asset minus in the event that EME or any Acquired Company is required to sell, transfer or convey assets as a result of any Order of a Governmental Authority in connection with the Chevron Litigation, any Debt

transferred or being transferred (including through the sale of a Person holding such Debt) in connection with the sale, transfer or conveyance of such asset, and <u>minus</u> the Debt amortization specifically with respect to any Non-Core Assets after the date of this Agreement and prior to 12:00 a.m. on the Closing Date.

"<u>Debtor Subsidiaries</u>" means Camino Energy Company, Chestnut Ridge Energy Company, Edison Mission Energy Fuel Services, LLC, Edison Mission Finance Co., Edison Mission Fuel Resources, Inc., Edison Mission Fuel Transportation, Inc., Edison Mission Holdings Co., EME Homer City Generation L.P., Edison Mission Midwest Holdings Co., Homer City Property Holdings, Inc., Mission Energy Westside, Inc., Midwest Finance Corp., Midwest Generation EME, LLC, MWG, Midwest Generation Procurement Services, LLC, Midwest Peaker Holdings, Inc., San Joaquin Energy Company, Southern Sierra Energy Company, Western Sierra Energy Company and each other Acquired Company that files as a debtor in the Chapter 11 Cases.

"<u>Debtor Subsidiary Assumed Liabilities</u>" shall have the meaning set forth in <u>Section 1.6(c)</u>.

"<u>Debtor Subsidiary Assumed Rejection Liabilities</u>" shall have the meaning set forth in <u>Section 1.6(c)</u>.

"<u>Deemed Disclosed</u>" means (i) the document or information was disclosed in a filing made by or on behalf of EME or any of its Subsidiaries in the Chapter 11 Cases prior to the date hereof or (ii) the document or information was included in an EME SEC Report.

"<u>Disclosure Statement</u>" shall have the meaning set forth in <u>Section 8.1(b)</u>.

"<u>Disclosure Statement Order</u>" shall have the meaning set forth in <u>Section 8.1(b)</u>.

"<u>Edison Marks</u>" shall have the meaning set forth in <u>Section 9.14</u>.

"<u>EIX</u>" means Edison International, Inc., a California corporation.

"<u>EIX 401(k) Plan</u>" shall have the meaning set forth in <u>Section 9.6(j)</u>.

"<u>EIX Litigation Claims</u>" means that term as defined in the Plan Term Sheet.

"<u>EIX Litigation Parties</u>" means that term as defined in the Plan Term Sheet.

"<u>EIX Midwest Gen Plan</u>" shall have the meaning set forth in <u>Section 9.6(j)</u>.

"<u>Eligible Employees</u>" means (i) current employees of EME (other than, for the avoidance of doubt, Acquired Company Employees) (including, for the avoidance of doubt, any individual who (A) is not actively at work by reason of illness, paid time off, short-term disability or other leave of absence or (B) is, or is expected to become, an employee of EME), or (ii) any employee who is otherwise listed on <u>Schedule A-2</u>.

"<u>EME</u>" shall have the meaning set forth in the Preamble.

"<u>EME 401(k) Plan</u>" shall have the meaning set forth in <u>Section 9.6(j)</u>.

"<u>EME Account</u>" shall have the meaning set forth in <u>Section 2.2(a)</u>.

"EME Assumed Liabilities" shall have the meaning set forth in Section 1.6(b).

"EME Assumed Rejection Liabilities" shall have the meaning set forth in Section 1.6(b).

"EME Designated Contacts" shall have the meaning set forth in Section 4.2.

"EME Material Adverse Effect" means a material adverse effect upon the business, assets, properties, results of operations or condition (financial or otherwise) of the Business, taken as a whole; provided that none of the following, either alone or taken together with other changes or effects, shall constitute or be taken into account in determining whether there has been an EME Material Adverse Effect: (i) changes in, or effects arising from or relating to, general business or economic conditions affecting the industry in which the Business is operated, (ii) changes in, or effects arising from or relating to, national or international political or social conditions, including the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel of the United States, (iii) changes in, or effects arising from or relating to, financial, banking, securities or commodities markets (including (V) any change in commodity prices (including, without limitation, the price of natural gas, coal and/or electricity), (W) any disruption of any of the foregoing markets, (X) any change in currency exchange rates, (Y) any decline or rise in the price of any security, commodity, contract or index and (Z) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the transactions contemplated hereby, (iv) changes in, or effects arising from or relating to changes in, GAAP, (v) changes in, or effects arising from or relating to changes in, Laws, Orders, or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Authority, (vi) changes in, or effects arising from or relating to, the taking of any action expressly contemplated by this Agreement, the announcement of this Agreement, or the Transaction, (vii) any existing event, occurrence, or circumstance with respect to which Purchaser has knowledge as of the date hereof (including any matter set forth in the EME SEC Reports), (viii) changes or effects that generally affect the electric power industry, electric power markets and/or electric power transmission and/or distribution, (ix) any failure, in and of itself, to achieve any projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or representatives), (x) any adverse change in or effect on the Business that is cured by or on behalf of any member of the Acquired Companies before the earlier of the Closing Date and the date on which this Agreement is terminated pursuant to Article 7, (xi) any adverse change in or effect on the Business that is caused by any delay in consummating the Closing as a result of any violation or breach by Purchaser of any covenant, representation or warranty contained in this Agreement or Purchaser's removal of any Available Contract from the Assumed Contract List, (xii) any changes or effects caused by or relating to the identity of Purchaser, (xiii) any changes or effects caused by or relating to the Chapter 11 Cases (including loss of credit and other third-party business relations matters), (xiv) a Major Loss, (xv) a Walnut Creek Loss, (xvi) the Chevron Litigation or an Order or determination in connection therewith, (xvii) the loss of the services of any employee(s), whether as a result of a strike, work stoppage or otherwise, (xviii) changes in or effects relating to Excluded Assets, Excluded Liabilities or Non-Core Assets, or (xix) the absence of any variances or waivers with respect to any Acquired Company from the IPCB; provided that, with respect to clauses (i), (iii) through (v) and (viii), such effects may be considered in determining whether there has been an EME Material Adverse Effect to the extent such effects have a disproportionate effect on the Business, taken as a whole, as compared to other Persons engaged in the same industry (or, in the case of clause (v), other Persons engaged in the same industry in the same jurisdiction(s) where such Laws, Orders, or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Authority have effect). For the avoidance of doubt, the condition set forth in Section 3.2(d) shall not be deemed an acknowledgment, admission or other concession on the part of

(a) EME that a loss in excess of 20% of the Stipulated Transaction Value constitutes an EME Material Adverse Effect, or (b) Purchaser Parties that a loss less than or equal to 20% of the Stipulated Transaction Value does not constitute an EME Material Adverse Effect, and such provision shall have no effect on the interpretation of this definition.

"EME SEC Reports" means each report, filing and document made by EME or any of its Subsidiaries on or after December 17, 2012 and prior to the date hereof, as amended prior to the date hereof.

"EME Severance Plans" shall mean the EME Severance Pay Plan and EME Exeuctive Severance Pay Plan which shall be drafted and adopted by EME between the date hereof and the Closing Date to mirror, respectively, the "Edison International Involuntary Severance Plan" and "Edison International 2008 Executive Severance Plan" as in effect immediately prior to the date hereof; provided, however, for the avoidance of doubt, that in no event shall the EME Severance Plans provide cash based severance or other compensation in excess of such benefits provided under the Edison International Involuntary Severance Plan and Edison International 2008 Executive Severance Plan, respectively.

"Employee Benefit Plan" means each "employee benefit plan" (as such term is defined in ERISA §3(3)) and each other material employee benefit plan, program or arrangement that is sponsored or maintained or contributed to by EME or any Acquired Companies or any ERISA Affiliate as of the Closing Date on behalf of any current or former employees of EME or any Acquired Company.

"Employee Welfare Benefit Plan" has the meaning set forth in ERISA §3(1).

"EMRA Approval" means any necessary approval from the Republic of Turkey Energy Market Regulatory Authority or any other Governmental Authority to transfer the interests in Doga Enerji Uretim Sanayi ve Ticaret L.S., Doga Isi Satis Hizmetleri ve Ticaret L.S., and Doga Isletme ve Bakim Ticaret L.S.

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means each entity that is treated as a single employer with the members of the Acquired Companies for purposes of Code § 414.

"Estimated Adjusted Base Purchase Price" shall have the meaning set forth in Section 1.2(b).

"Estimated Cash Purchase Price" shall have the meaning set forth in Section 1.2(b).

"Estimated Cash Target" shall have the meaning set forth in Section 1.2(b).

"Estimated Closing Cash" shall have the meaning set forth in Section 1.2(b).

"Estimated Closing Debt" shall have the meaning set forth in Section 1.2(b).

"Estimated Debt Target" shall have the meaning set forth in Section 1.2(b).

"Event of Loss" shall have the meaning set forth in Section 4.9.

"Excess Amount" shall have the meaning set forth in Section 1.3(c).

"Excess Loss Amount" means the lesser of (a) 10% of the Stipulated Transaction Value and (b) the amount by which (x) the total remaining costs (as determined by an Acceptable Appraiser) as of the Closing Date of repairing or restoring the facilities that suffered a Casualty or Condemnation Loss to a condition reasonably comparable to their condition prior to such Casualty or Condemnation Loss after giving effect to any Available Proceeds, exceeds (y) the amount equal to 10% of the Stipulated Transaction Value.

"Excluded Assets" shall have the meaning set forth in Section 1.5.

"Excluded Assets Contribution" shall have the meaning set forth in Section 1.8(a).

"Excluded Employee" shall have the meaning set forth in Section 9.6(a).

"Excluded Employee Benefit Plans" shall have the meaning set forth in Section 1.5.

"Excluded Employee Liabilities" means any Liabilities (i) of EME or any Debtor Subsidiary (x) under the Corporate Short-Term Incentive Plan and Edison Mission Energy 2013-2014 Long Term Incentive Plan, or any other post-petition bonus or incentive plans of the Debtor Entities or (y) for any change in control, retention or similar payments arising from the Transaction or severance obligations arising from a termination of employment prior to the Closing Date, in each case under applicable employment agreements or employee programs of the Debtor Entities, EME or any of their Affiliates, (ii) of EME or any Subsidiary to employees, former employees, retirees and retiree eligible employees (including any beneficiaries or dependents thereof) of EME and its Subsidiaries under any applicable pension, PBOP (post-retirement benefits other than pension), non-qualified, or any other benefit plans providing post-retirement benefits other than the EME 401(k) Plan and the Mirror Pension Plan (including claims arising under a theory of control group liability under Title IV of ERISA), and (iii) of EME or any Subsidiary thereof payable on termination to such Business Employees of EME and the Acquired Companies set forth on Schedule 9.6(f).

"Excluded Liabilities" shall have the meaning set forth in Section 1.7.

"Excluded Rejection Liabilities" shall have the meaning set forth in Section 1.7(d).

"Excluded Tax Liabilities" means (i) any and all Taxes owing to any Governmental Authority, in each case which are imposed on, or are attributable to the operations, assets, revenues, sales, payroll or income of, (a) except to the extent attributable to the Business for taxable periods, or portions of taxable periods, beginning after the Closing Date, EME or its Affiliates (other than the Acquired Companies) for any Taxable period, or (b) any Acquired Company with respect to any Taxable period, or a portion of a Taxable period (including quarterly estimated Tax periods) ending on or prior to the Closing Date, but excluding those Taxes (other than those specified in the following clause (ii)) that are not due and payable until after the Closing Date if such Taxes may be paid after the Closing Date without interest or penalty, (ii) without limiting any rights of EME pursuant to Section 9.5(c) or Section 9.5(d), (a) any Income Taxes payable by EME or any Acquired Company as a result of the Transaction or in respect of any cancellation of indebtedness income recognized in connection with the consummation of any of the transactions set forth in the Plan, and (b) any and all Taxes related to transactions undertaken pursuant to Section 1.8 or Section 4.8, or to the conversion of the Wholly Owned Companies to limited liability companies hereunder or (iii) any liability in respect of Taxes described in the preceding clauses (i) and (ii) as a result of the application of U.S. Treasury Regulation § 1.1502-6 or any comparable provision of state, local or foreign Law, as a transferee or successor.

"Expense Reimbursement" shall have the meaning set forth in Section 7.2(b).

"FERC" means the Federal Energy Regulatory Commission.

"FERC Filings" shall have the meaning set forth in Section 4.7(a).

"Final Cash Purchase Price" shall have the meaning set forth in Section 1.3(b).

"Final Order" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter which has not been reversed, stayed, modified, or amended, as to which the time to appeal or seek certiorari has expired or been waived by the Debtors (as defined in the Plan) and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court, may be filed relating to such order shall not prevent such order from being a Final Order; provided, further, that the Debtors reserve the right to waive any appeal period related to the Purchase and Sale Agreement or the transactions contemplated thereby with the consent of Purchaser.

"Form S-1" shall have the meaning set forth in Section 4.10(a).

"GAAP" means United States generally accepted accounting principles.

"Governmental Approvals" shall have the meaning set forth in Section 3.1(c)(iii).

"Governmental Authority" means any U.S. or foreign, federal, state, regional or local government, governmental agency, committee of governmental agencies, department, bureau, office, commission, authority or instrumentality, or court of competent jurisdiction.

"Homer City Debtors" means Chestnut Ridge Energy Company, Edison Mission Energy Services, Inc., Edison Mission Finance Co., Edison Mission Holdings Co., EME Homer City Generation L.P., Homer City Property Holdings, Inc., and Mission Energy Westside, Inc.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"IPCB" means the Illinois Pollution Control Board.

"Income Taxes" means all federal, state, local, and foreign income Taxes or other Taxes based on or measured by income, net worth or receipts including any franchise Taxes measured by or based upon income or receipts.

"Intercompany Accounts" shall have the meaning set forth in Section 9.11.

"Joliet Owner Lessors" means Nesbitt Asset Recovery Series J-1 and Joliet Trust II.

"Joliet Parties" means, collectively, MWG, the Joliet Owner Lessors, Wilmington Trust Company (as Owner Trustee), Nesbitt Asset Recovery LLC, Series J-1 (as Owner Participant), Joliet Generation II, LLC (as Owner Participant), The Bank of New York Mellon (as the successor Lease Indenture Trustee), and The Bank of New York Mellon, as the successor Pass Through Trustee.

"Knowledge of EME" means, and shall be limited to, the actual knowledge of the individuals set forth on Schedule A-3.

"Law" means any United States or foreign, federal, state or local law (including common law), statute, code, ordinance, rule, regulation, Order or other requirement of any Governmental Authority, as each of the foregoing is enacted and in effect as of the date hereof.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, mediation, investigation, inquiry, proceedings or claims (including counterclaims) by or before a Governmental Authority.

"Leverage Event" shall have the meaning set forth in Section 3.2(f).

"Liabilities" means, as to any Person, all indebtedness, claims of any kind or nature, including contingent or unliquidated claims, interests, commitments, responsibilities and obligations of any kind or nature whatsoever, direct or indirect, absolute or contingent, whether known or unknown, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not actually reflected, or required to be reflected, in such Person's balance sheet or other books and records, including Taxes.

"Lien" means any mortgage, pledge, lien, encumbrance, or other security interest, claim, community or other marital property interest, equitable interest, option, right of way, easement, encroachment, servitude, right of first option, right of first refusal or similar restriction, including any restriction on use, voting (in the case of any security or equity interest), transfer, receipt of income or exercise of any other attribute of ownership.  For the avoidance of doubt, "Lien" shall not be deemed to include any license of intellectual property.

"Losses" means actual direct, out-of-pocket losses, liabilities, damages or expenses (including reasonable legal fees).  "Losses" shall not include any consequential, punitive, special, incidental and indirect damages, and special or indirect losses, including business interruption, loss of future revenue, profits or income, diminution in value, loss of business reputation or opportunity or any damages based on a multiple, except to the extent in each case payable to third parties.

"Major Loss" shall have the meaning set forth in Section 4.9(b).

"Midwest Gen Union Employees" shall have the meaning set forth in Section 9.6(k).

"Mirror Pension Plan" shall have the meaning set forth in Section 9.6(k).

"MWG" means Midwest Generation, LLC, a Delaware limited liability company.

"MWG Intercompany Notes" means the intercompany notes, dated August 24, 2000, issued by EME in favor of MWG, as the same has been or may be amended or modified from time to time.

"MWG Permitted Debt" means any indebtedness under any certain postpetition intercompany loan made by EME, as lender, to MWG, as borrower, to satisfy any funding requirements of MWG through the Plan Effective Date.

"Non-Core Assets" means (i) American Bituminous, an approximately 80 MW waste coal facility in Grant Town, West Virginia, (ii) Big Sky, an approximately 240 MW wind powered-generating facility in Ohio, Illinois, (iii) Crawford Station, a 72-acre site at 3501 South Pulaski Road, Chicago, Illinois, (iv) Fisk Station, a 43-acre site at 1111 West Cermak Road, Chicago, Illinois (excluding the oil-fired generation facility and related property), and (v) Sampson's Canal, a canal near the Fisk Station located at 2251 and 2401 South Loomis Street, Chicago, Illinois.

"Non-Debtor Subsidiaries" means each of those Subsidiaries of EME that is not a Debtor Subsidiary.

"Non-EME Subsidiaries" means the Subsidiaries of EIX (other than EME and its Subsidiaries).

"Non-Income Tax" means any Tax that is not an Income Tax.

"Non-Rejectable Contracts" means the Collective Bargaining Agreements, the PoJo Leases and Documents, the EME 401(k) Plan, and the Mirror Pension Plan.

"Notes" means (i) $500 million principal amount of 7.50% Senior Notes due June 15, 2013 issued by EME; (ii) $500 million principal amount of 7.75% Senior Notes due June 15, 2016 issued by EME; (iii) $1.2 billion principal amount of 7.00% Senior Notes due May 15, 2017 issued by EME; (iv) $800 million principal amount of 7.20% Senior Notes due May 15, 2019 issued by EME; and (v) $700 million principal amount of 7.625% Senior Notes due May 15, 2027 issued by EME.

"Notice of Disagreement" shall have the meaning set forth in Section 1.3(b).

"Notice Period" shall have the meaning set forth in Section 4.6(d).

"Offered Terms" shall have the meaning set forth in Section 9.6(f).

"Order" means any order, judgment, determination or decree of any court or Governmental Authority.

"Organizational Documents" shall have the meaning set forth in Section 5.2(b).

"Owner Lessor" means, collectively, the Powerton Owners Lessors and the Joliet Owner Lessors.

"Paid Vacation Liabilities" shall have the meaning set forth in Section 9.6(h).

"Parent" shall have the meaning set forth in the Preamble.

"Parent Common Stock" means common stock of Parent, par value $0.01 per share.

"Partially-Owned Companies" shall have the meaning set forth in the Recitals.

"Partially-Owned Equity Interests" shall have the meaning set forth in the Recitals.

"Party" and/or "Parties" shall have the meaning set forth in the Preamble.

"Permits" means permits, registrations, approvals, authorizations, consents, licenses or certificates issued by any Governmental Authority.

"Permitted Asset Disposal" means the sale, transfer or conveyance of any assets of EME or any Subsidiary thereof for which the proceeds received by EME are not in excess of $25,000,000 individually or $50,000,000 in the aggregate (other than sales, transfers or conveyances of Non-Core Assets, Excluded Assets, sales of assets in the ordinary course of business consistent with past practices and any assets that EME or any Subsidiary is required to sell, transfer or convey as a result of any Order of a Governmental Authority in connection with the Chevron Litigation).

"Permitted Asset Disposal Purchase Price" means the aggregate proceeds (net of Taxes and expenses payable and other Liabilities to be discharged by EME or any of the Acquired Companies) received by EME or any Subsidiary thereof from a Permitted Asset Disposal.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a Governmental Authority.

"Petition Date" shall have the meaning set forth in the Recitals.

"Plan" shall have the meaning set forth in the Recitals.

"Plan Effective Date" shall have the meaning set forth in the Recitals.

"Plan Sponsor Agreement" shall have the meaning set forth in the Recitals.

"Plan Supplement" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be filed not later than ten days prior to the deadline to vote to accept or reject the Plan.

"Plan Term Sheet" shall have the meaning set forth in the Recitals.

"PoJo Lease Modifications" shall have the meaning set forth in Section 9.4(b).

"PoJo Leases and Documents" means the leases, agreements and documents listed on Exhibit E attached hereto.

"PoJo Parties" means the Powerton Parties, the Joliet Parties and each other Person that the Parties mutually agree are necessary in order to effectuate the transactions contemplated hereby with respect to the PoJo Leases and Documents.

"PoJo Restructuring Fees" has the meaning given to such term in the PoJo Term Sheet.

"PoJo Term Sheet" shall have the meaning set forth in Section 9.4(b).

"Powerton Parties" means, collectively, MWG, the Powerton Owner Lessors, Wilmington Trust Company (as Owner Trustee), Nesbitt Asset Recovery LLC, Series P-1 (as Owner Participant), Powerton Generation II, LLC (as Owner Participant), The Bank of New York Mellon (as the successor Lease Indenture Trustee), and The Bank of New York Mellon, as the successor Pass Through Trustee.

"Powerton Owner Lessors" means Nesbitt Asset Recovery Series P-1 and Powerton Trust II.

"Pre-Closing Reorganization" shall have the meaning set forth in Section 4.8.

"Proposed Cure Amounts" shall have the meaning set forth in <u>Section 4.5(a)</u>.

"PSA Order" shall have the meaning set forth in <u>Section 8.1(a)</u>.

"Purchased Interests" shall have the meaning set forth in the Recitals.

"Purchaser" shall have the meaning set forth in the Preamble.

"Purchaser Employment Conditions" shall have the meaning set forth in <u>Section 9.6(a)</u>.

"Purchaser Parties" shall have the meaning set forth in the Preamble.

"Purchaser Plans" shall have the meaning set forth in <u>Section 9.6(f)</u>.

"Rejected Contracts" shall have the meaning set forth in <u>Section 4.5(c)</u>.

"Rejected Contracts List" shall have the meaning set forth in <u>Section 4.5(c)</u>.

"Rejection Liabilities" means collectively, the EME Assumed Rejection Liabilities and the Debtor Subsidiary Assumed Rejection Liabilities.

"Related Persons" means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, agents, professionals, financial advisors, restructuring advisors, attorneys, accountants, investment bankers, financing source, or representatives of (i) any such Person and (ii) of any Affiliate of such Person; provided that "Related Persons" of EME shall not include (w) EIX, (x) any Non-EIX Subsidiary, (y) any EIX Litigation Party or (z) any Person that would otherwise (but for this proviso) be a Related Person of EME to the extent of its relationship with EIX, any Non-EME Subsidiary or any EIX Litigation Party.

"Remaining Support Obligations" shall have the meaning set forth in <u>Section 9.9(a)</u>.

"Remedies Exceptions" means the application of bankruptcy, moratorium and other Laws affecting creditors' rights generally and as limited by the availability of specific performance and the application of equitable principles.

"Replicated Plans" shall have the meaning set forth in <u>Section 4.4(c)</u>.

"Restoration Costs" means the aggregate costs (as determined by an Acceptable Appraiser) to restore, repair or replace property or assets subject to an Event of Loss to a condition reasonably comparable to their prior condition, less any insurance proceeds received by EME or any of the Acquired Companies in connection with such Event or Events of Loss; provided that any insurance proceeds received in connection with an Event or Events of Loss are either used to restore, repair or replace such property or assets subject to an Event or Events of Loss or made available to Purchaser.

"Retained Books and Records" means (a) all corporate seals, minute books, charter documents, corporate stock record books, original Tax and financial records and such other files, books and records to the extent they relate exclusively to any of the Excluded Assets or Excluded Liabilities or the organization, existence, capitalization or debt financing of EME, any Homer City Debtor or any Acquired Company not transferred, (b) all books, files and records if the disclosure thereof would (i) violate any legal constraints or obligations regarding the confidentiality thereof, (ii) waive any attorney client, work product or other legal privilege, (iii) disclose information about EME or any Homer City

Debtor or that are unrelated to the Business or (iv) disclose information about pertaining to project evaluation, price curves or projections or other economic predictive models, or (c) all books and records prepared in connection with the evaluation of bids relating to any Acquisition Proposal.

"Review Period" shall have the meaning set forth in Section 1.3(a).

"SEC" shall mean the United State Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended.

"Selected Employees" shall have the meaning set forth in Section 9.6(a).

"Schedules" means the Schedules delivered by EME to Purchaser on the date hereof.

"Shortfall Amount" shall have the meaning set forth in Section 1.3(c).

"Solicitation Period End-Date" shall have the meaning set forth in Section 4.6(a).

"Stipulated Transaction Value" means $3,600,000,000.

"Stock Purchase Price" shall have the meaning set forth in Section 1.2(a).

"Stock Purchase Price Numerator" shall have the meaning set forth in Section 1.2(a).

"Subsidiary" means, with respect to any Person, any corporation, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a partnership, association or other business entity, a majority of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof; provided that when the term "Subsidiary" is used herein with respect to EME, it shall not include the Homer City Debtors. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a partnership, association or other business entity if such Person or Persons shall be allocated a majority of partnership, association or other business entity gains or losses or shall be or control the managing director or general partner of such partnership, association or other business entity.

"Superior Proposal" means one or more bona fide written Acquisition Proposal(s) that is not executed in violation of Section 4.6 and that the board of directors of EME has concluded, in its good faith judgment, after consultation with its independent financial advisors and outside legal counsel, and taking into consideration all relevant factors including, among other things, all of the terms, conditions, financial, regulatory and other aspects of such Acquisition Proposal(s) and this Agreement (in each case taking into account any changes to this Agreement or the transactions contemplated hereby (or any other proposals) made or proposed in writing by Purchaser prior to the time of determination), the assets and the liabilities proposed to be purchased and assumed or excluded (and any value proposed to be paid by a proponent of an Acquisition Proposal in respect of any assets proposed to be included as part of any Permitted Asset Disposal, any Non-Core Assets or any Excluded Assets), the identity and financial wherewithal of such third party(ies) making the Acquisition Proposal(s), and any applicable breakup fee and expense reimbursement provisions, (a) is or are reasonably likely to be consummated in accordance

with its or their terms and (b) if consummated, is or are better for EME and its stakeholders than the transactions contemplated by this Agreement.

"Support Obligations" shall have the meaning set forth in Section 9.9(a).

"Supporting Noteholders" shall have the meaning set forth in the Recitals.

"Surviving Provisions" shall have the meaning set forth in Section 7.2(a).

"Taking" shall have the meaning set forth in Section 4.9.

"Target Assets" shall have the meaning set forth in Section 1.4.

"Target Equity Interests" shall have the meaning set forth in the Recitals.

"Target Holdings" shall have the meaning set forth in the Recitals.

"Tax" or "Taxes" means (a) any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, property, customs duties, franchise, social security, unemployment, withholding, disability, sales, use, transfer, value added, alternative or add on minimum or other tax of any kind, including any interest, penalties or additions to Tax or additional amounts in respect of the foregoing, (b) any liability for payment of amounts described in clause (a) payable by reason of Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof) or any analogous or similar provision under Law, as a result of successor or transferee liability, or being a member of an Affiliated Group for any period, or otherwise through operation of Law, and (c) any liability for payment of amounts described in clauses (a) or (b) as a result of any tax sharing, tax indemnity or tax allocation agreement or any other express or implied agreement or any practice, policy or arrangement of indemnifying or to indemnify any other Person for taxes.

"Tax Attributes" shall have the meaning set forth in Section 1.5.

"Tax Attributes Agreement" means any agreement that may, in each Parties' sole discretion, be entered into between EME and Purchaser whereby (a) EME agrees to deliver incremental tax attributes (including any Tax Attributes that are Excluded Assets) in addition to what would be available to Purchaser following the Asset Sale, and (b) Purchaser agrees to compensate EME for such incremental tax attributes.

"Tax Return" means any return, declaration, election, report, claim for refund, or information return or statement relating to Taxes.

"Termination Date" shall mean July 31, 2014; provided that if the Form S-1 has not been declared effective as of July 31, 2014, EME may by prior written notice to the Purchaser Parties elect to make the "Termination Date" be October 31, 2014.

"Transaction" shall have the meaning set forth in Section 1.1.

"Transfer Taxes" means all transfer, real property transfer, sales, use, goods and services, value added, recordation, documentary, stamp, duty, excise, and conveyance Taxes and other similar Taxes, duties, fees or charges, as levied by any Taxing authority in connection with the Transaction (in each case, after giving effect to the Confirmation Order), including any real property transfer Taxes imposed by any Governmental Authority, including all treble damages, penalties, interest, costs and fees

(including attorney's fees); <u>provided</u>, however, that for the avoidance of doubt, the term Transfer Taxes shall not include any Income Taxes.

"<u>Transferred Employee</u>" means (i) each Eligible Employee who accepts Purchaser's offer employment as set forth in <u>Section 9.6(a)</u> and (ii) each Acquired Company Employee.

"<u>Transferred Policies</u>" shall have the meaning set forth in <u>Section 9.13</u>.

"<u>True-Up Statement</u>" shall have the meaning set forth in <u>Section 1.3(a)</u>.

"<u>UCC</u>" shall have the meaning set forth in the Recitals.

"<u>Union Employees</u>" shall have the meaning set forth in <u>Section 9.6(b)</u>.

"<u>Viento Holdco Debt</u>" shall have the meaning set forth in <u>Section 9.5(c)</u>.

"<u>Viento Shares</u>" shall have the meaning set forth in <u>Section 9.5(c)</u>.

"<u>Walnut Creek Loss</u>" means any of the following: (i) the actual loss of all or substantially all of the approximately 479 MW gas-fired generating facility at the Walnut Creek Station; (ii) the destruction of all or substantially all of the Walnut Creek Station such that there remains no substantial remnant thereof which a prudent owner, desiring to restore the Walnut Creek Station to its original condition, would utilize as the basis of such restoration; (iii) the destruction of all or substantially all of the Walnut Creek Station irretrievably beyond repair; (iv) the destruction of all or substantially all of the Walnut Creek Station such that the cost of repair would equal or exceed the cost of replacement; (v) the destruction of all or substantially all of the Walnut Creek Station such that the insured may claim a "total loss" under any insurance policy covering the Walnut Creek Station upon abandoning the Walnut Creek Station to the insurance underwriters therefor; or (vi) an Event of Loss or Taking of all or a substantial portion of the real property at the Walnut Creek Station, <u>provided</u> that such Event of Loss or Taking is material to the operation of the Walnut Creek Station.

"<u>Walnut Creek Station</u>" means Walnut Creek Energy Park in the City of Industry, California.

"<u>Wholly-Owned Companies</u>" shall have the meaning set forth in the Recitals.

"<u>Wholly-Owned Equity Interests</u>" shall have the meaning set forth in the Recitals.

## **Exhibit B**

**Reorganization Trust Agreement**

*EXECUTION VERSION*

---

**REORGANIZATION TRUST AGREEMENT**

**BY AND AMONG**

**THE MANAGING TRUSTEES LISTED ON THE SIGNATURE PAGES HERETO,**

**AND**

**WILMINGTON TRUST, NATIONAL ASSOCIATION
(AS DELAWARE TRUSTEE)**

April 1, 2014

---

## REORGANIZATION TRUST AGREEMENT

This Reorganization Trust Agreement (this "<u>Reorganization Trust Agreement</u>") is made this 1st day of April, 2014 (the "<u>Effective Date</u>"), by and among each of the individuals listed on the signature pages hereto as "Managing Trustees" (each, a "<u>Managing Trustee</u>" and collectively, the "<u>Managing Trustees</u>") and Wilmington Trust, National Association, or its successor, as Delaware Trustee (in such capacity and as appointed in accordance with this Reorganization Trust Agreement, the "<u>Delaware Trustee</u>"), and supersedes and replaces that certain Reorganization Trust Agreement, dated as of March 14, 2014, in its entirety. This Reorganization Trust Agreement is entered into in accordance with the *Debtors' Third Amended Joint Chapter 11 Plan of Reorganization*, dated as of March 10, 2014 [Docket No. 2201] (as amended, modified, or supplemented from time to time, the "<u>Plan</u>"), which Plan was confirmed on March 11, 2014 [Docket No. 2206], and constitutes the trust agreement for the Reorganization Trust established in accordance with the Plan (the "<u>Reorganization Trust</u>"). Capitalized terms used but not otherwise defined in **Appendix A** to this Reorganization Trust Agreement shall have the meanings ascribed to them in the Plan.

## R E C I T A L S :

A.    The Plan contemplates (1) the creation of the Reorganization Trust and the issuance of the New Interests in the Reorganization Trust (the "<u>Beneficial Interests</u>") solely for the benefit of certain creditors of Edison Mission Energy ("<u>EME</u>") entitled to distribution under the Plan (collectively, the "<u>Beneficiaries</u>" and, each individually, a "<u>Beneficiary</u>") in accordance with this Reorganization Trust Agreement, the Confirmation Order and the Plan, and (2) that, on the Effective Date of the Plan, there shall be granted, assigned, transferred, conveyed, and delivered to the Reorganization Trust (a) all of the right, title, and interest in Excluded Assets other than the Settlement Retained Assets in connection with the consummation of the transactions pursuant to the Purchase Agreement and the EIX Settlement Agreement, (b) all rights, assets, liabilities and obligations of EME pursuant to the Purchase Agreement and the EIX Settlement Agreement (including all right, title, and interest in and to the EIX Notes, all rights against EIX and certain of its affiliates in respect of the Settlement Assumed Liabilities, and the EIX Escrow Account), and (c) the right to prosecute, settle, withdraw, or resolve in any manner approved by the Bankruptcy Court the Causes of Action that are Excluded Assets (collectively, together with all other assets identified in the Plan and/or the Confirmation Order as being or becoming assets of the Reorganization Trust and any proceeds or other property received in respect thereof, the "<u>Trust Assets</u>");

B.    The Plan contemplates that the Reorganization Trust shall be created for the primary purpose of performing all actions related to the Post-Effective-Date Reorganization Trust Matters with no objective to continue or engage in the conduct of a trade or business, except to the reasonably necessary to, and consistent with, its liquidating purpose;

C.    The Reorganization Trust is intended to qualify, for United States federal income tax purposes, as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations and a "grantor trust", pursuant to Sections 671–677 of the Internal Revenue Code of 1986, as amended (the "<u>Internal Revenue Code</u>"), with the Beneficiaries to be

treated as the grantors of the Reorganization Trust and deemed to be the owners of the Trust Assets (subject to the rights of creditors of the Reorganization Trust), and consequently, the transfer of the Trust Assets to the Reorganization Trust shall be treated as a deemed transfer of those assets from the Debtors to the Beneficiaries followed by a deemed transfer by such Beneficiaries to the Reorganization Trust for federal income tax purposes;

D.      The Reorganization Trust is intended to qualify as a "liquidating trust" for all purposes of the Investment Company Act of 1940, as amended (the "ICA"); and

E.      The Managing Trustees shall have all powers necessary to implement the provisions of the Plan and this Reorganization Trust Agreement and administer the Reorganization Trust, including the power to perform all actions related to the Post-Effective-Date Reorganization Trust Matters and to otherwise:  (1) preserve and maintain the Trust Assets; (2) object to and reconcile Claims against the Debtors entitled to distribution from the Reorganization Trust; (3) settle or compromise any Claims against the Debtors; (4) distribute to or utilize the Trust Assets for the benefit of the Beneficiaries; and (5) otherwise perform the functions and take the actions provided for or permitted in the Plan, the Confirmation Order, this Reorganization Trust Agreement, the EIX Settlement Agreement, or in any other agreement executed pursuant to the Plan.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein and in the Plan, the Managing Trustees and the Delaware Trustee agree as follows:

## ARTICLE I
## FORMATION OF REORGANIZATION TRUST

### 1.1.   Establishment

(a)      The Managing Trustees hereby agree to act as Managing Trustees as set forth herein for the Reorganization Trust, which shall constitute a statutory trust pursuant to and in accordance with Chapter 38 of Title 12 of the Delaware Code, Del. C. §§ 3801 et seq. (as the same may be amended from time to time, the "Trust Act"), and hereby ratify the formation of the Reorganization Trust pursuant to the Certificate of Trust (the "Certificate"), filed with the Secretary of State of the State of Delaware on March 14, 2014, pursuant to section 3810 of the Trust Act.  The purpose of the Reorganization Trust is to implement the provisions of the Plan and the Confirmation Order specified as being applicable to the Reorganization Trust and the taking of such lawful actions incidental thereto and not in violation of this Reorganization Trust Agreement.  The Reorganization Trust will not hold itself out as an investment company and will not conduct a trade or business.  The Reorganization Trust will distribute the Trust Assets to the Beneficiaries in accordance with this Reorganization Trust Agreement, the Plan, and the Confirmation Order and will not invest the Trust Assets other than in government securities or other investments that, in accordance with applicable law, would not require the Reorganization Trust to be registered under the ICA.  The Reorganization Trust shall take such other actions (including amending this Reorganization Trust Agreement), as the Managing Trustees shall reasonably determine in order to cause the Reorganization Trust to comply with the ICA (including any non-registration requirements thereunder).

2

(b)     The Reorganization Trust shall be known as "<u>EME Reorganization Trust</u>," in which name the Managing Trustees may, subject to the limitations contained in this Reorganization Trust Agreement, conduct the business of the Reorganization Trust, make and execute contracts, and sue and be sued.  In circumstances under which the Managing Trustees determine that the use of such name is not practicable or under circumstances in which the Managing Trustees are contractually bound to change that name, the Managing Trustees may adopt another name under which the Reorganization Trust may hold property or conduct its activities.

(c)     In accordance with the Plan and the Confirmation Order, each of the Debtors, the Non-Debtor Subsidiaries, and the Acquired Companies, as applicable, have assigned, transferred, conveyed, and delivered to the Reorganization Trust, for the benefit of the Beneficiaries, all of its right, title, and interest in and to all of the Trust Assets.  Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, all Trust Assets shall vest in the Reorganization Trust in accordance with section 1141 of the Bankruptcy Code.  Upon the transfer of the Trust Assets to the Reorganization Trust, the Debtors, the Non-Debtor Subsidiaries, and the Acquired Companies, as applicable, shall have no interest in or with respect to such Trust Assets or the Reorganization Trust.

(d)     The Trustees hereby acknowledge receipt of the Trust Assets on behalf of the Reorganization Trust and declare that the Trust Assets will be held in trust for the Beneficiaries in accordance with the terms of this Reorganization Trust Agreement.

(e)     It is the intention of the parties hereto that the Reorganization Trust shall be a statutory trust under the Trust Act and that this Reorganization Trust Agreement shall constitute the governing instrument of the Reorganization Trust.  It is not the intention of the parties hereto to create a general partnership, limited partnership, joint stock association, corporation, bailment or any form of legal relationship other than a Delaware statutory trust.  Nothing in this Reorganization Trust Agreement shall be construed to make the Beneficiaries a partner or member of a joint stock association.  Effective as of the date hereof, each Trustee shall have the rights, powers and duties granted to it herein with respect to accomplishing the purposes of the Reorganization Trust.

1.2.    <u>Place of Business</u>.

(a)     The address of the Reorganization Trust is 1100 North Market Street, Wilmington, Delaware, or such other address (in the State of Delaware) as the Managing Trustees may designate in writing to the Beneficiaries.   The Delaware Trustee or the Reorganization Trust shall receive service of process on the Reorganization Trust in the State of Delaware at the foregoing address.

(b)     The Reorganization Trust shall maintain an office and principal place of business in Santa Ana, California or such other place as the Managing Trustees may designate from time to time; <u>provided</u> that the Managing Trustees shall give prompt written notice (which notice may be effected by a posting on the website maintained by the Reorganization Trust) to the Beneficiaries of any change to the principal place of business of the Reorganization Trust.

3

1.3. <u>Exchange Act</u>. The Reorganization Trust is not subject to the registration requirements of the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>") and the Managing Trustees may, at their sole discretion, take all actions necessary or appropriate to prevent the Reorganization Trust from becoming subject to the Exchange Act, including limiting the number of holders of Beneficial Interests to 2,000 holders of record (as calculated in accordance with Rule 12g5-1 for purposes of Section 12(g) of the Exchange Act), including no more than 500 holders that are not accredited investors under the Exchange Act.

## ARTICLE II
## TRUSTEES

2.1. <u>Appointment of Managing Trustees; Number of Managing Trustees</u>.

(a) The number of individuals constituting the entire number of Managing Trustees shall initially be five (5) and thereafter shall be fixed from time to time solely by a resolution passed by a majority of the Managing Trustees; <u>provided</u> that in no event shall there be less than two (2) Managing Trustees or more than five (5) Managing Trustees, and as defined below, there shall be no more than two (2) Independent Trustees.

(b) The Managing Trustees shall appoint the Delaware Trustee to fulfill the Reorganization Trust's obligation pursuant to section 3807(a) of the Trust Act to have at least one trustee who has its primary residence or principal place of business in the State of Delaware. To the greatest extent permitted by the Trust Act, it is intended that the Delaware Trustee shall have only the powers set forth for a Delaware Trustee set forth herein and references to a Managing Trustee and Independent Trustee specifically do not include references to the Delaware Trustee. References herein to a "<u>Trustee</u>" is a reference to a Managing Trustee (including an Independent Trustee) and the Delaware Trustee and a reference to "<u>Trustees</u>" herein is collectively a reference to the Managing Trustees (including the Independent Trustee) and the Delaware Trustee.

(c) Each of the Managing Trustees who is party hereto on the date hereof (as set indicated on the signature page hereto) hereby accepts his appointment as a Managing Trustee as of the Effective Date. In addition to such appointment as a Managing Trustee, each of Frederic F. Brace and Hugh E. Sawyer accepts his appointment on the date hereof as an "<u>Independent Trustee</u>" and collectively as the "<u>Independent Trustees</u>" for all purposes of this Reorganization Trust Agreement. The signatory hereto as the Delaware Trustee accepts its appointment as the Delaware Trustee for all purposes of this Agreement.

2.2. <u>Resignation, Removal and Incompetency of Trustees</u>. A Trustee may resign at any time by giving not less than 15 days' prior written notice to the remaining Managing Trustees (in accordance with <u>Section 9.9</u> hereof).

2.3. <u>Removal for Cause</u>.

(a) The other Managing Trustees may remove any Managing Trustee for cause. As used in this Reorganization Trust Agreement, "cause" shall mean:

        (1)        such Managing Trustee's conviction of a felony or any other crime involving moral turpitude; or

        (2)        any act or failure to act by such Managing Trustee involving actual dishonesty, fraud, misrepresentation, theft or embezzlement; or

        (3)        such Managing Trustee's willful and repeated failure to substantially perform his/her duties under this Reorganization Trust Agreement and the Trust Act after written notice and an opportunity to cure; or

        (4)        such Managing Trustee's incapacity, such that s/he is unable to substantially perform his/her duties under this Reorganization Trust Agreement and the Trust Act for more than ninety (90) consecutive days.

(b)      The Managing Trustees may remove the Delaware Trustee and the Delaware Trustee may resign as Delaware Trustee in accordance with <u>Section 2.2</u> at any time for any reason; <u>provided</u> that any removal or resignation of the Delaware Trustee shall become effective only once the Managing Trustees have appointed a replacement "Delaware Trustee" meeting the requirements of section 3807(a) of the Trust Act and any person proposing to serve as the "Delaware Trustee" shall provide the Managing Trustees prior written notice for the Managing Trustees to determine if such individual meets the qualifications set forth in section 3807(a) of the Act. If the Managing Trustees fail to appoint a replacement "Delaware Trustee" within 45 days of the resignation of the incumbent Delaware Trustee, then the Delaware Trustee may petition the Bankruptcy Court (or such other court of competent jurisdiction) to appoint a replacement Delaware Trustee and the Reorganization Trust shall cover all reasonable costs associated with such petition. Any replacement Managing Trustee shall be appointed in accordance with <u>Section 2.4</u> hereof. A Trustee judged incompetent, or for whom a guardian has been appointed, shall be deemed to have resigned as of the date of such adjudication or appointment.

(c)      For purposes of these procedures, the "<u>Other Managing Trustees</u>" shall mean all Managing Trustees other than the Managing Trustee whose removal is being sought (such Managing Trustee, the "<u>Specified Trustee</u>").

        (1)        The Other Managing Trustees shall give written notice to the Specified Trustee, which notice shall describe in reasonable detail the actions or inactions on the basis of which the Other Managing Trustees have determined that cause exists for the removal of the Managing Trustee.

        (2)        The Specified Trustee shall have thirty (30) days from the date of his/her receipt of the notice from the Other Managing Trustees to respond to the determination of the Other Managing Trustees that cause exists for removal and to cure such cause, if a cure is possible. If the Specified Trustee so requests, the Specified

Trustee shall be given the opportunity to appear in person before the Other Managing Trustees to respond to the determination of the Other Managing Trustees.

(3)     Following such thirty (30) day period, whether or not the Specified Trustee has made any response to the notice of the Other Managing Trustees, if the cause forming the basis for removal has not been cured, the Other Managing Trustees may remove the Specified Trustee from office.

(4)     If the Other Managing Trustees does not vote to remove the Specified Trustee within sixty (60) days from the date notice is first given to the Managing Trustee, the Other Managing Trustees shall repeat these procedures if they determine thereafter to remove such Specified Trustee.

(5)     Notice of removal of a Managing Trustee shall promptly be posted to the Reorganization Trust website (if any).

2.4.    <u>Vacancies</u>.  If any or all of the Trustees cease to be Trustees hereunder, whether by reason of resignation, removal, incapacity, or death, such event shall not dissolve the Reorganization Trust or affect its continuity.  Until vacancies are filled, the Managing Trustees may exercise the powers of the Managing Trustees hereunder, <u>provided</u> that only the Independent Trustee(s) may exercise the powers of an Independent Trustee hereunder and only a person meeting the requirements of section 3807(a) of the Trust Act may exercise the power of a Delaware Trustee hereunder.  Vacancies with respect to an Independent Trustee shall be filled by the remaining Independent Trustee; vacancies with respect to a Managing Trustee who is not an Independent Trustee shall be filled by the remaining Managing Trustees who are not Independent Trustees; <u>provided</u> that, if there are no Trustees other than Independent Trustees in office, vacancies with respect to one or more Managing Trustees who are not Independent Trustees shall be filled by holders of a majority of the Beneficial Interests.  If at any time there shall be no Managing Trustees in office, successor Managing Trustees shall be appointed by holders of a majority of the Beneficial Interests.  Any Trustee elected to fill a vacancy created by the resignation, removal, incapacity, or death of a former Trustee shall hold office until the earlier of his resignation, removal, incapacity or death, in accordance with the terms of this Reorganization Trust Agreement.  Appropriate written evidence of the election and qualification of successor Trustees shall be filed with the records of the Reorganization Trust, with copies provided to the Managing Trustees and in such other offices or places as the remaining Managing Trustees may deem necessary, appropriate or desirable.

2.5.    <u>Actions by Managing Trustees</u>.

(a)     Subject to <u>Section 2.5(b)</u>, any action to be taken, consent to be provided or determination to be made by the Managing Trustees hereunder shall be taken upon the majority vote of the Managing Trustees then in office, with each Managing Trustee then in office entitled to one vote, in each matter submitted to the Managing Trustees for action, consent or determination.  Subject to <u>Section 2.5(b)</u>, any action, consent or determination of the Managing

Trustees may be taken at a meeting, at which a quorum of Managing Trustees is present, by vote of a majority of the Managing Trustees present, or without a meeting by written consents of the Applicable Percentage of Managing Trustees, which consents shall be filed with the records of the meetings of the Managing Trustees; provided that no such action, consent or determination, whether taken at a meeting or by written consent shall be effective unless written notice of such action, consent or determination proposed to be taken, provided or made or written consent proposed to be adopted was delivered to all Managing Trustees at least 48 hours' prior to the time such action, consent, determination or written consent becomes effective; provided, further, that 48 hours' prior notice is not required (i) at any meeting at which all Managing Trustees are in attendance, (ii) for unanimous written consents, (iii) at any regularly scheduled meeting, or (iv) if otherwise waived in writing by each Managing Trustee. Subject to Section 2.5(b), a quorum for all meetings of the Managing Trustees shall be the Applicable Percentage of the Managing Trustees then in office. When used herein, "Applicable Percentage" means (i) when there are five (5) Managing Trustees then in office, 60% or more and (ii) when there are less than (5) Managing Trustees then in office, a majority of the Managing Trustees then in office. Any action or actions permitted to be taken by the Managing Trustees hereunder may be taken pursuant to authority granted at a meeting of the Managing Trustees conducted by a telephone conference call or similar communications equipment by means of which all persons participating in such meeting can hear each other at the same time, and participation by such means shall constitute presence in person at such meeting and the transaction of Reorganization Trust business represented thereby shall be of the same authority and validity as if transacted at a meeting of the Managing Trustees held in person or by written consent. Any Managing Trustee may call a meeting of the Managing Trustees on at least 48 hours' prior written notice to all other Managing Trustees and at a time reasonably expected to permit the attendance of all other Managing Trustees; provided that a meeting of the Managing Trustees may be held on less than 48 hours' prior notice if (i) all Managing Trustees are in attendance at such meeting or (ii) such notice is waived in writing by each Managing Trustee; provided, further, that 48 hours' prior notice shall not be required for (i) any regularly scheduled meeting of the Managing Trustees or (ii) any unanimous written consent in lieu of a meeting of the Managing Trustees. The minutes of any meeting of the Managing Trustees held by telephone shall be prepared in the same manner as the minutes of a meeting of the Managing Trustees held in person. A telephonic alternative that permits all persons participating in such meeting to have reasonable telephonic access to the meeting and to hear each other at the same time shall be made available for all Managing Trustees for all meetings of the Managing Trustees.

(b)     Notwithstanding the provisions of Section 2.5(a) or any other provision herein to the contrary, in accordance with Article IV.H of the Plan, any action to be taken, consent to be provided, or determination to be made hereunder related to disbursements with respect to the Compensation and Benefits Programs Escrow (as such term is defined in the Plan) and any other payments with respect to any pre-Effective Date compensation, benefit, or incentive programs, including the Exit Plan, the other applicable Compensation and Benefits Plans, and any programs approved pursuant to the Final Wages Order, the Final Non-Insider Incentive Plan Order, and Final Insider Incentive Plan Order in accordance with the Purchase Agreement, other than any compensation, benefit, and incentive obligations assumed by the Purchaser or any Acquired Company pursuant to the Purchase Agreement, as applicable (as such terms are defined in the Plan) (collectively, "Independent Trustee Matters") shall be taken upon (and only upon) the unanimous vote of the Independent Trustees then in office, with each

Independent Trustee then in office entitled to one vote in each matter submitted to the Independent Trustees for such action, consent or determination. Any action, consent or determination of the Independent Trustees with respect to any Independent Trustee Matter may be taken at a meeting at which all, and only all, of the Independent Trustees are present, by unanimous vote of the Independent Trustees present or without a meeting by written consents of all Independent Trustees, which consents shall be filed with the records of the meetings of the Independent Trustees. A quorum for any meeting of the Managing Trustees at which an Independent Trustee Matter is submitted for action, consent or determination shall be constituted if, but only if, all Independent Trustees then in office are present. The minutes of any meeting of the Independent Trustees held by telephone shall be prepared in the same manner as the minutes of a meeting of the Independent Trustees held in person. A telephonic alternative shall be made available for all Independent Trustees for all meetings of the Independent Trustees with respect to the Independent Trustee Matters.

2.6. <u>Generally</u>. Subject to the other provisions hereof, the Managing Trustees shall generally be responsible for liquidating and administering (or abandoning) the Trust Assets and taking actions on behalf of, and being the representative of, the Reorganization Trust. Subject to the remaining provisions hereof, the Managing Trustees shall have the authority to bind the Reorganization Trust with respect to matters for which approval or consent has been obtained in accordance with this Reorganization Trust Agreement but shall for all purposes hereunder be acting as the Managing Trustees and not individually.

2.7. <u>Scope of Authority</u>. Subject to the remaining provisions hereof, the responsibilities and authority of the Managing Trustees shall include (a) calculating and implementing all distributions of Trust Assets in accordance with the Plan, (b) filing all required tax returns and paying taxes and all other obligations on behalf of the Reorganization Trust from funds held by the Reorganization Trust, (c) periodic reporting to the Beneficiaries and parties in interest of the status of distributions from the Trust Assets, and (d) liquidating (or abandoning) the Trust Assets and providing for the distribution of the net proceeds thereof in accordance with the provisions of the Plan.

2.8. <u>Powers of Managing Trustees</u>.

(a) Subject to the remaining provisions of this <u>Section 2.8</u>, the powers of the Managing Trustees shall, without any further Bankruptcy Court approval in each of the following cases, include without limitation (i) the power to invest funds in, and withdraw, make distributions and pay taxes and other obligations owed by the Reorganization Trust from funds held by the Managing Trustees and/or the Reorganization Trust in accordance with the Plan, (ii) the power to engage employees and professional persons to assist the Reorganization Trust and/or the Managing Trustees with respect to their responsibilities, and (iii) the power to prosecute, compromise and settle claims, on behalf of or against the Reorganization Trust. The Managing Trustees may incur any reasonable and necessary expenses in liquidating and converting the Trust Assets to Cash.

(b) In connection with the administration of the Reorganization Trust, except as otherwise set forth in this Reorganization Trust Agreement or the Plan, the Managing Trustees are authorized to perform any and all acts necessary and desirable to accomplish all actions

related to the Post-Effective-Date Reorganization Trust Matters, without further authorization from the Bankruptcy Court or the Beneficiaries. Without limiting the foregoing (but subject to any approval of the Independent Trustees required by <u>Section 2.5(b)</u>, the Managing Trustees shall be expressly authorized, but shall not be required, to:

(1)    protect and enforce the rights to the Trust Assets vested in the Reorganization Trust by this Reorganization Trust Agreement by any method deemed appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(2)    determine and satisfy any and all liabilities created, incurred or assumed by the Reorganization Trust;

(3)    file, if necessary, any and all tax and information returns with respect to the Reorganization Trust and pay taxes properly payable by the Reorganization Trust, if any;

(4)    pay all fees and expenses and make all other payments necessary to preserve, liquidate, and enhance the Trust Assets;

(5)    obtain insurance coverage with respect to the liabilities and obligations of the Managing Trustees and the Reorganization Trust (in the form of an errors and omissions policy, fiduciary policy or otherwise);

(6)    to obtain and maintain insurance coverage (including tail insurance) with respect to the Trust Assets and the liabilities and obligations of the Managing Trustees, and, if so determined by the Managing Trustees, such other insurance as the Managing Trustees determine as appropriate for the circumstances from time to time;

(7)    to reconcile, object to, and resolve Claims against the Debtors or the Reorganization Trust, and manage, control, prosecute and/or settle on behalf of the Estates or objections filed by the Reorganization Trust to Claims;

(8)    retain and pay such professional advisors to the Reorganization Trust as the Managing Trustees may select to aid in the prosecution of any claims that constitute, or the disposition of, Trust Assets, and to perform such other functions as the Managing Trustees consider appropriate. The Managing Trustees may commit the Reorganization Trust to, and the Reorganization Trust shall, pay such professionals compensation for services rendered and expenses incurred from the Trust Assets;

(9)     retain and pay a public accounting firm to perform such reviews and/or audits of the financial books and records of the Reorganization Trust as the Managing Trustees consider appropriate and to prepare and file any tax returns or informational returns for the Reorganization Trust as may be required. The Managing Trustees may commit the Reorganization Trust to and the Reorganization Trust shall pay such accounting firm reasonable compensation for services rendered and expenses incurred from the Trust Assets;

(10)    retain and pay such third parties as the Managing Trustees deem necessary or appropriate to assist them in carrying out their powers and duties under this Reorganization Trust Agreement, including with respect to the prosecution or disposition of Trust Assets. The Managing Trustees may commit the Reorganization Trust to and shall pay all such persons or entities compensation for services rendered and expenses incurred, as well as commit the Reorganization Trust to indemnify any such parties in connection with the performance of services from the Trust Assets;

(11)    to hold and dispose of Cash and shares of common stock of the Parent which are not distributed to holders of Allowed Unsecured Claims on the Effective Date, in each case in accordance with the Plan;

(12)    to sell the EIX Notes;

(13)    the perform under the EIX Settlement Agreement and the Purchase Agreement;

(14)    to maintain and dispose of the books and records transferred to the Reorganization Trust;

(15)    to enter into and exercise rights under contracts that are necessary or desirable to the administration of the Reorganization Trust and execute any documents or pleadings related to the liquidation of the Trust Assets or other matters related to the Reorganization Trust;

(16)    to establish and maintain bank accounts and terminate such accounts;

(17)    to set off amounts owed to the Debtors against distributions to the Beneficiaries;

(18)    to bring suits or defend itself against such suits, if any, in connection with any matter arising from or related to the Plan Documents that affects in any way the rights or obligations of the

10

Reorganization Trust, the Beneficiaries, or in its capacity as a Disbursing Agent, the holders of Allowed Claims, in their capacities as such;

(19)    to invest Trust Assets (including any earnings thereon or proceeds therefrom) in the manner permitted to be made by a Reorganization Trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities, including Revenue Procedure 94-45, 1994-2 C.B. 684; provided, however, that the Managing Trustees shall only authorize investments that are temporary investments in short-term government securities, time deposits, certificates of deposit, bankers' acceptances, commercial paper and money market funds or similar temporary, liquid, short-term investments;

(20)    to take all actions necessary and appropriate to minimize any adverse tax consequences to the holders of Allowed Unsecured Claims; provided that such actions do not result in an adverse tax consequence to the Reorganization Trust and are consistent with and are not contrary to the treatment of the Reorganization Trust as a "grantor trust" for United States federal income tax purposes;

(21)    to remove and replace the Delaware Trustee;

(22)    to act as a signatory on behalf of the Reorganization Trust and the Homer City Debtors for all purposes, including those associated with the novation of contracts or other obligations arising out of the sale or other disposition of the Debtors' assets;

(23)    to take all necessary actions and file all appropriate motions to obtain an order closing the Chapter 11 Cases;

(24)    to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions, as determined by the Managing Trustees to be necessary or appropriate to effectuate the terms of the Plan following the Effective Date; and

(25)    to take such other and further actions, including conversions, dissolutions, transfers, liquidations, or other corporate transactions, as determined by the Managing Trustees to be necessary or appropriate, in furtherance of the purposes of the Plan Documents in respect of the Debtors and their Estates as are not inconsistent with this Reorganization Trust Agreement or the other Plan Documents.

2.9.     Additional Powers of Managing Trustees.  Except as otherwise set forth in this Reorganization Trust Agreement or in the Plan, and subject to the retained jurisdiction of the Bankruptcy Court as provided for in the Plan, but without prior or further authorization, the Managing Trustees may control and exercise authority over the Trust Assets and over the protection, conservation and disposition thereof.  No person dealing with the Reorganization Trust shall be obligated to inquire into the authority of the Managing Trustees in connection with the protection, conservation or disposition of Trust Assets.

2.10.    Powers of Delaware Trustee.

(a)     Notwithstanding any provision hereof to the contrary, the duties and responsibilities of the Delaware Trustee shall be limited solely to (i) accepting legal process served on the Reorganization Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the office of the Delaware Secretary of State that the Delaware Trustee is required to execute under section 3811 of the Trust Act (including the Certificate of Trust).  Except as provided in the foregoing sentence, the Delaware Trustee shall have no management responsibilities or owe any fiduciary duties to the Reorganization Trust, the Managing Trustees, the Reorganization Trust Beneficiaries, or any other distributee of the Reorganization Trust hereunder.  The filing of the Certificate of Trust with the Secretary of State of the State of Delaware as provided under the Trust Act is hereby ratified.

(b)     By its execution hereof, the Delaware Trustee accepts the trusteeship of the Reorganization Trust on the terms set forth herein.  The Delaware Trustee shall not have any duty or liability with respect to the administration of the Reorganization Trust, the investment of the Trust Assets or the distribution of the Trust Assets to the Beneficiaries, and no such duties shall be implied.  The Delaware Trustee shall not be liable for the acts or omissions of the Managing Trustees, nor shall the Delaware Trustee be liable for supervising or monitoring the performance of the duties and obligations of the Managing Trustees under this Reorganization Trust Agreement.  The Delaware Trustee shall not be obligated to give any bond or other security for the performance of any of its duties hereunder.

2.11.    Other Activities of the Trustees.  The Trustees shall be entitled to perform services for and be employed by third parties. The Managing Trustees may delegate the performance of services and the fulfillment of responsibilities to other persons; provided, that only the Independent Trustees may consent to the Independent Trustee Matters.  Such persons shall be entitled to be compensated and to be reimbursed for out-of-pocket disbursements in the same manner as the Trustees, in accordance with this Reorganization Trust Agreement.

2.12.    Limitation of Managing Trustees' Authority.  The Reorganization Trust and the Managing Trustees shall not, and shall not be authorized to, engage in any trade or business with respect to the Trust Assets or any proceeds therefrom except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Reorganization Trust and shall take such actions consistent with the prompt orderly liquidation of the Trust Assets as are required by applicable law and consistent with the treatment of the Reorganization Trust as a liquidating trust under the ICA and Treasury Regulation section 301.7701-4(d), and such actions permitted herein.

2.13.  Liability of Trustees.

(a)  In no event shall any Trustee, member of the Reorganization Trust Management (as defined herein), or professional retained by the Reorganization Trust be liable to the Reorganization Trust or the Beneficiaries for any of such Trustee's acts or omissions, except for acts or omissions constituting bad faith or willful misconduct.

(b)  The Trustees shall not have any duty or obligation to manage or deal with the property of the Reorganization Trust (including the Trust Assets), or to otherwise take or refrain from taking any action under or in connection with any document contemplated herein to which any Trustee is a party or a payee, except as expressly provided by the terms of this Reorganization Trust Agreement.  There shall be no implied duties or obligations read herein against any Trustee, including without limitation, that no action requested to be taken by the Trustee shall require the performance of any investigation, analysis or other due diligence activities by the Trustee in respect to such action or the performance of his duties on behalf of the Reorganization Trust generally.

(c)  Pursuant to section 3803(b) of the Trust Act, in no event shall any Trustees be liable to any person for any act, omission or obligation of the Reorganization Trust or any Managing Trustee, and all persons having any claim against such Trustee by reason of the transactions contemplated by this Reorganization Trust Agreement or any agreement or instrument related to the Reorganization Trust shall look only to the property of the Reorganization Trust for payment or satisfaction thereof.

(d)  Pursuant to section 3806(c) of the Trust Act, to the extent that at law or equity the Trustees are found to have duties (including fiduciary ones) and liabilities relating to the Reorganization Trust or to the Beneficiaries, such Trustee's related duties and liabilities are hereby eliminated and restricted to the fullest extent allowable under applicable law and no Trustee shall be liable to the Reorganization Trust or to the Beneficiaries for any action taken in good faith in accordance with the terms hereof.

(e)  No provision of this Reorganization Trust Agreement shall require any Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of its rights or powers hereunder if such Trustee has reasonable grounds to believe that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it.

(f)  No Trustee shall be personally liable for the validity or sufficiency of this Reorganization Trust Agreement, the value or sufficiency of the Trust Assets, or for the due execution hereof by the other parties hereto.

(g)  The Delaware Trustee shall act solely as Delaware Trustee hereunder and not in its individual capacity, and all persons having any claim against the Delaware Trustee by reason of the transactions contemplated by this Reorganization Trust Agreement shall look only to the Trust Assets for payment or satisfaction thereof.

(h)  The Delaware Trustee may request the Managing Trustees to provide a certificate with regard to any fact or matter the manner of ascertainment of which is not

13

specifically prescribed herein, and such certificate shall constitute full protection to the Delaware Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon.

2.14.  <u>Reliance by Trustees</u>.  Except as otherwise provided herein:

(a)  Each Trustee may rely, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by him to be genuine and to have been signed or presented by the proper party or parties;

(b)  each Trustee may consult with legal counsel, financial or accounting representatives and other professionals to be selected by him and such Trustee shall not be liable for any action taken or omitted to be taken by him in accordance with the advice thereof; and

(c)  persons dealing with any Trustee shall look only to the Trust Assets to satisfy any liability incurred by such Trustee to such person in carrying out the terms of this Reorganization Trust Agreement, and such Trustee shall have no personal obligation to satisfy any such liability.

2.15.  <u>Reorganization Trust Management</u>.  The Managing Trustees may appoint the officers, employees, and other personnel of the Reorganization Trust as the Managing Trustees shall deem appropriate (all such officers, employees, and other personnel being collectively referred to as the "<u>Reorganization Trust Management</u>").  The Reorganization Trust Management may have such functions, authority, and duties as may be prescribed by the Managing Trustees.  Any member of the Reorganization Trust Management may resign at any time by communicating notice of such resignation to the Managing Trustees.  Any member of the Reorganization Trust Management may be removed at any time by the Managing Trustees with or without cause.  The compensation of the Reorganization Trust Management shall be as determined by the Managing Trustees.   Such compensation shall be paid out of the Reorganization Trust Budget.

2.16.  <u>Investment and Safekeeping of Trust Assets</u>.  All moneys and other assets received by the Reorganization Trust shall, until distributed or paid over as herein provided, be held in trust for the benefit of the Beneficiaries, but need not be segregated from other Trust Assets, unless and to the extent required by the EIX Settlement Agreement, the Purchase Agreement, the Plan, or by law.  The Trustees shall be under no liability for interest or producing income on any moneys received by the Reorganization Trust hereunder and held for distribution or payment to the Beneficiaries, except as such interest shall actually be received by the Reorganization Trust or the Managing Trustees on its behalf.  The Managing Trustees shall have the right and power to invest such Trust Assets (pending distributions in accordance with the Plan) in Cash equivalents; <u>provided</u>, <u>however</u>, that the right and power of the Managing Trustees to invest the Trust Assets, the proceeds thereof, or any income earned by the Reorganization Trust, shall be limited to the right and power to invest such assets (pending periodic distributions in accordance with this Reorganization Trust Agreement) in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary liquid investments, such as Treasury bills; and, <u>provided</u>, <u>further</u>, that the scope of any such permissible investments shall be limited to include only those investments, or shall be expanded to include

any additional investments, as the case may be, that a liquidating trust, within the meaning of the ICA and Treasury Regulation section 301.7701-4(d), may be permitted to hold, pursuant to the ICA and the Treasury Regulations, or any modification in the SEC guidelines or IRS guidelines, whether set forth in SEC rulings or IRS rulings, other SEC or IRS pronouncements or otherwise.

2.17.   <u>Authorization to Expend Trust Assets</u>.   Subject to the remaining terms of this Reorganization Trust Agreement, the Managing Trustees may expend the assets of the Reorganization Trust (i) as necessary to meet contingent liabilities and to maintain the value of the assets of the Reorganization Trust during liquidation, (ii) to pay the fees and expenses (including, but not limited to, any taxes imposed on the Reorganization Trust or fees and expenses in connection with litigation), and (iii) to satisfy other liabilities incurred or assumed by the Reorganization Trust (or to which the assets are otherwise subject) in accordance with this Reorganization Trust Agreement or the Plan.

2.18.   <u>Reorganization Trust Budget</u>.

(a)   Each fiscal year, the Managing Trustees shall approve a reasonably detailed annual plan and budget for the Reorganization Trust in a form consistent with the Wind Down Budget (any such plan and budget, as it may be amended from time to time in accordance with the terms hereof, the "<u>Reorganization Trust Budget</u>"), except that the Reorganization Trust Budget for the first fiscal year, if less than six calendar months, may be combined with the Reorganization Trust Budget for the next succeeding fiscal year, and the Reorganization Trust Budget for the last fiscal year, if less than six calendar months, may be combined with the Reorganization Trust Budget for the immediate prior fiscal year.   The Reorganization Trust Budget shall set forth (on an annual basis) in reasonable detail:   (1) the assumptions underlying the projected recoveries and expenses associated with the administration of the Reorganization Trust for the annual budget and the funding of the Disputed Claims Reserve in respect thereof, and (2) the anticipated distributions to the Beneficiaries.   The Reorganization Trust may disclose (in the discretion of the Managing Trustees) the Reorganization Trust Budget to Beneficiaries or one or more third parties subject to appropriate confidentiality protections.   The Reorganization Trust shall, in accordance with <u>Section 9.3(b)</u> of this Reorganization Trust Agreement, post to a public website it maintains the aggregate total amount of remaining expenses set forth in the Reorganization Trust Budget for the expected operation of the Reorganization Trust, as provided in <u>Section 9.3(a)</u> of this Reorganization Trust Agreement.

2.19.   <u>Compensation of the Trustees</u>.

(a)   The Trustees, Reorganization Trust Management, and the professionals and representatives of the Reorganization Trust and/or the Trustees shall be entitled to receive reasonable compensation for services rendered in an amount and on such terms as may be agreed to by the Managing Trustees from time to time.

(b)   All compensation and other amounts payable to the Reorganization Trust Management, Trustees, and the professionals and representatives of the Reorganization Trust and/or the Trustees (including all fees and expenses) shall be paid from the assets of the Reorganization Trust. If the Cash in the Reorganization Trust shall be insufficient to compensate such persons for any fees and expenses to which they are entitled hereunder, then the Managing

Trustees are hereby authorized to reduce to Cash that portion of the Trust Assets necessary so as to effect such compensation and reimbursement. If the assets of the Reorganization Trust are insufficient to fully satisfy the amounts payable to, or other obligations owing hereunder, the Beneficiaries shall be required to disgorge distributions received from the Reorganization Trust until all such amounts have been fully paid and all such obligations have been fully satisfied.

(c)     The Reorganization Trust shall reimburse the Trustees, the Reorganization Trust Management, and their respective professionals, representatives, and employees for the actual out-of-pocket fees and expenses incurred by them, including, without limitation, necessary travel, lodging, postage, telephone and facsimile charges upon receipt of periodic billings.

(d)     The Trust Assets shall be subject to the claims of the Trustees, the Reorganization Trust Management, and their respective professionals and representatives for any of their fees and expenses, and the Managing Trustees shall be entitled to reimburse such persons out of any available Cash in the Reorganization Trust, for compensation and actual out-of-pocket fees and expenses and against and from any and all loss, liability, expense, or damage which the Trustees, solely in their capacity as such, may sustain in good faith and without willful misconduct in the exercise and performance of any of the powers and duties of the Trustees. If any Trustee is removed pursuant to the provisions of <u>Section 2.2</u> hereof or any Trustee resigns, dies or becomes disabled, then such former Trustee (or his estate, successor or assigns) and any successor Trustee hereunder shall share any remaining additional compensation pursuant to this <u>Section 2.17</u> pro rata based on the total time spent by each as a Trustee hereunder.

2.20.     <u>Exculpation; Indemnification</u>.

From and after the Effective Date, the Trustees, the Reorganization Trust Management, the Reorganization Trust, and each of their respective employees, professionals, and representatives shall be and hereby are exculpated as set forth in the Plan.

Any act or omission taken with the approval of the Bankruptcy Court or the consent of the Beneficiaries holding a majority of the Beneficial Interests (by amount) or any act or omission taken in order to comply with terms of the Plan or this Reorganization Trust Agreement will be conclusively deemed not to constitute bad faith or willful misconduct.

The Reorganization Trust shall indemnify, defend and hold harmless the Trustees, the Reorganization Trust Management, and each of the employees, professionals, and representatives of the Trustees, the Reorganization Trust Management, and the Reorganization Trust (collectively, the "<u>Indemnitees</u>") from and against any and all claims, causes of action, liabilities, losses, damages and expenses (including attorneys' fees and expenses), to the fullest extent permitted by applicable law, other than as a result of the bad faith or willful misconduct of the person seeking indemnification. No Trustee shall be deemed a successor of EME.

The Managing Trustees and the Reorganization Trust shall be authorized to obtain (by using Cash in the Reorganization Trust) insurance coverage with respect to the responsibilities, liabilities and obligations of the Trustees, the Reorganization Trust, and those persons hired by the Trustees and the Reorganization Trust to discharge such responsibilities, liabilities and obligations.

16

The Reorganization Trust hereby acknowledges that one or more Indemnitees may have rights to indemnification, advancement of expenses and/or insurance provided by one or more Persons or Entities (collectively, the "Other Indemnitors"). The Reorganization Trust hereby agrees (i) that it is the indemnitor of first resort (i.e., its obligations to each Indemnitee are primary and any obligation of the Other Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by each Indemnitee are secondary), (ii) that it shall be required to advance the full amount of expenses incurred by each Indemnitee and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Reorganization Trust Agreement or any other agreement between the Reorganization Trust and such Indemnitee), without regard to any rights any Indemnitee may have against any Other Indemnitors, and (iii) that it irrevocably waives, relinquishes and releases the Other Indemnitors from any and all claims against the Other Indemnitors for contribution, reimbursement, indemnification, subrogation or any other recovery of any kind in respect thereof. The Reorganization Trust further agrees that no advancement or payment by any Other Indemnitors on behalf of a Indemnitee with respect to any claim for which a Indemnitee has sought indemnification from the Reorganization Trust shall affect the foregoing, and the Other Indemnitors shall have a right of contribution, reimbursement, indemnification and/or be subrogation to the extent of any such advancement or payment to all of the rights of recovery of a Indemnitee against the Reorganization Trust. The Reorganization Trust and each Indemnitee agree that the Other Indemnitors are express third party beneficiaries of the terms of this Section 2.20.

2.21.   <u>Termination</u>.  The duties, responsibilities and powers of the Trustees will terminate on the date the Reorganization Trust is dissolved under applicable law in accordance with the terms of this Reorganization Trust Agreement.

2.22.   <u>No Bond</u>.  The Trustees shall serve without bond.

## ARTICLE III
## THE BENEFICIARIES

3.1.   <u>Distributions to the Beneficiaries</u>.  The Beneficiaries' rights to distribution from the Reorganization Trust shall be that accorded to the Beneficiaries under the Plan.  Each distribution by the Managing Trustees to the Beneficiaries shall be made in accordance with the terms set forth herein.

3.2.   <u>Liability of the Beneficiaries</u>.  The Beneficiaries shall be entitled to the same limitation of personal liability extended to stockholders of private corporations for profit organized under the Delaware General Corporation Law.

3.3.   <u>Number of Beneficial Interests</u>.  Subject to increase in order to satisfy any applicable legal or regulatory requirement, the aggregate number of Beneficial Interests that the Reorganization Trust shall be authorized (but not required) to issue is 4,000,000,000.

3.4.   <u>Evidence of Beneficial Interests</u>.

17

(a)     Except as otherwise provided in this Reorganization Trust Agreement, Beneficial Interests will be issued in the form of a global unit certificate (the "<u>Global Beneficial Interest Certificate</u>") only, registered in the name of the Depository Trust Company (the "<u>DTC</u>") or its nominee (or the successor of either of them) and signed by any member of the Reorganization Trust Management, and interests in the Global Beneficial Interest Certificate will be held only through participants (including securities brokers and dealers, banks, trust companies, clearing corporations and other financial organizations) of DTC, as depositary. The Global Beneficial Interest Certificate shall bear such legend as may be required by DTC. The aggregate number of Beneficial Interests issued may from time to time be increased, if required by any legal or regulatory requirements, by adjustments made on the records of the Reorganization Trust and a corresponding increase in the number of Beneficial Interests evidenced by such Global Beneficial Interest Certificate (as shall be specified in the schedule included as part of the Global Beneficial Interest Certificate or the issuance of further Global Beneficial Interest Certificates in respect of such additional Beneficial Interests). Beneficial Interests will not be issued in definitive form, except in the limited circumstances described in <u>Section 3.4(b)</u>. For so long as DTC serves as depositary for the Beneficial Interests, the Reorganization Trust may rely on the information and records of DTC to make distributions and send communications to the holders of Beneficial Interests and, in so doing, any persons participating in the management of the Reorganization Trust, including the Managing Trustees and Reorganization Trust Management, shall be fully protected and incur no liability to any holder of Beneficial Interests, any transferee (or purported transferee) of Beneficial Interests, or any other person or entity.

(b)     If DTC is unwilling or unable to act, or to continue to act, as a depositary for the Beneficial Interests, the Reorganization Trust may issue Beneficial Interests in the form of certificates ("<u>Beneficial Interest Certificates</u>"), or, if one or more Global Beneficial Interest Certificates representing the Beneficial Interests has previously been issued, exchange the Beneficial Interests represented by Global Beneficial Interest Certificate(s) for Beneficial Interest Certificates. In such event, the Reorganization Trust shall maintain or cause to be maintained a Beneficial Interest register (the "<u>Beneficial Interest Register</u>") on which the ownership of each Beneficial Interest Certificate shall be recorded, and on which the transfer of such Beneficial Interest Certificates shall be reflected. The Reorganization Trust shall be entitled to treat the Person in whose name a Beneficial Interest Certificate is registered on such Beneficial Interest Register as the owner of such Beneficial Interest Certificate and the Beneficial Interests represented thereby for all purposes, including the right to receive distributions of Distributable Cash in respect thereof. The Reorganization Trust shall also in such event establish or cause to be established customary procedures for the transfer and exchange of Beneficial Interest Certificates and the replacement of lost, stolen or mutilated Beneficial Interest Certificates.

3.5.     <u>Issuance and Distribution of Beneficial Interests</u>.

(a)     Subject to the terms of the Plan, all Beneficial Interests issued or distributed in accordance with the provisions of <u>Article III</u> hereof to holders of Allowed Unsecured Claims entitled to receive Beneficial Interests hereunder shall be in full and final satisfaction of such Allowed Unsecured Claims.

18

(b)     On the Initial Distribution Date, there shall be issued to each holder of one or more Allowed General Unsecured Claims against EME (Not Assumed Liabilities) as of the Initial Distribution Record Date, a number of Beneficial Interests equal to the aggregate amount of Allowed General Unsecured Claims held by such holder in accordance with the Plan.

(c)     Each holder of one or more Disputed Unsecured Claims that were not Allowed, in whole or in part, as of the Initial Distribution Record Date and that are subsequently Allowed, in whole or in part, shall be issued from the Disputed Claims Reserve on the distribution date next following the date that such Claims become Allowed, a number of Beneficial Interests equal the aggregate amount of such Allowed Claims and any distribution to which, under the Plan, such holder is then entitled on account of such Beneficial Interests.

(d)     The issuance or distribution of Beneficial Interests in accordance with this Section 4.2 shall be subject to the provisions of Section 3.4(a).

3.6.    Manner of Distribution of Beneficial Interests.

(a)     Except in the circumstances described in Section 3.6(b), in order to receive their Beneficial Interests, holders of Allowed Unsecured Claims entitled to receive such Beneficial Interests must designate a direct or indirect participant in DTC with whom such holder has a securities account and take such other ministerial actions as the Trustees or the Reorganization Trust Management shall from time to time reasonably require by written communication to such holders, in the form of Exhibit A or otherwise. The Reorganization Trust shall communicate with the EME Senior Notes Indenture Trustee to obtain from it account information for the respective DTC participants through which the Beneficial Interests distributed to it will be held.

(b)     If and for so long as a holder of an Allowed Unsecured Claim (other than holders of EME Senior Notes Claims, whose Beneficial Interests will be issued to the EME Senior Notes Indenture Trustee) does not designate a direct or indirect participant in DTC and take such other actions required by Section 3.6(a), the Reorganization Trust may hold the Beneficial Interests such holder is otherwise entitled to receive, together with any Cash distributed in respect of such Beneficial Interests until such time as such holder complies with the requirements of Section 3.6(a), or, at the Reorganization Trust's sole discretion, liquidate the Beneficial Interests and/or the Trust Assets (including any common stock of the Parent) held by the Reorganization Trust on account of such Beneficial Interests and deliver the Cash proceeds of such liquidation to such holder. At any time following the date on which the Reorganization Trust determines, in its sole discretion, that a holder of an Allowed Unsecured Claim complies in full with the requirements of Section 3.6(a), but in any event, as soon as practicable following the beginning of the fiscal quarter next following such date, the Reorganization Trust shall distribute to such holder the Beneficial Interests and any distributions thereon to which such holder is entitled. Any Cash held by the Reorganization Trust on account of Beneficial Interests that remain undistributed pending compliance with the provisions of Section 3.6(a) as aforesaid shall be separately recorded by the Reorganization Trust.

(c)     The Reorganization Trust shall also be authorized to withhold and retain Beneficial Interests otherwise issuable to holders of Allowed Unsecured Claims that are subject

to tax withholding to the extent required by applicable tax laws, and any Beneficial Interests so withheld shall be deemed issued in satisfaction of such Claims for all purposes of the Plan and this Reorganization Trust Agreement. The Reorganization Trust shall have no obligation to issue or distribute Beneficial Interests or other consideration to the extent any such issuance or distribution would violate existing tax law.

3.7.  Transfers of Beneficial Interests; Absence of Market for Beneficial Interests.

(a)  Beneficial Interests shall be freely negotiable and transferable to the extent provided herein and the provisions of applicable securities laws. For so long as DTC continues to serve as depositary for the Beneficial Interests, the transferability of the Beneficial Interests shall also be subject to the requirements of DTC's electronic book-entry system.

(b)  The Beneficial Interests shall not be listed by the Reorganization Trust on a national securities exchange or interdealer quotation system. Neither the Reorganization Trust nor anyone acting on its behalf shall, directly or indirectly, engage in any activity designed to facilitate or promote trading in the Beneficial Interests, including by placing advertisements, distributing marketing materials, or collecting or publishing information regarding prices at which the interests may be transferred; provided that no activity undertaken by the Reorganization Trust in compliance with the terms of the Plan, the Confirmation Order, and this Reorganization Trust Agreement (collectively, the "Plan Documents") shall be deemed to facilitate or promote trading in the Beneficial Interests for these purposes.

3.8.  Rights of Beneficiaries. Each Beneficiary shall be entitled to participate in the rights and benefits due to it hereunder on account of its Beneficial Interests. Each Beneficiary shall take and hold the same, subject to all the terms and conditions of the Plan Documents. The interest of a Beneficiary is hereby declared and shall be, in all respects, personal property.

3.9.  Interest Beneficial Only. Except as expressly provided hereunder, a Beneficiary shall have no title to, right to, possession of, management of or control of the Reorganization Trust or the Trust Assets. The ownership of Beneficial Interests in the Reorganization Trust shall not entitle any Beneficiary to any title in or to the Trust Assets or to any right to call for a partition or division of such assets or to require an accounting, except as may be specifically provided herein.

3.10.  Conflicting Claims. If any conflicting claims or demands are made or asserted with respect to one or more Beneficial Interests, or a beneficial interest therein, the Reorganization Trust shall be entitled to refuse to comply with any such conflicting claims or demands. In so refusing, the Reorganization Trust may elect to make no payment or distribution with respect to the Beneficial Interests at issue subject to the claims or demands involved, or any part thereof, and the Reorganization Trust shall be entitled to refer such conflicting claims or demands to the Bankruptcy Court, which shall have exclusive and continuing jurisdiction over resolution of such conflicting claims or demands. Neither the Reorganization Trust, the Trustees, the Reorganization Trust Management, nor any Reorganization Trust representatives or agents, shall be or become liable to any party for either (i) the election to continue making

distributions pursuant to its books and records and/or the books and records of DTC, as applicable, without regard to the conflicting claims or demands; or (ii) the election to cease payments or distributions with respect to the subject Beneficial Interest or Beneficial Interests. In the event that the Reorganization Trust elects to cease payments, it shall be entitled to refuse to act until either (x) the rights of the adverse claimants have been adjudicated by a Final Order of the Bankruptcy Court (or such other court of competent jurisdiction) or (y) all differences have been resolved by a written agreement among all of such parties and the Reorganization Trust, which agreement shall include a complete release of the Reorganization Trust and the Trustees in form and substance reasonably satisfactory to the Reorganization Trust.

3.11.   <u>Beneficiary Liability to Third Persons</u>.  No Beneficiary shall be subject to any personal liability whatsoever, in tort, contract or otherwise, to any person in connection with the Trust Assets or the affairs of the Reorganization Trust, to the fullest extent provided by section 3803 (a) of the Trust Act.

3.12.   <u>Actions in the Right of the Reorganization Trust</u>.  No Beneficiary and no Beneficiaries shall have the right to bring an action in the right of the Reorganization Trust to recover a judgment pursuant to section 3816 of the Trust Act unless such Beneficiary or Beneficiaries individually or collectively own 75 percent or more of the outstanding Beneficial Interests.

## ARTICLE IV
## PURPOSE, AUTHORITY, LIMITATIONS, AND DISTRIBUTIONS

4.1.   <u>Purpose of the Reorganization Trust</u>.  The Reorganization Trust shall be established for the primary purpose of liquidating the Trust Assets, in accordance with the ICA and Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, its liquidating purpose.  The liquidation of the Trust Assets may be accomplished through the sale, transfer or conveyance of the Trust Assets and through the prosecution, compromise and settlement, abandonment or dismissal of any or all claims, rights or causes of action related thereto.

4.2.   <u>Resolution of Trust Assets by the Managing Trustees</u>.  The Managing Trustees shall be empowered to and may take all appropriate action with respect to the prosecution, settlement or other resolution of the Trust Assets except as provided in the Plan.

4.3.   <u>Books and Records</u>.  The Managing Trustees shall maintain, with respect to the Reorganization Trust and the Beneficiaries, books and records relating to the assets and income of the Reorganization Trust and the payment of expenses of, and liabilities of, claims against or assumed by, the Reorganization Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof in accordance with any reporting requirements herein and to comply with applicable provisions of law (including the Trust Act).  Except as otherwise expressly provided herein, nothing in this Reorganization Trust Agreement requires the Reorganization Trust to file any accounting or seek approval of any court with respect to the administration of the Reorganization Trust, or as a condition for making any payment or distribution out of the Trust Assets.

4.4. <u>Application of Trust Assets</u>. The Reorganization Trust shall apply all Trust Assets, and any proceeds therefrom, in accordance with the Plan, as follows:

(a) <u>Plan Administrator</u>. Notwithstanding anything to the contrary herein, the Reorganization Trust shall act as Plan Administrator under the Plan and shall make distributions to Holders of Allowed Claims in accordance with the Plan, irrespective of whether such Holders hold Beneficial Interests, in each case in accordance with the Plan.

(b) <u>Distribution; Withholding</u>. The Managing Trustees shall, based on available assets, distribute to the Beneficiaries all net Cash income, <u>plus</u> the common stock of the Parent, <u>plus</u> all net Cash proceeds from the liquidation of the Trust Assets (including as Cash for this purpose, all Cash equivalents) pursuant to the Plan; <u>provided</u>, <u>however</u>, that the Reorganization Trust may retain such amounts (i) as are necessary to meet contingent liabilities and to maintain the value of the Trust Assets during liquidation, (ii) to pay fees and expenses (including any taxes) of the Reorganization Trust or the Trustees (with respect to the Trust Assets), and (iii) to satisfy other liabilities incurred or assumed by the Reorganization Trust (or to which the Trust Assets are otherwise subject) in accordance with the Plan and the Reorganization Trust Agreement, including making distributions on account of Claims entitled to payment under the Plan (including Claims that become Allowed in accordance with the Plan after the date hereof), even if such Claims do not entitle the holders thereof to the receipt of Beneficial Interests. All such distributions shall be subject to the terms of the Plan and as set forth therein. For the avoidance of doubt, other than as expressly set forth in the Plan with respect to the Disputed Claims Reserve, the Managing Trustees may adjust the amounts retained to maintain the Trust Assets or to satisfy the liabilities of the Reorganization Trust in their sole discretion. The Managing Trustees may withhold from amounts distributable to any Entity any and all amounts, determined by the Managing Trustees to be required by any law, regulation, rule, ruling, directive or other governmental requirement of the United States or of any political subdivision thereof. Notwithstanding anything to the contrary in this <u>Section 4.4(b)</u>, the Managing Trustees shall not be required to obtain the employer identification numbers or tax identification numbers of any subsequent transferee of any Beneficial Interests distributed by the Reorganization Trust if (i) the DTC is the record owner of such Beneficial Interests or (ii) the Managing Trustees determine that failure to obtain such information will not result in a violation of applicable law by the Trustees or the Reorganization Trust.

(c) <u>Tax Identification Numbers</u>. The Managing Trustees shall require the Beneficiaries and any other beneficiary or other distributee of the Reorganization Trust to furnish to the Managing Trustees its Employer or Taxpayer Identification Number as assigned by the Internal Revenue Service and the Managing Trustees may condition any distribution to any such beneficiary or distributee upon receipt of such identification number.

4.5. <u>Compliance with Laws</u>. Any and all distributions of Trust Assets shall be made in compliance with applicable laws, including, but not limited to, applicable federal and state securities laws and the Trust Act.

# ARTICLE V
# TAX MATTERS

5.1.    Tax Treatment.

(a)    For all United States federal income tax purposes, all parties (including, without limitation, the Debtors, the Trustees, and the Beneficiaries) shall treat the transfer of the Trust Assets to the Reorganization Trust as a transfer of the Trust Assets (subject to any obligations relating to those assets) directly to Beneficiaries, followed by the transfer by such Beneficiaries to the Reorganization Trust of such Trust Assets in exchange for the Beneficial Interests.

(b)    Accordingly, those holders of Allowed Unsecured Claims receiving Beneficial Interests shall be treated for federal income tax purposes as the grantors and owners of their respective shares of the Trust Assets.  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

5.2.    Tax Reporting.

(a)    The Reorganization Trust shall file tax returns treating the Reorganization Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with the Plan.  The Reorganization Trust also shall annually send (or otherwise make available) to each holder of a beneficial interest in the Reorganization Trust a separate statement setting forth the holder's share of items of income, gain, loss, deduction, or credit and will instruct all such holders to report such items on their United States federal income tax returns or to forward the appropriate information to their respective beneficial holders with instructions to report such items on their United States federal income tax returns.  The Reorganization Trust also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Reorganization Trust that are required by any Governmental Unit or tax authority.

(b)    Allocation of Reorganization Trust taxable income and loss among the Beneficiaries shall be made Pro Rata (including Beneficial Interests held in the Disputed Claims Reserve, if any).

(c)    The Reorganization Trust shall (i) treat the Disputed Claims Reserve, the EIX Escrow Account, and the Trust Assets allocable thereto, as "disputed ownership funds" governed by Treasury Regulation section 1.468B-9 by timely making an election, (ii) file such tax returns and pay such taxes as may be required consistent with such treatment, and (iii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

(d)    The Reorganization Trust may request an expedited determination of taxes of the Reorganization Trust, including the Disputed Claims Reserve and the EIX Escrow Account, under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Reorganization Trust for all taxable periods through the dissolution of the Reorganization Trust.

(e)     As soon as practicable after the Effective Date, the Managing Trustees shall conduct a good faith valuation of the Trust Assets and report such valuation to the Beneficiaries (which report may be subject to appropriate confidentiality protections).   The valuation report of the Managing Trustees shall be used by the Trustees and may be used by the Beneficiaries for all federal income tax purposes. Any dispute regarding the valuation of the Trust Assets shall be resolved by the Bankruptcy Court.

5.3.    <u>Tax Payment</u>.   The Reorganization Trust shall be responsible for the payment, out of the Wind Down Budget, of any taxes imposed on the Reorganization Trust or the Trust Assets, including the Disputed Claims Reserve and the EIX Escrow Account.   In the event, and to the extent, that any Cash retained on account of Disputed Unsecured Claims and the EIX Escrow Account in the Disputed Claims Reserve is insufficient to pay any portion of such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, such respective classes of Disputed Unsecured Claims, such taxes shall be (x) reimbursed from any subsequent Cash amounts retained on account of the respective classes of Disputed Unsecured Claims or (y) to the extent such Disputed Unsecured Claims subsequently have been resolved, deducted from any amounts distributable by the Reorganization Trust as a result of the resolutions of such Disputed Unsecured Claims.

## ARTICLE VI
## TERMINATION OF REORGANIZATION TRUST

6.1.    <u>Dissolution of Reorganization Trust</u>.   The Reorganization Trust will dissolve upon the earlier of (i) the unanimous determination of the Managing Trustees and (ii) the third (3rd) anniversary of the Effective Date (the "<u>Third Anniversary Date</u>"); <u>provided</u>, <u>however</u>, that on or after the date that is six (6) months prior to the Third Anniversary Date (unless the Reorganization Trust has been dissolved prior to such date in accordance with this Reorganization Trust Agreement), the Managing Trustees may extend the term of the Reorganization Trust for a finite period if it is necessary to the liquidating purpose thereof; <u>provided</u>, <u>however</u>, that no extension shall be effective unless the Reorganization Trust receives advice of counsel or a favorable ruling from the SEC and the IRS, as applicable, that any further extension would not adversely affect the status of the trust as a grantor trust for federal income tax purposes or require registration as an investment company.   Upon dissolution of the Reorganization Trust in accordance with this <u>Section 6.1</u>, the Managing Trustees shall file a Certificate of Dissolution with the Secretary of State of the State of Delaware.   The Managing Trustees shall not unduly prolong the duration of the Reorganization Trust and shall at all times endeavor to resolve, settle or otherwise dispose of all claims that constitute Trust Assets and to effect the distribution of the Trust Assets to the Beneficiaries in accordance with the terms hereof and terminate the Reorganization Trust as soon as practicable in light of the terms of the Trust Assets.   Prior to and upon termination of the Reorganization Trust, the remaining Trust Assets will be distributed to the Beneficiaries, subject to the provisions set forth herein.   If any distributions of the Reorganization Trust are not duly claimed, such distributions will be disposed of in accordance with the Plan.

## ARTICLE VII
## AMENDMENT AND WAIVER

   7.1. <u>Amendment; Waiver</u>. Any Change to this Reorganization Trust Agreement may be made only with the prior written approval of the Managing Trustees; <u>provided</u>, <u>however</u>, that (a) any Change to this Reorganization Trust Agreement that would adversely affect the federal income tax status of the Reorganization Trust as a "grantor trust" (in accordance with <u>Section 5.2</u>) or to permit an action that would require registration of the Reorganization Trust as an investment company, if applicable, shall be made only with the unanimous prior approval or consent of the Managing Trustees, (b) any Change to <u>Section 2.1</u> or any other Change to this Reorganization Trust Agreement that would adversely affect any right of any Independent Trustee shall require the prior written consent of all Independent Trustees, (c) any Change that adversely affects any right of the Delaware Trustee shall require the prior written consent of the Delaware Trustee; and (d) any Change that would be materially inconsistent with the Plan or the Confirmation Order shall require prior Bankruptcy Court approval. When used herein, a "<u>Change</u>" means an amendment or waiver, including any amendment or waiver effected in connection with or through a merger or consolidation to which this Reorganization Trust is party.

## ARTICLE VIII
## PROVISIONS REGARDING DISTRIBUTIONS

   8.1. <u>Manner of Payment under the Plan</u>. Any payment in Cash to be made by the Managing Trustees shall be made, at the election of the Managing Trustees, by check drawn on a domestic bank or by wire transfer from a domestic bank. Any payment in the common stock of the Parent shall be made in accordance with <u>Section 3.6</u> of this Reorganization Trust Agreement.

   8.2. <u>Compliance with Tax Requirements/Allocation</u>. To the extent applicable, the Reorganization Trust shall comply with all tax withholding and reporting requirements imposed on it by any law or governmental authority, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding anything herein to the contrary, the Managing Trustees may condition delivery of any distributions of Trust Assets to any Beneficiary on the receipt of such signed documentation or information as may be reasonably requested in order for the Reorganization Trust to comply with law or to determine any withholding requirements of the Reorganization Trust in connection with such distribution.

## ARTICLE IX
## MISCELLANEOUS PROVISIONS

   9.1. <u>Intention of Managing Trustees to Establish Grantor Reorganization Trust</u>. This Reorganization Trust Agreement is intended to create a grantor trust for United States federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as a grantor trust.

   9.2. <u>Preservation of Privilege</u>. In connection with the rights, claims, and Causes of Action that constitute the Trust Assets, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Reorganization Trust shall vest in the Reorganization

Trust and its representatives, and the Managing Trustees are authorized to take all necessary actions to effectuate the transfer of such privileges. For the avoidance of doubt, neither the Managing Trustees nor the Reorganization Trust shall be treated as a successor for any purpose to EME or any other Debtor or their respective estates, except as expressly provided in the Plan or the Confirmation Order.

        9.3.    <u>Reporting</u>.

        (a)    The Reorganization Trust shall cause to be prepared, and shall post to a public website it maintains, financial reports on a quarterly and annual basis as provided in this <u>Section 9.3(a)</u>. Unless otherwise required by applicable law, such reports need not be prepared in accordance with Generally Accepted Accounting Principles (and need not be prepared using the liquidation basis of accounting), but in any event shall fairly present the assets, liabilities, income, and expenses of the Reorganization Trust for and as of the end of each reporting period. The financial reports shall be prepared on a consistent basis, except as may be disclosed in the notes to the financial statements. To the extent reasonably practicable, the financial reports shall include:

        (1)    Quarterly financial statements, which shall be prepared and posted no later than sixty (60) days after the end of each of the first three (3) quarters of the fiscal year; and

        (2)    Annual financial statements, which shall be prepared and posted no later than one hundred twenty (120) days after the end of each fiscal year.

        (b)    The Reorganization Trust shall cause to be prepared and shall post to its website, no later than sixty (60) days after the end of each quarter of the fiscal year, reports containing the following information regarding the activity of the Reorganization Trust during (i) the most recently completed fiscal quarter and (ii) in the report prepared after the end of each fiscal year, (A) the most recently completed fiscal year and (B) the time period since the Effective Date:

        (1)    the material Trust Assets disposed of during the relevant period and the material Trust Assets remaining as of the end of such period;

        (2)    the distributable Cash and common stock of the Parent distributed during the relevant period, in the aggregate and on a per Beneficial Interest basis;

        (3)    the aggregate total amount of remaining expenses set forth in the Reorganization Trust Budget for the expected operation of the Reorganization Trust; and

        (4)    such other information as the Managing Trustees may determine to include from time to time;

provided that the Reorganization Trust shall not disclose confidential information in such reports; <u>provided</u>, <u>further</u>, that the Reorganization Trust may disclose confidential information (including the Reorganization Trust Budget) to Beneficiaries or one or more third parties subject to appropriate confidentiality protections.

(c)    The Managing Trustees shall disclose any increase in compensation (as determined in accordance with <u>Section 2.19</u>) after the initial determination of such compensation.

(d)    The Managing Trustees shall also cause to be timely prepared, filed and distributed such additional statements, reports and submissions (x) as may be necessary to cause the Reorganization Trust to be in compliance with applicable law or to the extent otherwise necessary to allow the Beneficial Interests to be transferrable and tradable in accordance with applicable law or (y) as may be otherwise required from time to time by the Bankruptcy Court.

9.4.    <u>Named Party</u>.    In pursuing any Avoidance Actions, and/or other Reorganization Trust Causes of Action, or in disposing of any Trust Assets, or otherwise administering the Reorganization Trust or any Trust Assets, including, without limitation, the execution of documents, such as bills of sale, releases, and agreements, the Trustees may authorize the pursuit of such matters and/or execution of any such documents in the name of "EME Reorganization Trust" or in such other names or such representative capacities as necessary or appropriate.

9.5.    <u>Cooperation</u>.    The Reorganization Trust shall provide the Managing Trustees with copies of such of its books and records as the Managing Trustees shall reasonably require for the purpose of performing their duties and exercising their powers hereunder.

9.6.    <u>Prevailing Managing Trustee</u>.    If any Trustee is the prevailing party in a dispute regarding the provisions of this Reorganization Trust Agreement or the enforcement thereof, such Trustee shall be entitled to collect any and all costs, expenses and fees, including attorneys' fees, from the Reorganization Trust incurred in connection with such dispute or enforcement action.

9.7.    <u>Laws as to Construction</u>.    This Reorganization Trust Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to rules governing the conflicts of law.    If it is determined by a court of competent jurisdiction that any provision of this Reorganization Trust Agreement is invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Reorganization Trust Agreement. Whenever used herein, "including" or "includes" means "including, without limitation" or "includes, without limitation."

9.8.    <u>Severability</u>.    If any provision of this Reorganization Trust Agreement or the application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Reorganization Trust Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be

affected thereby, and such provision of this Reorganization Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

9.9.    Notices.  Any notice or other communication hereunder shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or letter box addressed to the person (or their successors or replacements) for whom such notice is intended at such address as set forth below, or such other addresses as provided to the other Trustees hereto:

If to the Reorganization Trust, to the following address:

3 MacArthur Place
Suite 100
Santa Ana, California  92707

with a copy, which shall not constitute notice, to:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attn.:  David R. Seligman, P.C. and Brad Weiland
Facsimile:  (312) 862-2200

-and-

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York  10022
Attn.:  Joshua A. Sussberg
Facsimile:  (212) 446-4900

If to the Delaware Trustee, to the following address:

Wilmington Trust, National Association
Rodney Square North
1100 North Market Street
Wilmington, Delaware 19890
Attn.: Corporate Trust Administration

If to the Managing Trustees, to the following addresses:

Timothy J. Bernlohr
TJB Management Consulting, LLC
4 Aldan's Way
Newtown, Pennsylvania 18940

- and -

Frederic F. Brace
221 Essex Road
Winnetka, Illinois 60093-4261

- and -

Kurt M. Cellar
15 Sunwich Road
Rowayton, Connecticut 06853

- and -

Eugene Davis
PIRINATE Consulting Group, LLC
5 Canoe Brook Drive
Livingston, New Jersey 07039

- and -

Hugh E. Sawyer
c/o Huron Consulting Group
Six Concourse Parkway
Suite 2050
Atlanta, Georgia 30328

with a copy, which shall not constitute notice, to:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attn.:  David R. Seligman, P.C. and Brad Weiland
Facsimile:  (312) 862-2200

-and-

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York  10022
Attn.:  Joshua A. Sussberg
Facsimile:  (212) 446-4900

-and-

Ropes & Gray LLP
1211 Avenue of the Americas
New York, New York  10036-8704
Attn.:  Keith H. Wofford
Facsimile:   (212) 596-9090

-and-

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199-3600
Attn.: Stephen Moeller-Sally
Facsimile: (617) 951-7050

9.10. <u>Headings</u>. The section headings contained in this Reorganization Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of the Plan, the EIX Settlement Agreement, or this Reorganization Trust Agreement or of any term or provision such documents.

9.11. <u>Survival</u>. The obligations of the Reorganization Trust set forth in this Agreement shall terminate upon termination of the Reorganization Trust in accordance with Article VI hereof; <u>provided</u> that any obligations set of the Reorganization Trust forth in <u>Section 2.13(d)</u>, <u>Section 2.20</u>, and Article IX hereof shall survive termination of the Reorganization Trust in accordance with the respective terms thereof.

9.12. <u>Entire Reorganization Trust Agreement</u>. This Reorganization Trust Agreement, including the Exhibits attached hereto, the Plan (including the Purchase Agreement, the EIX Settlement Agreement, and all other documents contained in the Plan Supplement) and the Confirmation Order contain the entire agreement between the parties and supersede all prior and contemporaneous agreements or understandings between the parties with respect to the subject matter hereof. For the avoidance of doubt, to the extent holders of Allowed Claims that would otherwise be entitled to receive Beneficial Interests have established or in the future establish trusts or other entities or vehicles to facilitate the implementation of the Plan with respect to their Beneficial Interests or for other purposes, the agreements governing such trusts or other entities or vehicles shall not limit or impose requirements in any way on the Reorganization Trust, the Reorganization Trust Management, the Trustees, or any other agent or representative of the Reorganization Trust, and to the extent there is any conflict between the provisions of such agreements and this Reorganization Trust Agreement, this Reorganization Trust Agreement shall have controlling effect

9.13. <u>Counterparts</u>. This Reorganization Trust Agreement may be executed in two or more counterparts, each of which shall be an original, but all such counterparts shall together constitute one and the same agreement.

9.14. <u>Bankruptcy Court Jurisdiction</u>. The Bankruptcy Court shall have exclusive jurisdiction over the Reorganization Trust and the Trustees, including the administration and activities of the Reorganization Trust and the Trustees, and the terms of this Reorganization Trust Agreement and any dispute related to the terms hereof.

**(THE REST OF THIS PAGE IS INTENTIONALLY LEFT BLANK)**

IN WITNESS WHEREOF, the parties hereto have executed and acknowledged this Reorganization Trust Agreement.

TRUSTEES

**TIMOTHY J. BERNLOHR,**
not individually but solely in his capacity as a
Managing Trustee

Date: _____April 1_____, 2014


**FREDERIC F. BRACE,**
not individually but solely in his capacity as a
Managing Trustee and Independent Trustee

Date: _____, 2014


**KURT M. CELLAR,**
not individually but solely in his capacity as a
Managing Trustee

Date: _____, 2014


**EUGENE DAVIS,**
not individually but solely in his capacity as a
Managing Trustee

Date: _____, 2014

      IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Reorganization Trust Agreement.

                        TRUSTEES

                        **TIMOTHY J. BERNLOHR,**
                        not individually but solely in his capacity as a
                        Managing Trustee

                        _____

                        Date: _____, 2014

                        **FREDERIC F. BRACE,**
                        not individually but solely in his capacity as a
                        Managing Trustee and Independent Trustee

                        Date: _____, 2014

                        **KURT M. CELLAR,**
                        not individually but solely in his capacity as a
                        Managing Trustee

                        _____

                        Date: _____, 2014

                        **EUGENE DAVIS,**
                        not individually but solely in his capacity as a
                        Managing Trustee

                        _____

                        Date: _____, 2014

IN WITNESS WHEREOF, the parties hereto have executed and acknowledged this Reorganization Trust Agreement.

TRUSTEES

**TIMOTHY J. BERNLOHR,**
not individually but solely in his capacity as a
Managing Trustee

_____

Date: _____, 2014

**FREDERIC F. BRACE,**
not individually but solely in his capacity as a
Managing Trustee and Independent Trustee

_____

Date: _____, 2014

**KURT M. CELLAR,**
not individually but solely in his capacity as a
Managing Trustee

_____

Date: April 1, 2014

**EUGENE DAVIS,**
not individually but solely in his capacity as a
Managing Trustee

_____

Date: _____, 2014

IN WITNESS WHEREOF, the parties hereto have executed and acknowledged this Reorganization Trust Agreement.

TRUSTEES

**TIMOTHY J. BERNLOHR,**
not individually but solely in his capacity as a
Managing Trustee

_____

Date: _____, 2014


**FREDERIC F. BRACE,**
not individually but solely in his capacity as a
Managing Trustee and Independent Trustee

_____

Date: _____, 2014


**KURT M. CELLAR,**
not individually but solely in his capacity as a
Managing Trustee

_____

Date: _____, 2014


**EUGENE DAVIS,**
not individually but solely in his capacity as a
Managing Trustee

_____

Date: _____April 1_____, 2014

**HUGH E. SAWYER**,
not individually but solely in his capacity as a
Managing Trustee and Independent Trustee

_____

Date: _____, 2014


**WILMINGTON TRUST COMPANY,
NATIONAL ASSOCIATION,**
not individually but solely in its capacity as an
Delaware Trustee

By: _____

Date: _____, 2014

2

**HUGH E. SAWYER,**
not individually but solely in his capacity as a
Managing Trustee and Independent Trustee

_____

Date: _____, 2014


**WILMINGTON TRUST, NATIONAL
ASSOCIATION,**
not individually but solely in its capacity as
Delaware Trustee

By: _____

Date: _April 1_, 2014

2

## Appendix A - Key Defined Terms

"Applicable Percentage" shall have the meaning ascribed to it in Section 2.5(a) of the Reorganization Trust Agreement.

"Beneficial Interest Certificates" shall have the meaning ascribed to it in Section 3.4(b) of the Reorganization Trust Agreement.

"Beneficial Interest Register" shall have the meaning ascribed to it in Section 3.4(b) of the Reorganization Trust Agreement.

"Beneficial Interests" shall have the meaning ascribed to it in the recitals to the Reorganization Trust Agreement.

"Beneficiaries" shall have the meaning ascribed to it in the recitals to the Reorganization Trust Agreement.

"Beneficiary" shall have the meaning ascribed to it in the recitals to the Reorganization Trust Agreement.

"Certificate" shall have the meaning ascribed to it in Section 1.1(a) of the Reorganization Trust Agreement.

"Delaware Trustee" shall have the meaning ascribed to it in the preamble to the Reorganization Trust Agreement.

"Effective Date" shall have the meaning ascribed to it in the preamble to the Reorganization Trust Agreement.

"EME" shall have the meaning ascribed to it in the recitals to the Reorganization Trust Agreement.

"Exchange Act" shall have the meaning ascribed to it in Section 1.3 of the Reorganization Trust Agreement.

"Global Beneficial Interest Certificate" shall have the meaning ascribed to it in Section 3.4(a) of the Reorganization Trust Agreement.

"ICA" shall have the meaning ascribed to it in the recitals to the Reorganization Trust Agreement.

"Indemnitees" shall have the meaning ascribed to it in Section 2.20 of the Reorganization Trust Agreement.

"Independent Trustee Matters" shall have the meaning ascribed to it in Section 2.5(b) of the Reorganization Trust Agreement.

"Internal Revenue Code" shall have the meaning ascribed to it in the recitals to the Reorganization Trust Agreement.

"Managing Trustee" shall have the meaning ascribed to it in the preamble to the Reorganization Trust Agreement.

"Managing Trustees" shall have the meaning ascribed to it in the preamble to the Reorganization Trust Agreement.

"Other Indemnitors" shall have the meaning ascribed to it in Section 2.21 of the Reorganization Trust Agreement.

"Other Managing Trustees" shall have the meaning ascribed to it in Section 2.3(c) of the Reorganization Trust Agreement.

"Plan" shall have the meaning ascribed to it in the preamble to the Reorganization Trust Agreement.

"Plan Documents" shall have the meaning ascribed to it in Section 3.7(b) of the Reorganization Trust Agreement.

"Reorganization Trust" shall have the meaning ascribed to it in the preamble to the Reorganization Trust Agreement.

"Reorganization Trust Agreement" shall have the meaning ascribed to it in the preamble to the Reorganization Trust Agreement.

"Reorganization Trust Budget" shall have the meaning ascribed to it in Section 2.19(a) of the Reorganization Trust Agreement.

"Reorganization Trust Management" shall have the meaning ascribed to it in Section 2.15 of the Reorganization Trust Agreement.

"Specified Trustee" shall have the meaning ascribed to it in Section 2.3(c) of the Reorganization Trust Agreement.

"Third Anniversary Date" shall have the meaning ascribed to it in Section 6.1 of the Reorganization Trust Agreement.

"Trust Act" shall have the meaning ascribed to it in Section 1.1(a) of the Reorganization Trust Agreement.

"Trust Assets" shall have the meaning ascribed to it in the recitals to the Reorganization Trust Agreement.

"Trustee" shall have the meaning ascribed to it in Section 2.1(b) of the Reorganization Trust Agreement.

"Trustees" shall have the meaning ascribed to it in Section 2.1(b) of the Reorganization Trust Agreement.